# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THE PUBLIC INTEREST LEGAL FOUNDATION,** | : | **CIVIL ACTION NO. 1:19-CV-622** |
| | : | |
| | : | **(Chief Judge Conner)** |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| **KATHY BOOCKVAR, Acting Secretary of the Commonwealth of Pennsylvania, JONATHAN M. MARKS, Deputy Secretary for Elections and Commissions, and the BUREAU OF COMMISSIONS, ELECTIONS AND LEGISLATION,** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM

The Public Interest Legal Foundation ("PILF") seeks production of voter records under the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20507. PILF claims that defendants have information documenting that noncitizens are registering to vote and voting in elections in the Commonwealth of Pennsylvania. According to PILF, the NVRA mandates disclosure of that information. Defendants move to dismiss PILF's complaint under Federal Rule of Civil Procedure 12(b)(6). We will grant in part and deny in part defendants' motion.

## I.    Factual Background & Procedural History

PILF is a public interest organization that "seeks to promote the integrity of elections nationwide." (Doc. 1 ¶ 5). Its stated mission is to ensure that voter rolls

"are free from ineligible registrants, noncitizens, individuals who are no longer residents and individuals who are registered in more than one location." (Id.)

Kathy Boockvar is the Secretary of the Commonwealth of Pennsylvania, and Jonathan M. Marks is the Commonwealth's Deputy Secretary for Elections and Commissions. (Id. ¶¶ 6-7). Deputy Secretary Marks heads the Commonwealth's Bureau of Commissions, Elections and Legislation, an arm of the Pennsylvania Department of State. (Id. ¶¶ 7-8). Together, defendants administer federal and state election laws in the Commonwealth. (Id. ¶¶ 5-8). PILF alleges that defendants are custodians of the records requested in the complaint. (Id. ¶ 9).

## A.     PILF's Records Request

During a recent investigation into voter fraud, PILF discovered that noncitizens were registered to vote and were voting in the Commonwealth's elections. (Doc. ¶ 27). Records obtained by PILF also showed that dozens of noncitizens in Philadelphia had self-reported their noncitizen status to election officials and cancelled their registrations.[1] (Id. ¶¶ 29-30). According to PILF, roughly half of the self-reported noncitizens had cast a ballot in an election. (Id. ¶ 31). PILF presented these findings to the State Government Committee of the Pennsylvania House of Representatives in October 2016. (Id. ¶ 32).

In September 2017, Philadelphia City Commissioner Al Schmidt revealed that a "glitch" at the Pennsylvania Department of Motor Vehicles ("DMV")

---

[1] As PILF notes in its complaint, it is both a state and federal crime for a noncitizen to apply for voter registration or to vote in any election. (See Doc. 1 ¶¶ 21-23 (collecting statutes)).

provided one explanation for this problem.  (Id. ¶ 33).  In an article published by the *Philadelphia Inquirer*, Commissioner Schmidt explained that this glitch had allowed noncitizens to register to vote when they renewed their driver's licenses.  (Id.)

The Pennsylvania House State Government Committee held a hearing one month later to explore the issue of noncitizen registration and voting in the Commonwealth, including the DMV glitch.  (Id. ¶ 44).  Deputy Secretary Marks testified at length as to the Department of State's investigation.  (Id. ¶¶ 49-54).  According to Marks, the Department of State had reviewed its voter-registration database and identified 1,160 instances of ineligible residents self-reporting and cancelling their inadvertent registrations.  (Id. ¶¶ 50-51).  The Department analyzed this initial data to determine if any of the self-reported ineligible registrants had voted (and if so, how many times) as well as how they had initially registered to vote.  (Id. ¶ 52).

The Department of State deepened its analysis after this initial review. At a hearing before the Pennsylvania Senate's State Government and Transportation Committees, then-Acting Secretary of the Department of State Robert Torres explained that the Department had begun "expert analysis" of the Commonwealth's voter-registration system and the driver-license database maintained by the Pennsylvania Department of Transportation ("PennDOT").  (Id. ¶ 59).  Commissioner Schmidt also testified at the joint hearing and summarized the Commonwealth's expert analysis.  (Id. ¶¶ 60-68).  Commissioner Schmidt testified that noncitizens who apply to PennDOT for a driver's license have their licenses tagged with an "INS Indicator."  (Id. ¶ 61).  He further testified that all voter-

registration applicants in the Commonwealth must register using either a driver's license or PennDOT ID. (Id. ¶ 62). Commissioner Schmidt explained that a person's driver's license can thus be used to determine both citizenship (by the INS Indicator) and voter registration (by the driver's license number). (Id. ¶ 63). According to Commissioner Schmidt, the Department of State's matching of these two identifiers revealed over 100,000 individuals who were registered to vote and tagged with an INS Indicator. (Id. ¶¶ 65-67).

On October 23, 2017, PILF sent a letter to the Department of State's Bureau of Commissions, Elections and Legislation requesting voter records. (Id. ¶ 69). PILF asked to inspect:

> 1. Documents regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration from any official information source, including information obtained from the various agencies within the U.S. Department of Homeland Security and the Pennsylvania Department of Transportation since January 1, 2006. This request extends to all documents that provide the name of the registrant, the voting history of such registrant, the nature and content of any notice sent to the registrant, including the date of the notice, the response (if any) of the registrant, and actions taken regarding the registrant's registration (if any) and the date of the action. … This request includes all voter records that were referenced in recent news media reports regarding individuals improperly exposed to registration prompts due to a "glitch" in PennDOT's Motor Voter compliance system. At least one news report claims that "a Pennsylvania Department of State review is underway." I seek all voter records contained in this review.
>
> 2. All documents and records of communication received or maintained by your office from registered voters, legal counsel, claimed relatives, or other agents since

January 1, 2006 requesting a removal or cancellation from the voter roll for any reason related to non-U.S. citizenship/ineligibility. Please include any official records indicating maintenance actions undertaken thereafter.

3. All documents and records of communication received or maintained by your office from jury selection officials—state and federal—since January 1, 2006 referencing individuals who claimed to be non-U.S. citizens when attempting to avoid serving a duty call. This request seeks copies of the official referrals and documents indicating where your office or local registrars matched a claim of noncitizenship to an existing registered voter and extends to the communications and maintenance actions taken as a result that were memorialized in any written form.

4. All communications regarding list maintenance activities relating to #1 through 3 above to appropriate local prosecutors, Pennsylvania Attorney General, Pennsylvania State Police, any other state law enforcement agencies, the United States Attorney's office, or the Federal Bureau of Investigation.

(Doc. 1-9 at 1-2). Defendants denied PILF's request. (Doc. 1 ¶¶ 74, 84, 89).

In April 2018, the Pennsylvania Department of State issued a statement outlining its efforts to identify and to remove noncitizens who were registered through the PennDOT system. (Id. ¶ 103; see also Doc. 1-14). That statement described "an intense data analysis and process" and indicated that the Department had compiled a list of suspected noncitizen registrants requiring further review. (Doc. 1 ¶ 104; Doc. 1-14 at 1). The Department then sent a letter to 7,702 suspected noncitizen registrants. (Doc. 1 ¶ 104; Doc. 1-14 at 1; see also Doc. 1 ¶ 106). In June 2018, the Department of State mailed similar letters to 11,198

suspected noncitizen registrants requesting that they either confirm their eligibility or cancel their registration.  (Doc. 1 ¶ 107).

### B.    Procedural History

PILF originally filed this lawsuit in 2018, asserting that defendants' denial of PILF's records request violated the NVRA.  We held that PILF fell within the NVRA's "zone of interests" and had standing, but that it failed to comply with the statute's notice requirements.  See Pub. Interest Legal Found. v. Boockvar, 370 F. Supp. 3d 449, 454-58 (M.D. Pa. 2019).  PILF commenced this action after satisfying the NVRA's notice requirements.  (Doc. 1 ¶¶ 117-25).  Defendants filed a motion (Doc. 12) to dismiss, which is ripe for disposition.

## II.    Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to reviewing the facts contained in the complaint, the court may also consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case."  Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the … claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint, the court conducts a three-step inquiry. See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded. Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556. A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

## III. Discussion

The parties dispute whether the records requested by PILF must be disclosed under the NVRA. They also dispute whether federal or state law prohibits disclosure of those records. We address these arguments in turn.

### A. NVRA Disclosure Provision

The NVRA regulates voter registration. In the NVRA's first section, Congress stated its findings:

(1) the right of citizens of the United States to vote is a fundamental right; (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

52 U.S.C. § 20501(a). Congress also codified the NVRA's purposes:

(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office; (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office; (3) to protect the integrity of the electoral process; and (4) to ensure that accurate and current voter registration rolls are maintained.

Id. § 20501(b). States must establish voting procedures consistent with these maxims. Id. § 20503(a).

Section 8 of the NVRA specifically governs voter-registration procedures. See id. § 20507(a). Section 8 also regulates any state "program or activity" designed to "protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll." Id. § 20507(b). Such a "program or activity" must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act," and generally may not remove registrants for failure to vote. Id. § 20507(b)(1), (2).

Two parts of Section 8 are at issue here: subsection 20507(a)(4), which we refer to as the "Mandatory Removal Provision," and subsection 20507(i), which we refer to as the "Disclosure Provision." The Mandatory Removal Provision requires

the state to establish a "general program" to remove registrants who have died or changed their residence from official lists of eligible voters. Id. § 20507(a)(4). States are otherwise prohibited from removing registrants from official lists of eligible voters unless the registrant requests removal, state law mandates removal, or the registrant is removed pursuant to a mandatory removal program. Id. § 20507(a)(3).

The Disclosure Provision instructs states to allow public inspection of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." Id. § 20507(i)(1). The Disclosure Provision expressly exempts two categories of records from its scope: records related to an individual's declination to register, and records identifying the agency where a voter registered. Id.

As a matter of first impression in our circuit, we are asked to interpret the NVRA's Disclosure Provision. Defendants argue the Disclosure Provision is linked to (and thus limited by) the Mandatory Removal Provision, allowing public access only to records that relate to programs created to remove registrants who have died or changed their residence. (Doc. 14 at 7). PILF seeks a broader reading, asserting that all records related to the Commonwealth's efforts to evaluate the eligibility of voters based on citizenship are subject to the Disclosure Provision. (Doc. 15 at 5-16). Culled to its essence, the parties' dispute turns on the meaning of the phrase "programs and activities" in the Disclosure Provision.

We start with the statutory text and first determine the common and ordinary meaning of its terms. Vorchheimer v. Philadelphian Owners Ass'n, 903 F.3d 100, 105 (3d Cir. 2018) (citing Artis v. District of Columbia, 583 U.S. ___, 138 S. Ct. 594,

603 (2018)).  To do so, we utilize standard dictionary definitions.  See Yates v. United

States, 574 U.S. ___, 135 S. Ct. 1074, 1081-82 (2015); Vorcheimer, 903 F.3d at 105.

A "program" is "a schedule or system under which action may be taken

towards a desired goal." *Program*, WEBSTER'S THIRD NEW INTERNATIONAL

DICTIONARY (3d ed. 2002); see also *Program*, COMPACT OXFORD ENGLISH DICTIONARY

(2d ed. 1989).  An "activity" is a "natural or normal function or operation." *Activity*,

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (3d ed. 2002); see also *Activity*,

COMPACT OXFORD ENGLISH DICTIONARY.  Applying these definitional terms, the

Disclosure Provision requires states to disclose "all records concerning the

implementation" of a schedule or system designed to serve a specific end, or a

particular function or operation, "conducted for the purpose of ensuring the

accuracy and currency of official lists of eligible voters."  52 U.S.C. § 20507(i)(1);

see also Project Vote/Voting for Am., Inc. v. Long, 682 F.3d 331, 335 (4th Cir. 2012);

Project Vote, Inc. v. Kemp, 208 F. Supp. 3d 1320, 1338 (N.D. Ga. 2016); True the Vote

v. Hosemann, 43 F. Supp. 3d 693, 719-20 (S.D. Miss. 2014).

Statutory text is not reviewed in a vacuum, and definitions are not

dispositive.  Yates, 135 S. Ct. at 1081-82.  A statute's terms must be considered in

context.  Id.  Defendants argue that the Disclosure Provision is limited to records

created under the Mandatory Removal Provision (*i.e.*, registrant death or change in

residence).  (Doc. 14 at 8-9).  The Disclosure Provision's text and its neighboring

subsections do not support this narrow interpretation.  The Disclosure Provision

requires disclosure of "all" records concerning "programs and activities" designed

to ensure accurate and current voter lists.  Congress shielded only two types of

records from this broad grant of access: records related to a person's decision

to forego registration or to the identity of the agency where a voter registered. 52

U.S.C. § 20507(i)(1). Had Congress intended to limit the Disclosure Provision's

reach to records that fall within the Mandatory Removal Provision's purview, it

could have used the "general program" language. Or it could have identified the

Mandatory Removal Provision by section. As PILF points out, Congress knew how

to refer to other subsections in drafting the NVRA. (Doc. 15 at 13). The express

inclusion of two exceptions and the abundant use of cross-references in the NVRA

suggest the exclusion of other potential exceptions.

Moreover, the Disclosure Provision requires production of "all" records, with

two exceptions. The word "all" is expansive. Long, 682 F.3d at 336. The Disclosure

Provision's two exceptions are narrow and specific. 52 U.S.C. § 20507(i)(1). The

contrast between the broad mandate to disclose "all" records and the tailored

protection of two types of records implies that Congress crafted this provision

carefully. We will not (and indeed, must not) read unexpressed limitations into an

unambiguous statute's terms. See Prestol Espinal v. Attorney Gen. of the United

States, 653 F.3d 213, 222 (3d Cir. 2011) (citing United States v. Johnson, 529 U.S. 53,

58 (2000)); see also ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE

INTERPRETATION OF LEGAL TEXTS 93 (2012).

Defendants nonetheless argue that the phrase "programs and activities" in

the Disclosure Provision necessarily refers to the Mandatory Removal Provision's

"general program" to remove registrants who have died or moved. (Doc. 14 at 9).

We disagree. The shared use of the word "program" in both provisions is as far

as their likeness extends.  The Mandatory Removal Provision requires states to

conduct "a general program" to remove registrants who have died or moved away.

52 U.S.C. § 20507(a)(4).  The Disclosure Provision concerns "programs and

activities" intended to ensure accurate voter rolls.  Id. § 20507(i).  The Mandatory

Removal Provision contemplates a *single* general program, while the Disclosure

Provision contemplates an *indefinite* number of programs *and* activities.  We

presume that when Congress uses different language in separate subsections of the

same statute, it intends different meanings.  See Sosa v. Alvarez-Machain, 542 U.S.

692, 712 n.9 (2004); Issa v. Sch. Dist. of Lancaster, 847 F.3d 121, 139 n.9 (3d Cir.

2017).  Defendants' preferred reading ignores this crucial lexical distinction.

PILF's interpretation of the Disclosure Provision, by contrast, accords

with this canon of consistent usage.  The phrase "programs and activities" as

used in the Disclosure Provision aligns neatly with another provision in Section 8—

specifically, subsection 20507(b), which governs "[a]ny State *program or activity* to

protect the integrity of the electoral process by ensuring the maintenance of an

accurate and current voter registration roll for elections."  52 U.S.C. § 20507(b)

(emphasis added).  The similarities between these subsections are obvious.  Both

refer to programs *and* activities designed to ensure accurate and current voter lists.

It is more likely that Congress's use of "programs and activities" in the Disclosure

Provision is a reference to subsection 20507(b), not the Mandatory Removal Provision.[2]

Our interpretation of the Disclosure Provision also furthers the NVRA's purposes. See SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 180-82. This reading does not prevent states from establishing procedures to increase the number of eligible voters, implementing the NVRA, or enhancing voter participation. Id. § 20501(b)(1), (2). Rather, a broad reading promotes the integrity of the voting process and ensures a public vehicle for ensuring accurate and current voter rolls. Id. § 20501(b)(3), (4). Because the Disclosure Provision is unambiguous, we need not consult legislative history. See Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005); United States v. Kouevi, 698 F.3d 126, 133 (3d Cir. 2012) (citation omitted).

Finally, we note that courts routinely permit disclosure of voter-related documents unrelated to registrant death or change in residence. See, e.g., Long, 682 F.3d at 336; Pub. Interest Legal Found. v. Bennett, No. 18-0981, 2019 WL 1116193, at *4 (S.D. Tex. Feb. 6, 2019), report and recommendation adopted *sub*

---

[2] We also reject defendants' suggestion that subsection 20507(c) limits the Disclosure Provision to records made under the Mandatory Removal Provision. Subsection 20507(c) explains that a state can meet the Mandatory Removal Provision's requirements by establishing a program through which the Postal Service assists in identifying registrants who have changed their residence. Id. § 20507(c)(1). Under that subsection, any program designed to "systematically" remove ineligible voters from voter lists must be completed 90 days before an election. Id. § 20507(c)(2)(A). Subsection (c) does not speak to the meaning of "programs and activities" in the Disclosure Provision. It simply explains how a "general program" under the Mandatory Removal Provision may operate. Id. § 20507(c)(1).

*nom.* Pub. Interest Legal Found., Inc. v. Bennett, No. 4:18-CV-00981, 2019 WL 1112228 (S.D. Tex. Mar. 11, 2019); Judicial Watch v. Lamone, No. 17-2006, 2018 WL 2564720, at *14 (D. Md. June 4, 2018); Kemp, 208 F. Supp. 3d at 1341-44; Hosemann, 43 F. Supp. 3d at 723-24. This judicial accord confirms our understanding of the Disclosure Provision's scope.

For all of these reasons, we conclude that the Disclosure Provision's broad grant of access is not limited to records related to registrant death or changes in residence. The records requested by PILF were created pursuant to a system designed to identify ineligible voters based on their noncitizen status. The Commonwealth has admitted as much in public comments regarding the ongoing investigations and has described at length the rigorous and targeted analysis of voter-registration data and driver's license data that produced the requested records. (See, e.g., Doc. 1 ¶¶ 50, 59, 64-67, 72, 104). Thus, the Commonwealth's effort to identify noncitizen registrants is a "program" or "activity" designed to identify noncitizens and ensure an accurate and current list of eligible voters. Records concerning this effort are therefore accessible to the public under the Disclosure Provision. 52 U.S.C. § 20507(i); see Bennett, 2019 WL 1116193, at *4; Kemp, 208 F. Supp. 3d at 1343; see also Long, 682 F.3d at 335-37.[3]

---

[3] The parties have not addressed whether personal information in the requested records should be redacted. We note that the Disclosure Provision does not guarantee unfettered access to confidential sensitive information. See Kemp, 208 F. Supp. 3d at 1344; True the Vote, 43 F. Supp. 3d at 733-39.

## B. Federal and State Law Protections

Defendants argue that, even if the NVRA's Disclosure Provision permits broad access to records, the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, and state law prohibit the disclosure requested here. (Doc. 14 at 12-14). PILF rejoins that the DPPA does not bar disclosure of derivative records, does not bar disclosure by defendants (as opposed to DMV officials), and permits disclosure to PILF as a "private attorney general" acting on the government's behalf. (Doc. 15 at 16-21).

The DPPA prohibits states from disclosing a driver's personal information without the driver's consent. <u>Maracich v. Spears</u>, 570 U.S. 48, 57 (2013) (citing <u>Reno v. Condon</u>, 528 U.S. 141, 144 (2000)). Specifically, the DPPA prevents a state DMV and its representatives from disclosing "personal information … obtained by the department in connection with a motor vehicle record." 18 U.S.C. § 2721(a). "Personal information" is "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status." <u>Id.</u> § 2725(3).

Notwithstanding this general prohibition, personal information may be disclosed in 14 circumstances. <u>See</u> <u>id.</u> § 2721(b). Relevant here, personal information may be disclosed under the governmental-function exception to private persons or entities "acting on behalf of a Federal, State, or local agency in carrying out its functions." <u>Id.</u> § 2721(b)(1). Authorized recipients of personal information

may only redisclose personal information if redisclosure also satisfies one of the 14 exceptions.  Id. § 2721(c).  It is consequently "unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b)."  Id. § 2722(a); see also id. § 2724(a).  The term "person" does not include the state or its agencies, but it does include individuals, organizations, and entities.  Id. § 2725(2).  In other words, under the DPPA, an authorized recipient of personal information has a limited ability to redisclose that information, and private entities and persons are liable if they impermissibly obtain or disclose personal information from a motor vehicle record.  Id. § 2721(c); see also id. §§ 2722(a), 2724(a).

Personal information is "from" a motor vehicle record when it derives from state DMV sources.  See Dahlstrom v. Sun-Times Media, LLC, 777 F.3d 937, 949 (7th Cir. 2015); Whitaker v. Appriss, Inc., No. 3:13-CV-826, 2014 WL 4536559, at *3 (N.D. Ind. Sept. 11, 2014) (citation omitted); see also Andrews v. Sirius XM Radio Inc., 932 F.3d 1253, 1260 n.5 (9th Cir. 2019) (citing Fontanez v. Skepple, 563 F. App'x 847, 848-49 (2d Cir. 2014); Siegler v. Best Buy Co. of Minn., 519 F. App'x 604, 605 (11th Cir. 2013)).  That the information does not take the form of a "motor vehicle record" is irrelevant.  See Senne v. Vill. of Palatine, 695 F.3d 597, 608-09 (7th Cir. 2012) (en banc).  Indeed, the DPPA protects "information" held by the DMV and supplied in connection with a motor vehicle record.  See 18 U.S.C. § 2721.

Several categories of records requested by PILF do not implicate protected driver information.  Those categories include documents obtained from non-DMV sources regarding potential noncitizen registrants, records of noncitizens

16

requesting removal or cancellation from the voter roll, communications with jury selection officials, and communications with prosecutors. (See Doc. 1-9 at 1-2). As described below, however, to the extent these requests implicate protected personal information contained in DMV records, they are shielded by the DPPA. The only remaining category of records is tied to the DMV glitch.

The glitch-related records and derivative lists created during the Commonwealth's investigation are protected by the DPPA to the extent they include personal information obtained by the DMV in connection with a motor vehicle record. As explained by Commissioner Schmidt, an individual's driver's license can be used to verify both citizenship (by the INS Indicator) and voter registration (by the driver's license number). (Doc. 1 ¶ 63). The source of the INS Indicator—according to PILF—is the DMV. (Id.) And the INS Indicator is information created in connection with a motor vehicle record. (See id. ¶ 61). That information was permissibly disclosed to Commonwealth investigators under the DPPA's governmental-function exception. See 18 U.S.C. § 2721(c). The DPPA, however, prohibits the Commonwealth from redisclosing "personal information" obtained through DMV records unless the redisclosure meets one of the DPPA's permissible uses.[4] Id.

---

[4] PILF argues that the DPPA does not apply to disclosures by entities or individuals other than state DMVs and their officials. (Doc. 15 at 18-19). PILF's reliance on Davis v. Freedom of Information Commission, 790 A.2d 1188 (Conn. Supp. 2001), is unconvincing in light of contrary federal cases. (Doc. 15 at 18). The Superior Court of Connecticut's decision does not bind our interpretation of federal law. See United States v. Bedford, 519 F.2d 650, 653 n.3 (3d Cir. 1975).

PILF first claims that citizenship status is not protected information.  (Doc. 15 at 20).  The DPPA employs the term "including" to identify several types of protected "personal information."  18 U.S.C. § 2725(3).  Congress usually intends the term "including" to indicate the "illustrative but not limitative" nature of listed examples.  See Campbell v. Acuff–Rose Music, Inc., 510 U.S. 569, 577 (1994); see also SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 132-33.  Thus, the fact that citizenship is not explicitly identified as protected personal information is not dispositive.  At this stage of the litigation, defendants have not shown that INS Indicators categorically do *not* qualify as identifying information.

Citizenship information is not the only information implicated here.  An individual's "driver identification number" is protected information.  18 U.S.C. § 2725(3).  The glitch-related information requested by PILF contains analysis matching noncitizen's driver's license numbers to the driver's license numbers of registered voters.  (Doc. 1 ¶ 65).  Such a compilation of driver's license numbers—with or without INS Indicators—is protected from redisclosure under the DPPA unless subject to an exception.  18 U.S.C. § 2721(c); see also Senne, 695 F.3d at 608.

We do not share PILF's concern that our holding will obliterate the public inspection rights envisioned by Congress.  (Doc. 15 at 5).  This case presents the unique situation where voter-related records and DMV records overlap.  In any event, Congress legislates with knowledge of the then-existing statutory landscape.  Parker Drilling Mgmt. Servs., Ltd. v. Newton, 587 U.S. ___, 139 S. Ct. 1881, 1890 (2019) (quoting McQuiggin v. Perkins, 569 U.S. 383, 398, n.3 (2013)).  The DPPA was enacted after the NVRA.  Compare Driver's Privacy Protection Act of 1994, Pub. L.

No. 103-322, Title XXX, 108 Stat. 1796, <u>with</u> National Voter Registration Act of 1993, Pub. L. No. 103-31, § 8, 107 Stat. 77.  We must presume that Congress knew of the potential interplay between the DPPA's privacy protections and the NVRA's disclosure mandate.

PILF further argues that, even if the glitch-related records contain personal information, PILF's status as a "private attorney general" warrants disclosure under the DPPA's governmental-function exception.  (Doc. 15 at 19 (citing <u>Ass'n of Cmty. Orgs. for Reform Now v. Fowler</u>, 178 F.3d 350, 364 (5th Cir. 1999)).  Assuming without deciding that the NVRA permits suits by private attorneys general, PILF does not explain how that claimed status under the NVRA would satisfy the DPPA's governmental-function exception.  The two laws work at cross-purposes: the NVRA encourages transparency, <u>see</u> 52 U.S.C. § 20501(b), and the DPPA protects privacy, <u>see</u> <u>Maracich</u>, 570 U.S. at 57.  PILF's two purported roles likewise serve different purposes: private attorneys general stand in the shoes of the public, <u>see</u> <u>Pa. Envtl. Def. Found. v. Bellefonte Borough</u>, 718 F. Supp. 431, 434 (M.D. Pa. 1989) (citing <u>Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n</u>, 453 U.S. 1, 16-17, 17 n.27, 21 (1981)), but entities invoking the DPPA's governmental-function exception stand in the shoes of the government, <u>see</u> 18 U.S.C. § 2721(b)(1).  These respective interests are on opposite sides of the current conflict.  PILF has thus not shown how its use of the requested records would assist the government in carrying out its functions.  18 U.S.C. § 2721(b)(1).

Finally, we need not consider whether the requested records are protected by Pennsylvania's Right-to-Know Law because PILF sought its records under the

NVRA.  To the extent Pennsylvania law conflicts with our interpretation of federal law, federal law controls.  Foster v. Love, 522 U.S. 67, 69 (1997); Holk v. Snapple Beverage Corp., 575 F.3d 329, 339 (3d Cir. 2009).

### C.  Zone of Interests

Defendants reiterate their arguments regarding the NVRA's zone of interests, but they have not presented new or modified arguments.  We adopt and incorporate the analysis in our earlier opinion.  See Boockvar, 370 F. Supp. 3d at 456.  We also incorporate our earlier standing analysis.  See id. at 454-56.

### D.  Bureau of Commissions, Elections and Legislation

Defendants lastly argue that the Bureau of Commissions, Elections and Legislation is improperly named as a defendant.  (Doc. 14 at 16).  We agree.  Absent waiver, sovereign immunity extends to state agencies and bureaus.  See Del. Riverkeeper Network v. Sec'y Pa. Dep't of Envtl. Prot., 833 F.3d 360, 375 (3d Cir. 2016) (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984)); Kincel v. Commonwealth, Dep't of Transp., 867 A.2d 758, 764 n.20 (Pa. Commw. Ct. 2005) (citation omitted).  The Commonwealth has not waived sovereign immunity. See Pa. Const. art. I, § 11; 42 Pa. Cons. Stat. §§ 102, 8521, 8522.

**IV.** **Conclusion**

The court will grant in part and deny in part defendants' motion (Doc. 12) to

dismiss.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    December 13, 2019