1            UNITED STATES DISTRICT COURT

2            MIDDLE DISTRICT OF PENNSYLVANIA

3                HARRISBURG DIVISION

4

5   THE PUBLIC INTEREST LEGAL,

6   FOUNDATION,

7            Plaintiff,          No. 1:19-cv-00622-CCC

8        vs.

9   KATHY BOOCKVAR, in her official
    capacity as Acting Secretary of the
10  Commonwealth of Pennsylvania,
    JONATHAN M. MARKS, in his official
11  capacity as Deputy Secretary for
    Elections and Commission, and the
12  BUREAU OF COMMISSIONS, ELECTIONS AND
    LEGISLATION,

13

14            Defendants.

15

16

17              ZOOM DEPOSITION OF

18              JONATHAN MARKS

19            SCRANTON, PENNSYLVANIA

20            FEBRUARY 12, 2021

21

22

23  ATKINSON-BAKER, INC.
    www.depo.com
24  REPORTER BY:  LOIS SIKOSKI
    FILE NO.:  AF00037

25

Exhibit A

```
1              UNITED STATES DISTRICT COURT

2            MIDDLE DISTRICT OF PENNSYLVANIA

3                  HARRISBURG DIVISION

4

5  THE PUBLIC INTEREST LEGAL

6  FOUNDATION,

7            Plaintiff,          No. 1:19-cv-00622-CCC

8        vs.

9  KATHY BOOCKVAR, in her official
   capacity as Acting Secretary of the
10 Commonwealth of Pennsylvania,
   JONATHAN M. MARKS, in his official
11 capacity as Deputy Secretary for
   Elections and Commission, and the
12 BUREAU OF COMMISSIONS, ELECTIONS AND
   LEGISLATION,
13

14            Defendants.

15

16

17          ZOOM deposition of Jonathan Marks, taken

18 on behalf of the Plaintiff, pursuant to the Federal

19 Rules of Civil Procedure, on Friday, February 12,

20 2021 scheduled at 10:00 a.m., before Lois Sikoski, a

21 Court Reporter-Notary Public in and for the

22 Commonwealth of Pennsylvania.

23

24

25
```

```
 1              A P P E A R A N C E S

 2                     - - -

 3   On behalf of the Plaintiff:
             Linda A. Kerns, Esquire
 4           Noel Johnson, Esquire
               Law Offices of Linda A. Kerns, LLC
 5             142 Locust Street, Suite 200
               Philadelphia, PA  19102
 6             linda@lindakernslaw.com
               (attending via ZOOM)
 7

 8   On behalf of the Defendants:
             Donna Walsh, Esquire
 9           Daniel T. Brier, Esquire
             Suzanne Conaboy Scanlon, Esquire
10             Myers Brier & Kelly, LLP
               Suite 200 425 Spruce Street
11             Scranton, PA  19153
               dwalsh@mbklaw.com
12             (attending via ZOOM)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    I N D E X

2   WITNESS               EXAMINATION BY        PAGE

3   Jonathan Marks        Ms. Kerns              6

4

5                    EXHIBITS
```

```
6   1  30 (B)(6) Deposition Topics for          14
       the Pennsylvania Department of
7      State.

8   2  Public Interest Legal Foundation's       24
       Request to Inspect Records 10/23/17 to
9      Jonathan Marks

10  3  December 4th, 2017 letter addressed to    28
       Mr. Jonathan Marks
11  4  Title 52 United States Code 20507         36

12  5  52 USCS Section 20183                     44

13  6  The Administration of Voter Registration  51
       in Pennsylvania 2018 Report to the
14     General Assembly

15  7  Section 1222 of Title 25 of the           54
       Pennsylvania Consolidated Statutes
16  8  County of Allegheny correspondence        66
       canceling voter registration
17  9  Reports Menu                              73

18  10 Philadelphia Voter Listing with Dates     77

19  11 4/12/16 letter to Shawna Powell           85

20  12 House State Government Committee          112
       Public Hearing on Non-citizens Voting
21     October 25th, 2017

22  13 Kathryn Boockvar Friday, 4/27/18 e-mail   132

23  14 Senate State Government and Transportation 151
       Committee Public hearing on Motor Voter,
24     Unlawful Voting and Cybersecurity

25  15 Commissioner Al Schmidt videotape testimony 157
```

```
 1                     EXHIBITS (Continued)

 2    16 Commissioner Al Schmidt videotape testimony 179

 3    17 Statement Voter Registration and Election    188
         Integrity
 4    18 December 2019 Pennsylvania Auditor          197
         General's Performance Audit Report
 5    19 April 27, 2018 DOS letter                    209

 6    20 June 12, 2018 DOS letter                     209

 7    21 DOS e-mail re: voter record verification     222

 8    22 Defendant's Responses to Plaintiff's         226
         Interrogatories
 9    23 February 29, 2008 letter to Harry            229
         VanSickle from Jury Administration
10       Supervisor Robert V. Barth, Jr.

11    24 City Life article                            232

12    25 County of Allegheny Department of            235
         Administrative Services Elections
13       Division

14    26 4/30/18 e-mail from Kathryn Boockvar         237

15    27 Jonathan Marks 8/10/18 e-mail               242

16    28 exhibits sent in e-mail on 2/11/21          246

17

18

19

20

21

22

23

24

25
```

Exhibit A          5

<pre>
 1                   P R O C E E D I N G S

 2                      JONATHAN MARKS,

 3          was examined and testified as follows:

 4                       EXAMINATION

 5   BY MS. KERNS:

 6        Q.   Good morning.  My name is Linda Kerns,

 7   Mr. Marks.  I represent the Public Interest Legal

 8   Foundation.

 9             Can you hear me?

10        A.   Good morning, Ms. Kerns.

11             I can.

12             Can you hear me okay?

13        Q.   Yes, I can.

14        A.   Great.

15        Q.   I don't know if you've participated in any

16   of these ZOOM depositions or court hearings before,

17   but in, in live-person court, a lot of times there's

18   a challenge as far as, you know, attorneys may be

19   talking before the witness is finished talking or

20   the witness talking before the attorney is finished

21   talking.  And I've noticed that in these ZOOM-type

22   proceedings, that kind of gets magnified.  So we'll

23   just have to take extra special care that, you know,

24   maybe to take a breath before we answer each other

25   or there's going to be a lot of talking over.
</pre>

1   That's just in my experience.  So I just wanted to

2   let you know about that first.  I'm sure the Court

3   Reporter will appreciate that.

4          And as far as exhibits go, we have --

5   we're going to use the "Chat" feature, and we'll

6   send everyone a copy of each exhibit.  And you can

7   get that from the bottom of your screen.  There

8   should be a "Chat" button.

9          And did you see that button?

10  A.    Yes.

11  Q.    Okay.

12         So when I'm ready to send an exhibit, if

13  you click on that window, it should open, and then

14  the exhibit will appear, and then you can have the

15  option of downloading it and looking at it or just

16  looking at it in the "Chat" button in the, in the

17  window.  So just let me know if that's not working.

18         And we'll be sharing the exhibits on the

19  screen too.

20         Okay?

21         MS. WALSH:  Yes.

22  A.    Okay.

23  Q.    All right.

24         Mr. Marks, have you ever been deposed

25  before?

1      A.    I have, yes.

2      Q.    And about how many times have you been

3  deposed?

4      A.    Depositions, probably in the double

5  digits, for sure.  I've testified quite a bit over

6  my career, so.

7      Q.    So you probably know how this works, but

8  for the sake of the record, I'm just going to go

9  over everything and the ground rules.

10         You understand that you're under oath and

11  that you must answer my questions fully, completely

12  and truthfully.

13         Do you understand?

14     A.    I understand, yes.

15     Q.    Now, we have a Court Reporter on the call.

16  She already introduced herself.  And she's going to

17  record everything.  So when you answer, you have to

18  use the words "Yes" or "No" when responding, instead

19  of shaking your head or saying "hm-mm" or "um"

20  because those types of answers are not clear on the

21  record.

22         Will you be able to do that?

23     A.    I will, yes.

24     Q.    And if you do not understand a question,

25  or our connection cuts out, or you couldn't hear me,

1   or you just weren't sure what I was saying, you can

2   ask me to repeat it or clarify.

3          So will you do that for me?

4   A.   I will, yes.

5   Q.   Because if you answer a question, I'm

6   going to assume that you heard the question that I

7   asked.

8   A.   Right.

9   Q.   And this is not a marathon.  I don't want

10  to torture anybody.  If you need a break, that's

11  fine, just let us know.  I just ask that if there's

12  a question pending, you answer the question prior

13  to, prior to us going on break.

14  A.   Understood.

15  Q.   And are you this morning under the

16  influence of any substance or anything that would

17  prohibit you from understanding my questions or

18  being able to answer them completely and truthfully?

19  A.   Other than the caffeine from my coffee,

20  no.

21  Q.   Yeah.  All right.

22         Well, I have caffeine too.  So that's

23  fine.

24         Now, do you understand that you are here

25  giving testimony on behalf of the Pennsylvania

1  Department of State?

2      A.   I do.

3      Q.   So I'll be asking a lot of questions, and

4  I may use the word "you", or "your office", or "the

5  Department", but for the vast majority of these

6  questions, I'm asking about the knowledge of the

7  Department of State.

8           So will that make sense to you?

9      A.   It will, yes.

10     Q.   And when I say "the Department of State",

11 most times I'll be referring to subordinate offices

12 within the Elections Division, such as the Bureau of

13 Commissions, Elections, and Legislation.

14          Do you understand that?

15     A.   I do, yes.

16     Q.   And if I need to ask you something

17 personally, I'll try to clarify that, but if I do

18 not for some reason clarify it appropriately, will

19 you just let me know?

20     A.   Yes.  I'll ask for a clarification

21 whenever necessary.

22     Q.   All right.

23          MS. WALSH:  And, Ms. Kerns, before we go

24 further, I'd just like to note for the record that

25 we did serve objections to the Rule 30(b)(6) notice,

```
1    and they would apply here today as well.
2          MS. KERNS:  Thank you.
3       Q.   So I do -- and I also want to note that I
4    received some documents last night here in my
5    office, I think it was past 6:00, if not closer to
6    7:00 p.m. by e-mail.  These apparently were
7    responsive to the Discovery Requests that my office
8    had sent out last summer.  They were -- the file,
9    there were some type of a problem with the file.  So
10   when I opened it, I could only see a couple of
11   pages.
12         So I'm just -- we let you know that, and I
13   want to say for the record, that you did resend
14   another copy this morning at around 9:30, about a
15   half hour before the deposition was about to begin.
16   So we obviously have not had a chance to look at
17   those in any type of detail.  So I want to preserve
18   our right, if we need to, to either extend this dep
19   or reopen it, based on what are in those records.
20         MS. WALSH:  And we don't agree that that's
21   something that needs to take place, but we
22   understand you're preserving your position.
23      Q.   All right.
24         Now, Mr. Marks, we're here on the case of
25   the Public Interest Legal Foundation versus Kathy
```

1  Boockvar.  The Docket No. is 1:19-CV-622.

2           Are you personally familiar with this

3  case?

4       A.  I am, yes.

5       Q.  Can you please tell me what you know about

6  it?

7           MS. WALSH:  Objection to form.

8       A.  Well, I have reviewed the various filings.

9  I've reviewed the interrogatories.  I've reviewed

10  our responses to those.  So I'm familiar with the

11  case and the various elements of the case.

12       Q.  And do you know what records we are -- my

13  client is seeking from the Department of State in

14  this case?

15           MS. WALSH:  Objection to form.

16       A.  I -- yes.

17       Q.  And what are those records?

18           MS. WALSH:  Objection to form.

19       A.  As I understand it, the -- your client is

20  seeking records related to an analysis of both

21  PennDOT database and the Statewide Uniform Registry

22  of Electors.

23           MS. WALSH:  I just note a further

24  objection to the extent that there were written

25  requests for information, which, obviously, are in

1 writing and speak for themselves.

2     Q.   Mr. Marks, do you have any notes in front

3 of you, or a computer screen, or anything that

4 you're referring to while you're answering my

5 questions?

6     A.   I do not, no.

7     Q.   Besides speaking with your attorney or

8 attorneys, did you personally do anything to prepare

9 for this deposition?

10     A.   I did.  I reviewed, again, the various

11 filings that were made in the case, our responses to

12 those filings.  I reviewed the records that the

13 Department turned over during discovery.

14     Q.   When you say you reviewed the records, did

15 you review all of the records, including what was

16 turned over last night?

17     A.   I did, yes.

18     Q.   Okay.

19     I'm going to refer to Exhibit 1 right now.

20 So my colleague will bring that up for us, and he's

21 going to share it on the screen.

22     Can you see that okay?

23     MS. WALSH:  Not yet.

24     MS. KERNS:  All right.  I have it on my

25 screen.

1            Ms. Walsh, do you have it on your screen?

2            MS. WALSH:  No.  We're attempting to pull

3    it up.

4            MS. KERNS:  I didn't have to do anything.

5    It just appeared when he shared it.

6            MS. WALSH:  We did not have the same

7    screen view then.  It's -- we're not able to see it

8    yet.

9            MS. KERNS:  Do you see it now?

10           MS. WALSH:  Yes.  Is it the 12 deposition

11   topic?

12           MS. KERNS:  Right.

13           MS. WALSH:  Yes.

14       A.  Yes, I can see it.  It's a little, a

15   little far away.

16           MS. KERNS:  So for the Court Reporter this

17   is going to be Exhibit 1.

18               (Deposition Exhibit No. 1 marked for

19       identification.)

20       Q.  And this is -- the caption at the top says

21   "Rule 30 (B)(6) Deposition Topics for the

22   Pennsylvania Department of State."

23           And, Mr. Marks, this was sent to your

24   counsel prior to this deposition.

25           Did anyone show this to you prior to

1    today?

2            MS. WALSH:  I'll just note an objection to

3    the extent we've also served objections to this

4    notice, as I mentioned earlier.

5            You can answer.

6        A.  Yes, I did see a copy of it.

7        Q.  And did you review it prior?

8        A.  I did, yes.

9        Q.  And did you talk to anyone about the

10   topics on this list?

11       A.  Sorry.  I'm having -- I don't know if I'm

12   going to be able to read all, all of the details

13   from this distance, but --

14           MS. WALSH:  Would you be able to send us a

15   copy of the document that you've put up?  We'll

16   print it out and we'll put it before the witness.

17           MS. KERNS:  Send it by how?  By e-mail?

18           MS. WALSH:  That would be fine.

19           MS. KERNS:  To whose e-mail address?

20           MS. WALSH:  You can send it to

21   dwalsh@mbklaw.com.

22       A.  That's better.

23           Yeah.  We just, we just blew it up.  So

24   it's little easier for me.

25           I just wanted to make sure I was looking

1    at the correct document.

2        Q.   Okay.

3             So I'm going to repeat my question.

4             Did you talk to anyone else about the

5    topics on this list prior to this deposition?

6        A.   Yes.  I spoke to counsel for the

7    Department and, and also counsel here.

8        Q.   Anyone else besides your counsel?

9        A.   No.

10       Q.   Now, you had earlier said that you had

11   reviewed the answers to the various Discovery

12   Requests that my office sent to the Department of

13   State.

14            Did you personally help prepare the

15   answers to any of those Discovery Requests?

16       A.   The answers were prepared by counsel.  I

17   did review the answers.

18            MS. WALSH:  And I'll just note an

19   objection to the extent I don't think she would be

20   asking you to divulge communications that you had

21   with counsel concerning any discovery matters, but I

22   caution you not to, to disclose any information.

23            THE WITNESS:  Understood.

24       Q.   So were you asked to find any documents

25   that were responsive to those Discovery Requests?

Exhibit A

1      A.   Yes.

2      Q.   And there was an additional batch of

3  documents sent to my office, I believe it was last

4  week.  I don't remember the date.

5           Are you familiar with that batch of

6  documents?

7      A.   I, I don't know exactly what was sent to

8  your office last week.

9      Q.   Are you aware that there was additional

10  documents sent to my office last week?

11      A.   I was aware that there was additional

12  discovery documentation sent to your office.

13      Q.   Do you know why those documents were not

14  sent until last week as opposed to last fall when

15  the rest of the documents were sent over?

16      A.   I do not.

17      Q.   Do you know why the documents that were

18  sent to my office last night were just sent last

19  night and not last fall when the rest of the

20  documents were sent?

21      A.   I do not.

22      Q.   Who prepared -- who provided those

23  documents to your counsel?

24      A.   Again, I don't know exactly what documents

25  were sent to you, but I did provide all documents in

1    my records that -- at the initial Discovery Request.

2        Q.   Okay.

3             Well, then, let's talk about what was sent

4    last night.

5             Are you familiar with that batch of

6    documents that were sent last night?

7        A.   I think I've answered that.  I'm not -- I

8    wasn't on the e-mail or the communications.  So I

9    don't have personal knowledge of exactly what was

10   sent last night.

11       Q.   Prior to me mentioning it this morning in

12   this deposition, were you aware that additional

13   documents were sent to me last night?

14       A.   I was not.

15       Q.   All right.

16            Mr. Marks, what is your current job title?

17       A.   I'm the Deputy Secretary for Elections and

18   Commissions at the Pennsylvania Department of State.

19       Q.   And how long have you held that position?

20       A.   Since February of 2019.

21       Q.   And what was your position -- were you

22   with the Department of State prior to February of

23   2019?

24       A.   I was, yes.

25       Q.   And what was your position then?

1    A.   I was the Commissioner of the Bureau of

2 Commissions, Elections and Legislation.

3    Q.   And how long were you in that position?

4    A.   From October 2011 through February

5 February 2019.

6    Q.   And prior to 2011, were you with the

7 Department of State?

8    A.   I was, yes.

9    Q.   And what was your position then?

10    A.   I was the Chief of the Division of the

11 Statewide Uniform Registry of Electors, or SURE.

12    Q.   And how long were you in that position?

13    A.   That was May 2008 through October of

14 2011.

15    Q.   And prior to that, were you with the

16 Department of State?

17    A.   I was.

18    Q.   And what was your position then?

19    A.   I was Chief of the Division of Elections.

20    Q.   And in what time period?

21    A.   In the Bureau of Commissions, Elections

22 and Legislation, that would have been from about

23 2004 through 2008.

24    Q.   And what were you doing prior to 2004?

25    A.   For a couple of years prior to that, I was

1  a legal assistant assigned to the Bureau of

2  Commissions, Elections and Legislation.

3      Q.   So what year did you start with the

4  Department of State?

5      A.   Well, I actually started with the

6  Department of State about 10 years earlier than

7  that, 1993, in the bureau -- corporation bureau.

8      Q.   So with your current position, can you

9  tell me what your job duties are?

10     A.   Well, my job duties are to oversee the

11  Bureau of Elections and Notaries, the Bureau of

12  Elections -- Election, Security and Technology, as

13  well as the Bureau of Campaign Finance and Civic

14  Engagement.  Most of my duties relate to overseeing

15  the Department's day-to-day operations regarding

16  election administration, campaign finance, lobbying

17  disclosure.

18          We do other things that are rarely talked

19  about, but it also includes notaries, all -- roughly

20  80,000 Commissioned Notaries have to apply or

21  register with the Department of State.  So that's,

22  that's pretty much the crux of what I do.

23     Q.   Who do you report to?

24     A.   I report to the Executive Deputy Secretary

25  of the Department as well as the Secretary of the

1    Commonwealth.

2          Q.    Who's the current Executive Deputy

3    Secretary of the Commonwealth?

4          A.    Sari Stevens.

5          Q.    And is there anyone acting in the

6    Secretary position now?

7          A.    Yes.  Veronica Degraffenreid.

8          Q.    I'm sorry.  Can you repeat that?

9          A.    Veronica Degraffenreid.

10         Q.    Now, with regard to your job duties, do

11   you have any specific responsibilities related to

12   the -- in your current position related to the SURE

13   system, the Statewide Uniform Registry of Electors?

14         A.    I do, inasmuch as the Bureau of Elections,

15   Security and Technology actually handles the

16   day-to-day operation of the SURE system or our

17   support of the SURE system for the various county

18   election boards.

19         Q.    What are your specific responsibilities

20   with regard to the SURE system?

21         A.    Well, again, I oversee the Bureau that

22   handles the day-to-day operations.  So it's, it's,

23   you know, providing sign-off approval on various

24   projects related to the SURE system, also ensuring

25   that the day-to-day operations of -- related to the

 1 | SURE system are running smoothly.

 2 |     Q.   Are you involved with requests for public

 3 | records as they relate to the SURE system?

 4 |     A.   I'm involved to the extent that I may need

 5 | to review requests for public records.  You're

 6 | talking about -- I'm not sure exactly what kind of

 7 | requests you're referring to, but if, if we get a

 8 | request for a public information, it will -- if it's

 9 | a Right-to-Know request, for example, it will go

10 | through our Right-to-Know officer.  Some other

11 | requests may go through our counsel's office.

12 |     Q.   So what kind of requests would go to the

13 | Right-to-Know office as opposed to the counsel's

14 | office?

15 |     A.   Well, it would be requests for public

16 | information made under the Right-To-Know --

17 | Pennsylvania's Right-to-Know Law.

18 |     Q.   So what would, then, go to the counsel's

19 | office as opposed to the Right-to-Know office?

20 |     A.   Well, it would depend on, it would depend

21 | on the request.  You know, obviously there's

22 | publicly available information.

23 |        For example, we publish, on a weekly

24 | basis, what we call the Full Voter Export.  Again,

25 | if, if we're requested -- if information is

1  requested outside of what is, is made publicly

2  available, we often consult with our counsel's

3  office to determine if we're able to provide that

4  information or if we're able to provide it -- you

5  know, some of the information.  So that's, that's

6  something we work with our counsel's office on to

7  determine what is appropriate to provide.

8      Q.   So are requests for information personally

9  handled by you?  Or do you have people that report

10  to you that handle this type of information?

11      MS. WALSH:  Objection to form.

12      A.   I -- if you're talking about the requests

13  themselves, they, they may come in through, you

14  know, any, any number of areas within the

15  Department.  But as I said, we will -- you know, if

16  it's a request for something that is publicly

17  available, it will be provided just upon request.

18      If it's a request for information that's

19  not publicly available, we consult with our counsel

20  to determine if we need to respond to the request,

21  either in whole or in part.

22      Q.   And in your current position, how many

23  people report to you?

24      A.   Directly report to me, three.

25      Q.   And then how about indirectly, how many

Exhibit A

1   people report to you?

2        A.   Well, the -- between the three bureaus

3   that I referenced earlier, there's roughly two dozen

4   people total.

5        Q.   Okay.

6             I'm going to go to an exhibit now, Exhibit

7   2.  And this is Docket Entry 1-9.  And it's a copy

8   of the Public Interest Legal Foundation's Request to

9   Inspect Records addressed to you dated October 23rd

10  2017.

11            We're going to put that up on the screen.

12            So, Mr. Marks, let me know when you can

13  see that letter.

14       A.   I can see it.

15            (Deposition Exhibit No. 2 marked for

16    identification.)

17            MS. KERNS:  Okay.  Great.

18            Could we go off the record for just a

19  second, because I'm having a problem with my screen

20  and I just need to fix it.

21            MS. WALSH:  Sure.

22            MS. KERNS:  Do you mind if we take a quick

23  break?  Does anyone mind if we take a quick break?

24            MS. WALSH:  No problem.

25            (Whereupon, there was a recess in

1   proceedings.)

2           MS. KERNS:  Okay.  We're going to go back

3   on the record.  Thank you for that.  I apologize for

4   the brief break.

5       Q.   So, Mr. Marks, I have what I have marked

6   as Exhibit 2 up on the screen.

7           Can you see that document on your screen?

8       A.   I can, yes.

9           MS. KERNS:  And Court Reporter, can you

10  see it?

11          COURT REPORTER:  Yes, ma'am.

12      Q.   All right, Mr. Marks.  Did the Department

13  of State receive this letter?

14          MS. WALSH:  Objection to form.

15      A.   Yes.

16      Q.   And who would have been the person in

17  charge of handling this letter?

18          MS. WALSH:  Objection to form.

19      A.   Well, as I said, this, this letter, it was

20  addressed to me.  So I would have received it and

21  consulted with our counsel on an appropriate

22  response.

23      Q.   And did the Department of State produce

24  any records in response to this letter?

25      A.   As I recall, no.  We replied to the

1  letter.

2      Q.   At the time you received the letter, did

3  any records exist that would have been responsive to

4  the request?

5          MS. WALSH:  Objection to form.

6      A.   I don't believe so, no.

7      Q.   I'm going to give you a chance to take a

8  look at that letter.  So let's go to paragraph 1 on

9  the first page.

10         MS. WALSH:  So you're controlling the --

11  you need to make it a little bit larger but feel

12  free to reach out and call out, you know, how you

13  would like to --

14         THE WITNESS:  Sure.

15         MS. WALSH:  -- if you can't see, you know,

16  the full paragraph or all of the language.

17     A.   And you're -- Ms. Kerns, you're referring

18  to the paragraph that begins, "Pursuant to

19  Section 20507," and then it has a numbered list

20  starting with No. 1?

21     Q.   Right.

22         So when you received that letter, you or

23  the Department received that letter on or about

24  October 23rd, 2017, were there any records in

25  existence that were responsive to this letter?

1            MS. WALSH:  Objection to form; also to the

2    extent that it's calling for a legal conclusion.

3       A.   I'm sorry.  I'm just reading the paragraph

4    in full.

5            No.

6       Q.   What did somebody just hand you?

7            MS. WALSH:  The letter.

8       A.   A paper copy of the letter.

9       Q.   So just so I'm clear, in -- on or about

10   October 23rd, 2017, there were no records that would

11   have been responsive to request No. 1?

12           MS. WALSH:  Objection to form; also to the

13   extent it calls for a legal conclusion, and it's

14   been asked and answered.

15      A.   That's correct, yes.

16      Q.   And I'm going to go through and ask the

17   same question of paragraphs two, three, and four.

18           Were there any -- at the time you received

19   it, were there any records in the possession of the

20   Department that were responsive to any of those

21   requests?

22           MS. WALSH:  Objection to form and to the

23   extent it calls for a legal conclusion.

24      A.   No.

25      Q.   How about, as we sit here today, are there

1   any records responsive to this request, starting

2   with, starting with paragraph 1?

3           MS. WALSH:  Same objection.

4       A.  No.

5       Q.  And as we sit here today, are there any

6   records responsive to paragraph 2?

7           MS. WALSH:  The same objection.

8       A.  No.

9       Q.  The same question for paragraph 3.  As we

10  sit here today, are there any records responsive to

11  paragraph 3?

12          MS. WALSH:  The same objection.

13      A.  No.

14      Q.  And as we sit here today, are there any

15  records in existence that would be responsive to

16  question paragraph No. 4 that begins "all

17  communications regarding list maintenance"?

18          MS. WALSH:  The same objection.

19      A.  No.

20      Q.  Okay.  I'm going to move on to Exhibit 3.

21          (Deposition Exhibit No. 3 marked for

22       identification.)

23      Q.  So we're going to put that up on the

24  screen.

25          Okay.

1          What I've marked as Exhibit 3 is the

2     December 4th, 2017 letter addressed to Mr. Jonathan

3     Marks.

4          MS. WALSH:  Ms. Kerns, we don't see it yet

5     on our screen.

6          Okay.  We've got it now.

7     Q.   Mr. Marks, can you see that, what I've

8     marked as Exhibit 3?

9     A.   Yes.  This is the December 4th, 2017

10    letter from Public Interest Legal Foundation.

11    Q.   Did the Department of State receive that

12    letter?

13         MS. WALSH:  Objection to form.

14    A.   Yes, I believe so.

15    Q.   When you say "believe so", is there

16    anything else that you need to check to be sure that

17    you received the letter?

18    A.   I -- I'm only looking at the top of the

19    letter at the moment.  So maybe if I -- if we scroll

20    down and read the letter, just to confirm.

21    Q.   Okay.

22         Let me know when you've reviewed it.

23    A.   Okay.  You can --

24         Okay.

25    Q.   Are you saying "okay" because you've

1    reviewed it?

2         A.   No.  I'm sorry.  I was saying "okay" to

3    you can scroll to the second page.  I apologize.

4              Okay.  I've finished reviewing it.

5              Yes, we received that letter.

6         Q.   Who would have been in charge of

7    processing this request?

8              MS. WALSH:  Objection to form.

9         A.   Well, again, this, this, this is a request

10   that we would have, we would have consulted with our

11   counsel on to determine if there were any responsive

12   records.

13        Q.   And did the Department of State produce

14   any records that was responsive to this letter?

15             MS. WALSH:  Objection to form and to the

16   extent it calls for a legal conclusion.

17        A.   I believe we replied to the letter.

18        Q.   Did the Department?

19        A.   Ms. Kerns, just -- I just want to make you

20   aware, I have a paper copy of the letter now.

21        Q.   You just said that you received -- I'm

22   sorry.  I think your answer was the Department of

23   State replied to the letter.  So my question was did

24   the Department of State produce any records in

25   response to this request?

1    A.    My recollection, no.

2    Q.    At the time that you received that letter,

3    which would have been on or about December 4th,

4    2017, did any records exist that were responsive to

5    this request?

6         MS. WALSH:  Objection to form and to the

7    extent it calls for a legal conclusion.

8    A.    No.

9    Q.    Who made the decision that there were no

10   records responsive to this letter marked as

11   Exhibit 3?

12        MS. WALSH:  Objection to the extent it

13   calls for communications with counsel that are

14   protected from discovery.

15   A.    Yes.

16        The decision was made in the

17   consultation -- I'm sorry.

18        MS. WALSH:  I'm sorry.  I'm just

19   cautioning you not to disclose communications you

20   had with counsel.

21   Q.    Did you make the decision, Mr. Marks, not

22   to respond to this -- not to produce records in

23   response to this letter?

24        MS. WALSH:  Same objection.

25   A.    Well, the -- yes.  The Department made the

1   decision that our response was appropriate.

2        Q.   Did any records exist that would have been

3   responsive to this letter?

4             MS. WALSH:  Objection; calls for a legal

5   conclusion, and it's been asked and answered.

6        A.   No.  Our response is self-explanatory.

7        Q.   Okay.

8             So I'm going to direct you to the

9   letter -- it's the paragraph that starts with "with

10  regard to Request 1(a), documents sought would most

11  recently include."

12            Are there any records, as we sit here

13  today, that are responsive to that request?

14            MS. WALSH:  Are you referring to the first

15  page of Exhibit 3?

16            MS. KERNS:  Yes.

17            MS. WALSH:  To the first bullet?

18            MS. KERNS:  Yes, the first bullet,

19  exactly.

20       A.   Yes, I have it.

21            With regard to request 1(a), that's the

22  paragraph you're referring to, the bullet?

23       Q.   Right.

24       A.   Is there a question pending?

25       Q.   Yes.  I'm sorry if I wasn't clear.

1          My question was are there any records that
2   exist today that are responsive to that request?
3          MS. WALSH:  Objection to form and to the
4   extent it calls for a legal conclusion.
5       A.   No.
6       Q.   I'm going to move onto the second bullet
7   point that starts as "Request 2".
8          Do you see that, Mr. Marks?
9       A.   I do.
10      Q.   Are there any documents that exist today
11  that are responsive to that request?
12         MS. WALSH:  Objection to form and to the
13  extent it calls for a legal conclusion.
14      A.   My understanding that any documents
15  responsive to this request were provided during
16  discovery.
17      Q.   So my question was do any records exist
18  today that are responsive to this request.  And your
19  response is that those records were provided during
20  discovery.
21         So would your answer to my question are
22  there any records responsive to this request that
23  exist today be "Yes" or "No"?
24         MS. WALSH:  Objection; asked and answered.
25      A.   Okay.

1          It would be "Yes", and those documents

2    would have been provided during discovery.

3         Q.   Did those documents exist in December of

4    2017?

5         A.   I don't recall that they did.

6         Q.   Is there anything that would help you

7    refresh your recollection as to whether they existed

8    in December of 2017?

9              MS. WALSH:  Objection to form.

10        A.   I, I don't think there was anything that

11   would refresh my memory.

12        Q.   Okay.

13             Let's go to the next bullet point, Request

14   4.  As we sit here today, are there any records in

15   existence described by that Request No. 4?

16        A.   No.

17        Q.   With regards to Exhibit 2 and Exhibit 3,

18   do you --

19             MS. WALSH:  I'm sorry, Ms. Kerns.  So the

20   record is clear, that's the October 23rd letter and

21   the December 4th letter?

22             MS. KERNS:  Yes.

23             MS. WALSH:  Thank you.

24        Q.   Mr. Marks, your testimony is that yes,

25   records exist that are responsive to Request No. 2,

1  which is the bullet point in the Exhibit 3

2  December 4th, 2017 letter, but you answered "no", to

3  any records that would have been responsive to the

4  other request.

5        Before we move on to the next exhibit, do

6  you want to change your testimony, after thinking

7  about it?  Or do you want the testimony that you

8  made to stand?

9        MS. WALSH:  Objection to form.

10     A.   I want --

11        MS. WALSH:  Depending on what you're

12  asking.

13     A.   I, I want the testimony to stand.

14     Q.   Mr. Marks, are you familiar with the

15  National Voter Registration Act, the NVRA?

16     A.   I am, yes.

17     Q.   Okay.

18        I'm going to now introduce Exhibit 4,

19  which is going to show up on your screen.

20        Let me know when you can see that.

21        Can you see that, Mr. Marks, yet?

22     A.   Yes.  This is a document that -- the top

23  header 52 USCS Section 20507.

24        MS. KERNS:  Okay.

25        So I'm going to mark this as Exhibit 4.

1          (Deposition Exhibit No. 4 marked for

2    identification.)

3       Q.   And this is a copy of Title 52 United

4    States Code 20507.  And I'm going to represent that

5    this is part of Section 8 of the National Voter

6    Registration Act.  And I am going to go to

7    Section (i) (1).  And we'll move to that on your

8    screen, where it says "Public disclosure of voter

9    registration activities".

10          Can you see that?

11      A.   Yes.

12      Q.   And I'm going to read that section.  It

13   says, "Each State shall maintain for at least 2

14   years and shall make available for public inspection

15   and, where available, photo copying at a reasonable

16   cost, all records concerning the implementation of

17   programs and activities conducted for the purpose of

18   ensuring the accuracy and currency of official lists

19   of eligible voters, except to the extent that such

20   records relate to a declination to register to vote

21   or to the identify of a voter registration agency

22   through which any particular voter is registered."

23      A.   Ms. Kerns, I just want to let you know I

24   was handed a paper copy of this exhibit as well.

25      Q.   Okay.

1        I'll give you a chance to go to Section

2   (i), No. 1.

3        Have you had a chance to look at it?

4        A.   I have, yes.

5        Q.   Is your office, meaning the Department of

6   State, familiar with that provision of the National

7   Voting Rights Act?

8        A.   Yes.

9        Q.   Are you personally familiar with that

10   provision of the National Voting Rights Act?

11        A.   I am, yes.

12        Q.   Is your office, meaning the Department of

13   State, required to comply with this provision of the

14   National Voting Rights Act?

15        MS. WALSH:   Objection to form to the

16   extent it calls for a legal conclusion.

17        A.   Yes.   I believe the Department and, and

18   other jurisdictions within the Commonwealth would

19   have to comply.

20        Q.   What do you mean by "other jurisdictions

21   within the Commonwealth"?

22        A.   It would be the county election offices.

23        Q.   When you say "county election offices",

24   can you explain what you mean by how they're

25   required to comply with provisions of the National

1    Voting Rights Act?

2          MS. WALSH:  Objection to the extent it

3    calls for a legal conclusion.

4          A.   Well, in, in the Commonwealth of

5    Pennsylvania, the county -- to be more specific, the

6    county voter registrar is actually the one that has

7    the records related to voter registration.  Those

8    are within the purview of the county voter

9    registrar.

10         Q.   So if your office -- so is it, is it your

11    office that is required to comply with provisions of

12    the National Voting Rights Act?  Or is it the county

13    registrars who are required to comply?

14          MS. WALSH:  Objection to form and also to

15    the extent it calls for a legal conclusion.

16         A.   I -- my, my understanding is it's both.

17         Q.   Which office would have the ultimate

18    responsibility to make sure that this provision of

19    the NVRA is being complied with?

20          MS. WALSH:  Objection to form and to the

21    extent it calls for a legal conclusion.

22         A.   Well, again, I believe both ultimately

23    would have the responsibility to comply with it.

24         Q.   Okay.

25          The excerpt that I just read and that

1  we've been referring to -- and you can see from

2  Exhibit 4 in front of you -- refers to, quote,

3  "Programs and activities conducted for the purpose

4  of ensuring the accuracy and currency of official

5  lists of eligible voters."

6          Do you see that part in the exhibit and we

7  highlighted it on the screen?

8      A.   I do, yes.

9      Q.   Does the Commonwealth of Pennsylvania have

10  programs and activities conducted for the purpose of

11  ensuring the accuracy and currency of the official

12  lists of eligible voters?

13          MS. WALSH:  Objection to the form to the

14  extent it calls for a legal conclusion.

15      A.   Pennsylvania does, yes.

16      Q.   Well, what are the programs and activities

17  that the Commonwealth of Pennsylvania has?

18      A.   Those are statutorily defined.  They

19  include the National Change of Address Program, the

20  five-year notice, and as an alternative, I believe

21  mass confirmation mailing would be considered under

22  this section.

23      Q.   With regard to that section, what is your

24  understanding of the meaning of the terms "accuracy

25  and currency of the official lists"?

1      MS. WALSH:  Objection to form to the

2  extent it calls for a legal conclusion.

3      A.   I mean I believe I would read the entire

4  phrase, "implementation of programs and activities

5  conducted for the purpose of ensuring the accuracy

6  and currency."  And that would include the voter

7  list maintenance activities prescribed by

8  Pennsylvania's voter registration law.

9      Q.   So for an official list of eligible voters

10 to be accurate and current, does that mean that the

11 lists should only include eligible registrants?

12     MS. WALSH:  Objection to form to the

13 extent it calls for the legal conclusion.

14     A.   I believe that it certainly is the purpose

15 of this statute and the Pennsylvania laws that I

16 referred to that the list be accurate.  And that's

17 the purpose of those lists maintenance programs.

18     Q.   So what do you mean by "accurate"?  What

19 would your description be of an accurate list?

20     A.   Well, an accurate list would be every

21 voter who is qualified and who has met the statutory

22 statutory requirements to register are on the roles.

23     Q.   So, Mr. Marks, by that answer, if there

24 are people who are not on the roles, yet, would

25 otherwise be eligible, is it your testimony that

1  it's the Department's job or role to get those

2  people on the rolls?

3          MS. WALSH:  Objection to form.  Also --

4          Go ahead.

5      A.   I don't think it's the Department's job to

6  get them on the rolls.  What I said is anyone who

7  met the statutory requirements, which includes

8  registering to vote.  So the voter would have to

9  take the action of registering to vote to be on the

10  voter rolls, but it's certainly our responsibility

11  to ensure that anyone who meets the qualifications,

12  who has taken that action, is on the rolls.

13      Q.   And once someone is on the rolls, what is

14  the Department's responsibility with regard to

15  maintaining the accuracy and currency of those

16  rolls?

17          MS. WALSH:  Objection to form.  It speaks

18  and it calls for a legal conclusion.

19      A.   Well, through the SURE system, we support

20  the county's -- the county voter registrar's

21  statutory obligation to conduct voter list

22  maintenance.

23      Q.   And what does that involve?

24      A.   That involves providing information to the

25  counties through the SURE system that we obtain for

Exhibit A

1    the National Change of Address Program, the counties

2    also -- it can conduct the five-year notice mailing

3    through the SURE system.

4         Q.   When you say the counties "can conduct",

5    does the Department of State give any directives to

6    the counties as to what they are supposed to be

7    conducting?

8         A.   We do, yes.

9         Q.   And what are those directives?

10        A.   Well, we provide, we provide counties with

11   information every year and reminders regarding their

12   responsibility, under both NVRA and Pennsylvania

13   law, to conduct annual list maintenance programs,

14   and we remind them of the deadline by which they

15   must conduct those programs.

16        Q.   Other than reminding, does the Department

17   of State take any action to make sure that those

18   programs are conducted appropriately?

19        A.   We do monitor the counties' -- the conduct

20   of, of the list maintenance activities.

21        Q.   How do you do that?

22        A.   We, we basically determine if counties

23   have, have generated the notices that they're

24   required to generate and send out to voters.

25             Each of these programs obviously requires

1    notification to the voter.

2        Q.    Other than --

3        A.    And we report on all of that activity

4    annually.  And that's published on our Web site.

5        Q.    Other than making sure that the notices go

6    out to voters, do the Department of State take any

7    other action as far as monitoring what the counties

8    are doing with regard to list maintenance?

9        A.    I'm not sure what you mean by any other.

10       Q.    So once the Department of State has

11   information that the counties sent out notices to

12   voters, does the Department of State do any follow

13   up with the counties as to what happened with those

14   notices?

15       A.    Well, that's, that's completely

16   transparent, and it's, it's reported on an annual

17   basis, so, yes.  But that's something that the

18   general public can monitor as well.

19       Q.    Okay.

20             I'd like to talk about the SURE system.

21   And we've already spoken about that, and you agree,

22   that's the Statewide Uniform Registry of Electors

23   system?

24       A.    That's correct, yes.

25       Q.    When did Pennsylvania implement the SURE

1  system?

2      A.   It was implemented beginning in 2003.  It

3  was actually a two-year transition from county

4  Legacy system to SURE, that started in 2003 and

5  ended in December 2005.  That's when the last county

6  came onto the SURE system.

7      Q.   Why did Pennsylvania implement the SURE

8  system?

9           MS. WALSH:  Objection to form, and I'll

10 just note this is straying from the topics that

11 brought us here today.  I'll give you leeway, but I

12 think you're straying from the specific topics and

13 the objections that lead in to those topics.

14     Q.   You can go ahead and answer.

15     A.   It was implemented because it's a

16 statutory requirement.

17     Q.   What statute was the Pennsylvania

18 Department of State following in implementing that

19 SURE system?

20     A.   The Act 3 of 2002.

21          (Deposition Exhibit No. 5 marked for

22 identification.)

23     Q.   Okay.

24          I'm going to show you Exhibit 5.  So we're

25 going to put that on your screen.

Exhibit A

1           Let me know when you can see that.

2           Can you see Exhibit 5, Mr. Marks?

3      A.   Yes.

4           This is -- the header is 52 USCS

5  Section 21983 -- or it's 21083?  I apologize, Ms.

6  Kerns.  My eyesight is not the best.

7      Q.   Okay.

8           Well, can you read it?

9      A.   I can.  I was having trouble with the,

10 with the blue font, but I can read it.

11     Q.   Okay.

12          I'm going to point you, then, to Section

13 small (a) (1) (A) That's right on that page, and

14 that's in black.

15     A.   I see that, yes.

16     Q.   Can you read what we've just highlighted?

17     A.   I'm looking at a blowup of a downloaded

18 version, so.

19          MS. WALSH:  I'm sorry.  It disappeared.

20          MS. KERNS:  I'm sorry.  I think he

21 highlighted it, and then the highlighting

22 disappeared.  We'll try again.

23          MS. WALSH:  Thank you.

24          Can you expand that?

25     A.   Is he sharing the screen or --

1          MS. WALSH:  We can see a screen.  We see

2     some highlighting.  It's too small to read.  So if

3     you can blow that up, that would be helpful.

4          Q.  Okay.

5               So we just blew it up.

6               Can you read it now?  Or what we

7     highlighted?  Or do you want me to take the

8     highlighting off?

9          MS. WALSH:  Actually, it's hard to see

10    what that is.

11              The witness was just handed a copy of

12    Exhibit 5.

13         A.  I have a paper copy.

14              So if I'm -- correct me if I'm wrong.

15    What's being highlighted is 21083 (a)(1) paragraph

16    (A).  It starts with "in general".

17         Q.  Right.

18         A.  Okay.

19              And, and, and you were highlighting that

20    entire paragraph?

21         Q.  Yes.

22         A.  Okay.  I have that.

23         Q.  And are you familiar with that paragraph?

24         A.  I am, yes.

25         Q.  Did Pennsylvania implement the SURE system

1   to comply with that paragraph?

2          MS. WALSH:  I just note an objection to

3   the form, to the extent you're calling for a legal

4   conclusion, and, also, again, you're straying beyond

5   the topics that brought us here today.

6          A.   The -- I mean the short answer is no.

7   Pennsylvania's law, Act 3 of 2002, was actually

8   enacted prior to this federal law.

9          Q.   What is the SURE system used for?

10         A.   Well, it is, it is the -- as its name

11  implies, it is the uniform registry of electors.

12  It's a statewide system that counties must maintain

13  their official voter registration records.

14         Q.   Can the Department of State access the

15  SURE system?

16         A.   We do have access to the SURE system, as

17  part of our responsibility to support and maintain

18  that system.

19         Q.   So does the Department of State use the

20  SURE system for anything other than supporting and

21  maintaining the system?

22         MS. WALSH:  Objection to form.

23         A.   I think that's a fair representation.

24         Q.   So what does the Department of State use

25  the SURE system for?

Exhibit A

1    A.   Oh, I'm sorry.  I, I misunderstood.

2         What I'm saying is it is a fair

3    representation that we use it to support and

4    maintain the county's voter registration records.

5    Q.   Can you describe what you mean by "support

6    and maintain"?

7    A.   Well, we -- I don't have Act 3 in front of

8    me, but it is a statutory requirement that we

9    establish a Statewide Uniform Registry of Electors,

10   and that we maintain it so that counties can,

11   counties can maintain their official voter

12   registration records in that statewide system.

13   Q.   So what do the counties use the SURE

14   system for?

15   A.   They use it to record their official --

16   the Statewide Uniform Registry Of Electors is

17   essentially each county's official voter registry.

18   Q.   Can the Department of State access the

19   same parts of the SURE system that the counties can

20   access?

21        MS. WALSH:  Objection to form.

22   A.   I don't know what you mean by "same parts

23   of the SURE system".

24   Q.   Okay.

25        I'll rephrase.

1      Are there any records that are maintained
2 by the SURE system that the counties can access that
3 the Department of State cannot access?

4      A.   Well, the SURE system is, as I said, the
5 official registry.

6      The Department does have access necessary
7 to maintain and support the SURE system.  The
8 records, though, are maintained by the counties in
9 the SURE system.

10     Q.   Right.

11     So my question is is there any part of the
12 SURE system that the -- or records in the SURE
13 system that the counties can access that the
14 Department of State cannot?

15     A.   The data that's contained in the SURE
16 system, the Department can access that, that data.

17     Q.   Can the Department of State change any
18 records in the SURE system?

19     A.   Only with explicit requests from the
20 county voter registrar.

21     Q.   Okay.

22     My question is not why they would access
23 it to change it.

24     Does the Department of State have the
25 ability to change a record, just like a county would

```
 1  have the ability to change a record?
 2          MS. WALSH:  Objection; asked and answered.
 3      A.   I -- it, it is theoretically possible for
 4  the Department to change a record, but we do not do
 5  that.
 6      Q.   Are there any parts of the SURE system
 7  records that the Department of State can access that
 8  an individual county would not be able to access?
 9      A.   Well, each county has access to its own
10  records.  So even across counties, not every county
11  user can access all counties' records, but the
12  Department has access to the SURE infrastructure,
13  the servers and other things that on which the SURE
14  system resides that a county wouldn't have access
15  to.
16          (Deposition Exhibit No. 6 marked for
17      identification.)
18      Q.   Okay.
19          I'm going to now refer to Exhibit No. 6.
20  This is a 46 page exhibit.  It might be tough to
21  print.  We're going to share it on the screen.  This
22  was originally Bates stamped as D1 to D46.
23          Let me know when you see it on your
24  screen, Mr. Marks.
25          Can you see it on your screen, Mr. Marks?
```

1          MS. WALSH:  We can see a part of the first

2     page.

3          A.   Yeah.  I see the cover, The Administration

4     of Voter Registration in Pennsylvania 2018 Report to

5     the General Assembly.

6          Q.   Have you ever seen this report before,

7     Mr. Marks?

8          A.   I have, yes.

9          Q.   And was this a report that was prepared by

10    the Department of State?

11         A.   Yes.

12         Q.   Okay.

13              I'm going to direct your attention to page

14    17 of that report, which is Bates-stamped 20.

15              MS. WALSH:  Ms. Kerns, I'm sorry.  We were

16    in the process of printing out a copy.  If you could

17    just bear with us a moment.

18              MS. KERNS:  Okay.

19              MS. WALSH:  The witness has before him

20    what's been marked as Exhibit 6.

21         Q.   Okay.

22              Great.

23              So if you go to Bates-stamped 20, which is

24    the -- I think it's the 17th page.

25         A.   Seventeen of the report?

1           Yes, I have that.

2      Q.   Okay.

3           So I'm going to direct your attention to

4    the part that it says "SURE Applications" and "SURE

5    Portals".

6      A.   Okay.

7      Q.   Is it fair to say that the only

8    application listed is called the "SURE Voter

9    Registration" or "SURE VR"?

10          MS. WALSH:  Objection to form.

11     A.   That's correct.

12     Q.   And I'm going to ask you to review just

13   that one section about the SURE VR where it says,

14   "The SURE VR application is used by counties to

15   process and maintain voter registration records and

16   to perform a number of election-related tasks,

17   including the management of vote history, absentee

18   ballots, whole books, election related reports, and

19   voter registration correspondence to voters".

20     A.   That's correct.

21     Q.   Can the Department of State access that

22   application, the SURE VR application?

23     A.   Well, the SURE VR is, is essentially

24   shorthand for the database.  So as we discussed, the

25   Department does have access to SURE for the purposes

1  of supporting and maintaining the system.

2      Q.   Can the SURE VR run reports?  Like, let's

3  look at the first election related task, "management

4  of voter history".  Would the Department of State be

5  able to use this application to run a report on vote

6  history?

7      A.   Yes.  The Department of State does

8  actually provide that information through the Full

9  Voter Export.

10      Q.   Are there any reports that a county can

11  run on the SURE RV that the Department of State

12  cannot run?

13      A.   The counties can run a variety of reports

14  through the SURE system.

15      Q.   Yeah.  But --

16      A.   The Department, the Department, again,

17  theoretically, could do that, but that's a function

18  that the county is undertaking.

19      Q.   When you say "theoretically", I'm just

20  going to ask you to not speak in theory but in

21  actuality.

22          Can the Department of State run the same

23  reports that a county can run?

24          MS. WALSH:  Objection to form.

25      A.   We could, yes.

1        MS. KERNS:  Okay.

2        I'm going to now refer to Exhibit 7.

3   We're going to put that up on the screen.

4            (Deposition Exhibit No. 7 marked for

5      identification.)

6   BY MS. KERNS:

7        Q.   Let me know when you can see it.

8             Can you see that, Mr. Marks?

9        A.   Yes.  And it has the header 25 Pa. C.S.

10  Section 1222.

11       Q.   Right.

12            So --

13       A.   Yes.

14       Q.   -- I'm marking this as Exhibit 7.  It's

15  Section 1222 of Title 25 of the Pennsylvania

16  Consolidated Statutes.

17            And I want to direct your attention to

18  subsection C where it says "Requirements".

19            Do you see that?

20       A.   I do, yes.

21       Q.   And the last sentence of that subsection

22  C, before the No. 1 says, "The SURE system shall, at

23  a minimum, do all of the following:"

24            Can you see that?

25       A.   I can, yes.

1    Q.   And then in No. 5, it indicates, "Permit

2    each commission and the department to have instant

3    access to a commission's registration records

4    maintained on the system."

5    A.   Correct.  Yes.

6    Q.   Where it says "commission and the

7    department", does "department" refer to the

8    Department of State?

9    A.   It does, yes.

10    Q.   But you would agree that the Department of

11    State has access to each commissioner's registration

12    records maintained in the SURE system?

13    A.   Yes.  For the purpose of supporting the

14    counties, yes.

15    Q.   Can you describe for me what the term

16    "voter list maintenance" means?

17    A.   Voter list maintenance is a, is a term of

18    art used to describe the statutorily-mandated list

19    maintenance activities or voter removal programs, I

20    believe is what the statute calls it.

21    Q.   Is the SURE system used to conduct voter

22    list maintenance?

23    A.   The SURE system is, is used in that it, it

24    gives the counties the functionality necessary to

25    generate the notices that must be sent out to

1  voters.

2      Q.   What was just put in front of you?

3      A.   It's a paper copy of the --

4      Q.   The exhibit?

5      A.   -- I'm looking at, yes.

6           MR. BRIER:  Ms. Kerns, this is Dan Brier.

7           Just so the record is clear, we will not

8  put anything in front of the witness throughout the

9  day unless it is an exhibit that you have identified

10  and required.  So what we have in place is a process

11  where someone is printing them as you are releasing

12  them, and we will, therefore, have only those

13  exhibits available to Mr. Marks and nothing else,

14  but I just don't want there to be a concern that

15  we're doing something else.

16           MS. KERNS:  Yeah.  I can't see who I'm

17  speaking to, but it wasn't necessarily a concern.  I

18  just wanted to ask a question because of something I

19  saw on the screen.

20           MR. BRIER:  And, again, I just want to

21  make sure that we have an understanding as to the

22  fact that we're not putting anything in front of him

23  that you're not publishing and marking.

24           MS. KERNS:  Okay.

25           Thank you.

1      Q.   So, Mr. Marks, can you tell me what

2   particular part or function of the SURE VR system is

3   used to perform voter list maintenance?

4           MS. WALSH:  Objection to form.

5      A.   Well, I don't, I don't know what you mean

6   by "particular part".

7           There are correspondences that can be

8   generated for a voter or a group of voters necessary

9   to conduct the statutorily required list maintenance

10  activities.  So these are system-generated

11  correspondences that counties would use and then

12  mail to the appropriate voters.

13     Q.   When you say "correspondence" are you

14  referring to --

15          You know what, I'll just ask you to define

16  it.  What do you mean by -- can you describe what

17  you mean by "correspondence".

18     A.   These are letters that the statute

19  actually requires the counties to send to voters.

20     Q.   And just to be clear, when you say

21  "letters", are they sent by the United States Post

22  Office?  E-mail?  Fax?

23     A.   I believe -- we don't send the letters,

24  so, but I believe the letters are sent via the

25  United States Postal Service.

Exhibit A

1      Q.    Who sends the letters?

2      A.    The county voting registrars.

3      Q.    Okay.

4            So when you say "we", you meant the

5   Department of State?

6      A.    Yeah.  I, I said we don't send the

7   letters.  The counties send the letters.

8            It's in -- in the same section, you'll

9   see, too that the system has to preserve the power

10  of the commissions to make determinations as to the

11  qualifications of applicants.  That is crystal clear

12  that that's not the Department of State's role.

13     Q.    Is the SURE system used to add new voter

14  registrations?

15     A.    In that it is the official voter registry,

16  yes.

17     Q.    And the SURE system, is it also used to

18  cancel voter registrations?

19     A.    It is, yes.

20     Q.    And who has the ability to cancel a voter

21  registration?  Is it the Department of State and the

22  county commissions?

23     A.    Just the county commissions.

24     Q.    If the Department -- if someone from the

25  Department of State wanted to cancel a voter

1  registration, would they be able to, through their

2  access to the SURE system?

3  　　　　MS. WALSH:  Objection to form.

4  　　A.  If somebody wanted to cancel a record,

5  yes, and they would have access to do that.  Well,

6  not everyone.

7  　　　　I want to be clear -- there -- we very

8  tightly control who has access to the SURE system,

9  even at the state.

10  　　Q.  And is that via -- when you say you

11  "tightly control", do you mean that it depends on

12  your log in, like one person's log in might be able

13  to do certain SURE system functions where another

14  person's log in can do other SURE system functions?

15  　　　　MS. WALSH:  Objection to form.

16  　　A.  I -- yeah.  I don't know what you mean by

17  "functions", but, again, our, our purpose is to

18  maintain the system.  That requires some level of

19  access in order to support the system.

20  　　　　What we do not have, our state users that

21  are able to go into a county's records and make

22  changes, unless that is explicitly requested by the

23  county.

24  　　Q.  Does the county ever explicitly request

25  the Department of State to change a voter record?

1        MS. WALSH:  Objection to form.

2        A.    There are occasions when a county may make

3    an error and they're requesting support from the

4    Department to correct the error.

5        Q.    Can you give me an example of an error?

6        A.    I wasn't really prepared to, you know,

7    testify about the inner workings of the SURE system

8    today, but there are occasions where -- you know,

9    the system is designed in such a way to allow -- to

10   enable counties to do all of those

11   statutorily-mandated duties.  On occasion, a user

12   will make an error that will have an adverse impact,

13   perhaps, upon on an individual voter record, and it

14   is something they may need support from the

15   Department of State to correct.

16       Q.    So does the SURE system contain the

17   complete voter registration file and voter record

18   for the voter?  Or are those files kept in places

19   other than the SURE system?

20       MS. WALSH:  Objection to form.

21       A.    The SURE system is the official registry.

22   So it is, it is the voter rolls for every county in

23   the Commonwealth.

24            So the date that it is entered into the

25   SURE system is indicative of the official voter

Exhibit A

1  registration rolls of the Commonwealth.

2      Q.   If, if, if a county commission wanted to

3  see a copy of, say, the completed registration

4  application of the voter, could you find a copy of

5  that in the SURE system, if the voter filled out a

6  paper application?

7      A.   No.

8          MS. WALSH:  I'm going to note an objection

9  to the form.  We're getting far afield of the topics

10  that brought us here today.  The witness is prepared

11  to testify about the topics that we've agreed to

12  over our objection.  I think your questions are very

13  far afield.  I encourage you to remain consistent

14  with the notice and the topics you've identified in

15  our objections.

16          MS. KERNS:  Well, I'm pretty confident I

17  am sticking with that.

18          MS. WALSH:  Well, can you enlighten me,

19  then, as to which paragraph of the notice this area

20  of questioning lead to?

21          MS. KERNS:  Do you want me to go back and

22  do that now?  Or do you want me to just keep

23  questioning, because we have a lot to get through?

24          MS. WALSH:  Well, I encourage you to

25  remain consistent with the notice that brought us

1  here today, and in our objections, we identified the

2  topics the witness would testify about.

3         I've given you leeway, but, again, I

4  encourage you to the --

5         MS. KERNS:  Okay.  Well, we'll just have

6  to agree to disagree.

7     Q.   The copies of correspondence that you

8  talked about, Mr. Marks, that were sent out by the

9  counties, are they stored in the SURE system?

10     A.   No.

11        MS. WALSH:  Objection to form.

12     A.   I want to -- if it's helpful, I want to be

13  clear.  The statewide registry is the official voter

14  rolls of the Commonwealth.  Any documentation that a

15  county receives that they use to enter information

16  into the SURE system is maintained by the counties.

17     Q.   Is voting history stored in the SURE

18  system?

19     A.   Well, voting history is data, so, yes.

20     Q.   And when a voter's record is updated, is

21  there a log as to when those changes are made in the

22  SURE system?

23        MS. WALSH:  Objection to form.

24     A.   Yes.  Each, each, each voter record has a,

25  a log that shows changes that are made to the

1  voter's record over time.

2      Q.  And does the SURE system keep track of the

3  date that a change was made?

4      A.  It does, yes.

5      Q.  Now, with regard to canceling a voter

6  registration, can you give me some reasons why a

7  voter's registration would be canceled?

8          MS. WALSH:  Objection to form, also to the

9  extent you're calling for a legal conclusion.

10      A.  A voter's registration record can be

11  canceled upon request from the voter.  It can be

12  canceled after a certain period of time, if a voter

13  receives a voter list maintenance notification and

14  does not reply to it or does not otherwise update

15  their voter record, they can ultimately be canceled

16  after a period of two federal General Elections.

17      Q.  Those, those reasons that you just

18  mentioned, would that be recorded in the SURE system

19  if and when a voter registration was canceled, the

20  reason for the cancelation?

21      A.  It would, yes.

22      Q.  And would a registration be canceled if an

23  election official determined that the voter was not

24  a United States citizen?

25      A.  If a, if a county determined that a

1  voter's record needed to be canceled, and the county

2  took that action to cancel the voter record, that

3  would be captured in the SURE system, yes.

4      Q.  Okay.

5          But my question was if an election

6  official determined that a voter was not a United

7  States citizen, would the registration be canceled?

8          MS. WALSH:  Objection; asked and answered.

9      A.  And my expectation is if the county made

10  that determination, they, they would cancel the

11  record, yes.  I mean that would be a question you

12  would have to ask an individual county, but --

13      Q.  Well, are you aware of any voter

14  registrations that have been canceled because

15  election officials determined that the voter was not

16  a United States citizen?

17      A.  I'm aware of voter registration records

18  that have been canceled, and the county has used the

19  status "non-citizen" as the reason for cancelation.

20      Q.  When you say "reason for cancelation", you

21  mean the reason that's coded into the SURE system?

22      A.  Yes.  That's entered into the SURE system

23  by the county election official.

24      Q.  So would there be any reason to enter that

25  status "not a citizen", other than if the election

Exhibit A

1  official determined that the voter was not a

2  citizen?

3          MS. WALSH:  Objection to form.

4      A.   I would expect that if the county selected

5  that reason, they have done some -- made some effort

6  to confirm that.

7      Q.   Well, you say you expect.

8          In your role at the Department of State,

9  maintaining and supporting, do you ever do any

10 follow up on this issue, if you learn that records

11 are canceled based on the descriptor "canceled not a

12 citizen"?

13         MS. WALSH:  Objection to form.

14     A.   I'm not sure what you mean by "follow up".

15 I mean a county has made the determination as the

16 record, as -- I mean, yeah.  That's very clear in

17 the statute, that the SURE system preserves the

18 power of the commissions to make determinations as

19 of the qualifications of applicants.  So if a county

20 takes an action to cancel a voter registration

21 record, it is expected that the county had cause to

22 do so.

23     Q.   Does the Department of State ever monitor

24 that to make sure that the cause was correct?

25     A.   We don't have access to original records.

1  We -- again, we are maintaining the SURE system.

2  It's the voter registrars that are responsible for

3  maintaining the official records in the SURE system.

4      Q.   What responsibility does the Department of

5  State have to make sure that those counties are

6  performing their duties correctly?

7          MS. WALSH:  Objection to form.

8      A.   Well, the Department of State it -- its

9  duty is to support the counties' efforts through

10  the, through the SURE system.  So the Department

11  provides not only access to the SURE system but also

12  job aids, guidance as necessary to remind counties

13  of their, of their statutory duties.

14              (Deposition Exhibit No. 8 marked for

15      identification.)

16      Q.   I'm going to show you Exhibit 8.  We're

17  going to put that on your screen.

18          Let me know when you can see that,

19  Mr. Marks.

20          Can you see that, Mr. Marks?

21      A.   I can see it.  I can, yes.

22      Q.   Okay.

23          This is -- for the record, Exhibit 8 is

24  Docket Entry 1-6.  It was Exhibit E to Plaintiff's

25  complaint.  It was also produced in discovery,

1   Bates-stamped PILF 168 through 174.  And these are

2   records that my client, the Public Interest Legal

3   Foundation, received from Allegheny County.

4            And I'm going to show you -- I'm going to

5   move the screen to page 6, which is Bates-stamped

6   No. 173.

7            Can you see that, Mr. Marks?

8       A.   Working on it.  Is that it.

9            MS. WALSH:  Yeah.

10      A.   I can, yes.

11      Q.   Okay.

12            In looking at that, can you, can you tell

13  me what that is?

14      A.   It appears to be a screen shot or a

15  photocopy of a screen shot of the, of the voters --

16  voter record.

17      Q.   Is this from the SURE system?

18      A.   Yes.

19      Q.   So specifically, is this from the SURE VR?

20      A.   Yes.

21      Q.   And would the Department of State be able

22  to access this record?

23            MS. WALSH:  Objection to form.

24      A.   It's possible for us to, to access voter

25  records, yes.

 1      Q.   And the county could also access -- the

 2   county official could also access this record

 3   through the SURE system; correct?

 4      A.   Correct.

 5      Q.   Is there, is there any type of official

 6   name for this, this screen on the SURE system?

 7           MS. WALSH:  Let the record show that the

 8   witness was just handed a copy of what has been

 9   marked as Exhibit 8.

10      Q.   I'll let you go to that number, that page.

11           It's -- let me know when you have it in

12   front of you.

13           At the bottom, it's 173, but it was

14   like --

15      A.   Okay.  It looks like something --

16      Q.   Yeah.

17      A.   I have it.

18      Q.   Okay.

19           So what -- who is the voter?  What is the

20   voter's name for this voter record?

21      A.   I believe -- it appears that the voter's

22   name is Felipe Rojas-Orta.

23      Q.   When you say "it appears".  Could it be

24   any other voter's record?

25      A.   No.  I'm, I'm looking at the name on the

 1 | screen shot.

 2 |     Q.  Okay.

 3 |        Now, I'm going to ask you to go to the

 4 | next page, which is Bates stamped 174.

 5 |     A.  Okay.

 6 |        I have it.

 7 |     Q.  Now, this appears to be a handwritten note

 8 | from Mr. Felipe Rojas-Orta.  And it says, "I wish to

 9 | cancel my voter registration because I am not a

10 | citizen."

11 |        Do you see that?

12 |     A.  I do, yes.

13 |     Q.  Okay.

14 |        Now, I'm going to ask you to go back to

15 | the previous page with the voter record.  At the top

16 | or near the top, there's a "status reason" section.

17 |     A.  Yes.  Near the top on the right.

18 |     Q.  Yes.

19 |        Can you tell me what that field means

20 | "status reason"?

21 |     A.  Yes.  It says "cancel - not a citizen".

22 |     Q.  And does "status reason", would that only

23 | be where it's recorded why someone is canceled?

24 |     MS. WALSH:  Objection to form.

25 |     A.  Well, the purpose of the "status reason"

1  field is to identify the status of the, of the

2  record.

3         So in this case, the record was canceled

4  for that specific reason.

5    Q.   And so what was the reason this person's

6  record was canceled?

7    A.   Well, according to the screen shot, it was

8  canceled for the reason "cancel - not a citizen".

9    Q.   Now, who would have entered -- and I don't

10 mean by the official -- the person's name, but what,

11 what, what is the job title of the person who would

12 have entered that "status reason" into the SURE

13 system?

14        MS. WALSH:  Objection to form.

15   A.   I, I don't know what the job title of the

16 person would have been.

17   Q.   Okay.

18        Now, let me back up.

19        Would it be somebody at the county level

20 or someone from the Department of State?

21   A.   It would be someone at the county level.

22   Q.   And who would make the decision to

23 classify a "status reason" as "cancel - not a

24 citizen"?

25   A.   A county official.

1    Q.   Now, what if there was, like, more than

2  one reason to cancel a record, who would make the

3  decision how to classify that?

4    A.   The county official would.

5    Q.   Can the SURE system on a -- can you use --

6  when I say "you", can a user utilize the SURE system

7  to run a report of all registrations that were

8  canceled for a specific status reason?

9    A.   I, I don't know for sure.  Again, I was

10  not prepared to talk in great detail about how the

11  SURE system works.  There are a variety of reports.

12  I don't recall off the top of my head if, if that

13  specific report could be run by a county.

14    Q.   Can it be run by the Department of State?

15    A.   I -- I guess what I'm trying to tell you

16  is I don't know if there's a specific report like

17  that.

18    Q.   If you needed to know the answer to that

19  question, would you be able to get the answer to

20  that question?

21         MS. WALSH:  Objection to form.

22    A.   I, I could.  I would, I would have to

23  review the user documentation of the SURE system.

24    Q.   Do you know, do you know what reports can

25  be run from the SURE system?

1    A.   I don't -- I -- there's a variety.  There
2  are dozens of reports that can be run from the SURE
3  system.  I don't have them memorized.
4    Q.   Okay.
5         So just so we're clear, you know the
6  reports can be run, but as we sit here today, you're
7  not sure if you could run a report on everyone whose
8  "status reason" was, say, "cancel - not a citizen",
9  like Mr. Felipe Rojas-Orta?
10   A.   Yeah.  I, I would have to confirm that.
11   Q.   Can you make a -- can you generate a
12  report of, say, the date a voter last voted?
13   A.   Well, again, that is, that is contained in
14  the Full Voter Export that the Department publishes
15  and provides on a weekly basis; so, yes.
16   Q.   Are you talking about the Export that just
17  the public can buy?
18   A.   That's correct.
19   Q.   I think that cost is, like, $20 or
20  something?
21   A.   That's right, yes.
22   Q.   So in that Export, is the "status reason"
23  in that report?
24   A.   It is -- that report, that report has only
25  active and inactive records, valid records in it.

1  So I don't believe that the -- and, again, this is

2  published on our Web site, so it's public

3  information.

4      Q.  So you, so you do not know the answers to

5  whether or not you could run a report based on --

6  and I just want to make clear before I move on.

7          You do not know the answers to whether or

8  not you could use the SURE system or a user could

9  use the SURE system to run a report on that "status"

10 field?

11     A.  Yeah.  What I'm, what I'm telling you is I

12 don't recall all of the various reports.  The

13 counties can run reports.  I just -- I want to

14 answer your question, but I don't have the list of

15 reports memorized.  So I don't know if they can run

16 a specific report to that effect.

17         (Deposition Exhibit No. 9 marked for

18 identification.)

19     Q.  Okay.

20         I'm going now to put up Exhibit 9 on your

21 screen.  Let me know when you can see it.

22         Can you see Exhibit 9 on your screen,

23 Mr. Marks?

24     A.  We're working on it.

25     Q.  Okay.

1          MS. WALSH:  Is this a multipage document?

2          MS. KERNS:  This is not.  This is only a

3   few pages.  This is -- these are records my client

4   received from Allegheny County.  They were

5   Bates-stamped PILF 897 through 901.

6      Q.   And up on the screen, I originally had the

7   first page and then -- I'm paging through now.

8          Now I'm back to the first page.

9          Can you see it?

10     A.   I can, yes.

11     Q.   So I have in front of you Exhibit 9.  Like

12  I said, I received from -- my client received from

13  Allegheny County.

14         Have you -- do you know what that page is

15  showing?  That first page?

16     A.   It appears to be a screen shot of the

17  "Reports Menu" from the SURE system.

18     Q.   Have you ever screen used -- excuse me.

19         Have you ever seen this screen before?

20  Not this particular screen shot.  I just mean this

21  screen "Reports Menu"?

22     A.   I have, yes.

23     Q.   Have you yourself, meaning, you,

24  Mr. Marks, ever used this report screen?

25     A.   I don't recall that I ever have, no.

1          MS. WALSH:  Let the record reflect the

2    witness has before him what's been marked as

3    Exhibit 9.

4          MS. KERNS:  Okay.  Great.

5          Thank you.

6    Q.   Now, is this "Reports Menu" a part of a

7    SURE system?

8    A.   Yes.  The "Reports Menu" is a function of

9    the SURE system, yes.

10   Q.   And is this part of the SURE VR?

11   A.   Yes.

12        If it helps, we can establish the SURE

13   system, SURE VR are one in the same.

14   Q.   So we can interchangeably say "SURE VR"

15   and "SURE system", and it's the exact same thing?

16   A.   Correct.  Yes.

17   Q.   So I'm going to give you a chance to look

18   at that.

19        Can you tell me, by looking at that screen

20   shot, what report was being run?

21        MS. WALSH:  Objection to form.

22   A.   I can tell that, that the user selected

23   the report item "voter status reason" and provided

24   the criteria "cancel - not a C" -- I can't see

25   obviously the rest of it, but -- so the user was

1  running a report on "Voter Status Reason" and

2  provided the specific criteria for that report.

3      Q.   With regard to that reason, "cancel - not

4  a C", I realize that it's cut off.

5          Do you know of any of other reasons that

6  would start with "cancel - not a C" other than

7  "cancel - not a citizen"?

8      A.   I don't, I don't know that there are any

9  others, no.

10     Q.   And there's a -- it says "Date Status

11 Change" and then it says "Starting With".  Can you

12 explain to me what that would do to the report by

13 entering that "Date Status Change" in there?

14     A.   Yes.  It would, it would provide a --

15 "Starting With" would be the -- you'd be looking for

16 records from that date forward.

17     Q.   And then at the -- near the bottom of the

18 screen, it says "Report Name:  Voter Listing with

19 Status".

20         Do you know what that means?

21     A.   Yeah.

22     Q.   Do you know what "Voter Listing with

23 Status" next to the "Report Name"?

24     A.   Well, I believe that's the name of the

25 report.

1     Q.   Okay.

2          So I'm going to go to the next page of

3     this exhibit.

4          Do you have that in front of you?  It's

5     Bates-stamped at the bottom.

6     A.   898.

7     Q.   Yeah.

8     A.   Yes, I have that.

9     Q.   Do you know what that is?

10    A.   It appears to be the first page of a

11    "Voter Listing with Status" report.

12    Q.   Okay.

13         Under the words "Voter Listing with

14    Status", it says, "Date Status Change from (D) From

15    01/01/2006 To 12/31/99999 AND Federal Voter (Y) is 0

16    AND Voter Status Reason (T) is XNC."

17         Do you know what those words mean up at

18    the top of that page?

19    A.   The "Date Status Change" relates back to

20    the page we just looked at where it's identifying

21    the criteria used when running the report.  So "Date

22    From" would be 1/1/2006.

23    Q.   Have you ever seen this particular report?

24    A.   This specific report, no.

25    Q.   Have you ever seen a report run by the

1  SURE system using criteria -- not necessarily this

2  criteria -- but other criteria?

3      A.  Yes.  I've, I've seen reports run using

4  the SURE system.

5      Q.  Okay.

6          So would it be fair to say that this is

7  the report that would be run using the criteria that

8  we saw in the previous page, the first page?

9          MS. WALSH:  Objection to form.

10     A.  It does appear to be, yes.

11     Q.  And at the top right-hand corner, it says

12 "XNC" as "Voter Status Reason".

13     A.  Yes.

14     Q.  Do you see that?

15     A.  I do, yes.

16     Q.  What does "XNC" mean?

17     A.  "X" is "canceled"; "NC" is "not a

18 citizen", and you'll, you'll see that under each

19 name on the list.

20     Q.  Okay.

21         So you would agree that these were -- this

22 is a list of voters whose registrations were

23 canceled because they were not citizens?

24         MS. WALSH:  Objection to form.

25     A.  I would agree that, yes, this is a list of

1  voters whose registration records were canceled for

2  the reason "not a citizen".

3      Q.   So would you agree that prior to these

4  registrants being canceled, these voters were on the

5  voter rolls in Pennsylvania?

6          MS. WALSH:  Objection to form.  My

7  objection is simply this is a document that you

8  produced that the witness hadn't seen prior to

9  today.

10     A.   Yes.  That is -- you can reasonably make

11  that assumption from, from this report.

12     Q.   Thank you.

13         Now I'm going to put up Exhibit 10 up on

14  your screen.  This is a, this is a five page

15  exhibit.

16             (Deposition Exhibit No. 10 marked for

17         identification.)

18     Q.   Let me know when you can see that,

19  Mr. Marks.  "Voter Listing with Dates" title.

20     A.   Is that the document?

21     Q.   Yes.

22     A.   So this is records my client, the Public

23  Interest Legal Foundation, produced in discovery.

24  They're Bates-stamped 32 through 37.

25     Q.   And you would agree that this is

1  Philadelphia County?

2       A.   Yes.  It appears to be in the top left

3  corner identifying that it's a report generated by

4  Philadelphia County.

5       Q.   Okay.

6            Now, at the top right-hand corner, there's

7  the -- it says "XNC".

8            And would you agree that this still means

9  "canceled - not a citizen" on this report?

10      A.   I don't have the benefit of the, of the

11  "Report Menu" as on the last one, but it is

12  consistent with that, indicating that the user

13  selected as a criteria, as a criteria the "Status

14  Reason, cancel - not a citizen".

15      Q.   Now, on this report under "Voter Address",

16  in addition to their street address, there's another

17  indication.

18            For example, if we go to the first voter

19  on the list, last name -- it's hard to pronounce,

20  Atoulelou Essohouna.  And it says "Voter Address",

21  starting with "567", and then it says "Dates: Last

22  Voted".

23            Do you know what that entry means "Dates:

24  Last Voted", with the date of November 2, 2010?

25      A.   I believe it is -- as the name implies,

1  that it is the date that vote history was last

2  recorded for this voter record.

3      Q.   So on that list -- and now we're

4  looking -- you would agree that this is the -- a

5  list that was run for -- based on the criteria at

6  the top, "January 1, 2013 to December 31, 2013",

7  that this was the list of voters who were canceled

8  because they were not citizens.

9          Do you agree with that?

10         MS. WALSH:  Objection to form.

11     A.   I -- they were -- it appears it is a list

12 of voters whose records were canceled for the reason

13 "not a citizen".

14     Q.   And you would agree that some of the names

15 on this list indicated that prior to being canceled,

16 these voters voted in an election?

17         MS. WALSH:  Objection to form.

18     A.   It would indicate, as we just discussed,

19 if it shows a date last voted, it would indicate

20 that the voter's record was -- had "vote history"

21 recorded on it.

22     Q.   Would there be any reason that a vote

23 history would be recorded, other than that voter

24 voted?

25     A.   It would be necessary to confirm with the

1  county, but if, if it was entered correctly, no.

2      Q.   So you would agree that Philadelphia

3  County has records of non-citizens who voted?

4          MS. WALSH:  Objection to form.

5      A.   I would agree, from looking at this

6  report, that there were voter records canceled for

7  the reason "not a citizen" that have vote history on

8  them indicating they may have voted.

9      Q.   Based on this report, would you agree that

10 the SURE system gives an option to generate a report

11 of voters who were canceled for "reason" of not

12 being a citizen with the inclusion of when they last

13 voted --

14         MS. WALSH:  Objection.

15     Q.   -- if they voted?

16         MS. WALSH:  I apologize.

17         Objection to form.

18     A.   Yes.  I, I, I don't know whether it's

19 contained all in one report.  You showed two

20 different reports here, but certainly, it

21 demonstrated that there are reports available that

22 the county could use to generate a list of canceled

23 voters who were canceled for the reason "not a

24 citizen" and could also provide this information

25 here that shows dates on that voter's record.

1    Q.   So for the one that's in front of you on

2  the screen -- and it's the first page of the

3  exhibit, this report was -- because of the "Date

4  Status Change" at the top, was this report people

5  whose status changed between January 1, 2013 and

6  December 31 of 2013?

7         MS. WALSH:  Objection to form.

8    A.   I'd have to review the whole report to

9  confirm that, but that is the criteria that was

10  selected for running the report.

11    Q.   Okay.

12         So if we go to the next page of the

13  exhibit -- sorry, the third page that's

14  Bates-stamped PILF 34.

15         MS. WALSH:  Ms. Kerns, the witness has a

16  paper copy of Exhibit 10.

17    Q.   Okay.

18         So it would be the third page of the paper

19  copy.

20         Is it fair to say that those -- that page

21  is voters whose statuses were changed between

22  January 1, 2014 and December 31, 2014?

23         MS. WALSH:  Do you mind giving us a Bates

24  number or the page that you're looking at?

25         MS. KERNS:  PILF 34.

1          MS. WALSH:  Thank you.

2      A.   Yes.

3      Q.   And then the next -- if you go to PILF

4  Bates-stamped F36, would you agree that that page is

5  voters whose status changed in the system from

6  January 1, 2015 though January -- excuse me,

7  December 31st, 2015?

8      A.   I can't, I can't confirm that, looking

9  at -- I notice that the last changed date on some of

10  these records pre-date 2015.  For example, the first

11  one.

12     Q.   Do you know why Philadelphia would have

13  ran this report?

14     A.   I don't, no.

15     Q.   Does the SURE system record what method

16  the voter registered?  Like, for example, if they

17  filled out a paper and mailed it in?  Or showed up

18  at the office to register?  Or registered through

19  the DMV?

20     A.   It does enable the counties to capture the

21  "source" code of the application.

22     Q.   And do the counties routinely do that?

23     A.   Yes.

24          MS. KERNS:  All right.  Now, I'm going to

25  put Exhibit 11 up on the screen.

1          THE WITNESS:  Can we take a break?

2          MS. WALSH:  Sure.

3          Ms. Kerns, would this be a convenient time

4    to take a five minute break?

5          MS. KERNS:  Sure.  Yeah.

6          We did not put that on the screen, so

7    sure, yeah.  And then just come back and let me

8    know.

9          MS. WALSH:  Okay.  Thank you.

10         THE WITNESS:  Thank you.

11         (Whereupon, there was a recess in

12   proceedings.)

13             (Deposition Exhibit No. 11 marked for

14      identification.)

15    Q.  All right.

16         So we're going to move on now to the next

17   exhibit, Exhibit 11.

18         This is an 11 page exhibit.

19         Mr. Marks, let me know when you can see it

20   on the screen.

21    A.  Okay.

22         I can see it.  This is a letter dated

23   April 12th, 2016 to Shawna Powell.

24    Q.  Yes.

25         So I'm marking this as Exhibit 11.  It is

1   Bates-stamped PILF 11 through 21.  It's a letter to

2   Mrs. Shawna Powell of the Public Interest Legal

3   Foundation.  And the letter is signed by Pedro

4   Cortés, Secretary of State.

5         When was Pedro Cortés the Secretary of

6   State of Pennsylvania?

7      A.   Well, he was twice the Secretary of State.

8   First back -- and I don't recall the exact dates

9   during the Rendell administration and then at the

10   beginning of the Wolf administration.  So I believe

11   2015 through his departure in either 2017 or early

12   2018.

13      Q.   So the first page is, you would agree, is

14   a cover letter from Pedro Cortés to Ms. Powell of

15   the Public Interest Legal Foundation?

16      A.   Yes.

17      Q.   And the first report, which is the second

18   page of that exhibit, we'll move to that.

19         I'm sorry.  I apologize.

20         There's two cover letters, one cover

21   letter dated April 12th, 2016 and then a second

22   cover letter.  And then right after the cover

23   letters, there's a report titled "Voter Registration

24   Total Since 2014".

25         Does that document look familiar to you?

1  Have you ever seen anything like that?

2      A.   I'm sorry.  We're scrolling through here

3  still.

4           MS. WALSH:  Are you referring to a

5  particular page or the entire compilation?

6           MS. KERNS:  I'll start with PILF 00015.

7      A.   Okay.

8           MS. WALSH:  Just so we're clear, since

9  we're looking at it on the screen, is that a chart

10  with a header "Voter Registration Totals Since

11  2014"?

12      Q.   Yes.  At the top it says "Voter

13  Registration Totals Since 2014".  It's Bates-stamped

14  PILF 0015.

15           Can you see that, Mr. Marks?

16      A.   I can, yes.

17      Q.   Does that document look familiar to you?

18      A.   It does, yes.

19      Q.   So can you tell me what it is?

20      A.   It's a summary of active voter

21  registrations as of those -- you'll see that each

22  column of the list has a date associated with it.

23  So it would be the, the number of the active

24  registrations in each of those six counties as of

25  that date.

1      Q.   And do you know where or how this report

2  was generated?

3      A.   It would have been the first two

4  columns -- well, actually, all four columns are

5  publicly available information.

6           So the first two appear to be the

7  certified active registrations prior to each of

8  those November elections.

9           And then the second two columns would be,

10  we report on a weekly basis, the total number of

11  registered voters and other voter registration

12  information that's published on our Web site.  It's

13  a spreadsheet.  And it appears that those totals

14  were pulled from that weekly spreadsheet as of a

15  specific date during 2016.

16      Q.   Does this data come from the SURE system?

17      A.   It -- yes, it does.  The data that's

18  published on our Web site is pulled from the SURE

19  system.

20      Q.   Are there any other sources for this type

21  of data other than the SURE system?

22      A.   No.  As I said, the first two columns are

23  active and inactive registrations.  And they, they

24  appear to be the certified totals for the

25  November 2015 election.  So those would have been

1    the totals certified in the SURE system by those six

2    county election offices.

3        Q.   Now, I'm going to move to the next page,

4    which is Bates-stamped PILF 16.

5            Can you see that?

6            It starts "Canceled Records By Types Since

7    2014".

8        A.   Yes, I can see that.

9        Q.   So this particular page, Bates-stamped 16,

10   has -- are those different reasons for cancelation,

11   those headings where it says "Cancel - Five-year

12   Voter Removal Program, Cancel Canvass, Cancel Not

13   Qualified"?

14       A.   Yes.

15       Q.   All right.

16           So I'm going to move down to Bates-stamped

17   PILF 18.

18           Can you see that in front of you?  It

19   says, "Canceled Records By Types Since 2014".  And

20   the first heading after -- the first column after

21   "County Name" is a "Department of Health Death

22   Notification".

23       A.   Yes, I can see that.

24       Q.   And then the second to last column says

25   "cancel - not a citizen".

1          Have you ever seen a report like this

2    prior to today?

3         A.   I'm sorry.  I'm just going across the

4    different columns.

5          It was an analysis.

6          All right.

7         Q.   So the question was have you ever seen a

8    report like this prior to today?

9         A.   I have not, no.

10         Q.   Now, this report, on the first column, it

11    lists six different counties.  So would it be fair

12    to say that this report was generated by the

13    Department of State?  Or did one of these counties

14    generate this report?

15          MS. WALSH:  Objection to form.

16         A.   I don't, I don't know.  The -- most, if

17    not all of this data is in the annual report

18    published for the General Assembly.

19         Q.   And is the source of this data the SURE

20    system?

21         A.   Yes.

22         Q.   To your knowledge, can the Department of

23    State run a similar report today using the SURE

24    system, maybe using a different date?

25         A.   We could provide the statistics for each

1  of these categories, yes.

2      Q.   When you say "statistics", do you mean the

3  number of registrations "cancel" --

4      A.   Correct.

5      Q.   -- "not a citizen"?

6      A.   Correct.

7      Q.   Now, we already saw a report from

8  Allegheny County where it indicated "Date: Last

9  Voted".

10          Could a report also be run, similar to

11  Exhibit 11, showing whether or not the registrants

12  who were canceled for not being a citizen had voted

13  prior to being canceled?

14          MS. WALSH:  Objection to form.

15      A.   Yes.  And the county could run -- as

16  Allegheny County did and Philadelphia did, could run

17  a similar report that a list of voter records that

18  you were canceled for the reason "not a citizen".

19      Q.   And could that report also include whether

20  or not those voters had voted?

21          MS. WALSH:  Objection to the form.  The

22  record will show that the witness has a paper copy

23  of Exhibit 11.

24          MS. KERNS:  Thank you.

25      A.   Yes.  The county could run a report that

1  would show that, of those canceled records, which

2  one had vote history recorded on that record.

3      Q.   Could the Department of State also run

4  this report from the SURE system?

5          MS. WALSH:  Objection to form.

6      A.   It is possible for a user at the

7  Department of State to run the reports that you

8  showed me earlier from Allegheny and Philadelphia

9  County.

10     Q.   Do you know if the Department of State

11 ever runs those types of reports?

12     A.   I -- other than during testing, no.

13     Q.   And we looked at the -- and you have it in

14 front of you, this exhibit, Exhibit 11.  This report

15 was produced with the cover letter from Pedro

16 Cortés.

17          Would you agree with that?

18     A.   Sorry.  I'm looking at the letter.

19 It's -- I don't know that I'd characterize what's

20 attached to this as a report, at least comparable to

21 what we looked at earlier.

22     Q.   Okay.

23          Well --

24     A.   This is a summary of data, would be how I

25 would characterize it.

1     Q.    Then would you agree that that was
2   produced, that summary of data, Bates-stamped PILF
3   15 through 21, with those cover letters by Pedro
4   Cortés of the Department of State?
5     A.    Yes.  I'm just looking at the list on the
6   first page to confirm.
7          Yes.
8     Q.    Would you agree that at that point in
9   time, the Department of State had records showing
10  that non-citizens were registered voters on the
11  Pennsylvania voter rolls at some point?
12         MS. WALSH:  Objection to form.
13    A.    I would agree that the Department of State
14  provided data, as described on this first cover
15  letter, regarding certified voter registration
16  totals as well as statistical information regarding
17  canceled voters in each of those six counties.
18    Q.    What do you mean by "statistical
19  information"?
20    A.    Well, I mean what's attached are
21  statistics.  They're numbers.  They're data.
22    Q.    Well, if we go to PILF -- Bates-stamped
23  PILF 18, wouldn't you agree that those numbers under
24  the heading "cancel - not a citizen" represent
25  actual voters -- voter registrants?

1    A.    They represent voter records that the
2  number of voter records that were canceled for the
3  reason "not a citizen" in each of those six
4  counties.
5    Q.    Is there any other reason that a voter
6  record would be coded as "canceled -- not a
7  citizen", other than the voter not being -- the
8  voter registrant not being a citizen?
9         MS. WALSH:  Objection to form.
10   A.    If it was done properly, as not an error,
11 that's correct.
12   Q.    Do you have any reason to believe that any
13 of the people -- any of the voter registrants who
14 were canceled due to the heading "not a citizen"
15 were canceled in error?
16   A.    I wouldn't have firsthand knowledge of
17 that.  That would be something the county would have
18 to review.
19   Q.    Well, do you have any secondhand knowledge
20 of that?
21   A.    What I'm saying is I wouldn't be in a
22 position to know whether it was done in error or
23 not.  The county would.
24   Q.    Do you have any reason to believe that any
25 of these were done in error?

1       A.   I don't, no.

2       Q.   And if you had reason to believe that

3   voter registrants were canceled under the category

4   "not a citizen" in error, would that be something

5   that the Department of State would investigate?

6       A.   Well, again, that's something the

7   county -- only the county could investigate.

8       Q.   Is that -- is the Department of State

9   concerned that voter registrants are being canceled

10  under the category "not a citizen" when, in fact,

11  they are citizens?

12      A.   One in -- we are certainly concerned with

13  the accuracy of, of voter records, but what I'm

14  telling you -- you're asking me to look at data and

15  make determination about individual records.  I

16  can't do that.  Nor could you.

17           That's -- those records are the counties'

18  records, is what I'm trying to tell you.

19           The, the expectation is this data is

20  accurate.  I'm not in a position to validate that.

21  The county is, though.

22      Q.   Are you aware of any instances where a

23  voter registrant was canceled under the category of

24  "not a citizen", and it was later determined that

25  that was an error?

1      A.    I'm not aware of any specific instance,

2  no.

3      Q.    In the past few minutes, we've looked at a

4  report from Philadelphia County and Allegheny

5  County, and they were Exhibits 8, 9 and 10.

6            So can the SURE system be used to run or

7  generate a non-citizen cancelation report for all of

8  the counties in the Commonwealth?

9      A.    Each, each county has the ability to run,

10  so it would be 67 individual reports.

11      Q.    So one report cannot be run that covers

12  the entire Commonwealth?

13            Is that your answer?

14      A.    I'm not aware that, that a single user can

15  run these reports at a statewide level.

16      Q.    But you would agree that 67 separate

17  reports could be run with --

18      A.    Yeah.  Each county could run a report and

19  report out on its own records, yes.

20      Q.    And whether or not the Department of State

21  has actually run that type of report, you would

22  agree that the Department of State would have the

23  ability to also run those reports?

24      A.    It is possible for a user at the

25  Department of State to, to run these reports.

1    Q.   I just want to be clear on this, what the
2  counties can do.
3         If I were to try to register to vote in
4  Philadelphia County, say, today, would the person at
5  the Philadelphia registrar's office, when they input
6  my name, would they be able to tell if I was
7  registered anywhere else in the state?  Or is that
8  data not available to them?
9    A.   That data is.  There's a duplicate search,
10  but counties cannot go in and alter each other's
11  records, and counties cannot go in and run reports
12  on other county's records.
13    Q.   Oh, okay.
14         I understand now.
15         So they might be able to find information,
16  but they can't necessarily -- Philadelphia can't
17  necessarily run a report on what Montgomery County
18  is doing?
19    A.   Correct.
20    Q.   Or vice versa.
21         I understand.
22         I want to go back to Exhibit 6 now.  I
23  think, I think you printed that out.
24    A.   Yes.
25    Q.   That was the document titled "The

1   Administration of Voter Registration," and I'm going

2   to --

3        A.    Yes.

4        Q.    -- ask you to go to Bates-stamped 40,

5   D00040.  At the bottom of that -- at the top of it,

6   it says "Commonwealth of Pennsylvania, Voter

7   Registration, List Maintenance Activities,"

8   "Cancelation of Voter Registration 2018",

9   Bates-stamped D40.

10            Can you see that?

11       A.    I can, yes.

12       Q.    Now, that is a chart.

13            Do you know how that chart was generated?

14       A.    Yes.  That -- this is data that was

15   certified by the 67 county Boards of Elections to

16   the Department of State.

17       Q.    When you say "certified", how does the

18   county get the data?

19       A.    So at the end of each calendar year, the

20   Department essentially extracts the statistics from

21   the system and then provides that to the counties,

22   and requesting that the counties verify the accuracy

23   of the information of the data, and then certify to

24   us that the -- you know, whether it's accurate or if

25   it's not, make corrections to it, and then certify

1   to us the totals that are used to provide the data

2   that's contained in this annual report.

3       Q.   So when you say "the Department of State

4   provides "-- I think you said the Department of

5   State provides the numbers to the counties and then

6   the counties verify it?

7       A.   Right.

8       Q.   Did I hear you correctly?

9       A.   Yes.  We do an extract of the statistics

10  that are contained in this report, including those

11  on this page.  We provide that information to the

12  counties.  And then they certify to us -- if it's

13  accurate, they will simply certify the number.  If

14  corrections are necessary, based on their validation

15  of the data, then they will certify a different

16  number, potentially.

17      Q.   And where does the Department of State get

18  the, get the data from?  You used the word "system".

19      A.   It's -- it, it comes out of the -- I, I

20  always use the term "back end" of the SURE system.

21  So it's, it's -- we're actually doing a data extract

22  from the servers, the reporting servers.

23      Q.   Okay.

24           So just if we go to the first county,

25  Adams County, the Department of State would have run

1    a report asking for voter registration canceled for

2    those reasons, in the top row:  "Voter request,

3    voter death, other move confirm", et cetera?

4         A.   It's not running a report.  It's, it's --

5    we're getting really into a technical discussion of,

6    of how this works, but it is a query of the database

7    to generate statistics, that are, then, provided to

8    the counties, that they need to verify, by looking

9    at their official records, to determine whether

10   those numbers are accurate.

11        Q.   When you use the word "statistics" you --

12   those numbers represent actual voter records.  Would

13   you agree with me?

14             Like, in Adams County, the "33" is -- that

15   represents actual voter records?

16             Would you agree with that?

17        A.   Well, it -- I wouldn't agree in all cases.

18   Sometimes it's capturing transactions in the system.

19        Q.   I guess I want to clarify, because you

20   keep using the word "statistics".

21             We're not talking percentages or

22   probabilities here.  These are --

23        A.   Well, this is data.  These are numbers,

24   but this is, this is -- and I don't want this to be

25   confused with the records contained in the SURE

1   system.

2          This is a query of the database to come up

3   with a number for each of these categories, for each

4   county, that captures transactions that the county

5   would have completed throughout the calendar year.

6   And it's necessary for the county, then, to certify

7   that we have correctly captured the, the number of

8   transactions for each of these categories.

9          And that's how the annual report to the

10  General Assembly is, is built, but it's certified by

11  the county election offices.

12       Q.   So what data does the county look at to

13  certify these numbers?

14       MS. WALSH:   Objection to form.

15       A.   The county would run reports on these

16  various -- you know, this is a pretty broad look at

17  the annual activity from the SURE system.   So the

18  county would run a number of reports in SURE to

19  validate the information in, in the data extract.

20       Q.   Can you explain to me why the number

21  produced by the Department of State's query -- we

22  can just use that first column, "Voter Request" --

23  would be different than what the, what the county

24  would find in its own -- in its own look at the

25  numbers?

Exhibit A

1          MS. WALSH:  Objection to form.

2      A.   Well, it's, as I said, at the end of each

3  calendar year.  So it's a snapshot in time.  We, we

4  do this query as specific -- it's December 31st.  We

5  do this query at a specific time.

6           If the county, for example, has records

7  that it has not yet processed from, so typically

8  it's, it's a matter of time.  There are occasions

9  where, you know, very rarely, a county may run a

10  report and realize that they've made an error and

11  incorrectly categorized something, but it's

12  typically because of the timeline.

13      Q.   Now, is there any specific reason that

14  this report is done using these categories, "voter

15  request", "voter death", "other move", and not other

16  categories?

17      A.   Yeah.  This -- as the header indicates,

18  these are the, the voter list maintenance activities

19  that are either required by statute or, or provided

20  for by statute.

21      Q.   Is this particular report ever run using

22  the "cancel - not a citizen" category?

23          MS. WALSH:  Objection to form.

24      A.   I, I don't know, seeing that does not fit

25  into voter list maintenance activities, no.

1      Q.    If a non-citizen would have responded to a

2    mailing, when is it possible that some of these

3    numbers include registrants who were removed for

4    being non-citizens because they fell under some of

5    these other categories?

6            MS. WALSH:  Objection to form.

7      A.    Yes.  It's possible.

8      Q.    All right.

9            I'm going to ask you to go back to

10   Exhibit 8, which is the Allegheny County documents.

11   The first page of it was -- at the top, it said

12   "Allegheny County Rich Fitzgerald County Executive",

13   Exhibit 8.

14     A.    Yes, I have that.

15     Q.    And if we go back to the one Bates-stamped

16   173, and it looks like on that screen shot -- we've

17   already established that this is a screen shot of

18   the SURE system; correct?

19     A.    Is that 173 or --

20     Q.    Yeah.  At the bottom, it's Bates-stamped

21   173.  It was kind of printed over, so it's not that

22   clear.

23            At the top, there's an indication from

24   Pacer that it's -- of the document?

25     A.    I'm sorry.  I was -- yeah.  I was having a

1  hard time with it.  Okay.

2      Q.   Okay.

3      A.   I think we're --

4      Q.   It says, at the top -- somebody wrote in

5  hand, "PennDOT voted 3 times."

6          Do you see that?

7      A.   Yes.

8      Q.   Okay.

9          So we previously talked about this

10 exhibit, and we agreed -- or you agreed that this

11 was a screen shot from a SURE system; correct?

12     A.   That's correct, yes.

13     Q.   Now, there appears to be tabs at the top

14 that say "General", "Districts", "Votes",

15 "Correspondence".

16         Do you see those?

17     A.   I, I do, yes.

18     Q.   Can anyone, who's using the SURE system,

19 click on those tabs?

20     A.   I, I don't know if someone with "read only

21 access" would be able to click on all of those tabs,

22 but a typical county user, that is updating voter

23 records, would be able to, yes.

24     Q.   So under the tab that says "Votes", what

25 information would be under that tab or in that tab,

1  if we were able to click on it?

2        MS. WALSH:  Objection to form.

3      A.  "Votes" I believe would be vote history

4  for that, that record.

5      Q.  And does "vote history" mean whether or

6  not the voter voted?

7      A.  Yes, it would, it would, it would indicate

8  that for this voter record, that the county recorded

9  a vote in, in an election.

10      Q.  Okay.

11        So in that same exhibit, I'm going to ask

12  you to go to the previous page, Bates-stamped 172.

13  At the top -- near the top, it says "Voting History

14  for Voter".

15      A.  Yes.

16      Q.  Is that what we would see if we, if we

17  clicked on that "Vote" tab?

18      A.  I, I don't know that you would see this

19  report.  I mean, this is a report -- the other --

20  the tab is -- it, it -- I guess I'm -- the best way

21  I can answer it is it would be the same data, but it

22  wouldn't necessarily be in the form of this report.

23        Does that make sense?

24      Q.  Yes.

25      A.  Like, this is a formated report; whereas,

1    the tab would be just, you know, a log, essentially.

2        Q.    So that the information on the "Vote" tab

3    would have this information but it might not look

4    like this?

5        A.    Right.

6        Q.    For this practitioner voter, what is

7    "Method AP" mean?

8        A.    "At polls".

9        Q.    So would it be fair to conclude, from this

10   record, that this voter who was canceled for not --

11   the reason "not a citizen", voted at the polls in

12   three elections?

13            MS. WALSH:  Objection to form.

14       A.    Yes.  It certainly indicates that this

15   voter record had vote history recorded at each of

16   those elections, and the method of voting was

17   recorded as "at the polls".

18       Q.    So is it fair to conclude that this voter

19   voted at the polls three times?

20            MS. WALSH:  Objection to form.

21       A.    I -- it -- it's fair to conclude, based on

22   the record maintained by the county that, that

23   this -- the individual voted in each of these

24   elections at the polls.

25       Q.    And if we can go back in that same

1   exhibit, to Bates-stamped 173, the tab that says

2   "Correspondence", which is right next to "Votes" on

3   the SURE screen.

4           Do you see that?

5       A.   I do.

6       Q.   So if -- do you know what the user would

7   see if they clicked on "Correspondence"?

8       A.   I don't recall exactly what they would

9   see.  It would be information about what

10   correspondence was sent to the voter, if any.

11      Q.   Do you know if it captures an image or a

12   scan of the actual correspondence?

13          MS. WALSH:  Objection to form.

14      A.   No, I believe it's data.

15      Q.   What do you mean by "data"?

16      A.   Well, it would show a date.  It would show

17   what type of correspondence was sent to the voter.

18      Q.   And would it also show correspondence

19   received from the voter?

20          MS. WALSH:  Objection to form.

21      A.   It would capture any response to the

22   correspondence, yes.

23      Q.   So if, if we -- looking at the same

24   exhibit, if we go to the one Bates-stamped 168,

25   which is actually the first page of the exhibit, at

1  the top, it says -- there's, like, the letterhead

2  "County of Allegheny Rich Fitzgerald County

3  Executive date," and then in handwriting "1-17-17",

4  would you agree that appears to be a letter to that

5  voter, Mr. Rojas-Orta?

6      A.   Yes.

7      Q.   So would that -- is your testimony that

8  that letter -- that the -- the fact that that letter

9  was sent would be captured in the SURE system under

10  "Correspondence", but you're not sure if the actual

11  letter would be in the SURE system?

12          MS. WALSH:  Objection to form.

13      A.   Well, this, this letter does not look like

14  correspondence that's generated by the SURE system.

15  But if the county sent this letter, they could

16  capture the date in the SURE system of when the

17  letter was sent.

18      Q.   Do you know, if this letter is not

19  recorded in the SURE system as an image or a scan,

20  where it would be kept?

21      A.   I would think --

22          MS. WALSH:  Objection to form.

23      A.   -- that it would be kept in the county's

24  official records.

25      Q.   Does the Department of State have a

1  protocol for the counties as to how these types of

2  records should be kept?

3      A.   Well, the statute provides for -- I mean,

4  the counties have to keep applications and other

5  documents for the statutorily-required period of

6  time in their, their paper records.

7      Q.   Going back to the Bates-stamped 173, which

8  is the picture -- or the screen shot of the SURE

9  screen, do you know what the user would see if they

10  clicked on that "Changes" tab, which is a few tabs

11  over from the "Votes" tab?

12      A.   It would contain any information about any

13  changes that were made to the voter record over

14  time.

15      Q.   What do you mean by "information"?

16      A.   Again, it would be sort of a log of

17  changes indicating dates, type of change, et cetera.

18      Q.   And then how about under "Documents", what

19  would be under "Documents"?

20          MS. WALSH:  Objection to form.

21      A.   Documents would be any, any additional

22  information that the county uploaded to the SURE

23  system.

24      Q.   What kind of documents would the county

25  upload to the SURE system?

 1          MS. WALSH:  Objection to form.

 2     A.    That would be up to the, up to the county

 3  whatever they believed relevant.

 4     Q.    Can you give me an example of the document

 5  that would be uploaded?

 6          MS. WALSH:  Objection to form.

 7     A.    I can't.

 8     Q.    Okay.

 9          I'm going to point you to the tab that

10  says "Application".  What would the user see under

11  that tab?

12     A.    That would include information about the

13  applications that were submitted by the registrant.

14     Q.    What kind of applications?

15     A.    Any, any application, so an initial

16  application, a change application.  So it would, it

17  would have dates and information about when the

18  voter submitted an application.

19     Q.    When you say "application", do you mean

20  the initial application to register to vote?

21     A.    It could be that, and it could be updates

22  as well.

23     Q.    And I'm sorry.  I'm not sure if I

24  understood your answer.

25          Would an actual scan of the application be

1    in there?  Or just a notation?

2        A.   Just --

3             MS. WALSH:  Objection to form.

4        A.   -- yeah, just a notation.  So it would

5    show, it would show data or information about

6    applications submitted by this registrant.

7        Q.   Okay.

8             And immediately under that, there's a

9    field called "Application Source:", where it says

10   "DOTIA".

11            Can you tell me what that means?

12       A.   "Application Source:" would be the, the

13   source of where the application came from.

14       Q.   Do you know what "DOTIA" stands for?

15       A.   I want to be careful here.  I know there

16   are -- there's a statutory prohibition about

17   divulging the source of agency applications.

18       Q.   Okay.

19            Well, my first -- my question was just do

20   you know what it stands for.  You don't have to tell

21   me what it stands for.

22       A.   I do, yes.

23       Q.   So under that field, are there more

24   than -- there would be more -- you could have other

25   choices, other than "DOTIA".

Exhibit A

1          Would you agree with that?

2     A.   That's correct, yes.

3     Q.   All right.

4          I'm going to move on to Exhibit 12.  This

5    is three pages.  We're going to put it on the

6    screen.

7          MS. WALSH:  Ms. Kerns, what's your

8    thinking about a lunch break, while we pull this

9    document up?

10          (Deposition Exhibit No. 12 marked for

11     identification.)

12          MS. KERNS:  If you'd like, once I get

13    through this, we can take a break for lunch.  How is

14    that?  Or can you not survive that?

15     A.   I'm good.

16          MS. WALSH:  That sounds fine.

17     Q.   Okay.  Like I said at the beginning, it's

18    not a marathon.  I don't want to torture anybody,

19    other than asking questions, which I know isn't

20    always pleasant.

21          Okay.

22          Let me know when you can see Exhibit 12.

23     A.   I have it.

24     Q.   So, Exhibit 12 that's captioned -- or at

25    the top, it says "House State Government Committee

1  Public Hearing on Non-citizens Voting October 25th,

2  2017", and then it says "Written Testimony of

3  Jonathan Marks, Commissioner".

4      Is this your written testimony?

5  A.  Yes.  It appears to be.

6  Q.  Did you prepare this document?

7  A.  I, I reviewed the documents.  I believe

8  our Communications office would have prepared the

9  initial draft.

10  Q.  And did you, did you appear before a

11  committee to talk about this on October 25, 2017?

12  A.  I did, yes.

13  Q.  All right.

14      I'm going to direct you to paragraph 4

15  where it says, "The Department undertook an analysis

16  of the statewide voter registration database to

17  determine whether ineligible residents were

18  registered and voting.  We are using this analysis

19  as a starting point to examine every part of the

20  voter registration process."

21      When did the Department first undertake

22  that analysis referred to in that paragraph?

23  A.  I believe it would have been a few months

24  prior to that hearing, and maybe two months.

25  Q.  Why did the Department undertake that

1  analysis regarding ineligible residents registered

2  in voting?

3         MS. WALSH:  The witness has just been

4  handed a copy of what's been marked Exhibit 12.

5         And I'll just note an objection to the

6  form.  The document speaks for itself.

7         MS. KERNS:  Well, I'm going to disagree

8  with you on that because if the document spoke for

9  itself, I wouldn't be asking the question.

10     Q.  So my question is why did the Department

11  undertake an analysis of the statewide voter

12  registration database to determine whether

13  ineligible residents were registered in voting, and

14  like you said, approximately two months prior to

15  when this document was prepared and presented?

16         MS. WALSH:  Same objection.

17     A.  I'm just reading the testimony.

18     Q.  Sure.

19     A.  So we undertook this analysis to

20  understand the scope and the nature of this issue --

21     Q.  Well, what, what process --

22     A.  -- to inform, to inform our

23  decision-making.

24         And if you look at the, the next page of

25  the testimony, we talk about the improvements that

1    the Department had already undergone at PennDOT, and

2    plans for future enhancements.  So we were -- we

3    undertook the analysis to inform -- you know, inform

4    our decision-making regarding this issue of, of

5    registrants inadvertently registering to vote

6    without, without possessing the qualifications.

7         Q.   So my question was why this particular

8    analysis at this particular time?

9              MS. WALSH:  Objection; asked and answered.

10             MS. KERNS:  I don't think he did answer

11   why.

12        Q.   What triggered this analysis?

13             MS. WALSH:  Same objection.

14        A.   Well, I mean, the Department was aware

15   that citizens may have been put in a position or --

16   excuse me, non-citizens may have been put in a

17   position that led them to register inadvertently,

18   and we wanted to understand both the scope of that

19   issue and, and also the potential causes of it, so

20   that any additional enhancements that we made would

21   be effective.

22        Q.   So how was the Department made aware of

23   that?

24        A.   Well, we were, we were made aware of, of

25   the, the potential PennDOT issue based on

1   discussions with county election officials.

2          Going back to 2015, we did understand,

3   based on discussions with stakeholders, that the

4   Motor Voter screens in particular may need

5   improvement to avoid the possibility of somebody

6   inadvertently registering without possessing those

7   qualifications.

8       Q.   So was this analysis -- did you

9   specifically only focus on what you termed

10  inadvertent registrations by non-citizens?  Or did

11  you focus on any registrations by non-citizens?

12      A.   Well, it would include any registrations

13  by potential non-citizens.  But based on the

14  information we had available, was made available to

15  us by county election officials, it appeared that

16  these were inadvertent registrations due to

17  misunderstanding.

18      Q.   And who came to that conclusion that, that

19  it was a misunderstanding of the voter registrant?

20          MS. WALSH:  Objection to form.

21      A.   Well, I believe, you know, I --

22  ultimately, the county election officials made that

23  determination.

24      Q.   How would a county election official know

25  whether or not a voter registration was inadvertent?

Exhibit A

1          MS. WALSH:  Objection to form.

2     A.   Well, I -- they would have received

3   communication from the voter indicating that they

4   had inadvertently registered to vote or that -- so I

5   would expect that in most cases they would obtain

6   that information directly from the registrant.

7     Q.   So are you saying that voters would use

8   that term "inadvertent" and communicate that to the

9   county registration officials?

10     A.   I don't know that they would use that

11   specific term.  What I'm saying is county election

12   officials reported to us that they had concerns

13   about the potential for non-citizens to

14   inadvertently register.  That's how it was

15   characterized.  And that's what we were looking at.

16          Our analysis, however, looked at the

17   entire universe of voter records that were canceled

18   for that reason.

19     Q.   So let's start with these county election

20   officials.  Was this all 67 counties brought this to

21   your attention?  Or was it a particular county or

22   counties?

23     A.   It -- our -- primarily Philadelphia

24   County.

25     Q.   Was there a particular individual in

Exhibit A

 1 | Philadelphia County that brought this to your

 2 | attention?

 3 |     A.    The -- Commissioner Schmidt had initially

 4 | reached out to the Department in 20-- -- earlier in

 5 | 2017 to raise his concerns about this potential

 6 | issue.

 7 |     Q.    Did any other counties bring it to the

 8 | attention of the Department of State?

 9 |     A.    I don't recall having any discussions with

10 | other counties.

11 |     Q.    Going back to that same paragraph in your

12 | report, you state "The Department undertook an

13 | analysis."

14 |           Can you describe what you mean by

15 | "analysis"?

16 |     A.    Well, analysis is -- so we, we looked at

17 | the 1,160 records.

18 |           And we actually provide a summary of that

19 | analysis, beginning at the bottom of page 1

20 | regarding those records.

21 |     Q.    Okay.

22 |           Mr. Marks, I'm going to ask you to step

23 | back, though, because this says "The Department

24 | undertook an analysis."  And then you jumped to

25 | 1,160 records.  So I'm having trouble understanding

Exhibit A

1    how you got from Commissioner Schmidt told you

2    there's a problem, to we found 1,160 records.

3              Can you walk me through those steps.

4         A.   Well, we, we were doing an analysis of

5    data that was available to us in the SURE system.

6    So I don't know, I don't know that you connect the

7    two directly, but it was -- certainly Philadelphia

8    County was doing its own review or analysis,

9    whatever you want to call it, of this issue.

10             The Department then undertook looking at

11   it on a statewide basis and, and expanding it to

12   records maintained by 67 counties.  And that's how

13   we arrived at this end result that's, that's

14   reported here in my testimony.

15        Q.   Well, Mr. Marks, what data is captured in

16   the SURE system that would have alerted you that a

17   particular registrant was ineligible due to

18   citizenship status?

19             MS. WALSH:  Objection to form.

20        A.   Well, I think we've just spent the last

21   several hours reviewing the information that, that

22   would be recorded by the counties in the SURE system

23   that would indicate records that, that would fit

24   that category.  And these are the "cancel - not a

25   citizen" records.

Exhibit A

1    Q.   So in this testimony where you say "The

2  Department undertook an analysis of the statewide

3  voter registration database to determine whether

4  ineligible residents were registered in voting,"

5  that analysis was to look at the SURE system and

6  determine whether any records were canceled;

7  correct?

8         MS. WALSH:  Objection to form.

9    A.   Correct, yes.

10    Q.   So that analysis would not have included

11  any registrants who were ineligible due to

12  citizenship status but had not yet been canceled?

13         MS. WALSH:  Objection to form.

14    A.   That's correct, yes.

15    Q.   When you say "the Department undertook

16  analysis", was there any persons, outside of the

17  Department, involved in this analysis?

18    A.   No.  This -- the 1,160 records, this was

19  conducted by the Department.

20    Q.   In the paragraph above that paragraph that

21  we're talking about, there's a sentence that says

22  "data alone - particularly point-in-time data like

23  that available from the Systematic Alien

24  Verification for Entitlement (SAVE) program - is not

25  in and of itself a reliable indicator that a person

Exhibit A

1    is not a U.S. citizen."

2              Can you tell me why that is not a reliable

3    indicator?

4         A.   Because it's been proven over time to be

5    very unreliable.

6         Q.   Is there a more reliable system than the

7    Systematic Alien Verification for Entitlements

8    program?

9              MS. WALSH:  Objection to form.

10        A.   I'm not aware of a, a system that is

11   reliable in terms of validating a person's

12   citizenship status.

13        Q.   All right.

14             You indicate in your testimony that "In

15   our initial analysis of statewide records, we found

16   1,160 records that indicate a registrant apparently

17   self-reported and canceled their registration

18   because they were not citizens."

19             So the universe of your analysis was only

20   those registrants who had self-reported their

21   citizenship status?

22        A.   Correct.

23        Q.   And over what timeframe was, was this

24   analysis done, meaning what years did it cover?  Or

25   did it cover the entire -- everyone in the database

Exhibit A

1  in the SURE system at that time?

2     A.   It included everyone in the database at

3  that time.  The high level, 1,160.

4          And if you read my testimony, the 2000

5  through 2017, we were looking at vote history,

6  meaning that piece of it.

7          Just keep in mind, as we discussed

8  earlier, counties did not start transitioning to

9  SURE until 2003, and that continued through 2005.

10        So prior to that, there's -- you know,

11  there's not a hundred percent reliability of that

12  data because it would have been contained, if

13  anywhere, in a Legacy system maintained by the

14  county.

15     Q.   In this testimony where you call it -- you

16  refer to these as "1,160 records", does that mean

17  1,160 registrants?

18     A.   It's 1,160 voter records which would be

19  registrants, yes.

20     Q.   And for this particular analysis, if the

21  registrant had not self-reported, they would not be

22  captured in this particular analysis; correct?

23        MS. WALSH:  Objection to form.

24     A.   Well, I, I don't know that in every case

25  they were self-reported.  This is apparently

1   self-reported.  That was the information available

2   to us, but it's, it's -- what it indicates is what

3   it says; it's 1,160 records that were canceled for

4   the reason "not a citizen".

5       Q.   Other than self-reporting, would there --

6   to your knowledge, would there be any other way the

7   registrant would have been canceled, other than

8   self-reporting?

9       A.   If, if the county were made aware that

10  somebody may be in that category and verified that,

11  they could, they could cancel a record for that

12  status reason.

13      Q.   How would that happen?

14      A.   I -- it would be --

15           MS. WALSH:  Objection to form.

16      A.   They would have to be made aware that --

17  you know, it's like any other Motor registration

18  record, if they obtained information indicating that

19  they needed to validate or otherwise verify the

20  qualifications of the registrant, they would then

21  pursue that and make a determination.

22      Q.   With regard to these 1,160 records, was --

23  do you know if a -- if there was a report run on the

24  statewide SURE system to determine to find these,

25  based on that category?  Or how the Department came

Exhibit A

1   up with these 1,160 records?

2        A.   It was a query of the database.

3        Q.   When you were -- is this, is this similar

4   to the query you were talking about before, the

5   "back end" query?

6             MS. WALSH:   Objection do form.

7        A.   Yes.

8        Q.   And that would have been accurate as to

9   that date and time as to whatever was entered into

10  the SURE system; correct?

11       A.   That's correct.

12       Q.   Okay.

13            It indicates that there was only -- "the

14  1,160 records were only identified from 46

15  counties."  Is that because the query was only

16  limited to those counties?  Or were all 67 --

17       A.   No.

18       Q.   -- counties queried?

19            I'm sorry.

20       A.   No.  All 67 counties were queried.

21       Q.   And your report indicates that 248 of

22  those voter registrants had voted at least one time.

23            Do you know if that was part of the query,

24  the number of times voted?

25       A.   Yes, it was.  It would have queried "vote

1   history" for each of those records.

2      Q.   So this testimony was October 25th, 2017.

3   So as of, as of the time that you did this analysis,

4   which you testify was approximately two months prior

5   to the testimony, you -- the Department had

6   information that at least 248 individuals who were

7   not citizens had voted in Pennsylvania; is that

8   correct?

9           MS. WALSH:  Object to the form.

10     A.   I don't recall exactly what, what the

11  timeline was for the completion of the analysis, but

12  at some point we did have this data indicating the

13  records -- that 1,160 records were canceled for the

14  reason "not a citizen", and that of those, 248 of

15  those records had recorded on their vote history at

16  least one vote.

17     Q.   Other than the query in the SURE system,

18  did your analysis include any other research?

19     A.   No.  It was, it was conducted with data in

20  the SURE system.

21     Q.   Okay.

22          If we go to the next page, page 2 of 3 of

23  your testimony.  It's Bates-stamped 1181 at the

24  top -- near the top.  You refer to "a deeper

25  analysis".

1          Can you describe for me what "a deeper

2    analysis" is?

3      A.   Well, that was looking not -- that was

4    looking beyond the high-level vote history, the

5    statistics, and actually looking at individual years

6    and how many potential ballots may have been cast by

7    that group of registrants.

8      Q.   So was this a different query in the back

9    end of the SURE system?

10          MS. WALSH:  Objection to form.

11     A.   It, it would have been a drill down into

12   the high-level numbers.

13          So if you go to the previous page, or even

14   at the top of that page, you'll see where we

15   identify the 248 records and then provide the

16   records that show at least one vote, and then we

17   drill down further to actually expand that to show

18   the total number or votes, which is 544.

19          Does that, does that make sense?  I may

20   have done a bad job of explaining that, but it's,

21   it's building out the details of those 248 records.

22     Q.   You're saying the 248, the "248" refers to

23   the actual voters.  Some of those voters voted more

24   than once, which means that it would have been a

25   total of 544 ballots?

1      A.   It refers to the 248 voter records.

2           And on page 1, we summarize the data on

3  page 2.  In the first full paragraph, we provide

4  details about those 248 and how many, how many

5  ballots may have been cast and over what time

6  period.

7      Q.   And when you talk "deeper analysis", you

8  were still limiting yourself to the 1,160 records;

9  correct?

10     A.   We were limiting ourselves to the data

11  that was available in SURE, yes.

12     Q.   All right.

13          If you -- looking at this same exhibit,

14  page 2 of 3 at the bottom, the second paragraph from

15  the bottom --

16     A.   Yes.

17     Q.   -- your testimony states that "The

18  Department is in the process of establishing a voter

19  registration guidance working group that includes

20  key stakeholders."

21          Was that working group established?

22     A.   It, it was, yes.

23     Q.   When?

24     A.   Oh, I don't, I don't recall the exact

25  timeline.

1      Q.   Who was on the working group?

2      A.   I don't have, I don't have the list in

3   front of me, but it was Department staff working

4   with county officials, as well as other interested

5   stakeholders.

6      Q.   So --

7      A.   There is a --

8           I'm sorry.  Go ahead.

9      Q.   No.  Go ahead.  Finish what you were going

10  to say.

11     A.   I believe there is information on our Web

12  site, but I, I don't have it in front of me.

13     Q.   When you say "other interested

14  stakeholders", would they be individuals who are not

15  employees of the Department of State or any one of

16  the 67 counties?

17     A.   That's correct, yes.

18     Q.   Who decided who was on the working group?

19     A.   Well, that's -- it's ultimately, you know,

20  our stakeholders are anyone who, you know, reaches

21  out to the Department of State.  They're, they're

22  typically, you know, voting rights' advocates.  So

23  it includes the League of Women Voters, Committee of

24  70 in Philadelphia.  It would be the County

25  Commissioners Association of Pennsylvania.  It

1  would -- it includes -- and, again, I don't have the

2  list in front of me, but that's -- that hopefully

3  gives you the general gist of it.

4      Q.  Would anyone be turned away from the

5  working group?

6      A.  That would ultimately be up to the members

7  of the working group.

8      Q.  That sounds a little bit circular.  So who

9  decides --

10     A.  Well, it's an informal group of

11  stakeholders.  So it's -- you know, it's not a

12  formally established, you know, body.

13     Q.  Do you know if anyone was turned away to

14  be on this working group?

15         MS. WALSH:  Objection.

16     A.  I'm not aware of anyone, no.

17     Q.  And is this working group still in place?

18     A.  No.  This, this specific working group,

19  no.

20     Q.  Do you know why this working group is no

21  longer in place?

22     A.  It, it actually completed its, its

23  mission.

24     Q.  What was its mission?

25     A.  Well, I mean I think it's, you know,

1  evaluating the voter registration process.

2       Q.   Did the working group issue a report?

3       A.   Again, it's not a formal working group.

4  This was an informal working group.  There is a work

5  product on the Department's Web site, a Motor Voter

6  Registration Guide for Voter Registration drives,

7  but it also informed our -- and really validated our

8  assumptions about what we needed to be looking at,

9  as it relates to this issue, and what additional

10 work we may need to do.

11      Q.   As it relates to what particular issue?

12 Can you describe what particular issue you're

13 talking about?

14      A.   Inadvertent registration of, of potential

15 non-citizens.

16      Q.   Okay.

17           So where, in this testimony, do you show

18 that these registrations were inadvertent?

19           MS. WALSH:  Objection to form.

20      A.   Again, that is based on the information

21 that was available to us at the time.

22      Q.   Is that information in some type of a

23 report or something that I could review that shows

24 that the registration was inadvertent?

25      A.   That was --

1          MS. WALSH:  Objection to form.

2      A.   -- that was, that was the way it was

3   characterized by county officials and other groups

4   that were concerned about this problem.

5      Q.   And do you know how they came to that

6   conclusion that it was inadvertent?  Were these

7   1,160 voters interviewed?

8          MS. WALSH:  Objection to form.

9      A.   You'd have to ask them.

10          MS. KERNS:  All right.

11          So I was going to move on to another

12   exhibit.  So I think this would be a good time to

13   break.

14          THE WITNESS:  Thank you.

15          MS. KERNS:  Can we say -- I don't want to

16   break for too long.

17          And how much time do you need, Ms. Walsh?

18          MS. WALSH:  2:30.

19          MS. KERNS:  Could we say 2:15?  Or is that

20   too soon?

21          MS. WALSH:  We'll try for 2:15.  That's

22   fine.

23          MS. KERNS:  Okay.

24          I'll see you back here at 2:15.

25              (Luncheon recess, 1:45 o'clock p.m.

1          until 2:15 o'clock p.m.)

2                    AFTERNOON SESSION

3                    (Deposition Exhibit No. 13 marked for

4      identification.)

5    BY MS. KERNS:

6          Q.   All right.

7               I'm going to put up Exhibit 13 on the

8    screen, and this is an e-mail dated Friday,

9    April 27th, 2018, and it's Bates-stamped D182.

10              Let me know when you can see it.

11         A.   I can see it.

12         Q.   Okay.

13              So this is Exhibit 13.  It's an e-mail

14   from Kathryn Boockvar.

15              And I'm going to ask you if you've ever

16   even this e-mail prior to today?

17         A.   It does look familiar, yes.

18         Q.   All right.

19              It's addressed to "Election Stakeholder".

20              Are these recipients the same working

21   group that we mentioned and talked about when we

22   talked about the previous exhibit, Exhibit 12,

23   before the lunch break?

24         A.   The working group would have been a subset

25   of, of this group, but these are the election

1    stakeholders, yes.

2         Q.   So is there anyone who's a stakeholder

3    who's not on this list?

4         A.   There doesn't appear to be.

5         Q.   Who determined who was a stakeholder?

6         A.   Well, again, that is -- I mean that's

7    ultimately determined by the, the stakeholder group

8    itself, but the stakeholder work group is something

9    that has been in place for a number of years.  It

10   started with, like, county election officials, and a

11   few -- the statewide organizations like the League

12   of Women Voters.  And it's an informal, informal

13   group of stakeholders.

14             MS. WALSH:  Ms. Kerns, we handed Mr. Marks

15   a copy of Exhibit 13.

16             MS. KERNS:  Okay.

17             Thank you.

18        Q.   And was this publicly advertised, so that

19   if other individuals or group felt that they could

20   be stakeholders, they could join this group?

21        A.   Again, it's an informal group.  So it's

22   not, it's not provided for or required by statute or

23   anything else.  It is -- it made sense to us, to the

24   Department, to include county election officials,

25   county commissioners, through CCAP and other groups

1  that expressed interest in voting rights' advocacy,

2  to have -- you know, to come together and, and, you

3  know, discuss issues that, that were important to

4  them.

5      Q.  So who decided who to include in this

6  group?

7      A.  I think initially, I, I believe it may

8  have been Secretary Cortés.

9      Q.  And then were different groups or

10 individuals added as time progressed?

11     A.  Yes.  My recollection is as time

12 progressed, groups were added.  And this -- you

13 know, it's become sort of a self-functioning thing

14 where, you know, the group members, the stakeholder

15 members themselves will determine, you know, what

16 additional group that, you know, may be involved.

17     Q.  Does the group keep records of their

18 meetings?

19     A.  No.  Again, this is all very informal.

20 These are discussions primarily.

21     Q.  Are there records of the discussions?

22     A.  Records of the discussions?  There are --

23 I'm, I'm not aware that there are minutes or

24 anything from, from the meeting.

25     Q.  So there was a physical meeting?

                                    Exhibit A

1    A.   In the past, there have been.  As I said,

2  this has been many in place for many, many years.

3  So there have been physical meetings.  There have

4  been -- obviously, with COVID-19, there have been --

5  they've all been virtual meetings.

6    Q.   When was the last meeting?

7    A.   The last meeting would have been just a

8  couple of weeks ago.

9    Q.   And was that announced anywhere?

10    A.   No.  Again, it's an informal group of

11  stakeholders.

12    Q.   So this meeting was not announced?

13    A.   Correct.

14    Q.   Is the Department of State keeping a

15  record of the communications to and from this group?

16    MS. WALSH:  Objection to form.

17    A.   Yeah.  I'm not sure what you mean by

18  "communications", but, certainly, any records that

19  the Department is required to maintain, whether it's

20  about this or any other subject, are maintained

21  appropriately.

22    Q.   Well, it appears that Kathryn Boockvar,

23  from the Department of State, communicated with this

24  group by electronic mail.

25    So is the Department keeping records of

1  the communications to this group and from this

2  group?

3         MS. WALSH:  Objection to form.

4      A.   Well, again, we have to maintain records

5  like e-mails.  I mean, the fact that you have this

6  record indicates that our staff is maintaining their

7  records as required.

8      Q.   And are the records, regarding this

9  communication, specifically with this group being

10  maintained separately so that if someone were to

11  request all of the correspondence to and from this

12  group, you would be able to produce it?

13         MS. WALSH:  Objection to form.

14     A.   Again, we -- like all other e-mail, we are

15  maintaining it as required.  So, yes; an e-mail to

16  this group, e-mail to anyone who contacts the

17  Department of State would, would be made available

18  as appropriate.

19     Q.   But anyone who contacts the Department of

20  State would have to know these meetings were taking

21  place to even ask for it; correct?

22         MS. WALSH:  Objection to form.

23         To ask for what?

24     Q.   The communication from the Department of

25  State to this group?

1          MS. WALSH:  Same objection.

2      A.   I suppose they would have to be informed

3   what they were, what they were asking for.

4      Q.   Now, this e-mail starts off by saying

5   "Dear Election Stakeholder:  As reported previously,

6   there was a programming error in the PennDOT Motor

7   Voter electronic system that may have led to some

8   individuals inadvertently registering to vote."

9          Are there documents that exist as to this

10   specific programming error?

11          MS. WALSH:  Objection to form.

12      A.   Documents that exist regarding the

13   programming error?

14      Q.   Yes.

15      A.   I, I don't know.  It's a pretty broad

16   category, but any documents that exist regarding the

17   PennDOT Motor Voter issue would have been turned

18   over during discovery.

19      Q.   And back to the working group.  You said

20   there was a meeting a few weeks ago.

21          Did you attend that meeting, virtually or

22   otherwise?

23      A.   I did, yes.

24      Q.   How long did the meeting last?

25      A.   I believe it was a little bit under an

1    hour.

2          Q.    Did you take notes?

3          A.    I did not, no.

4          Q.    When was the meeting prior to that?

5          A.    I don't, I don't recall.  It had been

6    several months.

7          Q.    In looking at this list, was there any,

8    was there any attempt to make sure that there was

9    some diversity in this, in this meeting -- for these

10   meeting participants?

11              And what I mean by "diversity" is it

12   appears a lot of these organizations are either

13   leftist organizations or funded by leftist-type

14   groups.

15              So was there any attempt to include people

16   from other political leanings?

17              MS. WALSH:  Objection to form.

18         A.    I, I don't know what's meant by "leftist"

19   or left leaning or, you know, this -- a lot of these

20   are natural -- you know, County Commissioners

21   Association, the NAACP, League of Women Voters.  I

22   mean, these are pretty widely known organizations

23   in -- you know, in the case of the League of Women

24   Voters either non-partisan or bipartisan.  So I

25   don't -- aside from your characterization, again,

1  this is an informal group of stakeholders.  Just,

2  just like any other group of, of individuals who

3  would reach out to the Department of State regarding

4  the specific issue.

5      Q.   So were there other informal groups set up

6  with the Department of State, like this specific

7  working group regarding voter registration issues?

8          MS. WALSH:  Objection to form.

9      A.   No.  Not, not related to, to voter

10  registration or elections.

11     Q.   When is the next meeting of this working

12  group?

13     A.   I, I don't know if we have a meeting

14  scheduled yet at this point.

15     Q.   Will there be another meeting?

16     A.   I expect that there will be.

17     Q.   If my client, Public Interest Legal

18  Foundation, considered themselves a stakeholder,

19  would they be able to start participating in these

20  meetings?

21          MS. WALSH:  Objection.  You've moved very

22  far afield from the topics that brought us here

23  today.

24     A.   Yeah.  Again, it would be up to the other

25  stakeholder members.

1    Q.   Would there be a vote?

2         MS. WALSH:  Objection.

3    A.   Again, this is --

4         MS. WALSH:  You need to talk about the

5    specific topics in the notice and subject to our

6    objections.  You're now very far afield from that.

7    You're asking hypothetical questions about things

8    that might or might not happen in the future, about

9    issues that have nothing to do or matters that have

10   nothing to do which was put forth.

11        I encourage you to sticking more closely

12   to the notice that you served and the objections

13   noted.

14   Q.   So the question was would there be a vote?

15        MS. WALSH:  Objection; calls for

16   speculation.

17   A.   Yeah.  It's an informal group.  So it

18   would be, it would be a question to the, to the

19   members.

20   Q.   Okay.

21        In this Exhibit No. 13, the first

22   paragraph indicates, and that Ms. Boockvar wrote,

23   "Since then, an intense data analysis yielded a list

24   of individuals for whom voter registration

25   eligibility required further confirmation."

1           What was that "intense data analysis"?

2      A.   That was an analysis conducted in, in

3   consultation with our Office of Chief Counsel.

4      Q.   So what was done to intensely analyze the

5   data?

6      A.   Our counsel engaged with an expert to do

7   an analysis of voter registration records and motor

8   vehicle records to determine the, the universe of

9   potential individuals that required more -- had more

10  scrutiny in terms of their, their qualifications

11  specifically related to citizenship.

12     Q.   What was the methodology used in the

13  analysis?

14          MS. WALSH:  Objection to the extent you're

15  calling for information that's protected from

16  disclosure by the attorney-client privilege and the

17  work-product doctrine.

18          Now, the witness -- I would encourage the

19  witness -- or caution the witness not to disclose

20  any communications that might fall within that

21  category.

22     A.   I, I, I think we described it publicly as

23  a race blind analysis conducted by an expert using

24  various sources of data to confirm this list of

25  potential -- this list of individuals that needed

1    additional follow up.

2        Q.   What were the sources of data?

3        A.   I don't know.

4        Q.   Who was the expert?

5        A.   I don't know the name of the expert.

6        Q.   Did the expert issue a report?

7        A.   I don't know if the expert issued a

8    report.

9        Q.   How would the expert communicate the

10   result of that work, which appears to be a letter

11   sent to 7,702 individuals?

12            MS. WALSH:  Objection to form.

13       A.   Well, again, this was conducted by our

14   Office of Chief Counsel.  So I'm not, and I'm not

15   familiar with, with the way that information is

16   communicated between counsel and the expert.

17       Q.   What data did Mrs. Boockvar use in order

18   to determine -- or did the Department of State use

19   in order to determine that it would mail a letter to

20   7,702 individuals?

21            MS. WALSH:  Objection to form.

22       A.   Well, ultimately, the Department was

23   provided a list that was derived from the Motor

24   Voter records and that comparison against the voter

25   records, and that's, that's where the list came

1   from.

2       Q.   "Was provided".  You're saying "was

3   provided".  The Department was provided that list by

4   who?

5           MS. WALSH:  I'll note an objection to

6   form, and also to the extent you're asking for

7   privileged communications and privileged attorney

8   work product.

9           MS. KERNS:  I'm  not asking for

10  communication or work product.  I'm asking for who

11  provided this information.  That's not --

12          MS. WALSH:  I noted my objection.

13      A.   I mean, I've already answered this

14  question.  This was done by our Office of Chief

15  Counsel.  So it would have been ultimately through

16  our chief counsel's office.

17      Q.   So is it your testimony that no one in the

18  Department of State knows the identity of this

19  expert?  Or just you don't know the identity of this

20  expert?

21          MS. WALSH:  Objection to form.  There's an

22  objection to the request for that information, and

23  it's included in our written objection and there's

24  objections to the Discovery Request.

25      Q.   So, Mr. Marks --

1          MS. WALSH:  You're asking -- to the extent

2     you're asking for the identity of an expert, you're

3     asking for privileged information.

4          MS. KERNS:  I disagree with you.

5          MR. BRIER:  Well, then, take it to the

6     Court.

7     Q.   So, Mr. Marks, is it your testimony that

8     the Department of State doesn't know the identity or

9     does not want to reveal the identity?

10          MS. WALSH:  Same objection.  The

11     witness -- this isn't a topic that he was designated

12     to testify on.

13     A.   I --

14          MS. WALSH:  You're outside the scope of

15     your own notice and our objections.

16     Q.   So, Mr. Marks, do you not know the name of

17     the person?

18          MS. WALSH:  Objection; asked and answered.

19     He's told you he doesn't know.

20     Q.   Mr. Marks, have you ever heard of somebody

21     called Eitan Hersh, E-I-T-A-N, H-E-R-S-H?

22     A.   I have not, no.

23     Q.   With regard to this e-mail from Kathy --

24     Kathryn Boockvar, do you know why these 7,702

25     individuals were determined to be, to be required to

1  send this letter from the Department of State?

2          MS. WALSH:  Objection to form.

3      A.   It --

4          MS. WALSH:  Also, to the extent, again,

5  you're delving into privileged areas.  If you can

6  answer without disclosing privileged information.

7      A.   It, it is our understanding based on that

8  expert analysis conducted by our counsel, that this

9  was the group of individuals that required

10 additional scrutiny regarding their qualifications.

11     Q.   Are these individuals in addition to the

12 1,160 individuals that we talked about with regard

13 to the last exhibit or does this encompass those

14 individuals?

15     A.   It would be separate from those

16 individuals.  So it would be in addition to.  It

17 would be -- 1,160 were records already canceled.

18     Q.   And this letter uses the term

19 "inadvertent" several times, where Ms. Boockvar, in

20 the first sentence, she states, "As reported

21 previously, there was a programming error in the

22 PennDOT Motor Voter electronic system that may have

23 led to some individuals inadvertently registering to

24 vote."

25          How is the analysis done for these

 1   individuals that their registration was inadvertent?

 2       A.   Well, this -- so reading this sentence you

 3   just read, you know, we were talking about it, and

 4   this ties us back to my testimony before the House

 5   State Government Committee, the programming error at

 6   PennDOT, all of the information that was available

 7   to us and the way it was characterized to us by, you

 8   know, multiple groups, including county election

 9   officials that they were inadvertent.

10           This analysis, this expert analysis done

11   by our Office of Chief Counsel, under threat of

12   litigation, is separate from the 1,160.  So I want

13   to make sure we're keeping those two things

14   separate.

15       Q.   What was the threat of litigation?  Threat

16   of litigation by who?

17       A.   Well, I would -- certainly, you know, your

18   client, by this point in time.

19       Q.   So this intense data analysis was

20   completed because my client threatened to litigate?

21           MS. WALSH:  Objection to form; that's not

22   what the witness testified to.

23       A.   Yeah.  I mean, this, this is something

24   that we certainly believed that there was potential

25   for litigation.  There was actually, you know,

1  threat of litigation.  And we wanted to protect

2  personal information as well about individuals who

3  ultimately became the subject of this analysis.

4       Q.   Did the Department of State, once it

5  received this intense data analysis from this

6  expert, did the Department of State review the data

7  and then determine to send out the letters to 7,702

8  individuals?

9            MS. WALSH:  Objection.

10      Q.   Or, or did The Department of State just

11 take the data from the expert and decide, then, to

12 send the letters to all of the individuals?

13           MS. WALSH:  Objection to form, and also

14 note an objection to the extent you're asking about

15 privileged communications with counsel and other --

16      Q.   Now, you testified, Mr. Marks, that you

17 received an intense data analysis from an expert.

18           Did the Department of State then do

19 further analysis and decide who to send letters to?

20 Or did the Department of State just take that

21 analysis and send the letters just only based on

22 that analysis?

23           MS. WALSH:  Objection to form, to the

24 extent it mischaracterizes the witness's testimony

25 and also an objection to the extent you're asking

1   for privileged communication.

2          If you can answer without disclosing

3   privileged communication, you may.

4       A.   I, I can't speak to what review our

5   counsel's office did, but we were assured that this

6   list represented the most responsible, accurate list

7   of individuals who required additional follow up

8   regarding their qualifications to be registered.

9       Q.   And what put them on that list?

10          MS. WALSH:  Objection; it calls for a

11   privileged communications and privileged attorney

12   work product.

13       A.   Well, I think it's --

14          MS. WALSH:  If you can answer without

15   disclosing privileged communications, you may.

16       A.   I mean I think it's clear from this e-mail

17   that it -- they were derived from this analysis that

18   included Motor Voter -- or motor vehicle records as

19   well as voter registration records.

20       Q.   And those voter registration records are

21   from the SURE system?

22          MS. WALSH:  Objection, to the extent

23   you're asking for privileged communication and

24   privileged attorney work product.  If you can answer

25   without disclosing privileged communications, you

1  may.

2      A.   I, I understand that voter registration

3  records from the SURE system were one element of

4  data that fed the analysis.

5      Q.   What other voter registrations exist in

6  the Commonwealth of Pennsylvania, other than the

7  SURE system records?

8      A.   Well, again, that is -- the SURE system is

9  the official registry.  The 67 county Boards of

10 Election or county voter registrars are required to

11 maintain their official list of voters inside the

12 SURE system.  So the answer is I -- there are no

13 other official records.

14     Q.   And in this Exhibit No. 13, in this

15 e-mail, near the bottom, the second paragraph from

16 the end, it states the department will use

17 nationally-recognized authentication programs such

18 as the ERIC voter list maintenance database in this

19 effort.

20          What is the ERIC voter list maintenance

21 database?

22     A.   I, I don't know exactly what, what

23 secretary -- or, or Ms. Boockvar meant at the time,

24 but the ERIC program is the Electronic Registration

25 Information Center, of which Pennsylvania is a

1 member. And it's a consortium of states that share

2 voter registration and motor vehicle data to aid

3 each member state in conducting required list

4 maintenance activities.

5     Q.   How long has Pennsylvania been a member of

6 ERIC?

7     A.   Since 2015.

8     Q.   In this e-mail, Ms. Boockvar states "The

9 Department will use-nationally-recognized

10 authentication programs such as the ERIC voter list

11 maintenance database in this effort."

12          Did that use of ERIC, in reality, occur

13 after the e-mail was sent on April 27th, 2018?

14          MS. WALSH:  Objection to form.

15     A.   Well, I mean we continue to use ERIC to

16 this day to conduct -- to enable counties to conduct

17 voter list maintenance.

18          If you're talking about the analysis, back

19 up in the first paragraph, I'm not -- I don't

20 believe that ERIC was, was used in that analysis.

21     Q.   And do you have access to ERIC?

22     A.   Well, all -- the member states have access

23 to ERIC.  I'm not sure what you mean by "access".  I

24 mean, ERIC is a -- is an organization, a consortium

25 of states, and then we are a member.  So to that

Exhibit A

1  extent, yes, we have access.

2      Q.   I'm going to go to exhibit -- the next

3  exhibit, Exhibit No. 14.

4              (Deposition Exhibit No. 14 marked for

5      identification.)

6      Q.   Let me know when you can see that on your

7  screen.

8          Can you see Exhibit 14 on your screen?

9      A.   This is titled the Senate State Government

10 and Transportation Committee Public hearing on Motor

11 Voter, Unlawful Voting and Cybersecurity.

12     Q.   Yes.  This is the written testimony of

13 then Acting Secretary Robert Torres.

14     A.   Yes.  I see that.

15     Q.   And it's dated December 12th, 2017.

16         I'm going to ask you to go to page -- or I

17 can move it to page 3.  And on page 3, in the third

18 paragraph -- the second full paragraph from the top,

19 it -- Robert -- Mr. Torres testified, "Finally, the

20 Department is drafting a voter registration and list

21 maintenance modernization plan."

22         Do you see that, where that sentence is in

23 the testimony?

24     A.   I do, yes.

25     Q.   Was that plan drafted?

1    A.   I don't, I don't know specifically what he

2  was referring to by this plan, but there's certainly

3  our -- a multitude of work products of that

4  modernization plan on our, on our Web site.

5    Q.   So any plan that was drafted for voter

6  registration and list maintenance is available on

7  the Department's Web site?

8        MS. WALSH:  Objection to form.

9    A.   Again, I don't know what he was referring

10 to specifically by "plan", but certainly work

11 products regarding voter registration list

12 maintenance and even voting modernization are

13 available on the Department's Web site.

14   Q.   Are there any plans that are drafted that

15 are not available on the Department's Web site?

16       MS. WALSH:  Objection to form.  He told

17 you he doesn't know what this, what this written

18 testimony refers to.

19   A.   Yeah.  And I'm not -- not knowing exactly

20 what he was referencing there, you know, the

21 Department has, you know, a variety of, of

22 documents, but it's hard for me to know exactly what

23 he was referring to here.

24   Q.   Okay.

25       MS. WALSH:  The witness has been handed a

Exhibit A

1  | copy of Exhibit 14.

2  |      Q.   Does The Department have a voter

3  | registration and list maintenance modernization

4  | plan?

5  |      A.   Not that I'm aware of, no.

6  |      Q.   Is the Department in the process of

7  | drafting a voter registration and list maintenance

8  | modernization plan?

9  |      A.   As, as this term is used here by then

10 | Secretary Torres, no.

11 |      Q.   Well, how else would the term be used?

12 |      A.   Well, I --

13 |           MS. WALSH:  Objection.  You're asking the

14 | witness about a document that the witness -- you

15 | know, a record -- this is a document that the

16 | witness isn't familiar with.  You're very far afield

17 | from the 30(b)(6) notice that brought us here today

18 | and our objections to that notice, and also I object

19 | to the form of the question.

20 |           Which topic is this relevant to?

21 |           MS. KERNS:  I'm following up on his

22 | answer.

23 |           MS. WALSH:  I don't agree.

24 |      A.   Well, my answer is I don't know what he

25 | was referring to by that plan, so.

1        I'm sorry I can't be more helpful.

2        Q.   Does the Department have any plans to

3   address issues related to registration and voting by

4   non-citizens?

5        MS. WALSH:   Same objection.   Again, we're

6   here to talk about a request that was served back in

7   2017 that didn't really relate to this issue.   I

8   don't see how this is relevant to any of the topics

9   in your notice.

10        To the extent you're asking for something

11   that might be protected by the deliberative process

12   privilege, by the attorney-client privilege; those

13   are my objections.

14        A.   It's a broad question, so I'll give a

15   broad answer.

16        The Department is always looking to

17   improve, you know, whether it's, you know, accuracy

18   of voting lists, whether it's improving upon the

19   statutorily mandated voter list maintenance, whether

20   it's improving, you know, voting systems themselves.

21   I mean, we're always looking to improve our

22   processes and improve the way we support the

23   counties in conducting their statutorily required

24   duties.

25        So I wouldn't -- you know, I would

1  describe it more as a mission than a plan.  I mean

2  that's an ongoing mission of the Department of

3  State.

4      Q.   Has the Department engaged any experts,

5  other than experts engaged by the counsel, to assist

6  with these efforts?

7          MS. WALSH:  Objection; again, you're very

8  far afield from the (30)(b)(6) notice and our

9  objections.  I'm not sure how this is relevant to

10 any of the topics that we've agreed and offered to

11 produce a witness on.

12     A.   And I don't know what you mean by "these

13 efforts"?

14     Q.   You just testified that the Department is

15 working on -- constantly working on modernization

16 and improvement.  So I'm asking has the Department

17 itself engaged any outside experts?  Or is that done

18 internally?

19         MS. WALSH:  Objection; outside the scope

20 of the notice; far afield from the topics that

21 brought us here today, and also note an objection to

22 the form, and to the extent your question might

23 delve into areas covered by the deliberative process

24 and other privileges, including the attorney-client

25 privilege.

1      A.   I mean I -- as part of our ongoing efforts

2   to improve our processes, we would engage experts as

3   necessary on any number of topics.

4      Q.   We were talking earlier about

5   Commissioner -- Philadelphia Commissioner Al

6   Schmidt.

7           Do you know him personally?

8      A.   I do, yes.

9      Q.   And we talked a little bit earlier about

10  some of the research that he has done in

11  Philadelphia on non-citizen registration and voting.

12          Are you familiar with the research that

13  Commissioner Al Schmidt has done?

14          MS. WALSH:  Objection to form.

15     A.   I, I, I am familiar with the information

16  that he shared with the Department regarding his

17  research, yes.

18     Q.   All right.  Well, when in the exhibit that

19  we just looked at, Exhibit 13 was testimony at a

20  December 12th, 2017 hearing.

21          MS. WALSH:  Are you talking about Exhibit

22  14?

23     Q.   I'm sorry.  You know what --

24     A.   Okay.

25     Q.   -- yes.  Sorry.  Exhibit 14.  I apologize.

1        Commissioner Schmidt also testified at

2   that hearing.  I don't have a transcript, but I do

3   have a videotape of it.  And, I'm going to play that

4   and mark it as 15.

5            (Deposition Exhibit No. 15 marked for

6       identification.)

7        MS. KERNS:  There's a link to the full

8   hearing of this video in paragraph 64 of our

9   complaint.  So we're going to pull that up.

10       MS. WALSH:  Will the colloquy, whatever it

11  is you're pulling up, be transcribed and be part of

12  the record?

13       MS. KERNS:  I think the Court Reporter can

14  transcribe it, yes.  I've done that in other

15  depositions.

16   Q.   So, this first clip, just for the record,

17  runs from 59:03 seconds to 59:39 seconds.

18       Let me know when you can see that,

19  Mr. Marks.

20   A.   I can see it, yes.

21   Q.   Okay.

22   A.   Now, I can't.

23       Sorry.

24       I see it again.

25       (Video testimony of Commissioner

1          Al Schmidt.)

2          COMMISSIONER SCHMIDT:  -- This last

3     summer, in July, I reached out to

4     Secretary Cortés in the Department of

5     State, whom I have terrific respect

6     for, and began a series of meetings

7     throughout the summer, in July,

8     August, and September, to bring the

9     issue to their attention and then

10    to bring to their attention sort of

11    how we learned about how it was

12    occurring.

13         So we basically found a problem

14    where three quarters of the problem

15    was caused by non-citizens getting

16    driver's licenses and then being

17    asked if they want to register to

18    vote at PennDOT, at the very point

19    in time they provided documentations

20    showing that they're not citizens.

21          (End of video testimony.)

22    Q.   Okay.

23         Mr. Marks, had you ever reviewed that

24  testimony prior to today?

25    A.   I'm certain I did; a long time ago, not

1    recently.

2         Q.    And did the Department of State, in fact,

3    have meetings with Commissioner Schmidt that July,

4    August, and September?

5         A.    I, I recall two meetings; one in July and

6    one in September.

7         Q.    Were you at those meetings?

8         A.    I was at those two meetings, yes.

9         Q.    Were they in person?

10        A.    Yes.

11        Q.    Were there in Harrisburg or at The

12   Department of State?  Or were they in Philadelphia?

13        A.    They were in Harrisburg.

14        Q.    Do you have notes from those meetings?

15        A.    I do not, no.

16        Q.    How long were the meetings?

17        A.    I think the first meeting was longer than

18   the second.  My recollection is the first meeting

19   may have been as long as an hour and a half, maybe

20   closer to two hours; second meeting, my recollection

21   is that it maybe was an hour.

22        Q.    Did you take any notes at that meeting?

23        A.    I did not take notes at either meeting,

24   no.

25        Q.    Did anyone take notes at the meeting?

1      A.    I don't recall if anyone took notes at the

2   meeting.

3      Q.    Was there an agenda for the meeting?

4      A.    No.

5      Q.    How did you know what you were going to

6   talk about, if there was no agenda?

7      A.    The first meeting, I didn't know what we

8   were going to talk about.  I, I do recall that

9   Commissioner Schmidt had contacted Secretary Cortés

10  indicating that he wanted to talk about, you know, a

11  sensitive or serious matter with him.  That's my

12  recollection.

13     Q.    Who was at the meeting, the first meeting?

14     A.    Secretary Cortés was at the first meeting,

15  Commissioner Schmidt and Deputy Commissioner Seth

16  Bluestein from Philadelphia County.  I was at the

17  meeting.  I believe we may have had someone from our

18  Office of Chief Counsel at the meeting, and I can't

19  recall if there was another person from the

20  Department at the meeting.

21     Q.    And how about at the second meeting?

22     A.    The second meeting would have been the

23  same individuals.  I do, I do believe that

24  definitely there was someone from our Office of

25  Chief Counsel at that meeting, but in addition to

1   Commissioner -- Secretary Cortés, Commissioner

2   Schmidt, Deputy Commissioner Bluestein, myself,

3   there was also a Communications person from

4   Philadelphia in attendance at that meeting.

5       Q.   What do you mean by a "communications

6   person"?

7       A.   As I recall, she was described as, as

8   someone from their, like, press or Press and

9   Communications office, and I can't recall her name.

10      Q.   And between the first meeting and the

11  second meeting, was there any communication between

12  the Department of State and Commissioner Schmidt?

13      A.   I, I don't know if there was any

14  communication between the Secretary Cortés and, and

15  Commissioner Schmidt or any direct communication

16  between the Department and Commissioner Schmidt.

17      Q.   What was discussed at the first meeting?

18      A.   I -- so my recollection is Commissioner

19  Schmidt came to us with information indicating that

20  they had started researching an issue that I believe

21  was, was raised with their office by local advocacy

22  groups, particularly groups who were representing

23  clients who were seeking, seeking citizenship.

24          And, you know, as I recall, you know, they

25  were raising concerns because they were finding out,

1   as they were working with these clients, that at

2   some point in time those clients had registered to

3   vote through a misunderstanding.  And this was

4   obviously causing an issue for them as they were

5   attempting to, to get citizenship in the United

6   States.  And I think -- I believe that was the

7   impetus for their, their research.

8       Q.   Did Commissioner Schmidt bring anything to

9   that first meeting as far as a report or documents?

10      A.   I believe Commissioner Schmidt's Deputy

11  Commissioner brought some examples of documents,

12  perhaps, screen shots and maybe some letters from

13  individual voters or provided on behalf of

14  individual voters by, by either attorneys or some

15  other caseworker that, that would have been

16  representing their interests.

17      Q.   And did you keep copies of whatever

18  Commissioner Schmidt provided to you?

19           MS. WALSH:  Objection to form.

20      A.   I -- they were shown to us.  I don't, I

21  don't recall that we were actually given copies.

22      Q.   And you used the word "inadvertent" again.

23           Did you -- so are you saying that these

24  individuals did not intend to register to vote?

25      A.   Again, that, that is -- that's where

1  everything was pointing and that's how it was

2  characterized by Commissioner Schmidt himself.

3      Q.  So of those that were registered to vote,

4  who actually had a voting history, did those people

5  also not mean to actually vote?

6          MS. WALSH:  Objection to form.

7      A.  I -- you know, I'm not a -- you know, I'm

8  not an attorney so I don't, I don't know where the

9  line is with intent, but, again, you know -- it --

10  everything -- all of the information that was

11  available to us indicating that there was a

12  misunderstanding, and they either believed that they

13  were qualified to register and vote, or in, in the

14  majority of cases, they didn't even realize that

15  they were registering to vote, and, and took no

16  action after that date, until they realized that

17  they had inadvertently registered.

18      Q.  Did the Department of State, at that first

19  meeting, share any information with Commissioner

20  Schmidt regarding analysis the Department of State

21  was doing on the issue of non-citizens being

22  registered to vote?

23          MS. WALSH:  Objection to form.

24      A.  No.

25      Q.  Was the Department of State doing any

1  analysis at that time?

2       MS. WALSH:  Objection to form.

3    A.   No.

4    Q.   And were there any follow-up e-mails or

5  communications between that first meeting and the

6  second meeting?

7       MS. WALSH:  Objection to form.

8    A.   I don't, I don't recall if there were any,

9  any follow-up communications between the first and

10 second meeting.

11   Q.   Would you be able to search your e-mail to

12 look for that?

13      MS. WALSH:  Objection.

14   A.   I --

15      MS. WALSH:  The documents have been

16 produced.

17   Q.   So all of the follow-up communication has

18 been produced?

19      MS. WALSH:  Objection to form.  You asked

20 for communications.  There were a couple of e-mails

21 that have been produced.

22   A.   Yeah.  And I, I apologize if I'm getting

23 the timeline wrong.  You're asking if it was between

24 the first and the second meeting.  I don't recall,

25 but any e-mails that I would have had with anyone in

1  Philadelphia County about this issue were turned

2  over.

3      Q.   So was Commissioner Schmidt, during that

4  first meeting, only talking about a problem in

5  Philadelphia County?

6      A.   Yes.  That's my recollection.

7      Q.   And other than people coming in and

8  reporting this issue, that they had registered to

9  vote and didn't want to be registered, or an

10  advocacy group coming in with them and saying that

11  they wanted to be registered, had Commissioner

12  Schmidt done any other analysis that he discussed

13  with you at that meeting?

14      A.   I, I, I don't believe so, no.  I don't, I

15  don't recall him doing any other analysis.

16      Q.   At that first meeting, do you know about

17  how many voter registrants Commissioner Schmidt

18  believed were on the voter rolls, yet were not

19  citizens?

20          MS. WALSH:  Objection to form.

21      A.   I believe what he provided to us was

22  approximately 300 voters who had, who had reported

23  to the county in one way or another.

24      Q.   And at that second meeting, did he bring

25  any more to your attention?

1      A.   I, I think by that second meeting, they

2   had a -- had completed, as I recall, their, their

3   own research and their own analysis, and it didn't

4   turn out to be, you know, approximate, it was a

5   little above 300 records that they had looked at and

6   they had reviewed.

7      Q.   Did he explain to you how he conducted

8   that analysis?

9      A.   I don't recall that he explained it in

10  great detail, but my understanding is that the --

11  that the, you know, county used records in its

12  possession, you know, hard copy records in its

13  possession to go back through to determine, you

14  know, how this was reported to the counties, through

15  whom it was reported which -- you know, which, you

16  know, which county staff or which area of county

17  voter registration office had processed, that they

18  were looking into those details.

19     Q.   Now, we had previously talked -- it was in

20  connection with Exhibit 11.  We previously talked

21  about Exhibit 11, which was correspondence from

22  Pedro Cortés, and that was in 2016, and that

23  referenced an analysis that the Department of State

24  had been doing, including cooperating with the

25  Pennsylvania Department of Transportation?

1          MS. WALSH:  Are you referring to a
2     particular place in Exhibit 11 that you would like
3     the witness to refer to?
4          Q.   On the document Bates-stamped 14.
5          A.   Yes.
6          Q.   That letter referenced that The Department
7     was committed to working with the Pennsylvania
8     Department of Transportation to modify the Motor
9     Voter process?
10         A.   That's correct.
11         Q.   So by that point in time had the
12    Department of State analyzed driver's license
13    records, along with voter registration records?
14         MS. WALSH:  Objection to form.
15         A.   No.
16         Q.   Has that ever happened?
17         MS. WALSH:  Objection, to the extent
18    you're asking about a privileged investigation
19    conducted by an expert retained by counsel.
20         The witness is instructed not to answer.
21         MS. KERNS:  Well, I'm asking if the
22    Department has ever analyzed the Department of
23    Transportation records, along with the voter
24    registration records, to determine whether people
25    were non-citizens.

1          MS. WALSH:  You're asking about an

2   analysis done internally within the Department of

3   driver's license records.  I similarly note an

4   objection to the extent that driver's license

5   records are protected from disclosure by federal and

6   state law.

7          MS. KERNS:  I'm not asking for the

8   records.  I'm asking if there was an analysis done.

9          MS. WALSH:  Objection to form.

10      A.   So when you're -- this sentence in this

11   letter, "the Department believes" -- I'm sorry.  "In

12   close collaboration with PennDOT".

13          Is that the sentence you're referring to?

14      Q.   That, and the sentence before it.

15      A.   "In addition, the Department is committed

16   to working with PennDOT" --

17      Q.   Yes.

18          So at the top.

19      A.   -"to modify the Motor Voter process to

20   more prominently display the citizenship question."

21   We did that.

22          "In close collaboration with PennDOT, the

23   Department has reordered the screens that are

24   displayed to users so that the citizenship

25   requirement is a first screen."  So we did

1  accomplish that.

2         And further, we also translated the Motor

3  Voter screens into a dozen additional languages,

4  beyond English and Spanish, that they were already

5  translated to.

6             (Deposition Exhibit No. 16 marked for

7       identification.)

8  Q.   Okay.

9         So I'm going to move to my next exhibit.

10  This is Exhibit 16.

11         We're going to put it up on the screen.

12         This exhibit is also a video clip of

13  Commissioner Schmidt.  It's from the same date and

14  the same testimony.  Again, the full video is

15  available in the complaint, paragraph 64 of the

16  complaint.

17         At this time --

18         (Video testimony of Commissioner

19         Al Schmidt.)

20         COMMISSIONER SCHMIDT:  Meaning the

21      Department of State.  The initial

22      match of driver's license numbers

23      with INS indicators to voter

24      registration database records

25      with driver's license numbers was

1      in excess of 100,000 in Pennsylvania.

2           (End of video testimony.)

3      Q.   Could you see and hear that, Mr. Marks?

4      A.   I could, yes.

5      Q.   So at that meeting -- and that was at

6   1:3:37 to 1:3:57.

7           When he testified in front of the

8   Department of State, Commissioner Schmidt referred

9   to meetings.  And he said, quote, "In our meetings

10  with the Department of State, the initial match of

11  driver's license numbers with INS indicators to

12  voter registration database records with driver's

13  license numbers was in excess of 100,000 in

14  Pennsylvania."

15          Is that an analysis that Commissioner

16  Schmidt performed?

17          MS. WALSH:  Objection to form.

18     A.   No.  I, I wouldn't call it an analysis,

19  but, no, it is not -- that was not something

20  Commissioner Schmidt performed.

21     Q.   If you wouldn't call it an "analysis",

22  what would you call it?

23     A.   Well, I would call it what he called it.

24  I don't, I don't entirely agree with his

25  representation.  He said "match".  And what he was

1  referring to there is a match of records in

2  PennDOT's database drivers' records to records in

3  voter registration to determine if any of those

4  records had an INS indicator on their PennDOT

5  record.

6      Q.   When was that initial match performed?

7          MS. WALSH:  Objection to form.

8      A.   My recollection is it would have been

9  around September of 2017.  It was, it was around the

10  same window of time that we had had those two

11  meetings with Commissioner Schmidt.

12      Q.   Was that match discussed in the meetings

13  with Commissioner Schmidt?

14          MS. WALSH:  Same objection.

15      A.   It, it was, yes, the second meeting.

16      Q.   And who performed that initial match?

17          MS. WALSH:  Objection to form.

18      A.   That would have been the Department of

19  Transportation and the Department of State.

20      Q.   Okay.

21          But who, who did it?  So there was a

22  representative from the Department of State?  How

23  did they do it?

24      A.   Yeah.  I mean, we don't -- because,

25  because PennDOT's records are protected under

1  federal law, we don't just have access to them.  So

2  to do anything like this, it has to be in

3  collaboration with PennDOT.

4      Q.   So how is it -- can you explain to me how

5  it was done?

6      A.   I did not do it, but I -- this was, this

7  was -- as I said, I would not describe it as an

8  analysis.  This was a very high level, literally, a

9  match to determine what is the universe of records

10  that is our starting point, that we may need to look

11  at.

12          And I'll, I'll point out at this point, an

13  INS indicator, on PennDOT's database, doesn't mean

14  the person's not a citizen.  It doesn't even mean

15  that the person was a non-citizen at any point in

16  the past.

17          There are a variety of INS indicators on

18  PennDOT records.

19          So it was really just identifying what is

20  the universe of records, that would be our starting

21  point, if we were going to do an analysis.

22          And, and we were clear with Commissioner

23  Schmidt when, when we provided that information.

24      Q.   Who, in your Department, performed the

25  match?

1      A.   Again --

2           MS. WALSH:  Objection to form.

3      A.   -- the match requires both agencies

4  working together.  We don't have access to PennDOT's

5  database.  So that would have been conducted by our

6  Bureau of Elections, Security and Technology in

7  conjunction with staff at the Department of

8  Transportation.

9      Q.   Who, from your Bureau, worked on it on

10  your side, on the Department of State's side?

11      A.   It would have been, it would have been

12  Mike Moser, the Director of the Bureau of Election

13  Security and Technology.

14      Q.   And were you physically present when this,

15  when this was -- match was occurring?

16      A.   I was not, no.

17      Q.   And what happened as a result of this

18  match?  Was a report generated?

19      A.   No, I don't believe a report was

20  generated.  Again, it was a high-level match to

21  determine what is the universe of records that we

22  need to look at.  So I don't, I don't believe that a

23  report was generated as part of that process.

24      Q.   Well, what was generated as a result of

25  the match?

1          MS. WALSH:  Objection.

2     Q.   Was a list generated?

3          MS. WALSH:  Objection to form.

4     A.   I don't, I don't know if a list was

5     generated.  Certainly, there, there was information,

6     when comparing the records in the two databases,

7     that approximately 100,000 records appear to be a

8     match.

9          And, you know, I should point out, too,

10    even -- these are two completely different

11    databases.  So even, even the matching is not in

12    every case a hundred percent.  So this -- these were

13    all caveats provided to Commissioner Schmidt at the

14    time of the meeting.  This was really just the

15    universe of records that we would need to look at.

16    It's just one very small step.

17    Q.   So you have Mike Moser at the Bureau, and

18    he, in conjunction with the Department of State,

19    performs a match?

20    A.   The Department of Transportation.

21    Q.   Excuse me.  The Department of

22    Transportation performs a match?

23    A.   Yes.

24    Q.   So once, once these records are matched,

25    again, was there a list generated?  Or what did you

Exhibit A

1 | do with those matches?

2 |        MS. WALSH: Objection; asked and answered;

3 | mischaracterizes the testimony.

4 |     A. I, I don't know that a list was generated.

5 |     Q. Well, how do you know that there was --

6 | there were any matches?

7 |     A. Well, again, this was conducted -- I

8 | wasn't present. But this was a -- this was

9 | comparing records in one database against records in

10 | another database to determine, based on certain

11 | criteria, if there appeared to be matches between

12 | the two databases. And then from there, to

13 | determine if on, on the Department of

14 | Transportation's side, if any of those potential

15 | matches had an INS indicator on them, and, and what

16 | that total number was.

17 |        So I don't, I don't know what -- you know,

18 | I don't know what was generated by doing those

19 | queries of the system of two completely separate

20 | systems.

21 |     Q. Was anything generated?

22 |        MS. WALSH: Objection; asked and answered.

23 |     A. I don't know if anything was generated.

24 |     Q. How did you know that a record matched?

25 |        MS. WALSH: Objection to form;

1  mischaracterizes the testimony.

2      A.   Well, again, we, we would have provided

3  PennDOT with voter registration records for the

4  entire Commonwealth, and then that would be used to

5  match against -- based on criteria, to determine if

6  they were, you know, potentially the same person

7  were used to match against PennDOT's database to

8  determine, you know, what the, what the number of

9  potential matches were, and then from there, to

10  determine how many of those had an INS indicator on

11  the record.

12      Q.   What was the number of potential matches?

13      A.   It was 100,000.  Or I mean, you're talking

14  about potential matches just broadly between the two

15  systems?

16      Q.   Yes.

17          MS. WALSH:  Note an objection to the form

18  of the question.

19      A.   I don't know that that was even part of

20  the match, but I would expect that -- yeah, I mean

21  I'm not going to guess at what that number may be.

22      Q.   Well, you just used the number 100,000.

23  What was 100,000?

24      A.   Well, a hundred thousand is -- as

25  Commissioner Schmidt testified to, a hundred

1  thousand was the number of records that may have

2  matched between the voter registration, the SURE

3  database and PennDOT's motor vehicle records that

4  had an INS indicator on the motor vehicle record.

5      Q.   So what data was matched between the voter

6  registration record and the driver's license record?

7  The names and addresses in the voter registration

8  record were matched with the driver's license

9  record, and any of those that matched, and had an

10 INS indicator, that was the match you were looking

11 for?

12          MS. WALSH:  Objection to form.

13     A.   Correct.

14          MS. WALSH:  I think you're

15 mischaracterizing the testimony.

16     A.   Yeah.  We were looking for -- of, of the

17 records maintained in the voter registration

18 database as compared to PennDOT's motor vehicle

19 records how many individuals, who may be the same

20 person, and even that's not a guarantee in such a

21 high-level match, but how many of those on their

22 motor vehicle record had an INS indicator.

23     Q.   And you -- just so I'm clear, you

24 testified that that initial match, the number was

25 about a hundred thousand?

1          MS. WALSH:  Objection to form; also

2    mischaracterizes the testimony.

3        A.   Yes.  A hundred thousand records that

4    would -- and, again, we were abundantly clear with

5    Commissioner Schmidt that only was indicative of the

6    number of records that we would have to examine.  It

7    was not at all indicative of the number of -- it's

8    not even indicative of the number of people who

9    match a hundred percent between the two databases.

10       Q.   Well --

11       A.   It's certainly not indicative of the

12   number of the non-citizens who may be registered to

13   vote.

14       Q.   Well, let's focus on the process.

15            So Mike Moser, in this process, gets to

16   the point where there's approximately a hundred

17   thousand matches between the voter registration

18   database and the driver's license database with the

19   INS indicator.

20            What did he do next?

21            MS. WALSH:  Objection to form.

22       A.   Well, that was the end of it.  I mean

23   that, that was the purpose of the match, was to

24   determine the number of records that would need to

25   be, be examined.

Exhibit A

1    Q.   Well, let's talk first exactly what was

2   matched between the voter registration database and

3   the driver's license database.

4          Were names matched?

5          MS. WALSH:  Objection; these questions

6   have been asked and answered.

7    A.   Yeah.  I mean I can't speak for PennDOT's

8   side at all, but, certainly, to do a match, you

9   would need to match name, date of birth, and any

10   other personal identifying information that you may

11   have.

12    Q.   And on the Department of State's end, on

13   the voter registration database, you have name, date

14   of birth.

15          Do you have driver's license numbers in

16   the, in the voter registration database?

17          MS. WALSH:  Objection to form.

18    A.   For --

19          MS. WALSH:  Also, objection to the extent

20   you're asking for information that's privileged and

21   protected from disclosure.  It's derived from the

22   driver's license record.

23    Q.   I'm not asking for a driver's license

24   record.  I'm trying to, I'm trying to -- I just want

25   to understand what happened here.

1          You have records at the Department of

2   State in the SURE system, and some of those records

3   have driver's license numbers.  Some of the voter

4   registration records have driver's license numbers

5   attached to them; correct?

6        A.   Correct.

7        Q.   And some of them don't?

8        A.   Correct.

9        Q.   And why would there not be a driver's

10  license record attached to a voter registration

11  record?

12          MS. WALSH:  Objection to form.

13        A.   Well, there's more than one reason.  A

14  registered voter may not have a driver's license,

15  the most obvious reason.

16          The registered voter may have registered

17  before driver's license -- before the Health America

18  Vote Act and before Act 3 of 2002, a registered

19  voter may have provided the last four digits of

20  their social security number as opposed to driver's

21  license numbers.  Those are three reasons.

22        Q.   And was this a -- when Mike Moser

23  performed this match, can you tell me what data

24  points he was looking to match?

25        A.   And, again, you're --

1          MS. WALSH:  Object to the form and you're

2  mischaracterizing the testimony, and these questions

3  have been asked and answered.

4          A.   Yeah.  I want to be clear.  Mike Moser did

5  not perform the match.

6          Q.   Oh.  Who performed the match?

7          A.   The match was performed between the

8  Department of State and the Department of

9  Transportation.  No one person can do such a match.

10          The only way that we could conduct this

11  match was to work closely with the Department of

12  Transportation and use data contained in their motor

13  vehicle database.  You can't -- no one person has

14  access to those two sources, and certainly not

15  anyone at the Department of State.

16          So I want to be clear, when you

17  characterize it as Mike Moser doing the match,

18  that's not what happened.

19          Q.   Okay.

20          Then explain to me what happened, because

21  I'm still not clear.

22          MS. WALSH:  Objection; asked and answered.

23          A.   Mike Moser represented the Department of

24  State in this match.  Staff at the Department of

25  Transportation was on the other side.

1    This match occurred between the two

2  departments.  It was a collaborative effort.

3    So it's inaccurate to say Mike Moser

4  performed the match.  It would be more accurate to

5  say that the two agencies conducted a match of their

6  two databases.

7    Q.   And I'm asking just procedurally how that

8  was done.  Was another software program used where

9  data was uploaded looking for matches?  Or were they

10  merged --

11    MS. WALSH:  Objection to form.

12    Q.   -- and you looked for matches?  I don't

13  understand the mechanics.

14    A.   The mechanics are we provide the voter

15  registration data, the Department of Transportation

16  matches it against their records.

17    Q.   Right.

18    Okay.

19    Now we're getting somewhere.

20    So you provided -- and what was on the

21  list that you provided as far as the data points?

22  Did you provide that everything in the SURE system

23  would be --

24    A.   Looking at the name, date of birth,

25  address, I believe.  So it would be, it would be

1  anything that would be useful on the, on the voter

2  registration record.

3      Q.   Okay.

4          And do you know, do you know if this --

5  was it, like, downloaded into an Excel spreadsheet?

6  Or what software program --

7      A.   I don't think you could download that many

8  records.  I mean we're turning over the entire

9  data.  It's basically, like, the Full Voter Export.

10  You're talking about millions of records that would

11  have been provided.

12          How PennDOT, you know, pulled them in to

13  do their side of it, I, I don't know, but it -- I

14  don't expect that it was an Excel spreadsheet.

15      Q.   So the actual match part was done on the

16  PennDOT side, not on the Department of State's side?

17      MS. WALSH:  Objection to form.

18      A.   Yeah.  It -- you know, the Department of

19  Transportation's records are protected.  So, you

20  know, this -- it made more sense for us to provide

21  information to them, that they could, then, use to

22  conduct the matching.

23      Q.   And when this process was occurring, did

24  the Department of State establish what data points

25  had to match for it to be considered a match?

Exhibit A

1        And I can give you an example.

2        A.   Yeah.  I mean, I mean the minimum to

3   consider a match would be, you know, first name,

4   last name, date of birth.  If you had a driver's

5   license or the last four of SSN, that would be

6   preferable to establish a match.  You know, if you

7   had a different middle name, that would not be a

8   match.  I mean, they're pretty, you know, pretty

9   well-established criteria.  And even that's not a

10  100 percent guarantee.

11       Q.   Now, once the Department -- once the

12  Department of Transportation performed that match,

13  the result was that there was a universe of records

14  of registered voters who also had that INS

15  indicator; correct?

16       MS. WALSH:  Objection to form.

17       A.   I -- it was a, it was a number of records

18  that appeared to match between the two databases,

19  that, in PennDOT's database, had an INS indicator on

20  the record.

21       Q.   All right.

22            Then what happened next?  Did the

23  Department of Transportation person pick up the

24  phone and call you and say, "This is how many we

25  found."  Or was a list generated?

1          MS. WALSH:  Objection; asked and answered.

2      A.   Yeah.  I don't, I don't know that a list

3  was generated.  I do know that the number was

4  communicated to the Department of State.

5      Q.   Do you know who it was communicated to at

6  the Department of State?

7      A.   I, I believe it would have been Mike

8  Moser.

9      Q.   And then what did Mike Moser do with that

10  information?

11      A.   Well, he provided me and Secretary Cortés

12  with, with the, with the number.

13      Q.   And then what did you do with the number?

14  Or what did Secretary Cortés do with the number, if

15  the answer is different?

16      A.   Well, in our subsequent meeting, that's

17  when we told Commissioner Schmidt that that was the

18  universe of the records that we would need to

19  further analyze.

20      Q.   And so, other than Commissioner Schmidt,

21  did you or Secretary Cortés or anyone from the

22  Department of State tell anyone else about this

23  match?

24          MS. WALSH:  Objection to form.

25      A.   No.

Exhibit A

1     Q.    Was this number shared with anyone else in

2    the Department of State?

3     A.    I don't believe that it was, no.

4     Q.    And what did you do next with regard to

5    the match?

6          MS. WALSH:  Objection to form.

7     A.    Well, I think, I think at that point in

8    time, Commissioner Schmidt had -- you know, in spite

9    of our warnings that this number did not indicate in

10   any way the potential number of non-citizens that

11   may be registered to vote, he testified before the

12   Senate State Government Committee and put that

13   number out there.

14    Q.    Right.

15          But my question was what did you do or

16   what did Secretary Cortés do?

17    A.    Well, at that point, you know, the number

18   was out there, and we were, we were trying to

19   explain that the match was really to just get an

20   idea of what universe of records we may need to look

21   at.

22          Subsequent to all of this, then we engaged

23   our Office of Chief Counsel to conduct --

24          MS. WALSH:  I'm instructing you not to get

25   into privileged areas.

1          THE WITNESS:  Okay.

2          MS. WALSH:  So you shouldn't discuss what

3    you discussed with the Office of Chief Counsel.

4      Q.   Then -- so what happened next?

5          MS. WALSH:  Objection; he's answered that

6    several times.

7      Q.   So then you spoke to your counsel.  That's

8    the answer?

9      A.   Well, no.  The answer is then Commissioner

10   Schmidt, despite our warnings, mentioned the 100,000

11   number in the Senate State Government Committee

12   hearing.

13     Q.   And after that, did the Department of

14   State itself, without counsel, undertake any

15   analysis?

16     A.   No.

17     Q.   All right.  I'm going to pull up the next

18   exhibit, Exhibit 17.

19         MS. WALSH:  Is this a good place for a

20   five-minute break?

21         MS. KERNS:  Sure.

22         MS. WALSH:  Thank you.

23         (Whereupon, there was a recess in

24   proceedings.)

25         (Deposition Exhibit No. 17 marked for

1    identification.)

2              MS. KERNS:  We're going to put up on the

3    screen Exhibit 17.  And this is the -- it's

4    Bates-stamped D215 through D226.  And the document

5    is entitled "Statement Voter Registration and

6    Election Integrity."

7         Q.   Are you familiar with this document?

8         A.   I don't, I don't have it up in front of me

9    yet.

10        Q.   Okay.

11             Let me know when you can see it.

12        A.   I can see it.

13        Q.   Are you familiar with this document?

14        A.   Yes.  That document looks familiar.

15        Q.   Do you know who authored it?

16        A.   I don't know if you can scroll to the

17   bottom of this.

18             I believe it may have been a statement

19   from our Communications office.

20        Q.   All right.

21             In the -- on the first page in the first

22   bullet point, it says "The department retained an

23   expert to conduct a full analysis of registration

24   data by comparing the voter rolls with other

25   available state databases."

```
1            Do you know when that full analysis

2   occurred?

3            MS. WALSH:  I just note an objection, and

4   also to the extent you're asking him about

5   privileged attorney work product or privileged

6   attorney communications.

7        A.   Yeah.  I mean this an analysis that was

8   conducted by our Office of Chief Counsel with, with

9   an expert, and I believe the analysis took --

10           MS. WALSH:  I'm going to instruct you not

11  to answer and disclose any information about the

12  privileged analysis or privileged attorney work

13  product investigation.

14       Q.   When you refer to the "Office of Chief

15  Counsel", are you referring to the Office of Chief

16  Counsel of the Department of State?

17       A.   The Office of Chief Counsel is, as I

18  understand it, I'm not, I'm not one of the attorneys

19  at the Department, but as I understand it, the

20  Office of Chief Counsel is actually part of the

21  Office of General Counsel, and they are assigned to

22  the Department of State as, as counsel.

23       Q.   And do you know who this expert is?

24           MS. WALSH:  Objection; asked and answered.

25       A.   Yes, as I said, several hours ago, no.
```

Exhibit A

1      Q.   So who do you, who do you work with at the

2   Office of Chief Counsel?  Are there specific

3   attorneys that you work with?

4      A.   There are, yes.

5      Q.   And are they considered part of the

6   Department of State?

7           MS. WALSH:  Objection to form.

8      A.   No.  Again, I'm not -- my understanding is

9   they are -- they actually work for the Office of

10  General Counsel, and they are assigned to the

11  Department of State.  And this is true of other

12  state agencies.  They're assigned to specific

13  agencies.

14          MS. WALSH:  So the witness has received a

15  paper copy of Exhibit 17.

16          MS. KERNS:  Okay.

17          Thank you.

18     Q.   On Exhibit 17 where it says "The

19  Department retained an expert."  It's the first

20  bullet point.  That first bullet point also

21  indicates "the initial analysis yielded a

22  responsible list of individuals for whom voter

23  registration status required further" information

24  {verbatim}.

25     A.   Further confirmation.

1      Q.   -- "confirmation".  Sorry.

2      A.   Yes.

3      Q.   So was the Department of State provided

4   with that list?

5           MS. WALSH:  Objection; mischaracterizes

6   the document.  And the witness is not going to

7   answer questions about the privileged work product

8   performed by the expert.

9           MS. KERNS:  I'm going to have to ask you

10  to put on the record what exactly, what exactly are

11  you saying is privileged?

12          MS. WALSH:  You're saying that the

13  Department retained counsel, who retained an expert,

14  and the results of that analysis and investigation

15  conducted by the expert, communications with the

16  expert are privileged, attorney work product and

17  attorney-client communications.

18          MS. KERNS:  Under what authority are you

19  claiming it's privileged?

20          MS. WALSH:  Under the attorney-client

21  privilege and the work-product doctrine.

22          MS. KERNS:  So -- no.  I need you to

23  explain this to me, because it doesn't sound like

24  the Department was seeking legal advice.

25          It sounds like that an expert was

1    retained, and this, this press release says "by the

2    Department".  So I don't understand how that can be

3    considered privileged or, or attorney work product

4    because no one is talking about legal advice here.

5         MS. WALSH:  I'm not going to engage with

6    you in a debate on this during this deposition.  The

7    witness is here to answer factual questions.  I will

8    place my objection on the record.

9         The witness has testified that the

10   Department ed consulted with counsel.  There's been

11   testimony and evidence in the case, and

12   representations in the case, that counsel retained

13   an expert.

14        Our position is that that engagement is

15   protected by the attorney-client privilege and under

16   the attorney work-product doctrine.  And it's not

17   something that's appropriate for discovery, and it's

18   not something that's discoverable or able to be

19   disclosed under the NVRA.

20        Ms. Kerns, again, I'm happy to engage with

21   you on that point and I'm happy to debate with you.

22   It's not the place for it right now.

23        The witness is here to answer questions

24   about factual issues that are appropriate.  And we

25   contend that this one is not.  This subject is not

Exhibit A

1    appropriate for discovery.

2         Q.   Was the expert an attorney?

3         A.   I don't know.

4         Q.   Was the expert providing legal advice?

5         MS. WALSH:  Objection.  The witness has

6    told you he doesn't know the expert.

7         Q.   Was the expert --

8         MS. KERNS:  He didn't, he didn't answer.

9    Was the expert providing legal advice?

10        MS. WALSH:  I'm noting an objection.  I'm

11   putting an objection on the record that you're

12   delving into an area that we contend is privileged.

13   The witness is not going to answer questions about

14   communications involving the expert.

15        MS. KERNS:  So it's your position that if

16   the Department simply -- if the Department of State

17   wants to keep something shrouded in secrecy, all

18   they have to do is have the Office of Chief Counsel

19   conduct it, even if it has nothing to do with legal

20   advice?

21        Is that your position?

22        MS. WALSH:  I'm not sure who you're asking

23   that question of.  If it's me, the answer is no.  We

24   placed -- I told you already.  We told you several

25   times what our position is, and we contend that this

Exhibit A

1   investigation, this analysis, these communications

2   with this expert are covered by the attorney-client

3   privilege and by the attorney work-product doctrine.

4   It's not an appropriate subject for discovery, and

5   this witness won't be answering questions about

6   that.

7       Q.   Mr. Marks, was Exhibit 17 made available

8   to the public?

9       A.   You're referring to this exhibit here?

10  This statement?

11      Q.   Yeah.  Oh, I'm sorry.  It doesn't have a

12  number on it.

13          Yes.  "Statement - Voter Registration and

14  Election Integrity".

15      A.   Yes, I believe it was.  I think.

16      Q.   So if the material is privileged, why did

17  the Department retain an expert and make that -- the

18  fact that the Department retained an expert to

19  conduct a full analysis available to the public?

20          MS. WALSH:  Objection to form.  I think

21  you're mischaracterizing the testimony and what this

22  document says.

23          The fact that an expert was disclosed, and

24  that it's identified in this document, does not make

25  the analysis unprivileged.  It doesn't waive the

1  privilege.  It doesn't make the privilege go away.

2     Q.   So, Mr. Marks, is it your position that

3  the Department is not going to reveal to the public

4  who this expert was?

5          MS. WALSH:  Objection.

6          I told you several times.  The identity of

7  the expert is a privileged matter.  It's not

8  something that's required to be disclosed.  And the

9  witness isn't here today -- he won't be answering

10 any questions that are covered by this privileged

11 matter -- that are subject to the privilege of the

12 work-product doctrine, and your question is

13 argumentative, and I believe it is inappropriate.

14    Q.   What is the definition of an expert?  What

15 would the qualifications be for an expert to conduct

16 an analysis of registration data, Mr. Marks?

17         MS. WALSH:  Objection.  Objection.  You're

18 calling for, you're calling for legal conclusions.

19 You're asking hypothetical questions, and the

20 witness is not going to answer about these

21 investigations and the entirety of the expert that's

22 the subject -- that is referenced in this document.

23         MS. KERNS:  Okay.

24         Ms. Walsh, I just want you to clarify.

25 Are you saying that the identity of an expert is

1    protected by a privilege?

2          MS. WALSH:  Yes.  The identity of a

3    consulting expert, that is not a testifying expert,

4    is protected.  And, again, I'm happy to debate this

5    with you in another forum, in a more appropriate

6    forum.  The witness is here today to answer

7    appropriate factual questions.

8          MS. KERNS:  So the privilege you're saying

9    that if the Department hires any expert, if the

10   Office of Chief Counsel hires any expert that is

11   automatically covered by a privilege?

12         MS. WALSH:  My position is the expert

13   retained in this matter is that it's privileged

14   matter.  It's covered by the attorney-client

15   privilege and the work-product doctrine.  And it's

16   not something that's an appropriate subject for

17   discovery.

18         If you want to have a theoretical debate

19   about other experts and other circumstances, I'm

20   happy to do that, but this isn't the time or the

21   place for it.  I suggest you get back to your

22   30(b)(6) topics, the ones that we didn't object to,

23   and ask the witness factual questions.

24         MS. KERNS:  When you say "this matter",

25   are you talking about the investigation -- the full

1  analysis of registration data?  Or are you talking

2  about litigation?

3          MS. WALSH:  I'm talking about your

4  questions, asking this witness about this expert

5  analysis that we contend is privileged and protected

6  from disclosure.

7          MS. KERNS:  Why don't we to go to, why

8  don't we go to the next exhibit, Exhibit 18.

9          And you're not going to be able to print

10  this one out because it is a lot of pages.

11      A.   So I'm going to put it up on the screen,

12  and let me know when you can see that, Mr. Marks.

13          MS. WALSH:  Is there a Bates number

14  associated with the document?

15          MS. KERNS:  It is Bates-stamped PILF

16  001360 through 1551.  I'm going to mark this as

17  Exhibit 18.  It's a copy of the December 2019

18  Pennsylvania Auditor General's Performance Audit

19  Report.

20          (Deposition Exhibit No. 18 marked for

21  identification.)

22      Q.   Can you see it, Mr. Marks?

23      A.   Not yet.  No.  I'm working on it.

24      Q.   Let me know when you can see it, Mr.

25  Marks.

1      Is it up there, Mr. Marks?

2   A.   No.  We're --

3   Q.   Okay.

4        It will take some time.

5   A.   We're bringing it up.

6        All right.

7        I can see it now.

8   Q.   Okay.

9        So this is Exhibit 18.  It is the

10  Performance Audit Report.  It's authored by Eugene

11  A. DePasquale, Auditor General, and it's dated

12  December 2019.

13       Have you ever seen this document before?

14  A.   I have, yes.

15  Q.   Have you read the document?

16  A.   I have.

17  Q.   All right.

18       I'm going to now move the screen to

19  Bates-stamped 01529.  It's actually page 162 of the

20  report.

21       Let me know when you can see that.

22  A.   1529.  Did you say 01529?

23  Q.   01529 is the Bates stamp at the bottom.

24  Yeah.  At the top of the page, it says -- it has the

25  header "Performance Audit", and the first line says

1   "Registration Application to DOS."

2           Can you see that?

3           MS. WALSH:  We're not there yet.

4     A.   Okay.

5           I think, I think this is it.  A

6   Performance Audit.  Pennsylvania Department of State

7   Statewide Uniform Registry of Electors.

8     Q.   Right.

9     A.   It looks like it's start in the middle of

10  a paragraph.  "Registration Applications to DOS"?

11    Q.   Right.

12          So I'm going to ask you to go down to the

13  second full paragraph that starts "In addition to

14  working with PennDOT."

15          Do you see that paragraph?

16    A.   Yes.

17    Q.   All right.

18          So the second sentence states "DOS" --

19  which I think you'd would agree is the Department of

20  State -- "management stated that they retained an

21  expert, a tenured Associate Professor of Political

22  Science, to conduct an analysis by comparing the

23  Commonwealth's voter registration data with other

24  available Commonwealth databases."

25    A.   Correct.

1    Q.   Do you know the name of that tenured

2  Associate Professor of Political Science?

3         MS. WALSH:  Objection; asked and answered.

4    A.   I do not, no.

5    Q.   Did the Department of State share that

6  information with the Auditor General?

7         MS. WALSH:  Objection.

8    A.   I, I don't believe so.

9    Q.   Do you know where this Associate Professor

10  is tenured?

11   A.   I do not.

12   Q.   Is this the same expert that was

13  referenced in the previous exhibit?

14        MS. WALSH:  Note an objection to the form.

15  And, again, the witness has told you several times

16  he doesn't know who the expert was.  He told you

17  that in response to your question about the earlier

18  exhibit.  He told you that in response to your

19  questions about this exhibit.  Objection; the

20  question has been asked and answered several times.

21   Q.   This paragraph, Mr. Marks, the second full

22  sentence says "DOS management".

23        Who is DOS management?

24        MS. WALSH:  Objection to form.

25   A.   I believe -- I can't answer for the

1   Auditor General, but I believe the Auditor General

2   was referring to the Department of State's executive

3   staff.

4       Q.   So does the Department of State executive

5   staff know who the tenured professor is?

6           MS. WALSH:  Objection.  Again, our

7   position is that the identity of the expert is a

8   privileged matter.  I think your questioning is

9   inappropriate.  I don't think it's appropriate to

10  ask you know, what this witness believes other

11  people would know about this privileged matter.

12  It's not something he's going to ask answer

13  questions about today.

14      Q.   The third sentence says that "We requested

15  information from Department of State regarding what

16  Commonwealth databases were used for the analysis

17  and the results of the analysis; however, the

18  Department of State would not provide this

19  information."

20          Do you know why the Department of State

21  declined to provide this information?

22          MS. WALSH:  Objection; objection to form,

23  and to the extent you're asking about, you know,

24  you're delving into privileged matters.

25          I told you several times you've asserted

1  in this case that this was a privileged analysis.

2  It was covered by privileged -- the attorney-client

3  privilege and it's privileged attorney-work product.

4      Q.   Mr. Marks, in that same paragraph, on the

5  exhibit that's up on your screen, in that paragraph

6  that starts, "in addition to working with PennDOT,"

7  it says that the tenured Associate Professor -- it

8  says a tenured Associated Professor of Political

9  Science to conduct an analysis by comparing the

10  Commonwealth's voter registration data with other

11  available Commonwealth databases.

12          Do you know what the other available

13  Commonwealth databases were?

14          MS. WALSH:  Objection; asked and answered,

15  and, again, you're getting into an area that's

16  protected from discovery by the attorney-client

17  privilege and the attorney work-product doctrine.

18      Q.   Do you know what the other available

19  Commonwealth databases were, Mr. Marks?

20          MS. WALSH:  I instruct the witness not to

21  answer the question about the privileged

22  investigation and analysis.

23      Q.   I am going back to the previous exhibit,

24  Exhibit 17, which was the Statement on Voter

25  Registration and Election Integrity.

1        Do you have that in front of you?  We

2   marked that as 17.

3        A.   I do, yes.

4        Q.   And here The Department of State uses that

5   language "other available state databases".

6             Is this referencing the same expert and

7   the same analysis as in the Auditor General's

8   Report?

9             MS. WALSH:  I just note an objection.  I

10   think the question has been asked and answered.

11        A.   Yes, I believe it does.

12        Q.   And do you know if other databases were

13   used, other than state databases?  Were any

14   commercial databases used?

15             MS. WALSH:  Objection.  The witness isn't

16   here to testify about matters that are protected by

17   the attorney-client privilege and by the attorney

18   work-product doctrine.  What the expert did, what

19   the expert analyzed, the specifics of it, are

20   matters that are not appropriate for discovery.

21        Q.   Mr. Marks, in Exhibit 17, which I think

22   you have in front of you.  I think you're holding

23   that.  The statement.

24        A.   I have it, yes.

25        Q.   Okay.

1          Good.

2          In that first bullet point, it says "The

3   initial analysis yielded a responsible list of

4   individuals for whom voter registration status

5   required further confirmation."

6          Can you tell me what it means by "a

7   responsible list"?  Like, what's the definition of

8   "a responsible list"?

9       A.   I think a responsible list is one that is

10  done -- it's the opposite, I guess, the best way to

11  describe it, the match that was done between voter

12  registration database with the PennDOT database.

13      Q.   And does the Department of State have that

14  responsible list in its possession?

15          MS. WALSH:  Objection.  Again, you're

16  getting into an area that's protected from

17  disclosure by the attorney-client privilege and the

18  work-product doctrine.  And this is a product of an

19  expert analysis, and this expert was retained by

20  counsel.

21      Q.   Mr. Marks, does the Department of State

22  have that list in its possession?

23          MS. WALSH:  Same objection.  I instruct

24  the witness not to answer questions about this

25  expert analysis.

1     Q.   Mr. Marks, would you consider this

2   analysis part of list maintenance activities?

3     A.   No.

4     Q.   Do you know why the Department would --

5   somebody decided that this list required further

6   confirmation?

7        MS. WALSH:  Again, if you can answer the

8   question without disclosing privileged

9   communications -- or discussing or not disclosing

10   any part of the expert analysis, you can do so.

11     A.   Any data analysis, no matter how robust,

12   would provide potential -- you know, potential

13   records, but it wouldn't be 100 percent.  There's no

14   guarantee that it would be a hundred percent

15   accurate.  So it would require further confirmation.

16     Q.   Who performed that further confirmation?

17     A.   I believe if you go on and read the

18   remaining bullet points, I think it describes how

19   the Department proceeded with the mailing of letters

20   to, to the registrants, and then the subsequent

21   action that was taken.

22     Q.   No.

23        The question was who, who decided what

24   required further confirmation in that first bullet

25   point?

 1          MS. WALSH:  Objection; again, you're

 2   getting into -- you're asking specifically about a

 3   privileged analysis conducted by an expert retained

 4   by counsel protected by the attorney-client

 5   privilege and the work-product doctrines.

 6          Your question was really what happened

 7   next.  The witness answered that question.  He said

 8   the answer is contained in the rest of this

 9   document.  Letters were sent out, and it described

10   actions that were taken.

11      Q.   Mr. Marks, how did the Department

12   determine that those 7,702 registrants needed to

13   receive letters?

14          MS. WALSH:  Objection; you're asking about

15   the privileged analysis.  You're asking about the

16   privileged investigation that was done by an expert

17   retained by counsel.

18          MS. KERNS:  Okay.

19          What I'm seeking is the, the name of the

20   expert, the methodology, the analysis that was

21   performed, the result of the analysis, what was done

22   with that analysis, and how the Department of State

23   reached the conclusion that 7,702 registrants were

24   going to get letters.

25          So if you're going to continue to object,

Exhibit A

1  I understand that, but I want to make clear that

2  that's what I'm seeking, and I'm going to have to

3  file a Motion to Compel on those issues.

4         MS. WALSH:  You've asked those questions,

5  and to some of those questions, the witness has told

6  you he doesn't know the answer.  And we've taken the

7  position, and I've objected appropriately, I

8  believe, to your questions asking about the details

9  of this relationship with an expert and the work

10  that was done by the expert under the

11  attorney-client privilege and at the direction of

12  counsel.  And, again, we contend that that

13  information is privileged and is not an appropriate

14  subject for discovery.

15     Q.  Mr. Marks, whose decision was it that the

16  office of counsel would retain the expert rather

17  than the Department of State?

18         MS. WALSH:  Objection.  You're asking for

19  privileged communications.

20     Q.  If you go to the third bullet on

21  Exhibit 17, which we're still talking about,

22  there -- that third bullet indicates that based on

23  further expert analysis the Department mailed

24  letters to one thousand -- excuse me, 11,198

25  registrants.

1          Are those 11,198 registrants in addition

2    to the 7,702 registrants described in the previous

3    bullet point?

4         A.   No.  They would be inclusive of the 7,702.

5         Q.   So if you look at those bullet points,

6    prior to the May 2018 primary, the Department mailed

7    letters to 7,702 registrants.

8          Then there was further expert analysis,

9    and the Department mailed letters to 11,198

10   registrants on June 12th, which would have been over

11   a month letter.

12         So did those 7,702 people get additional

13   letters, and that's why you're including them in the

14   11,198?

15         MS. WALSH:  Objection to form.  I think

16   you're mischaracterizing what this document says.

17        A.   Yes.  That the 7,702 is part of the

18   11,198; so 7,702 would have received both letters.

19        Q.   Who determined that further expert

20   analysis was needed?

21         MS. WALSH:  Objection.  You're calling for

22   information that's protected from disclosure by the

23   attorney-client privilege and work-product doctrine.

24        Q.   Are you okay, Mr. Marks?

25        A.   I am, yes.  Being inside all day, the heat

1    starts to get to me.

2              (Deposition Exhibit No. 20 marked for

3    identification.)

4         Q.   Okay.  I'm going to go to Exhibit 20.

5              Can you see that, Mr. Marks?

6         A.   We're working on it.

7              MS. WALSH:  Is there a Bates number?

8              MS. KERNS:  Yes.  It is number one -- it

9    starts with 190.

10             I'm having -- I'm going to go off the

11   record for just two or three minutes.  Okay.

12             MS. WALSH:  Sure.

13             (Whereupon, there as a recess in the

14   proceedings.)

15             (Deposition Exhibit No. 19 and Deposition

16   Exhibit No. 20 marked for identification.)

17   BY MS. KERNS:

18        Q.   Okay.

19             I apologize.  I skipped an exhibit, by

20   accident.  It's Exhibit 19.  We're going to put it

21   up on the screen.  It's Bates-stamped D186.

22             Mr. Marks, can you see that?

23        A.   I'm working on it.

24             Yes.

25        Q.   Was this the letter that the 7,702 people

1  received?

2      A.   Let me look at this to see if we can

3  confirm.  Go back up to the top again.  I just want

4  to look at the date again.

5          Yes.

6      Q.   And did any of the recipients respond to

7  this letter?

8      A.   I don't recall that any of the recipients

9  responded to the -- to this letter, no.

10     Q.   Okay.

11         So if we go back to Exhibit 17, which was

12  the Statement - Voter Registration and Election

13  Integrity, that indicated based on further expert

14  analysis, after that initial letter went out, the

15  Department mailed letters to 11,198 individuals.

16     A.   That's correct, yes.

17     Q.   And now I'm going to put up Exhibit 20,

18  which is -- I referred to previously.  It's

19  Bates-stamped D190 through D198.

20         Let me know when you can see it.

21     A.   Okay.

22         We have it up now.

23     Q.   Is -- Exhibit 20, that's in front of you,

24  is that the letter that went out to the 11,198

25  people?

1     A.   Let me scroll through this.

2     Yes.

3     Q.   And did the Department receive any

4 responses to this letter?

5     A.   We did, yes.

6     Q.   And was there a list kept of the

7 responses?

8     MS. WALSH:  Objection to form.

9     A.   Yes.  We did track the responses.

10    Q.   And if the, if the recipients responded to

11 their local election offices, did you also track

12 those?

13     MS. WALSH:  Objection to form.

14    A.   No.  I believe we instructed them to

15 respond to us, and then we would forward the

16 information to the county election offices.

17    Q.   All right.

18     Now, I'm going to go back to Exhibit 17,

19 which I think you have in front of you, by paper?

20    A.   I do, yes.

21    Q.   Okay.

22     I'm going to direct you to what's

23 Bates-stamped D217.

24    A.   I have that.

25    Q.   And at the top of the page, it says

1  "Universe Review".

2       Do you see that?

3  A.  I do, yes.

4  Q.  Have you seen that page before?

5  A.  I have, yes.

6  Q.  And would you agree this still refers to

7  the 11,198 records that we were talking about when

8  we discussed the previous exhibit that was the

9  letter that was sent out?

10  A.  Yes.

11  Q.  And can you explain to me what letter "I"

12  means.  Two hundred eighty-six removed because they

13  were already canceled?

14  A.  Yes.  They had -- in the intervening time,

15  their voter records have been canceled.

16  Q.  And in double ii, No. 1, it says "1,915"

17  people "affirm their registration."

18       How did the people affirm their

19  registration?

20  A.  They affirmatively responded that they

21  were in fact qualified, that they were citizens and

22  met qualifications to be registered.

23  Q.  Well, how did they respond?  Like what was

24  the mechanism?  Was it a letter?  E-mail?  Phone

25  call?

1      A.   It would have been the letter.

2      Q.   Okay.

3           So that's Exhibit 20.

4           MS. WALSH:  We do not have a paper copy of

5      that.

6           MS. KERNS:  Oh, sorry.

7           Okay.

8           I'll put that back up then.

9      A.   We have, we have it up.

10      Q.   When you said that they mailed back a

11     letter, is that what they mailed back?

12      A.   I believe it was part of -- sorry.  Could

13     you scroll down, Chris.

14           Yes.

15      Q.   What did the Department of State do with

16     the letters, once they received them?

17      A.   We tracked their responses and I believe

18     retained the letters.

19      Q.   Retained them how?

20      A.   We didn't -- these we would not -- the

21     affirmative responses would have not been forwarded

22     to the county election offices.

23      Q.   I'm sorry.  I didn't hear that.

24           You did forward them?  Or did not?

25      A.   I don't believe we did not -- I don't

Exhibit A

1  believe these responses would have been forwarded to

2  the county election offices.

3      Q.   Okay.

4           So what happened to those letters?

5      A.   I believe those letters are retained by

6  the Department.

7      Q.   And what would have been sent to the

8  counties?

9      A.   Individuals who -- requesting cancelation.

10     Q.   And do you know what the counties would

11  have done with those letters?

12     A.   They would have, they would have

13  verified -- if they requested cancelation, they

14  would have canceled the records.

15     Q.   And would they have retained those

16  letters?

17          MS. WALSH:  Objection to form.

18     A.   I, I -- yes, I would expect that they

19  would, yes.

20          MS. WALSH:  I'll just note for the record

21  that the witness was handed copies of the last -- I

22  believe it's 19 and 20.

23          THE WITNESS:  Yes.

24     Q.   As we stand here today, does the

25  Department still have those 1,915 letters?

1          MS. WALSH:  Objection.

2      A.   I believe so, yes.

3          Bless you.

4          MS. WALSH:  Bless you.

5          MS. KERNS:  Thank you.

6      Q.   Were they kept in paper form or were they

7  scanned?

8      A.   I don't know.

9      Q.   Was anything else done to affirm that

10  these individuals meet the requirement, other than

11  reviewing their -- the letter that they sent back?

12      A.   No.

13      Q.   Okay.

14          When we -- turning back to Exhibit 17,

15  which was the one that had Bates-stamped 217,

16  "Universe Review".

17      A.   Yes.  I have it.

18      Q.   And it says "215" were "canceled on the

19  form sent."

20          What form was sent?

21      A.   The requests for cancelation.

22      Q.   Okay.

23          And is that the form that's in Exhibit 20,

24  Bates-stamped 195, the letter dated June 12th, 2018?

25      A.   Yes.

1      Q.    And what does the Department of State do

2    after receiving that form?

3      A.    These were forwarded to the appropriate

4    county election office.

5      Q.    So who would have, who would have canceled

6    the registration?  Would it have been the Department

7    of State or the county office?

8      A.    It would have been the county office.

9      Q.    Do you know if any of these forms were

10   returned directly to the county office and not to

11   the Department of State?

12     A.    I don't recall if any of the forms were

13   returned to the county office.  Or, wait.  I'm

14   sorry.

15          No.  They would have been sent to the

16   county office.

17     Q.    Upon -- so the voter request to cancel

18   registration were not sent to the Department of

19   State?

20     A.    I believe we, we instructed -- we provided

21   a copy of the form, along with the addresses for the

22   voter registration offices.

23     Q.    All right.

24          Going back to Exhibit 17, the one that

25   says "Universe Review", and it's Bates-stamped 217.

1     A.   Yes.

2     Q.   Under double ii 3, why did "84 need

3   further review"?

4     A.   I, I don't recall.  I, I believe that may

5   have been because the response was unclear.

6     Q.   And who, if anybody, conducted that

7   further review?

8     A.   It -- I believe it would have been

9   conducted in conjunction with the appropriate

10  county, if necessary.

11    Q.   So were those voter registrants contacted?

12    A.   I, I don't, I don't recall if they were

13  contacted by the Department.

14    Q.   Were they contacted by the voter

15  registration offices?

16         MS. WALSH:  Objection to form.

17    A.   I believe ultimately, yes.

18    Q.   And on that same page where it says

19  "Universe Review", No. 2 says "that leaves 8,698

20  records, broken down as follows."

21         Under No. 2, there are two categories: "No

22  Response" and "Undeliverable".

23    A.   Right.

24    Q.   So does that mean that 8,698 people did

25  not receive this letter, either because there was no

1   response or because the address was undeliverable?

2          MS. WALSH:  Objection to form.

3      A.   Well, I think it would be fair to say that

4   the 8,985, plus 1,073 undeliverable would have not

5   received it.  The remainder in, in "i" above did not

6   respond.

7      Q.   And what did the Department of State do

8   with those 8,698 records?

9      A.   We provided that information to the, to

10  the appropriate county election offices.

11     Q.   And then what happened after that?

12     A.   The counties were -- the counties did

13  additional investigation or follow up as, as

14  necessary.

15     Q.   How do you know that?

16     A.   Well, we, we understood from some counties

17  that they had -- you know, our advice to them was to

18  consult with our solicitor to determine next steps,

19  and we know that counties did that.

20     Q.   Did the Department of State do a follow up

21  on whether or not any of these 8,698 records are

22  still registered voters?

23     A.   I don't recall that we've done an

24  additional analysis.

25     Q.   Is it possible any of those 8,689 records

 1  are still on the voter rolls?

 2          MS. WALSH:  Objection to form.

 3      A.   It's possible, yes.

 4      Q.   And further down on that page, under No. 4

 5  where it says "Files were sent to the appropriate

 6  counties on July 26th and loaded into their security

 7  FTP sites."

 8          What files were sent?

 9      A.   The files would have been the list of

10  voters that would require additional outreach or

11  investigation by the counties.

12      Q.   In this universe of 11,198?

13      A.   It would be the, the 8,700 that did not

14  already respond or there was not already a

15  resolution.

16      Q.   After that part of the process, where

17  files were sent to the appropriate counties, did the

18  Department of State do anything else to identify any

19  other registrants that might lack citizenship?

20          MS. WALSH:  Objection to form.

21      A.   No.  I'm not aware of any others.

22      Q.   And have you spoken directly with Al

23  Schmidt about his testimony regarding the hundred

24  thousand matches?

25      A.   I have not, no.

1     Q.   Has anyone from the Department spoken to

2  him about that testimony?

3     A.   I, I don't believe so, no.

4     Q.   And why was the universe of people who got

5  letters, the 11,198, and not the 100,000 that

6  initially matched?

7          MS. WALSH:  Just note an objection, again,

8  to the extent you're asking questions that delves

9  into an area that's protected from discovery by the

10  attorney-client privilege and the work-product

11  doctrine.

12     A.   Well, the 100,000 --

13          MS. WALSH:  If you can answer the question

14  without getting into either privileged

15  communications or privileged investigation, but I

16  would caution you not to do so, not to disclose that

17  information.

18     Q.   So can you tell me why the full 100,000

19  registrants did not get letters?

20          MS. WALSH:  Same objection.

21     A.   I -- you know, as, as we told Commissioner

22  Schmidt, that was simply the universe of potential.

23  There was no, there was no evidence or no reliable

24  information to suggest that that many individuals on

25  the voter records were not citizens.

1    Q.   And who determined whether or not that

2    information was reliable?

3    A.   The Department, and I think common sense

4    actually dictated that it wasn't.

5    Q.   How would common sense dictate?

6    A.   Well, you know, you're doing, you're doing

7    a match of point-in-time data against another

8    database.  So without additional information, there

9    would be no way to determine whether any of those

10   individuals were not citizens, for example, at the

11   time they registered.

12        As I said, there are a variety of INS

13   indicators, and not all of them mean that the voter

14   isn't a citizen.  So it was a very-high level -- and

15   that's why I would never characterize it as an

16   analysis.

17        And maybe I can give you an example, if it

18   helps.

19        The State of Florida attempted a similar

20   thing, and started with the universe of, I think,

21   180,000, and after doing a more responsible analysis

22   ended up with several thousand in that -- as they

23   did additional investigation with their county

24   election offices, that was whittled down to just a

25   few hundred.

1      Q.   Well, I'm talking about Pennsylvania, not

2   Florida.

3          So with regard to the INS indicators on

4   the driver's license, what else would the INS

5   indicator indicate other than citizenship status?

6          MS. WALSH:  Objection to form.

7      A.   I'm not an expert on, on everything within

8   PennDOT's database, but my understanding is not all

9   of those INS indicators indicate that somebody is

10  not a citizen.

11         And even the ones that do indicate that

12  somebody may not have been a citizen at a point in

13  time doesn't indicate that they're currently not a

14  citizen.

15         MS. KERNS:  Okay.  I'm going to pull up

16  Exhibit -- what I'm going to mark as Exhibit 21.

17  This is Bates-stamped 184 -- D184 and D185.

18              (Deposition Exhibit No. 21 marked for

19       identification.)

20      Q.   Let me know when you can see that.

21         Do you have that in front of you?

22      A.   184?

23      Q.   Yeah.

24      A.   Did you say 184?

25      Q.   Bates-stamped D184 and D185.  It's an

1  e-mail from Kathy Boockvar to the County Election

2  Directors --

3      A.   Yes, I have that.

4      Q.   -- dated April 27th of 2018.

5      A.   Yes.

6      Q.   If you go to the second page, Secretary

7  Boockvar states, "Currently, the Department is

8  continuing its analysis.  Following the Primary,

9  when voter roll maintenance may legally occur, the

10  department will use nationally-recognized list

11  maintenance practices, including the use of updated

12  registration information obtained through the ERIC

13  voter maintenance program, to conduct analysis and

14  take additional verification actions."

15      Did the Department of State end up using

16  the ERIC information?

17      A.   No.

18      Q.   Why not?

19      A.   Well, the ERIC information wouldn't be

20  informative.

21      MS. WALSH:  Ms. Kerns, the witness has a

22  paper copy which he was just handed of Exhibit 21.

23      MS. KERNS:  Okay.

24      Thank you.

25      Q.   So in this e-mail, Secretary Boockvar

1  states specifically, "including the use of updated

2  registration information obtained through the ERIC

3  voter list maintenance program."

4        Why did Ms. Boockvar write that in the

5  e-mail, if that information would not be

6  informative?

7        MS. WALSH:  Objection to form.

8    A.   I think the only, the only thing that ERIC

9  would be able to give us is, perhaps, an updated

10  address.

11    Q.   Did the Department conduct further

12  analysis?

13        MS. WALSH:  I just note an objection.

14        And I understand from your question, are

15  you asking whether the Department internally and

16  separate and aside from the experts analysis?  Is

17  that what you're asking?

18        MS. KERNS:  Yes.

19    A.   No.  This, this ties directly back to

20  the -- I forget which exhibits they were, but the

21  letters.

22        So after the Primary, we sent letters to

23  11,198.  That was after additional expert analysis.

24    Q.   This Exhibit 21 -- excuse me, yeah, 21

25  references "further analysis" and "continuing

1    analysis".

2            So was that performed?

3            MS. WALSH:  Objection; asked and

4    answered.

5        A.  Yes.  I think -- and I think that's

6    demonstrated in the, in the exhibits we provided

7    previously.

8            This was, this was written to the counties

9    at the time the 7,702 went out.

10           And then as you may recall in the

11   Statement, we indicated additional analysis was

12   conducted, and that resulted in the mailing of

13   11,198 records after this date -- I'm sorry, 11,198

14   letters.  Not records.

15       Q.  With regard to the analysis, earlier you

16   testified that you believe that the SAVE, S-A-V-E,

17   database is not a reliable source when it comes to

18   verifying the citizenship of registered voters.

19           Do you remember testifying about that

20   earlier today?

21           MS. WALSH:  Note an objection to the form.

22       A.  Yes.

23       Q.  If a reliable database existed, do you

24   think that kind of a database would be helpful in

25   performing voter list maintenance?

1          MS. WALSH:  Objection to form; calls for

2     speculation.  What are you -- I'm not even sure what

3     you're asking, what specific databases or potential

4     databases you're talking about.  I don't know how

5     the witness can answer that question.

6          Q.   Can you answer the question, Mr. Marks?

7          A.   I, I don't know whether it would be

8     helpful or not.  I'd have to know what it is.

9          Q.   Are you --

10         A.   And to be clear, the same database.  It's

11    not, it's not simply my opinion.

12              The Department of Homeland Security has

13    stated that it's not reliable for verifying

14    citizenship for voter registration.  Even the former

15    Secretary of State in Kansas conceded that SAVE is

16    not a reliable source.

17         Q.   Are you aware of any databases that are

18    reliable sources with regard to that information?

19              MS. WALSH:  Objection to form.

20         A.   I'm not aware of a database that would

21    confirm someone's citizenship, no.

22              (Deposition Exhibit No. 22 marked for

23         identification.)

24         Q.   All right.

25              I'm going to now go to Exhibit 22.  And

1    this is the Defendant's Responses to Plaintiff's

2    Interrogatories.  And these were provided July -- in

3    or about July 13th, 2020.

4              Let me know when you can see that.

5         A.   Okay.  We have it up.

6         Q.   Okay.

7              If you go to Interrogatory No. 5, which is

8    page 8 of the responses.  And Interrogatory No. 5

9    states "Describe the activities and role of the

10   Electronic Registration Information Center (ERIC)

11   with respect to the non-citizen matching analysis

12   and the initial statewide analysis."

13             Do you see that?

14        A.   I do, yes.

15        Q.   And in her response -- which is the third

16   full paragraph of the response, it states "Secretary

17   Boockvar has no firsthand knowledge that the

18   Electronic Registration Information Center was used

19   for either purpose."

20             Was the -- is that, is that interrogatory

21   answer accurate?

22        A.   Let me scroll back up to the

23   interrogatories.  I just want to make sure I --

24             Yes, it is.

25        Q.   So we listed another exhibit where Ms.

1    Boockvar sent an e-mail out stating that --

2        A.    Is it 21?  Exhibit 21?

3        Q.    Yes.

4        A.    Okay.

5              I have it.

6        Q.    Yeah.

7              Referring that "including the use of

8    updated registration information obtained through

9    ERIC."

10             So how do you square those two statements?

11       A.    Oh.  I, I can't speak for Ms. Boockvar,

12   but the -- you know, I think it's clear that ERIC --

13   the ERIC program data could not be used to determine

14   the citizenship status of an individual.

15       Q.    So was that e-mail, that Secretary

16   Boockvar sent out referring to ERIC, inaccurate?

17             MS. WALSH:  Objection to form.

18       A.    I think to the, to the extent that it was

19   understood to mean that ERIC would be able to

20   provide information regarding the citizenship status

21   of vote registrants, then yes.

22             MS. KERNS:  All right.

23             I'm going to pull up Exhibit 23, and Ms.

24   Walsh, I'm almost through, just so you know.

25             MS. WALSH:  Thank you.

1          The witness -- oh, wait.  He has got in

2    front of him a copy of 22, just to --

3          MS. KERNS:  No. I'm sorry.  I'm now

4    pulling up Exhibit 23, which is Bates-stamped

5    PILF 937 through PILF 938.  And this I'm marking as

6    Exhibit 23.

7                (Deposition Exhibit No. 23 marked for

8        identification.)

9        Q.   Let me know when you can see it.

10       A.   This is February 29 in 2008?

11       Q.   Right.

12       A.   United States District Court.

13       Q.   Right.

14       A.   It looks like there's a Post-It note

15   posted over top of it.

16       Q.   Right.  There's handwriting on it.

17            And this is a letter from the Jury

18   Administration Supervisor for the United States

19   District Court for the Western District of

20   Pennsylvania.

21            The first paragraph of this letter reads

22   that "this letter and its enclosure is to notify

23   you" -- and it's addressed to Mr. Harry VanSickle of

24   the Commonwealth of Pennsylvania, Department of

25   State -- "it's to notify you of those individuals

1  who notified the Jury Office of the U.S. District

2  Court Western District of Pennsylvania, during the

3  jury qualification process, that they are not U.S.

4  citizens."

5          Have you ever seen a letter like this

6  before?

7      A.   I have, yes.

8      Q.   Now, that first paragraph, the last

9  sentence says "The attached list of names was

10  included in the voter records this court received

11  after the November 2006 General Election."

12          Do you see that?

13      A.   I do, yes.

14      Q.   And the next page of that exhibit, at the

15  top, it says "Non-Citizen Report".

16      A.   Yes.

17      Q.   What do the counties -- I'm sorry.  What

18  would the Department of State do, once they received

19  a letter like this?

20      A.   We would provide the information to the

21  counties.

22      Q.   And how often does the Department of State

23  receive letters like this?

24      A.   They are, they are infrequent but

25  periodically.

1     Q.   Can you describe "periodically".

2     A.   My, my recollection is that we would get

3     them maybe, you know, once every couple of years, at

4     most.

5     Q.   Now, this one is from the United States

6     District Court, which is the federal court.

7          Does the Department of State ever receive

8     them from Pennsylvania state courts?  Any Courts of

9     Common Pleas?

10    A.   I don't, I don't recall that we've

11    received letters like this from state -- the State

12    Court System.

13    Q.   Do you know if the County Commissioners

14    receive letters from the state court, from the State

15    Court System?

16    A.   I don't know if the counties receive

17    letters directly from the State Court System.

18    Q.   When the Department of State receives a

19    letter like this, does the Department of State

20    maintain a copy?

21    A.   We would, we would forward it on to the

22    county election office; so we, we would have a

23    record of those communications.

24    Q.   Are those records maintained in the SURE

25    system?

```
1        A.   The voter records or --

2        Q.   I'm sorry.

3             The records of these types of letters?

4        A.   They are not.

5                  (Deposition Exhibit No. 24 for

6        identification.)

7        Q.   Now, I'm going to show you Exhibit No. 24.

8   I'm going to pull that up.

9             Let me know when you can see it.

10            Can you see it on your screen?

11       A.   Almost there.  I -- this has "City Life"

12  at the top.

13       Q.   Right.  So I'm going to --

14       A.   I see that.

15       Q.   So this is a Philadelphia magazine article

16  dated January 9, 2021.  And I'm going to go to the

17  paginated 1 of 8, 2 of 8.  I'm going to go to 3 of

18  8.

19       A.   Can you scroll.

20       Q.   Mr. Marks, can you see that?

21       A.   Which part of it?

22       Q.   Well, can you see at the top of the page,

23  it says -- near the top, there's a line that says,

24  "I have no idea.  I'm so sorry."

25            Can you see that?
```

1      A.   I'm looking for it.

2           Oh, yes.  Okay.

3      Q.   Okay.

4           So right under that, there's a paragraph

5  that starts "Trump's sentiments about Philly

6  elections weren't exactly new."

7           Do you see that paragraph?

8      A.   I'm sorry.  I'm having a hard time.  I

9  think the glare is starting to -- from the lights,

10  the darker it gets.

11          MS. WALSH:  We're printing a copy.

12          THE WITNESS:  Okay.

13          MS. WALSH:  It should be a few seconds.

14     A.   Okay.  I apologize, Ms. Kerns.

15     Q.   Let me know when you have it.

16     A.   I'd walk up to the screen, but I assume

17  you don't want to see a close-up of my tie.

18     Q.   I'm fine.

19          While it's printing, I'll say that the

20  question was -- or the paragraph starts "Trump's

21  sentiments about Philly elections weren't exactly

22  new.  I've lived here all my life, and I've heard of

23  the "old dead people" voting thing for as long as I

24  can remember.  Has anyone ever actually voted in the

25  name of a dead person?"

1          And then as part of the answer,

2     Mr. Schmidt says "And we have investigated these

3     claims dozens of times, and every single time,

4     there's no evidence of fraud."

5          Do you know what he means "we have

6     investigated"?  Is that -- do you know if he means

7     the Department of -- and I realize that you might

8     not have seen this before.

9          Do you know if he's referring to

10    investigations by the Department of State or

11    investigations by the department -- the Philadelphia

12    City Commissioners?

13          MS. WALSH:  Objection to form.

14     A.   I, I don't know.  I haven't seen the

15    article before, and I, I can't say for certainty,

16    but -- for certain, but I would, I would expect that

17    he's referring to the Board of Elections.

18     Q.   All right.

19          And then further down, near the end of the

20    article, there's a question that says "Right before

21    the election, I saw a media report that 90 percent

22    of eligible voters were registered to vote in

23    Philadelphia, which seems suspiciously high, even

24    though I know there was a lot of interest in this

25    election."

1          And Mr. Schmidt's answer is "Well, the

2    Pennsylvania registration system prohibits anyone

3    from being removed from the rolls unless they've

4    been inactive for seven years, which is missing 14

5    elections in a row."

6          Would you consider that statement

7    accurate?

8          MS. WALSH:  Objection to form.

9      A.   No, I would disagree with it.  I don't

10   know that it's a -- if he's referring to someone who

11   is simply registered and then did not do anything

12   for a period of seven years; I think he's maybe

13   doing the math on the five-year notice, plus the two

14   federal elections.

15         But when he says "inactive", I, I take

16   that to mean that the record -- the voter record is

17   inactive.  That would occur, in most cases, over the

18   course of just two federal elections.

19     Q.   Okay.

20     A.   I don't know exactly what he was trying to

21   communicate here.  You know, it's his statement, but

22   maybe he was trying to make a point regarding the,

23   the -- you know, requirements of the NVRA as well as

24   Pennsylvania's Voter Registration Law.

25                 (Deposition Exhibit No. 25 marked for

1          identification.)

2      Q.   Okay.

3           I just have a couple more exhibits.

4           This one is Bates-stamped D241, and it is

5   dated April 19, 2010.

6           Let me know when you can see it.

7           We're going to put it up on the screen.

8   It's Bates-stamped D241.

9      A.   At the top, County of Allegheny Department

10  of Administrative Services Elections Division?

11     Q.   Right.

12     A.   I see it.

13     Q.   That letter -- the author of that letter

14  is Mark Walosik, Division Manager.

15          Do you know Mr. Walosik?

16     A.   Yes.  I did know Mark Walosik.

17     Q.   At the bottom of the letter, in

18  handwriting, it says "Original list and letter in,

19  single quote, 'citizenship issues; single quote,

20  'file'."

21          Do you see that?

22     A.   I do, yes.

23     Q.   Do you know what he's referring to?

24     A.   I don't, no.

25     Q.   Does each county keep a citizenship issue

1   file?

2       A.   I don't know that.

3       Q.   Does the Department of State keep that

4   type of a file?

5       A.   No.

6       Q.   Is there a file in the SURE system called

7   "citizenship issues" that you're aware of?

8       A.   No.

9       Q.   All right.  I'm going to move to the next

10  exhibit, Exhibit 26, and this is Bates-stamped D2091

11  through D2093.

12               (Deposition Exhibit No. 26 marked for

13          identification.)

14      Q.   Let me know when you can see that.

15      A.   I can see it.  This is a -- it appears to

16  be an e-mail from Kathryn Boockvar.

17      Q.   Yes.

18      A.   Dated April 30th, 2018.

19      Q.   Right.

20               And if you scroll down, it's in response

21  from an e-mail from Nick Custodio of Philadelphia.

22               Have you ever seen --

23      A.   Yes.

24      Q.   I'm sorry.

25               Have you ever seen this e-mail before?

Exhibit A

1      A.   I don't recall seeing this e-mail, no.

2      Q.   Okay.

3           Well, if you look at what Mr. Custodio

4  wrote, he said, "Kathy, Lisa would like to know:

5  How many of these are going out in Philadelphia?

6  How many of these people in Philadelphia have voted?

7  Is there a search in SURE that we can do to get a

8  list of who this is going to?  Or could you provide

9  us with a list?  What happens to those who don't

10  respond to the letter?  Is there with some way to

11  log that a voter confirms that they meet all of the

12  requirements so that they are excluded from any

13  future communications/risk to their voting status

14  and related to this matter."

15          And Mrs. Boockvar responded, "Hi, Nick.

16  Federal and state laws protect the privacy of these

17  individuals.  So we cannot release the list."

18          Do you know what she's referring to when

19  she talks about federal and state law protecting the

20  privacy?

21          MS. WALSH:  Object to the form.

22      A.   I'm not, I'm not an attorney.  I do know

23  that the list was derived in part with protected

24  driver's license or motor vehicle records, but I

25  don't, I don't know specifically what laws she's

1   referring to.

2       Q.   And Ms. Boockvar said in that e-mail,

3   "Approximately 2,101 people recently or currently

4   registered in Philadelphia were mailed the letter."

5           Do you know how that was determined who

6   those 2,100 people were?

7           MS. WALSH:  Just note an objection, again,

8   to the extent you're asking the witness about the

9   privileged investigation, which is protected from

10  disclosure.

11      A.   I would -- I believe she was referring

12  to -- because if you go to the beginning of this

13  thread, it is her e-mail to the counties regarding

14  the expert analysis that the Department had

15  undertaken.  So I believe she's answering that in

16  the context of that.  So that number would have been

17  derived from that expert analysis.

18      Q.   And here again, Ms. Boockvar, in that same

19  answer, the second sentence from the last says,

20  "After the primary, when list maintenance can

21  legally occur, the department will take further

22  steps and conduct further analysis, including use of

23  the ERIC voter list maintenance program."

24          Did that further analysis occur?

25          MS. WALSH:  Same objection, to the extent

1  you're asking about a privileged analysis and

2  investigation.

3      A.   As, as we noted earlier, between the, the

4  April letter and the subsequent June letter,

5  additional analysis occurred resulting in the list

6  of 11,198.

7          In regard to the reference to the ERIC

8  voter list maintenance program that did not occur.

9  ERIC does not provide informative information

10 regarding the citizenship status.

11     Q.   Would there be a reason why Ms. Boockvar

12 keeps referring to ERIC?

13     A.   I, I can't answer that.  I don't know.

14     Q.   You had testified that after sending the

15 second letter to the 11,198 individuals that you

16 sent the counties files, and those files included

17 individuals that had not responded to the letters or

18 who had undelivered mail.

19          Do you remember that testimony?

20     A.   I do, yes.

21     Q.   Did those files include the identities of

22 those individuals?

23     A.   I believe those files included the names

24 of those individuals, yes.

25     Q.   Did it include any other identifying

1   information, like address or voter number?

2       A.   I, I believe it would have included that

3   information about each, each registrant, yes.

4       Q.   Then why didn't federal law and state law

5   protect the identity of those individuals at that

6   point in time?

7           MS. WALSH:  Objection; it calls for a

8   legal conclusion.

9       A.   Yeah.  Again, I'm not, I'm not an

10  attorney.

11      Q.   But you would agree that there was some

12  type of a determination made that that was not

13  privileged or protected; correct?

14          MS. WALSH:  No.  Mischaracterizes the

15  testimony.  I object.  I object to the form of the

16  question and I object to the extent you're seeking a

17  legal conclusion.

18      Q.   Who makes the determination, Mr. Marks, of

19  when something is protected by federal or state law?

20  Is it someone from the Department of State?

21          MS. WALSH:  Objection; it calls for a

22  legal conclusion.  You're far outside the narrow

23  scope of what this deposition was supposed to be

24  about, and I object to the form of the question.

25      A.   I'll go back to my testimony earlier this

Exhibit A

1  morning.  We, we consult with our counsel over what

2  information is, is appropriate to provide under

3  whether it's federal or state law.  So that would be

4  a decision done in consultation with our counsel.

5           (Deposition Exhibit No. 27 marked for

6      identification.)

7      Q.   Okay.

8           I'm going to pull up my last exhibit,

9  Exhibit 27, and this is Bates stamped D2170 through

10  D2175.

11           Let me know when you can see that.

12      A.   It's an e-mail from me dated

13  August 10th or 16th, 2018.

14      Q.   Okay.

15           If you go down to the second page of this

16  exhibit.  It's Bates-stamped D2171.

17           Do you see that?

18      A.   I do, yes.

19      Q.   So there's an e-mail from

20  paelectiondirectors@yahoogroups.com, and it's to

21  paelectiondirectors@yahoogroups.com.

22           MS. WALSH:  Are you referring to an e-mail

23  on Monday, July 30th at 10:43 a.m.?

24           MS. KERNS:  Yes.

25      Q.   Yes.  The second page of this exhibit.

1      A.   Yes.  I see that.

2      Q.   What is that?  Who's a member of that

3  Yahoo group?

4      A.   Those are county election officials.

5      Q.   When did that Yahoo group start?

6      A.   I don't know.

7      Q.   Are you a member of that Yahoo group?

8      A.   No.

9      Q.   Have you ever received an e-mail from that

10  Yahoo group?

11      A.   We do, if, if, if I'm copied on an e-mail

12  that goes to the group, yes, but we can't respond to

13  the group.

14      Q.   Why not?

15      A.   Because we're not members.

16      Q.   How long have you been aware that this

17  group existed?

18      A.   I believe it has existed for several

19  years, perhaps, a decade.

20      Q.   Are they e-mails or communications in

21  this -- in and among this group archived anywhere?

22      A.   I don't know.

23      Q.   Was this type of group -- was this group

24  authorized by the Department of State as a way to

25  communicate?

1      A.   No.

2           MS. WALSH:  Objection to form.

3           MS. KERNS:  I'm sorry.  I didn't hear

4    that, Ms. Walsh.

5           MS. WALSH:  I said "objection to form".

6      Q.   Okay.

7           In this, in this e-mail that you sent to

8    Shari Brewer on August 10th, 2018 --

9      A.   Yes.

10     Q.   -- you say "Other counties have reviewed

11   the individuals' voter registration records to

12   determine whether the records included additional

13   information that might be useful for further

14   determination.  If you do not identify information

15   that warrants a challenge to an individual's

16   eligibility, we are not suggesting that you have an

17   obligation to assert a challenge."

18           How would the counties identify

19   information that warrants a challenge?

20           MS. WALSH:  Objection to form.

21     A.   Well, the counties, the counties would

22   work with their solicitor and, and potentially the

23   district attorney to investigate, as they would any

24   other election issue or potential election

25   irregularity, and determine whether they could

1  ascertain information that would require them to

2  take additional action.

3      Q.   So if you can explain to me what they

4  would use to identify the information that warrants

5  a challenge?

6          MS. WALSH:  Objection; asked and answered.

7      A.   Well, I think that would be, I think that

8  would be up to each county to determine what

9  information they may have available to them to make

10  that determination that done consultation with

11  their, with their county solicitor and their

12  election board.

13          MS. KERNS:  And I'm sorry.  I know I said

14  that was the last exhibit, but I have one more

15  exhibit, which is essentially all of the documents,

16  because I haven't had a chance to go through them.

17  I'm just going to have to mark them as an exhibit,

18  the batch of documents that I received last night by

19  e-mail that I couldn't open and look at until this

20  morning at 9:30.

21          So I don't know if you have them in front

22  of the witness, Ms. Walsh?

23          MS. WALSH:  We do not.

24          MS. KERNS:  I'm sorry?

25          MS. WALSH:  We do not.

 1          MS. KERNS:  Well, we'll try to put it up

 2   on the screen to share it.

 3          And we're going to mark this as Exhibit --

 4   this would be Exhibit 28.  And the best way to

 5   identify it is the exhibits sent by counsel for the

 6   Department on -- by e-mail on December --

 7   February 11th, 2021.

 8          (Deposition Exhibit No. 28 marked for

 9   identification.)

10      Q.   So can you see that first page, Mr. Marks?

11      A.   I can.  It's, it's hard to see the

12   details.

13      Q.   Can you tell me what this is?

14      A.   It appears to be a list.

15      Q.   Can you tell what it was generated from?

16      A.   Well, I can, I can tell what format it's

17   in.  It appears to be a spreadsheet, and it appears

18   to be a list of voter records.

19      Q.   Can you tell if this was generated by SURE

20   or from SURE?

21      A.   I would expect that the, that the data in,

22   in the list would have been at least in part

23   generated using SURE data.

24      Q.   Have you ever seen this before?

25      A.   I did see a copy of this this morning.

1    Q.   Had you seen it prior to this morning?

2    A.   I don't recall seeing it prior to this

3  morning, no.

4    Q.   Do you remember earlier, when we discussed

5  a query that you said you had performed that

6  generated 1,160 records?

7    A.   Yes.

8    Q.   Is this that -- is this the results of

9  that query?

10   A.   I believe it is, yes.

11   Q.   When you generate a query, I think you

12  called it a back-end-query.  Is this what the result

13  looks like?

14       MS. WALSH:  Objection to form.

15   A.   It -- this is what -- yeah.  This is what

16  the results of the data -- it would depend on the

17  query, you know, obviously.  The columns may be

18  different, and depending on what you're querying,

19  but, yes, it will pull data, and you typically would

20  pull that into a, you know, access -- or Excel

21  database depending on the size.

22   Q.   So moving down to the next part, can you

23  tell me what these next records are?  If you can

24  see, we put it up on the screen.  It says "Row

25  Labels", "Count of VoterIDNum", N-U-M, "Row Labels".

1      A.   That appears to be a -- now, you're

2   testing my technical knowledge, but it looks like a

3   -- I can't think of the word, all of a sudden.

4   It's, it's like a summary of the data.  It's a pivot

5   table.

6          MS. WALSH:  Ms. Kerns, we're having

7   difficulty seeing the entirety of the screen.  And

8   I'm not sure if that's on our end or your end, but

9   we're not able to see the -- it's at the top.

10     Q.   Well, for instance, like it would -- it

11  will -- it has what looks like maybe a year, "Row

12  Labels 1977-05-17" and then underneath it, it says

13  "Bucks".  And it says "Count of Voter ID Num".

14         Do you know?

15     A.   I mean, this is, this is a pivot table

16  inside of the spreadsheet that sort of summarizes

17  the raw data within the spreadsheet.

18     Q.   So what would --

19         MS. WALSH:  I apologize for interrupting.

20         So the witness was just handed a paper

21  printout of the documents --

22         MS. KERNS:  Oh.

23         MS. WALSH:  -- that you referenced.  I

24  think it will make things -- we'll able to see the

25  records, since we're trying to look here at the big

1   screen.

2          MS. KERNS:  Yeah.  That helps.

3          MS. WALSH:  And I'll also just note that

4   the redactions of personal identifying information,

5   was done by our office.  We had given you that in a

6   cover letter sent to you yesterday.

7          Is there a particular page of the Bates

8   number you would like the witness to turn to in the

9   paper copy we put in front of him?

10     Q.   Well, let's -- for some reason mine got

11  corrupted too.

12         Well, Mr. Marks, if we go back to that

13  part with the -- you called it a pivot.  Did you run

14  that report?

15     A.   I did not, no.

16     Q.   Do you know who ran that report?  Or do

17  you want to call it a report or a query?

18     A.   I would say it's the results of a query,

19  but I believe our Bureau of Election, Security and

20  Technology would have run this.

21     Q.   Do you know when it was run?

22     A.   I don't know exactly when it was run.  I

23  believe it would have been September of 2017.

24     Q.   All right.

25         Let's go to the part that Bates-stamped

1  2228 and 2229.  I'm sorry.  It's weird.  I can't --

2  I'm having trouble pulling up -- can you go to where

3  it says 2228 and 2229.

4          MS. WALSH:  Bear with us.  We're getting

5  there.

6      A.   I have 2228.  Yes.

7      Q.   All right.

8          And there's a -- I think I'm referring to

9  the right page.  It says "Grand Total 642".

10     A.   Yes.

11     Q.   What is that a grand total of?

12     A.   It would be -- appears to be a grand total

13  of the records summarized in this pivot table, which

14  begins -- it's hard to -- it's a printout of a

15  spreadsheet.  So it begins on 2221.

16     Q.   So what does that 642 represent?

17  Six-forty-two what?

18     A.   I don't know.  It's a, it's a pivot table.

19  So it is a summary of raw data.  And not knowing

20  what the -- it looks like it's a -- just based on

21  the headers on the pivot table, it looks like it is

22  a count of voter ID numbers.

23     Q.   Do you know what this -- my office

24  received this last night.

25          Do you know what this was responsive to?

1  Or what, what discovery question this was answering?

2        MS. WALSH:  I can answer that.  Again, I

3  know you're not looking for an answer from me, but I

4  think I can cut through a lot of this.

5        MS. KERNS:  Yes.

6        MS. WALSH:  So this summarizes the, the

7  dates of the -- as I understand it, the dates of the

8  registrations by year of the registrations that were

9  later canceled, as reported in the first table.

10  Again, that's my reading of it.

11        But you can see, there are row labels,

12  1977 Bucks, 1, Butler 1.  That's at least the page

13  that we have on our screen.  I apologize.  It's a

14  little bit difficult, and I don't know that we're

15  looking exactly what you're looking at.

16     A.   This is 2221.

17        Yeah.  That's what I'm looking at too.

18     Q.   So, Mr. Marks, the query that resulted in

19  this table, could the Department of State run a

20  similar query today using SURE?

21     A.   I expect that we could, yes.

22     Q.   And if you go down to what's Bates-stamped

23  2234, it indicates 11 -- a total of 1,159.  So what

24  is that a total of?

25     A.   It appears to be -- if you follow it back

1  several pages, it appears to be a total of a list of

2  records with a "status reason cancel - not a

3  citizen".

4      Q.  Do you know who produced this?  I don't

5  know what to call it.  Should I call it a

6  spreadsheet or a report or a --

7      A.  It does -- it appears to be a spreadsheet.

8  So I think it's fair to call it a spreadsheet.

9      Q.  Do you know who produced this?

10      MS. WALSH:  Well, we produced it to you.

11      MS. KERNS:  Meaning -- no.  I'm sorry.

12      Q.  I mean, do you know who -- I don't mean

13  produced it to me.  I mean do you know who created

14  this?

15      A.  I believe it would have been generated by

16  our Bureau of Elections, Security and Technology.

17      Q.  And do you know when this was done?

18      A.  I, I would assume it was done around the

19  same time frame, September 2017, but that's, that's

20  an assumption.  There's a lot of pages here, so.

21      Q.  So if you think it was done around 2017,

22  do you know why it was not sent to my office until

23  last night?

24      A.  I do not.

25      Q.  Okay.

Exhibit A

1          And in that same pile, I'm going to direct
2    you to 2245.  Let me know when you get to it.
3          A.   I see it.  I have that.
4          Q.   Okay.
5          So that's an e-mail from Seth Bluestein to
6    Jonathan Marks on September 7, 2017.
7          A.   I see that, yes.
8          Q.   So was that produced as a result of the
9    meetings that we talked about earlier between your
10   office and Al Schmidt's office?
11         MS. WALSH:  Objection to form.
12         A.   It was produced in, in conjunction with
13   the meetings with Commissioner Schmidt's office.
14         Q.   So do you know -- and I don't mean to use
15   the word "produced" because I know "produced"
16   usually means what you would give to an attorney,
17   but do you know how that Excel spreadsheet, which
18   appears to be attached in written form starting at
19   2246, do you know how that was created?
20         A.   I don't know.
21         Q.   Is that information from the SURE system?
22         A.   It could be.  That information is
23   contained in the SURE system.  Whether the SURE
24   system was used to produce the list or not, I don't
25   know.

1    Q.   So Mr. Bluestein talks about in his cover

2  e-mail, "Please find attached the draft excel file

3  that we're working on.  We are actively checking and

4  supplementing it with more information.  So the file

5  is a work-in-progress."

6         Was the Philadelphia City Commissioners

7  doing an analysis, separate and apart from the

8  analysis being conducted by the Department of State?

9    A.   Yes.  The, the Commissioners office was

10  doing its own analysis of this issue.

11   Q.   Was the Commissioners' office math using

12  Pennsylvania Department of Transportation records to

13  do their analysis?

14   A.   I don't know.  I don't believe so.

15   Q.   So do you know how the Philadelphia

16  Commissioners' Office would determine how to put or

17  why people would appear on this list?

18   A.   I don't know the details of how they, they

19  determine that.

20   Q.   Did you ask them?

21   A.   Well, I, I don't know the details of how

22  they determine in each individual record, but that

23  was part of our discussions.

24         As you may recall, I testified earlier

25  this morning that they had shown us examples or, or

Exhibit A

1  samples at our first meeting of letters or

2  correspondence or records that they had obtained,

3  either directly from voters or from voters, or from

4  individuals representing them.  So I would think

5  that they used their records.  To what extent they

6  used SURE to do this, I don't know.

7     Q.  When you received this file from Mr.

8  Bluestein, did you take any other action on this

9  list?

10    A.  No.  This list, as Deputy Commissioner

11  Bluestein noted in this e-mail, was a

12  work-in-progress.  This was basically a snapshot of

13  Philadelphia County's analysis of its own records.

14    Q.  Okay.

15       If you go down to Bates-stamped 2253, I'm

16  going to ask you if you can tell me what that

17  appears -- what that is?

18    A.  2253?

19    Q.  Yes.

20    A.  This -- it appears to be additional

21  columns, perhaps in the spreadsheet that captured

22  the party, date registered, registration source,

23  date last changed, the driver's license.  There's a

24  "yes", which would indicate to me that that there

25  may be a driver's license on the record; the same

1   with social security number, and then date last

2   voted.

3       Q.   And this -- you would agree this is part

4   of the same spreadsheet attached to Mr. Bluestein's

5   e-mail; correct?

6       A.   It appears to be part of the same

7   spreadsheet, yes.

8       Q.   And he captioned this e-mail and

9   attachment "Non-Citizen Data sheet 9/7/17".

10          MS. WALSH:   Can you give the Bates number?

11      Q.   That would have been on --

12      A.   2245?

13      Q.   Yes.

14      A.   Yes.

15      Q.   So is this a list of registrants that

16  Philadelphia determined to be non-citizens?

17      A.   I can only speak to -- I mean, I think his

18  e-mail speaks for itself, that this was part of

19  their investigation of potential non-citizens.  I

20  can't speak to the methodology that was used to, to

21  verify that information.

22      Q.   Did the Department of State take any

23  action to verify this information?

24      A.   No.

25      Q.   Were these individuals removed from the

1  voter rolls?

2     A.   My understanding is that upon completion

3  of their analysis, Philadelphia took appropriate

4  action, which would mean canceling records that

5  required cancelation.

6     Q.   What, if anything, was done with the voter

7  records where it indicated that non-citizens had

8  voted?

9          MS. WALSH:  Objection to form.

10    A.   I don't know what Philadelphia did with

11 records that indicated that there was a vote on the

12 record.

13    Q.   Okay.  I'm going to point you to

14 Bates-stamped 2296.

15         MS. WALSH:  Did you tell us a couple of

16 minutes ago that you were at your last exhibit and

17 we're nearing the seven hours.

18         Are you close to completing this

19 deposition?

20         MS. KERNS:  Yes.

21    Q.   Are you at 2296, Mr. Marks?

22    A.   I am, yes.

23    Q.   Okay.

24         If you look at 2295, this -- there's an

25 e-mail from Wanda Murren.  Who is Wanda Murren?

1      A.   She's our Director of Press --

2   Communications and Press.  Excuse me.

3      Q.   All right.

4           Is she still your Director of

5   Communications and Press?

6      A.   She is, yes.

7      Q.   Okay.

8           Attached to this e-mail, and starting at

9   2296, there appears to be some type of a narrative.

10  At the top it says "Pennsylvania Department of

11  State".  And then it -- their narrative starts with

12  "the maintenance and accuracy".

13     A.   Yes.

14     Q.   Have you ever seen this document before,

15  2296 through 2299?

16     A.   It does look familiar.  I believe I may

17  have reviewed it prior to this deposition.

18     Q.   Was that sent to Chris Brennan with the

19  e-mail Bates-stamped 2295?

20     A.   It appears so, yes.

21     Q.   Was this document made public, other than

22  being sent to Mr. Brennan, Bates-stamped 2296 to

23  2299?

24          MS. WALSH:  Objection to form.

25     A.   I don't know that this specific -- this

1  appears to be an e-mail.  I don't know that this

2  specific e-mail was made public.

3      Q.   Did -- other than this e-mail, did Wanda

4  Murren have any discussions with Chris Brennan about

5  the contents of this e-mail?

6      A.   I don't know.  I don't know.

7      Q.   If you look at 2299, at the top of the

8  page, September 28, 2017, it says the Department of

9  State authorized the PennDOT purchase order to

10  reconfigure the Voter Motor process.

11         Do you have a copy of that purchase order?

12         MS. WALSH:  Objection.  You're far outside

13  the scope of the topics that have brought us here

14  today.  We're at the tail end of the seven hours.

15  This has nothing to do with the topics that bring us

16  here today.

17      Q.   Do you have a copy of that purchase order,

18  Mr. Marks?

19      A.   I don't know that I have a copy of the

20  purchase order, no.

21      Q.   Okay.

22         So let's just wrap-up by having you refer

23  back to Exhibit No. 2, which was the letter dated

24  October 23rd, 2017.

25         I think you had printed that out earlier.

1         MS. WALSH:  You told us you're at the tail

2    end of your exhibits.  You're at the end of your

3    seven hours.  Are you almost finished?

4         MS. KERNS:  Well, see.  I had planned this

5    deposition, Ms. Walsh, based on the information I

6    had in my possession, and then I got dumped hundreds

7    of exhibits last night.  So I might have -- you

8    know, it might have upset my planning.

9         Q.   Mr. Marks, do you have Exhibit No. 2 in

10   front of you?

11        A.   I do, yes.

12        Q.   Okay.

13             I'm just going to direct your attention to

14   paragraph No. 1.  We looked at this earlier today.

15   And it says "Documents regarding all registrants who

16   were identified as potentially not satisfying the

17   citizenship requirements."

18             I'm not going to belabor and read the

19   whole thing.

20             Do you remember reviewing this paragraph

21   this morning?

22        A.   Yes.

23        Q.   Okay.

24             So what I'm going to ask you, now, is at

25   the time you received this letter, did records exist

1  that were described by this request by this

2  paragraph?

3          MS. WALSH:  Objection to form to the

4  extent that you're asking a legal conclusion.

5      Q.  I don't think it's a legal conclusion.

6  I'm asking him after -- because we've gone through a

7  lot of documents today.

8          So now I'm asking him.

9          At the time you received this letter, the

10  Department of State received this letter, did

11  documents exist regarding all registrants who were

12  identified as potentially not satisfying the

13  citizenship requirements for registration?

14          MS. WALSH:  Same objection; objection to

15  form, and also to the extent your request calls for

16  a legal conclusion.

17      A.  I don't believe there were documents that

18  were responsive.  And I think that was explained in

19  our response to this request.

20      Q.  Okay.

21          That's not the question that I asked.  The

22  question is paragraph No. 1 is a description of

23  types of documents.

24          Did any of those documents exist in the

25  Department of State's possession when you received

1 this request?

2          MS. WALSH:  Objection; asked and answered.

3     A.    Yeah.  I'll stick with my answer.  I

4 believe we've replied to this request explaining why

5 there were no documents responsive to the request.

6     Q.    All right.

7          Well, to kind of condense this.  Would

8 that be your same answer if I asked you, in

9 paragraph No. 2, if at the time you received this

10 letter, did the Department have any documents and

11 records of communication received or maintained by

12 your office from registered voters, legal counsel,

13 claimed relatives or other agents since January 1,

14 2006 requesting a removal or cancelation from the

15 voter roll for any reason related to the non-U.S.

16 citizenship and eligibility?

17          MS. WALSH:  Just note an objection to the

18 form and to the extent the request seeks a legal

19 conclusion.

20     A.    My answer would be the same, yes.  Yeah.

21 And it was explained in our response to the request.

22     Q.    Okay.

23          So with regard to that exhibit in front of

24 you, paragraphs one, two, three and four, would you

25 consider any of the documents that we've reviewed

1  today to be described by those requests?

2          MS. WALSH:  Objection to form.  We've

3  reviewed a lot of documents today.  He's explained

4  to you the history of how we got here, that there

5  was a written response.  We all know there was a

6  detailed record that was developed in the court that

7  preceded today.  I think your question calls for a

8  legal conclusion.  Whether documents are responsive

9  to this letter or whether they're required to be

10 produced under the MVRA, those are legal -- those

11 questions require legal conclusions.  Okay.

12         MS. KERNS:  And I think that you are

13 coaching your witness by droning on and on with your

14 objections.

15     Q.  So I'm just going to ask him to answer

16 whether or not anything we discussed today can be

17 described -- that you looked at today can be

18 described by paragraphs one, two, three and four.

19     Q.  You can answer the question, Mr. Marks.

20         MS. WALSH:  And, Counsel, thanks for

21 asking me, but I take issue with your saying I'm

22 droning on and on.  You've asked some of these same

23 questions again and again.  You've used up your

24 seven hours.  We've given you considerable leeway.

25 Now you're asking questions that are clearly, I

1  believe, inappropriate because they ask for legal

2  conclusions, and I'm making a record, as I'm

3  entitled to do.

4          MS. KERNS:  And, Ms. Walsh, you know, I

5  gave you leeway too, when I got dumped records, last

6  week and then last night, for requests that were

7  sent out last summer.

8      Q.   So, again, Mr. Marks, this is the last

9  question of the day.  And just to be clear, we can

10  either have the reporter read it back or I can

11  repeat it.  Which would you like?

12      A.   You can go ahead and repeat it.

13      Q.   Of the many documents that we've reviewed

14  today, would you consider any of them as being

15  described by paragraphs 1, 2, 3, and 4 of this

16  letter October 23, 2017?

17          MS. WALSH:  Objection; calls for a legal

18  conclusion.

19      A.   I, I didn't write this letter.  So I

20  don't, I don't know what exactly was intended, but

21  as noted in our response, the Department did not

22  have records that we believe that are responsive to

23  the request.

24          MS. KERNS:  Okay.

25          That concludes it.  Thank you.

1            Mr. Marks, Ms. Walsh, have a nice evening

2    and whoever else is in the room.

3            MS. WALSH:  Thank you.

4

5            (Deposition concluded at 6:07

6    o'clock p.m.)

7            (Signature not waived.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    PUBLIC LEGAL FOUNDATION

2    vs.

3    KATHY BOOCKVAR, in her official capacity

4

5                        - - - -

6                       CERTIFICATE

7

8         I, JONATHAN MARKS, do hereby certify that I
     have read the foregoing transcript of my deposition,
9    and it is a true and correct copy of my testimony,
     except for the changes, if any, made by me on the
10   attached Deposition Correction Sheet.

11

12                    _____

13                    JONATHAN MARKS

14

15                    _____

16                    (Date)

17

18   _____

19   Notary Public

20

21   _____

22   (Date)

23                                                  ls

24

25
```

```
 1  COMMONWEALTH OF PENNSYLVANIA )

 2  COUNTY OF ALLEGHENY          )

 3

 4            I, Lois Sikoski, a Court Reporter
    and a notary public in and for the Commonwealth of
 5  Pennsylvania, do hereby certify that the witness
    JONATHAN MARKS, was by me first duly sworn to
 6  testify to the truth, the whole truth, and nothing
    but the truth; that the foregoing deposition was
 7  taken at the time and place stated herein; and that
    the said deposition was recorded stenographically by
 8  me and then reduced to typewriting under my
    direction, and constitutes a true record of the
 9  testimony given by said witness, all to the best of
    my skill and ability.
10
              I further certify that the inspection,
11  reading and signing of said deposition were not
    waived by counsel for the respective parties and by
12  the witness.

13            I further certify that I am not a
    relative, or employee of either counsel, and that I
14  am in no way interested, directly or indirectly, in
    this action.
15
              IN WITNESS WHEREOF, I have hereunto set
16  my hand and affixed my seal of office this 23rd day
    of February, 2021.
17

18

19  _____
    Lois Sikoski
20  Notary Public

21
    My Commission Expires August 2, 2024.
22

23

24

25
```

Exhibit A

## Exhibits

**Exhibit 1**  4:6
13:19 14:17,18

**Exhibit 2**  4:8
24:6,7,15 25:6
34:17 259:23
260:9

**Exhibit 3**  4:10
28:20,21 29:1,8
31:11 32:15
34:17 35:1

**Exhibit 4**  4:11
35:18,25 36:1
39:2

**Exhibit 5**  4:12
44:21,24 45:2
46:12

**Exhibit 6**  4:13
50:16,19 51:20
97:22

**Exhibit 7**  4:15
54:2,4,14

**Exhibit 8**  4:16
66:14,16,23 68:9
103:10,13

**Exhibit 9**  4:17
73:17,20,22
74:11 75:3

**Exhibit 10**  4:18
79:13,16 83:16

**Exhibit 11**  4:19
84:25 85:13,17,
25 91:11,23
92:14 166:20,21
167:2

**Exhibit 12**  4:20
112:4,10,22,24
114:4 132:22

**Exhibit 13**  4:22
132:3,7,13
133:15 140:21
149:14 156:19

**Exhibit 14**  4:23
151:3,4,8 153:1
156:21,22,25

**Exhibit 15-16**
4:25 5:2

**Exhibit 17**  5:3
187:18,25 188:3
190:15,18 194:7
202:24 203:21
207:21 210:11
211:18 215:14
216:24

**Exhibit 18**  5:4
197:8,17,20
198:9

**Exhibit 19**  5:5
209:15,20

**Exhibit 20**  5:6
209:2,4,16
210:17,23 213:3
215:23

**Exhibit 21**  5:7
222:16,18
223:22 224:24
228:2

**Exhibit 22**  5:8
226:22,25

**Exhibit 23**  5:9
228:23 229:4,6,7

**Exhibit 24**  5:11
232:5,7

**Exhibit 25**  5:12
235:25

**Exhibit 26**  5:14
237:10,12

**Exhibit 27**  5:15
242:5,9

**Exhibit 28**  5:16
246:4,8

---

## $

**$20**  72:19

---

## (

**(1)**  36:7 45:13

**(30)(b)(6)**  155:8

**(a)**  45:13 46:16

**(a)(1)**  46:15

**(B)(6)**  14:21

**(D)**  77:14

**(i)**  36:7 37:2

**(T)**  77:16

**(Y)**  77:15

---

## -

**-"to**  168:19

---

## 0

**0**  77:15

**00015**  87:6

**001360**  197:16

**0015**  87:14

**01/01/2006**
77:15

**01529**  198:19,
22,23

---

## 1

**1**  13:19 14:17,18
26:8,20 27:11
28:2 37:2 54:22
81:6 83:5,22
84:6 118:19
127:2 212:16
232:17 251:12
260:14 261:22
262:13 264:15

**1(a)**  32:10,21

**1,073**  218:4

**1,159**  251:23

**1,160**  118:17,25
119:2 120:18
121:16 122:3,16,
17,18 123:3,22
124:1,14 125:13
127:8 131:7
145:12,17

146:12 247:6

**1,915**  212:16
214:25

**1-17-17**  108:3

**1-6**  66:24

**1-9**  24:7

**1/1/2006**  77:22

**10**  20:6 79:13,16
83:16 96:5

**100**  184:10
205:13

**100,000**  170:1,
13 174:7 176:13,
22,23 187:10
220:5,12,18

**10:43**  242:23

**10th**  242:13
244:8

**11**  84:25 85:13,
17,18,25 86:1
91:11,23 92:14
166:20,21 167:2
251:23

**11,198**  207:24
208:1,9,14,18
210:15,24 212:7
219:12 220:5
224:23 225:13
240:6,15

**1181**  125:23

**11th**  246:7

**12**  14:10 112:4,
10,22,24 114:4
132:22

**12/31/99999**
77:15

**1222**  54:10,15

**12th**  85:23 86:21
151:15 156:20
208:10 215:24

**13**  132:3,7,13
133:15 140:21
149:14 156:19

**13th**  227:3

**14**  151:3,4,8
153:1 156:22,25
167:4 235:4

**15**  93:3 157:4,5

**1529**  198:22

**1551**  197:16

**16**  89:4,9 169:6,
10

**162**  198:19

**168**  67:1 107:24

**16th**  242:13

**17**  51:14 187:18,
25 188:3 190:15,
18 194:7 202:24
203:2,21 207:21
210:11 211:18
215:14 216:24

**172**  105:12

**173**  67:6 68:13
103:16,19,21
107:1 109:7

**174**  67:1 69:4

**17th**  51:24

**18**  89:17 93:23
197:8,17,20
198:9

**180,000**  221:21

**184**  222:17,22,24

**19**  209:15,20
214:22 236:5

**190**  209:9

**195**  215:24

**1977**  251:12

**1977-05-17**
248:12

**1993**  20:7

**1:19-CV-622**
12:1

**1:3:37**  170:6

**1:3:57**  170:6

**1:45** 131:25

---

**2**

**2** 24:7,15 25:6 28:6 33:7 34:17, 25 36:13 80:24 125:22 127:3,14 217:19,21 232:17 259:23 260:9 262:9 264:15

**2,100** 239:6

**2,101** 239:3

**20** 51:14,23 209:2,4,16 210:17,23 213:3 214:22 215:23

**20--** 118:4

**2000** 122:4

**2002** 44:20 47:7 180:18

**2003** 44:2,4 122:9

**2004** 19:23,24

**2005** 44:5 122:9

**2006** 230:11 262:14

**2008** 19:13,23 229:10

**2010** 80:24 236:5

**2011** 19:4,6,14

**2013** 81:6 83:5,6

**2014** 83:22 86:24 87:11,13 89:7,19

**2015** 84:6,7,10 86:11 88:25 116:2 150:7

**2016** 85:23 86:21 88:15 166:22

**2017** 24:10

**26:24** 27:10 29:2,9 31:4 34:4, 8 35:2 86:11 113:2,11 118:5 122:5 125:2 151:15 154:7 156:20 171:9 249:23 252:19, 21 253:6 259:8, 24 264:16

**2018** 51:4 86:12 98:8 132:9 150:13 208:6 215:24 223:4 237:18 242:13 244:8

**2019** 18:20,23 19:5 197:17 198:12

**2020** 227:3

**2021** 232:16 246:7

**20507** 26:19 35:23 36:4

**21** 86:1 93:3 222:16,18 223:22 224:24 228:2

**21083** 45:5 46:15

**215** 215:18

**217** 215:15 216:25

**21983** 45:5

**22** 226:22,25 229:2

**2221** 250:15 251:16

**2228** 250:1,3,6

**2229** 250:1,3

**2234** 251:23

**2245** 253:2 256:12

**2246** 253:19

**2253** 255:15,18

**2295** 257:24 258:19

**2296** 257:14,21 258:9,15,22

**2299** 258:15,23 259:7

**23** 228:23 229:4, 6,7 264:16

**23rd** 24:9 26:24 27:10 34:20 259:24

**24** 232:5,7

**248** 124:21 125:6,14 126:15, 21,22 127:1,4

**25** 54:9,15 113:11 235:25

**25th** 113:1 125:2

**26** 237:10,12

**26th** 219:6

**27** 242:5,9

**27th** 132:9 150:13 223:4

**28** 246:4,8 259:8

**29** 229:10

**2:15** 131:19,21, 24 132:1

**2:30** 131:18

---

**3**

**3** 28:9,11,20,21 29:1,8 31:11 32:15 34:17 35:1 44:20 47:7 48:7 104:5 125:22 127:14 151:17 180:18 217:2 232:17 264:15

**30** 14:21

**30(b)(6)** 10:25 153:17 196:22

**300** 165:22 166:5

**30th** 237:18 242:23

**31** 81:6 83:6,22

**31st** 84:7 102:4

**32** 79:24

**33** 100:14

**34** 83:14,25

**37** 79:24

---

**4**

**4** 28:16 34:14,15 35:18,25 36:1 39:2 113:14 219:4 264:15

**40** 98:4

**46** 50:20 124:14

**4th** 29:2,9 31:3 34:21 35:2

---

**5**

**5** 44:21,24 45:2 46:12 55:1 227:7,8

**52** 35:23 36:3 45:4

**544** 126:18,25

**567** 80:21

**59:03** 157:17

**59:39** 157:17

---

**6**

**6** 50:16,19 51:20 67:5 97:22

**64** 157:8 169:15

**642** 250:9,16

**67** 96:10,16 98:15 117:20 119:12 124:16, 20 128:16 149:9

**6:00** 11:5

**6:07** 265:5

---

**7**

**7** 54:2,4,14 253:6

**7,702** 142:11,20 144:24 147:7 206:12,23 208:2, 4,7,12,17,18 209:25 225:9

**70** 128:24

**7:00** 11:6

---

**8**

**8** 36:5 66:14,16, 23 68:9 96:5 103:10,13 227:8 232:17,18

**8,689** 218:25

**8,698** 217:19,24 218:8,21

**8,700** 219:13

**8,985** 218:4

**80,000** 20:20

**84** 217:2

**897** 74:5

**898** 77:6

---

**9**

**9** 73:17,20,22 74:11 75:3 96:5 232:16

**9/7/17** 256:9

**90** 234:21

**901** 74:5

**937** 229:5

**938** 229:5

**9:30** 11:14 245:20

Exhibit A

**A**

**a.m.** 242:23

**ability** 49:25
50:1 58:20 96:9,
23

**absentee** 52:17

**abundantly**
178:4

**access** 47:14,16
48:18,20 49:2,3,
6,13,16,22 50:7,
8,9,11,12,14
52:21,25 55:3,11
59:2,5,8,19
65:25 66:11
67:22,24 68:1,2
104:21 150:21,
22,23 151:1
172:1 173:4
181:14 247:20

**accident** 209:20

**accomplish**
169:1

**accuracy** 36:18
39:4,11,24 40:5
41:15 95:13
98:22 154:17
258:12

**accurate** 40:10,
16,18,19,20
95:20 98:24
99:13 100:10
124:8 148:6
182:4 205:15
227:21 235:7

**Act** 35:15 36:6
37:7,10,14 38:1,
12 44:20 47:7
48:7 180:18

**acting** 21:5
151:13

**action** 41:9,12
42:17 43:7 64:2
65:20 163:16
205:21 245:2
255:8 256:23

257:4

**actions** 206:10
223:14

**active** 72:25
87:20,23 88:7,23

**actively** 254:3

**activities** 36:9,
17 39:3,10,16
40:4,7 42:20
55:19 57:10 98:7
102:18,25 150:4
205:2 227:9

**activity** 43:3
101:17

**actual** 93:25
100:12,15
107:12 108:10
110:25 126:23
183:15

**actuality** 53:21

**Adams** 99:25
100:14

**add** 58:13

**added** 134:10,12

**addition** 80:16
145:11,16
160:25 168:15
199:13 202:6
208:1

**additional** 17:2,
9,11 18:12
109:21 115:20
130:9 134:16
142:1 145:10
148:7 169:3
208:12 218:13,
24 219:10 221:8,
23 223:14
224:23 225:11
240:5 244:12
245:2 255:20

**address** 15:19
39:19 42:1
80:15,16,20
154:3 182:25
218:1 224:10
241:1

**addressed** 24:9
25:20 29:2
132:19 229:23

**addresses**
177:7 216:21

**administration**
20:16 51:3 86:9,
10 98:1 229:18

**Administrative**
236:10

**adverse** 60:12

**advertised**
133:18

**advice** 191:24
192:4 193:4,9,20
218:17

**advocacy** 134:1
161:21 165:10

**advocates**
128:22

**affirm** 212:17,18
215:9

**affirmative**
213:21

**affirmatively**
212:20

**afield** 61:9,13
139:22 140:6
153:16 155:8,20

**AFTERNOON**
132:2

**agencies** 173:3
182:5 190:12,13

**agency** 36:21
111:17

**agenda** 160:3,6

**agents** 262:13

**agree** 11:20
43:21 55:10 62:6
78:21,25 79:3,25
80:8 81:4,9,14
82:2,5,9 84:4
86:13 92:17
93:1,8,13,23
96:16,22 100:13,

16,17 108:4
112:1 153:23
170:24 199:19
212:6 241:11
256:3

**agreed** 61:11
104:10 155:10

**ahead** 41:4
44:14 128:8,9
264:12

**aid** 150:2

**aids** 66:12

**alerted** 119:16

**Alien** 120:23
121:7

**Allegheny** 67:3
74:4,13 91:8,16
92:8 96:4
103:10,12 108:2
236:9

**alter** 97:10

**alternative**
39:20

**America** 180:17

**analysis** 12:20
90:5 113:15,18,
22 114:1,11,19
115:3,8,12 116:8
117:16 118:13,
15,16,19,24
119:4,8 120:2,5,
10,16,17 121:15,
19,24 122:20,22
125:3,11,18,25
126:2 127:7
140:23 141:1,2,
7,13,23 145:8,25
146:10,19 147:3,
5,17,19,21,22
148:17 149:4
150:18,20
163:20 164:1
165:12,15 166:3,
8,23 168:2,8
170:15,18,21
172:8,21 187:15
188:23 189:1,7,
9,12 190:21
191:14 194:1,19,

25 195:16 197:1,
5 199:22 201:16,
17 202:1,9,22
203:7 204:3,19,
25 205:2,10,11
206:3,15,20,21,
22 207:23 208:8,
20 210:14
218:24 221:16,
21 223:8,13
224:12,16,23,25
225:1,11,15
227:11,12
239:14,17,22,24
240:1,5 254:7,8,
10,13 255:13
257:3

**analyze** 141:4
185:19

**analyzed**
167:12,22
203:19

**announced**
135:9,12

**annual** 42:13
43:16 90:17 99:2
101:9,17

**annually** 43:4

**answering** 13:4
194:5 195:9
239:15 251:1

**answers** 8:20
16:11,15,16,17
73:4,7

**AP** 106:7

**apologize** 25:3
30:3 45:5 82:16
86:19 156:25
164:22 209:19
233:14 248:19
251:13

**apparently** 11:6
121:16 122:25

**appeared** 14:5
116:15 175:11
184:18

**appears** 67:14
68:21,23 69:7

Exhibit A

74:16 77:10 80:2
81:11 88:13
104:13 108:4
113:5 135:22
138:12 142:10
237:15 246:14,
17 248:1 250:12
251:25 252:1,7
253:18 255:17,
20 256:6 258:9,
20 259:1

**applicants**
58:11 65:19

**application**
52:8,14,22 53:5
61:4,6 84:21
110:10,15,16,18,
19,20,25 111:9,
12,13 199:1

**applications**
52:4 109:4
110:13,14 111:6,
17 199:10

**apply** 11:1 20:20

**appropriately**
10:18 42:18
135:21 207:7

**approval** 21:23

**approximate**
166:4

**approximately**
114:14 125:4
165:22 174:7
178:16 239:3

**April** 85:23
86:21 132:9
150:13 223:4
236:5 237:18
240:4

**archived** 243:21

**area** 61:19
166:16 193:12
202:15 204:16
220:9

**areas** 23:14
145:5 155:23
186:25

**argumentative**
195:13

**arrived** 119:13

**art** 55:18

**article** 232:15
234:15,20

**ascertain** 245:1

**Assembly** 51:5
90:18 101:10

**assert** 244:17

**asserted** 201:25

**assigned** 20:1
189:21 190:10,
12

**assist** 155:5

**assistant** 20:1

**Associate**
199:21 200:2,9
202:7

**Association**
128:25 138:21

**assume** 9:6
233:16 252:18

**assumption**
79:11 252:20

**assumptions**
130:8

**assured** 148:5

**Atoulelou** 80:20

**attached** 92:20
93:20 180:5,10
230:9 253:18
254:2 256:4
258:8

**attachment**
256:9

**attempt** 138:8,
15

**attempted**
221:19

**attempting** 14:2
162:5

**attend** 137:21

**attendance**
161:4

**attention** 51:13
52:3 54:17
117:21 118:2,8
158:9,10 165:25
260:13

**attorney** 6:20
13:7 143:7
148:11,24 163:8
189:5,6,12
191:16 192:3,16
193:2 194:3
202:17 203:17
238:22 241:10
244:23 253:16

**attorney-client**
141:16 154:12
155:24 191:17,
20 192:15 194:2
196:14 202:2,16
203:17 204:17
206:4 207:11
208:23 220:10

**attorney-work**
202:3

**attorneys** 6:18
13:8 162:14
189:18 190:3

**Audit** 197:18
198:10,25 199:6

**Auditor** 197:18
198:11 200:6
201:1 203:7

**August** 158:8
159:4 242:13
244:8

**authentication**
149:17 150:10

**author** 236:13

**authored**
188:15 198:10

**authority**
191:18

**authorized**
243:24 259:9

**automatically**
196:11

**avoid** 116:5

**aware** 17:9,11
18:12 30:20
64:13,17 95:22
96:1,14 115:14,
22,24 121:10
123:9,16 129:16
134:23 153:5
219:21 226:17,
20 237:7 243:16

**B**

**back** 25:2 61:21
69:14 70:18 74:8
77:19 85:7 86:8
97:22 99:20
103:9,15 106:25
109:7 116:2
118:11,23 124:5
126:8 131:24
137:19 146:4
150:18 154:6
166:13 196:21
202:23 210:3,11
211:18 213:8,10,
11 215:11,14
216:24 224:19
227:22 241:25
249:12 251:25
259:23 264:10

**back-end-query**
247:12

**bad** 126:20

**ballots** 52:18
126:6,25 127:5

**based** 11:19
65:11 73:5 81:5
82:9 99:14
106:21 115:25
116:3,13 123:25
130:20 145:7
147:21 175:10
176:5 207:22
210:13 250:20
260:5

**basically** 42:22
158:13 183:9

255:12

**basis** 22:24
43:17 72:15
88:10 119:11

**batch** 17:2,5
18:5 245:18

**Bates** 50:22
69:4 83:23
197:13 198:23
209:7 242:9
249:7 256:10

**Bates-stamped**
51:14,23 67:1,5
74:5 77:5 79:24
83:14 84:4 86:1
87:13 89:4,9,16
93:2,22 98:4,9
103:15,20
105:12 107:1,24
109:7 125:23
132:9 167:4
188:4 197:15
198:19 209:21
210:19 211:23
215:15,24
216:25 222:17,
25 229:4 236:4,8
237:10 242:16
249:25 251:22
255:15 257:14
258:19,22

**bear** 51:17 250:4

**began** 158:6

**begin** 11:15

**beginning** 44:2
86:10 112:17
118:19 239:12

**begins** 26:18
28:16 250:14,15

**behalf** 9:25
162:13

**belabor** 260:18

**believed** 110:3
146:24 163:12
165:18

**believes** 168:11
201:10

**benefit** 80:10

**big** 248:25

**bipartisan** 138:24

**birth** 179:9,14 182:24 184:4

**bit** 8:5 26:11 129:8 137:25 156:9 251:14

**black** 45:14

**Bless** 215:3,4

**blew** 15:23 46:5

**blind** 141:23

**blow** 46:3

**blowup** 45:17

**blue** 45:10

**Bluestein** 160:16 161:2 253:5 254:1 255:8,11

**Bluestein's** 256:4

**board** 234:17 245:12

**boards** 21:18 98:15 149:9

**body** 129:12

**Boockvar** 12:1 132:14 135:22 140:22 142:17 144:24 145:19 149:23 150:8 223:1,7,25 224:4 227:17 228:1,11, 16 237:16 238:15 239:2,18 240:11

**books** 52:18

**bottom** 7:7 68:13 76:17 77:5 98:5 103:20 118:19 127:14, 15 149:15 188:17 198:23

236:17

**break** 9:10,13 24:23 25:4 85:1, 4 112:8,13 131:13,16 132:23 187:20

**breath** 6:24

**Brennan** 258:18,22 259:4

**Brewer** 244:8

**Brier** 56:6,20 144:5

**bring** 13:20 118:7 158:8,10 162:8 165:24 259:15

**bringing** 198:5

**broad** 101:16 137:15 154:14, 15

**broadly** 176:14

**broken** 217:20

**brought** 44:11 47:5 61:10,25 117:20 118:1 139:22 153:17 155:21 162:11 259:13

**Bucks** 248:13 251:12

**building** 126:21

**built** 101:10

**bullet** 32:17,18, 22 33:6 34:13 35:1 188:22 190:20 204:2 205:18,24 207:20,22 208:3, 5

**bureau** 10:12 19:1,21 20:1,7, 11,13 21:14,21 173:6,9,12 174:17 249:19 252:16

**bureaus** 24:2

**Butler** 251:12

**button** 7:8,9,16

**buy** 72:17

——————

**C**

**C.S.** 54:9

**caffeine** 9:19,22

**calendar** 98:19 101:5 102:3

**call** 8:15 22:24 26:12 119:9 122:15 170:18, 21,22,23 184:24 212:25 249:17 252:5,8

**called** 52:8 111:9 144:21 170:23 237:6 247:12 249:13

**calling** 27:2 47:3 63:9 141:15 195:18 208:21

**calls** 27:13,23 30:16 31:7,13 32:4 33:4,13 37:16 38:3,15,21 39:14 40:2,13 41:18 55:20 140:15 148:10 226:1 241:7,21 261:15 263:7 264:17

**campaign** 20:13,16

**cancel** 58:18,20, 25 59:4 64:2,10 65:20 69:9,21 70:8,23 71:2 72:8 75:24 76:3, 6,7 80:14 89:11, 12,25 91:3 93:24 102:22 119:24 123:11 216:17 252:2

**cancelation**

63:20 64:19,20 89:10 96:7 98:8 214:9,13 215:21 257:5 262:14

**canceled** 63:7, 11,12,15,19,22 64:1,7,14,18 65:11 69:23 70:3,6,8 71:8 78:17,23 79:1,4 80:9 81:7,12,15 82:6,11,22,23 89:6,19 91:12, 13,18 92:1 93:17 94:2,6,14,15 95:3,9,23 100:1 106:10 117:17 120:6,12 121:17 123:3,7 125:13 145:17 212:13, 15 214:14 215:18 216:5 251:9

**canceling** 63:5 257:4

**Canvass** 89:12

**caption** 14:20

**captioned** 112:24 256:8

**capture** 84:20 107:21 108:16

**captured** 64:3 101:7 108:9 119:15 122:22 255:21

**captures** 101:4 107:11

**capturing** 100:18

**care** 6:23

**career** 8:6

**careful** 111:15

**case** 11:24 12:3, 11,14 13:11 70:3 122:24 138:23 174:12 192:11, 12 202:1

**cases** 100:17 117:5 163:14 235:17

**caseworker** 162:15

**cast** 126:6 127:5

**categories** 91:1 101:3,8 102:14, 16 103:5 217:21

**categorized** 102:11

**category** 95:3, 10,23 102:22 119:24 123:10, 25 137:16 141:21

**caused** 158:15

**causing** 162:4

**caution** 16:22 141:19 220:16

**cautioning** 31:19

**caveats** 174:13

**CCAP** 133:25

**Center** 149:25 227:10,18

**certainty** 234:15

**certified** 88:7,24 89:1 93:15 98:15,17 101:10

**certify** 98:23,25 99:12,13,15 101:6,13

**cetera** 100:3 109:17

**challenge** 6:18 244:15,17,19 245:5

**chance** 11:16 26:7 37:1,3 75:17 245:16

**change** 35:6 39:19 42:1 49:17,23,25

Exhibit A

50:1,4 59:25 63:3 76:11,13 77:14,19 83:4 109:17 110:16

**changed** 83:5, 21 84:5,9 255:23

**characterizatio n** 138:25

**characterize** 92:19,25 181:17 221:15

**characterized** 117:15 131:3 146:7 163:2

**charge** 25:17 30:6

**chart** 87:9 98:12, 13

**Chat** 7:5,8,16

**check** 29:16

**checking** 254:3

**chief** 19:10,19 141:3 142:14 143:14,16 146:11 160:18, 25 186:23 187:3 189:8,14,15,17, 20 190:2 193:18 196:10

**choices** 111:25

**Chris** 213:13 258:18 259:4

**circular** 129:8

**circumstances** 196:19

**citizen** 63:24 64:7,16,25 65:2, 12 69:10,21 70:8,24 72:8 76:7 78:18 79:2 80:9,14 81:13 82:7,12,24 89:25 91:5,12,18 93:24 94:3,7,8,14 95:4, 10,24 102:22 106:11 119:25

121:1 123:4 125:14 172:14 221:14 222:10, 12,14 252:3

**citizens** 78:23 81:8 95:11 115:15 121:18 125:7 158:20 165:19 212:21 220:25 221:10 230:4

**citizenship** 119:18 120:12 121:12,21 141:11 161:23 162:5 168:20,24 219:19 222:5 225:18 226:14, 21 228:14,20 236:19,25 237:7 240:10 260:17 261:13 262:16

**City** 232:11 234:12 254:6

**Civic** 20:13

**claimed** 262:13

**claiming** 191:19

**claims** 234:3

**clarification** 10:20

**clarify** 9:2 10:17, 18 100:19 195:24

**classify** 70:23 71:3

**clear** 8:20 27:9 32:25 34:20 56:7 57:20 58:11 59:7 62:13 65:16 72:5 73:6 87:8 97:1 103:22 148:16 172:22 177:23 178:4 181:4,16, 21 207:1 226:10 228:12 264:9

**click** 7:13 104:19,21 105:1

**clicked** 105:17 107:7 109:10

**client** 12:13,19 67:2 74:3,12 79:22 139:17 146:18,20

**clients** 161:23 162:1,2

**clip** 157:16 169:12

**close** 168:12,22 257:18

**close-up** 233:17

**closely** 140:11 181:11

**closer** 11:5 159:20

**coaching** 263:13

**code** 36:4 84:21

**coded** 64:21 94:6

**coffee** 9:19

**collaboration** 168:12,22 172:3

**collaborative** 182:2

**colleague** 13:20

**colloquy** 157:10

**column** 87:22 89:20,24 90:10 101:22

**columns** 88:4,9, 22 90:4 247:17 255:21

**commercial** 203:14

**commission** 55:2,6 61:2

**commission's** 55:3

**Commissioned** 20:20

**Commissioner** 19:1 113:3 118:3 119:1 156:5,13 157:1,25 158:2 159:3 160:9,15 161:1,2,12,15, 16,18 162:8,10, 11,18 163:2,19 165:3,11,17 169:13,18,20 170:8,15,20 171:11,13 172:22 174:13 176:25 178:5 185:17,20 186:8 187:9 220:21 253:13 255:10

**commissioner' s** 55:11

**commissioners** 128:25 133:25 138:20 231:13 234:12 254:6,9

**Commissioner s'** 254:11,16

**commissions** 10:13 18:18 19:2,21 20:2 58:10,22,23 65:18

**committed** 167:7 168:15

**committee** 112:25 113:11 128:23 146:5 151:10 186:12 187:11

**common** 221:3, 5 231:9

**Commonwealth** 21:1,3 37:18,21 38:4 39:9,17 60:23 61:1 62:14 96:8,12 98:6 149:6 176:4 199:24 201:16 202:11,13,19 229:24

**Commonwealth 's** 199:23 202:10

**communicate** 117:8 142:9 235:21 243:25

**communicated** 135:23 142:16 185:4,5

**communication** 117:3 136:9,24 143:10 148:1,3, 23 161:11,14,15 164:17 262:11

**communication s** 16:20 18:8 28:17 31:13,19 113:8 135:15,18 136:1 141:20 143:7 147:15 148:11,15,25 161:3,5,9 164:5, 9,20 188:19 189:6 191:15,17 193:14 194:1 205:9 207:19 220:15 231:23 243:20 258:2,5

**communication s/risk** 238:13

**comparable** 92:20

**compared** 177:18

**comparing** 174:6 175:9 188:24 199:22 202:9

**comparison** 142:24

**Compel** 207:3

**compilation** 87:5

**complaint** 66:25 157:9 169:15,16

**complete** 60:17

**completed** 61:3
101:5 129:22
146:20 166:2

**completely**
8:11 9:18 43:15
174:10 175:19

**completing**
257:18

**completion**
125:11 257:2

**complied** 38:19

**comply** 37:13,
19,25 38:11,13,
23 47:1

**computer** 13:3

**conceded**
226:15

**concern** 56:14,
17

**concerned**
95:9,12 131:4

**concerns**
117:12 118:5
161:25

**conclude** 106:9,
18,21

**concluded**
265:5

**concludes**
264:25

**conclusion**
27:2,13,23 30:16
31:7 32:5 33:4,
13 37:16 38:3,
15,21 39:14
40:2,13 41:18
47:4 63:9 116:18
131:6 206:23
241:8,17,22
261:4,5,16
262:19 263:8
264:18

**conclusions**
195:18 263:11
264:2

**condense** 262:7

**conduct** 41:21
42:2,4,13,15,19
55:21 57:9
150:16 181:10
183:22 186:23
188:23 193:19
194:19 195:15
199:22 202:9
223:13 224:11
239:22

**conducted**
36:17 39:3,10
40:5 42:18
120:19 125:19
141:2,23 142:13
145:8 166:7
167:19 173:5
175:7 182:5
189:8 191:15
206:3 217:6,9
225:12 254:8

**conducting**
42:7 150:3
154:23

**confident** 61:16

**confirm** 29:20
65:6 72:10 81:25
83:9 84:8 93:6
100:3 141:24
210:3 226:21

**confirmation**
39:21 140:25
190:25 191:1
204:5 205:6,15,
16,24

**confirms**
238:11

**confused**
100:25

**conjunction**
173:7 174:18
217:9 253:12

**connect** 119:6

**connection**
8:25 166:20

**considerable**
263:24

**considered**

39:21 139:18
183:25 190:5
192:3

**consistent**
61:13,25 80:12

**Consolidated**
54:16

**consortium**
150:1,24

**constantly**
155:15

**consult** 23:2,19
218:18 242:1

**consultation**
31:17 141:3
242:4 245:10

**consulted**
25:21 30:10
192:10

**consulting**
196:3

**contacted**
160:9 217:11,13,
14

**contacts**
136:16,19

**contained**
49:15 72:13
82:19 99:2,10
100:25 122:12
181:12 206:8
253:23

**contend** 192:25
193:12,25 197:5
207:12

**contents** 259:5

**context** 239:16

**continue** 150:15
206:25

**continued**
122:9

**continuing**
223:8 224:25

**control** 59:8,11

**controlling**
26:10

**convenient**
85:3

**cooperating**
166:24

**copied** 243:11

**copies** 62:7
162:17,21
214:21

**copy** 7:6 11:14
15:6,15 24:7
27:8 30:20 36:3,
24 46:11,13
51:16 56:3 61:3,
4 68:8 83:16,19
91:22 114:4
133:15 153:1
166:12 190:15
197:17 213:4
216:21 223:22
229:2 231:20
233:11 246:25
249:9 259:11,17,
19

**copying** 36:15

**corner** 78:11
80:3,6

**corporation**
20:7

**correct** 16:1
27:15 43:24
46:14 52:11,20
55:5 60:4,15
65:24 68:3,4
72:18 75:16
91:4,6 94:11
97:19 103:18
104:11,12 112:2
120:7,9,14
121:22 122:22
124:10,11 125:8
127:9 128:17
135:13 136:21
167:10 177:13
180:5,6,8 184:15
199:25 210:16
241:13 256:5

**corrections**

98:25 99:14

**correctly** 66:6
82:1 99:8 101:7

**correspondenc**
**e** 52:19 57:13,17
62:7 104:15
107:2,7,10,12,
17,18,22 108:10,
14 136:11
166:21 255:2

**correspondenc**
**es** 57:7,11

**corrupted**
249:11

**Cortés** 86:4,5,
14 92:16 93:4
134:8 158:4
160:9,14 161:1,
14 166:22
185:11,14,21
186:16

**cost** 36:16 72:19

**counsel** 14:24
16:6,7,8,16,21
17:23 23:19
25:21 30:11
31:13,20 141:3,6
142:14,16
143:15 145:8
146:11 147:15
155:5 160:18,25
167:19 186:23
187:3,7,14
189:8,15,16,17,
20,21,22 190:2,
10 191:13
192:10,12
193:18 196:10
204:20 206:4,17
207:12,16 242:1,
4 246:5 262:12
263:20

**counsel's**
22:11,13,18
23:2,6 143:16
148:5

**count** 247:25
248:13 250:22

**counties** 41:25

Exhibit A

42:1,4,6,10,22 43:7,11,13 47:12 48:10,11,13,19 49:2,8,13 50:10 52:14 53:13 55:14,24 57:11, 19 58:7 60:10 62:9,16 66:5,12 73:13 84:20,22 87:24 90:11,13 93:17 94:4 96:8 97:2,10,11 98:21,22 99:5,6, 12 100:8 109:1,4 117:20,22 118:7, 10 119:12,22 122:8 124:15,16, 18,20 128:16 150:16 154:23 166:14 214:8,10 218:12,16,19 219:6,11,17 225:8 230:17,21 231:16 239:13 240:16 244:10, 18,21

**counties'** 42:19 50:11 66:9 95:17

**county** 21:17 37:22,23 38:5,6, 8,12 41:20 44:3, 5 49:20,25 50:8, 9,10,14 53:10, 18,23 58:2,22,23 59:23,24 60:2,22 61:2 62:15 63:25 64:1,9,12,18,23 65:4,15,19,21 67:3 68:1,2 70:19,21,25 71:4,13 74:4,13 80:1,4 82:1,3,22 89:2,21 91:8,15, 16,25 92:9 94:17,23 95:7,21 96:4,5,9,18 97:4, 17 98:15,18 99:24,25 100:14 101:4,6,11,12, 15,18,23 102:6,9 103:10,12 104:22 105:8 106:22 108:2,15

109:22,24 110:2 116:1,15,22,24 117:9,11,19,21, 24 118:1 119:8 122:14 123:9 128:4,24 131:3 133:10,24,25 138:20 146:8 149:9,10 160:16 165:1,5,23 166:11,16 211:16 213:22 214:2 216:4,7,8, 10,13,16 217:10 218:10 221:23 223:1 231:13,22 236:9,25 243:4 245:8,11

**county's** 41:20 48:4,17 59:21 97:12 108:23 255:13

**couple** 11:10 19:25 135:8 164:20 231:3 236:3 257:15

**court** 6:16,17 7:2 8:15 14:16 25:9,11 144:6 157:13 229:12, 19 230:2,10 231:6,12,14,15, 17 263:6

**courts** 231:8

**cover** 51:3 86:14,20,22 92:15 93:3,14 121:24,25 249:6 254:1

**covered** 155:23 194:2 195:10 196:11,14 202:2

**covers** 96:11

**COVID-19** 135:4

**created** 252:13 253:19

**criteria** 75:24 76:2 77:21 78:1, 2,7 80:13 81:5

83:9 175:11 176:5 184:9

**crux** 20:22

**crystal** 58:11

**currency** 36:18 39:4,11,25 40:6 41:15

**current** 18:16 20:8 21:2,12 23:22 40:10

**Custodio** 237:21 238:3

**cut** 76:4 251:4

**cuts** 8:25

**Cybersecurity** 151:11

### D

**D00040** 98:5

**D1** 50:22

**D182** 132:9

**D184** 222:17,25

**D185** 222:17,25

**D186** 209:21

**D190** 210:19

**D198** 210:19

**D2091** 237:10

**D2093** 237:11

**D215** 188:4

**D217** 211:23

**D2170** 242:9

**D2171** 242:16

**D2175** 242:10

**D226** 188:4

**D241** 236:4,8

**D40** 98:9

**D46** 50:22

**Dan** 56:6

**darker** 233:10

**data** 49:15,16 62:19 88:16,17, 21 90:17,19 92:24 93:2,14,21 95:14,19 97:8,9 98:14,18,23 99:1,15,18,21 100:23 101:12, 19 105:21 107:14,15 111:5 119:5,15 120:22 122:12 125:12, 19 127:2,10 140:23 141:1,5, 24 142:2,17 146:19 147:5,6, 11,17 149:4 150:2 177:5 180:23 181:12 182:9,15,21 183:9,24 188:24 195:16 197:1 199:23 202:10 205:11 221:7 228:13 246:21, 23 247:16,19 248:4,17 250:19 256:9

**database** 12:21 52:24 100:6 101:2 113:16 114:12 120:3 121:25 122:2 124:2 149:18,21 150:11 169:24 170:12 171:2 172:13 173:5 175:9,10 176:7 177:3,18 178:18 179:2,3,13,16 181:13 184:19 204:12 221:8 222:8 225:17,23, 24 226:10,20 247:21

**databases** 174:6,11 175:12 178:9 182:6 184:18 188:25 199:24 201:16 202:11,13,19 203:5,12,13,14

226:3,4,17

**date** 17:4 60:24 63:3 72:12 76:10,13,16 77:14,19,21 80:24 81:1,19 83:3 84:9 87:22, 25 88:15 90:24 91:8 107:16 108:3,16 124:9 163:16 169:13 179:9,13 182:24 184:4 210:4 225:13 255:22, 23 256:1

**dated** 24:9 85:22 86:21 132:8 151:15 198:11 215:24 223:4 232:16 236:5 237:18 242:12 259:23

**dates** 79:19 80:21,23 82:25 86:8 109:17 110:17 251:7

**day** 56:9 150:16 208:25 264:9

**day-to-day** 20:15 21:16,22, 25

**dead** 233:23,25

**deadline** 42:14

**Dear** 137:5

**death** 89:21 100:3 102:15

**debate** 192:6,21 196:4,18

**decade** 243:19

**December** 29:2, 9 31:3 34:3,8,21 35:2 44:5 81:6 83:6,22 84:7 102:4 151:15 156:20 197:17 198:12 246:6

**decide** 147:11, 19

**decided** 128:18 134:5 205:5,23

**decides** 129:9

**decision** 31:9, 16,21 32:1 70:22 71:3 207:15 242:4

**decision-making** 114:23 115:4

**declination** 36:20

**declined** 201:21

**deeper** 125:24 126:1 127:7

**Defendant's** 227:1

**define** 57:15

**defined** 39:18

**definition** 195:14 204:7

**Degraffenreid** 21:7,9

**deliberative** 154:11 155:23

**delve** 155:23

**delves** 220:8

**delving** 145:5 193:12 201:24

**demonstrated** 82:21 225:6

**dep** 11:18

**department** 10:1,5,7,10 12:13 13:13 14:22 16:7,12 18:18,22 19:7,16 20:4,6,21,25 23:15 25:12,23 26:23 27:20 29:11 30:13,18, 22,24 31:25 37:5,12,17 42:5, 16 43:6,10,12 44:18 47:14,19,

24 48:18 49:3,6, 14,16,17,24 50:4,7,12 51:10 52:21,25 53:4,7, 11,16,22 55:2,7, 8,10 58:5,12,21, 24,25 59:25 60:4,15 65:8,23 66:4,8,10 67:21 70:20 71:14 72:14 89:21 90:13,22 92:3,7, 10 93:4,9,13 95:5,8 96:20,22, 25 98:16,20 99:3,4,17,25 101:21 108:25 113:15,21,25 114:10 115:1,14, 22 118:4,8,12,23 119:10 120:2,15, 17,19 123:25 125:5 127:18 128:3,15,21 133:24 135:14, 19,23,25 136:17, 19,24 139:3,6 142:18,22 143:3, 18 144:8 145:1 147:4,6,10,18,20 149:16 150:9 151:20 152:21 153:2,6 154:2,16 155:2,4,14,16 156:16 158:4 159:2,12 160:20 161:12,16 163:18,20,25 166:23,25 167:6, 8,12,22 168:2, 11,15,23 169:21 170:8,10 171:18, 19,22 172:24 173:7,10 174:18, 20,21 175:13 179:12 180:1 181:8,11,15,23, 24 182:15 183:16,18,24 184:11,12,23 185:4,6,22 186:2 187:13 188:22 189:16,19,22 190:6,11,19

191:3,13,24 192:2,10 193:16 194:17,18 195:3 196:9 199:6,19 200:5 201:2,4, 15,18,20 203:4 204:13,21 205:4, 19 206:11,22 207:17,23 208:6, 9 210:15 211:3 213:15 214:6,25 216:1,6,11,18 217:13 218:7,20 219:18 220:1 221:3 223:7,10, 15 224:11,15 226:12 229:24 230:18,22 231:7, 18,19 234:7,10, 11 236:9 237:3 239:14,21 241:20 243:24 246:6 251:19 254:8,12 256:22 258:10 259:8 261:10,25 262:10 264:21

**Department's** 20:15 41:1,5,14 130:5 152:7,13, 15

**departments** 182:2

**departure** 86:11

**Depasquale** 198:11

**depend** 22:20 247:16

**depending** 35:11 247:18,21

**depends** 59:11

**deposed** 7:24 8:3

**deposition** 11:15 13:9 14:10,18,21,24 16:5 18:12 24:15 28:21 36:1 44:21 50:16 54:4 66:14 73:17 79:16

85:13 112:10 132:3 151:4 157:5 169:6 187:25 192:6 197:20 209:2,15 222:18 226:22 229:7 232:5 235:25 237:12 241:23 242:5 246:8 257:19 258:17 260:5 265:5

**depositions** 6:16 8:4 157:15

**Deputy** 18:17 20:24 21:2 160:15 161:2 162:10 255:10

**derived** 142:23 148:17 179:21 238:23 239:17

**describe** 48:5 55:15,18 57:16 118:14 126:1 130:12 155:1 172:7 204:11 227:9 231:1

**describes** 205:18

**description** 40:19 261:22

**descriptor** 65:11

**designated** 144:11

**designed** 60:9

**detail** 11:17 71:10 166:10

**detailed** 263:6

**details** 15:12 126:21 127:4 166:18 207:8 246:12 254:18, 21

**determination** 64:10 65:15 95:15 116:23 123:21 241:12,

18 244:14 245:10

**determinations** 58:10 65:18

**determine** 23:3, 7,20 30:11 42:22 100:9 113:17 114:12 120:3,6 123:24 134:15 141:8 142:18,19 147:7 166:13 167:24 171:3 172:9 173:21 175:10,13 176:5, 8,10 178:24 206:12 218:18 221:9 228:13 244:12,25 245:8 254:16,19,22

**determined** 63:23,25 64:6,15 65:1 95:24 133:5,7 144:25 208:19 221:1 239:5 256:16

**developed** 263:6

**dictate** 221:5

**dictated** 221:4

**difficult** 251:14

**difficulty** 248:7

**digits** 8:5 180:19

**direct** 32:8 51:13 52:3 54:17 113:14 161:15 211:22 253:1 260:13

**direction** 207:11

**directives** 42:5, 9

**directly** 23:24 117:6 119:7 216:10 219:22 224:19 231:17 255:3

**Director** 173:12

258:1,4

**Directors** 223:2

**disagree** 62:6 114:7 144:4 235:9

**disappeared** 45:19,22

**disclose** 16:22 31:19 141:19 189:11 220:16

**disclosed** 192:19 194:23 195:8

**disclosing** 145:6 148:2,15, 25 205:8,9

**disclosure** 20:17 36:8 141:16 168:5 179:21 197:6 204:17 208:22 239:10

**discoverable** 192:18

**discovery** 11:7 13:13 16:11,15, 21,25 17:12 18:1 31:14 33:16,20 34:2 66:25 79:23 137:18 143:24 192:17 193:1 194:4 196:17 202:16 203:20 207:14 220:9 251:1

**discuss** 134:3 187:2

**discussed** 52:24 81:18 122:7 161:17 165:12 171:12 187:3 212:8 247:4 263:16

**discussing** 205:9

**discussion** 100:5

**discussions** 116:1,3 118:9 134:20,21,22 254:23 259:4

**display** 168:20

**displayed** 168:24

**distance** 15:13

**district** 229:12, 19 230:1,2 231:6 244:23

**Districts** 104:14

**diversity** 138:9, 11

**Division** 10:12 19:10,19 236:10, 14

**divulge** 16:20

**divulging** 111:17

**DMV** 84:19

**Docket** 12:1 24:7 66:24

**doctrine** 141:17 191:21 192:16 194:3 195:12 196:15 202:17 203:18 204:18 208:23 220:11

**doctrines** 206:5

**document** 15:15 16:1 25:7 35:22 74:1 79:7, 20 86:25 87:17 97:25 103:24 110:4 112:9 113:6 114:6,8,15 153:14,15 167:4 188:4,7,13,14 191:6 194:22,24 195:22 197:14 198:13,15 206:9 208:16 258:14, 21

**documentation** 17:12 62:14 71:23

**documentations** 158:19

**documents** 11:4 16:24 17:3, 6,10,13,15,17, 20,23,24,25 18:6,13 32:10 33:10,14 34:1,3 103:10 109:5,18, 19,21,24 113:7 137:9,12,16 152:22 162:9,11 164:15 245:15, 18 248:21 260:15 261:7,11, 17,23,24 262:5, 10,25 263:3,8 264:13

**DOS** 199:1,10,18 200:22,23

**DOTIA** 111:10, 14,25

**double** 8:4 212:16 217:2

**download** 183:7

**downloaded** 45:17 183:5

**downloading** 7:15

**dozen** 24:3 169:3

**dozens** 72:2 234:3

**draft** 113:9 254:2

**drafted** 151:25 152:5,14

**drafting** 151:20 153:7

**drill** 126:11,17

**driver's** 158:16 167:12 168:3,4 169:22,25 170:11,12 177:6, 8 178:18 179:3, 15,22,23 180:3, 4,9,14,17,20

184:4 222:4 238:24 255:23, 25

**drivers'** 171:2

**drives** 130:6

**droning** 263:13, 22

**due** 94:14 116:16 119:17 120:11

**dumped** 260:6 264:5

**duplicate** 97:9

**duties** 20:9,10, 14 21:10 60:11 66:6,13 154:24

**duty** 66:9

**dwalsh@ mbklaw.com.** 15:21

**E**

**E-I-T-A-N** 144:21

**e-mail** 11:6 15:17,19 18:8 57:22 132:8,13, 16 136:14,15,16 137:4 144:23 148:16 149:15 150:8,13 164:11 212:24 223:1,25 224:5 228:1,15 237:16,21,25 238:1 239:2,13 242:12,19,22 243:9,11 244:7 245:19 246:6 253:5 254:2 255:11 256:5,8, 18 257:25 258:8, 19 259:1,2,3,5

**e-mails** 136:5 164:4,20,25 243:20

**earlier** 15:4

16:10 20:6 24:3 92:8,21 118:4 122:8 156:4,9 200:17 225:15, 20 240:3 241:25 247:4 253:9 254:24 259:25 260:14

**early** 86:11

**easier** 15:24

**ed** 192:10

**effect** 73:16

**effective** 115:21

**effort** 65:5 149:19 150:11 182:2

**efforts** 66:9 155:6,13 156:1

**eighty-six** 212:12

**Eitan** 144:21

**election** 20:12, 16 21:18 37:22, 23 52:18 53:3 63:23 64:5,15, 23,25 81:16 88:25 89:2 101:11 105:9 116:1,15,22,24 117:11,19 132:19,25 133:10,24 137:5 146:8 149:10 173:12 188:6 194:14 202:25 210:12 211:11, 16 213:22 214:2 216:4 218:10 221:24 223:1 230:11 231:22 234:21,25 243:4 244:24 245:12 249:19

**election-related** 52:16

**elections** 10:12, 13 18:17 19:2, 19,21 20:2,11,12

Exhibit A

21:14 63:16 88:8
98:15 106:12,16,
24 139:10 173:6
233:6,21 234:17
235:5,14,18
236:10 252:16

**electors** 12:22
19:11 21:13
43:22 47:11
48:9,16 199:7

**electronic**
135:24 137:7
145:22 149:24
227:10,18

**element** 149:3

**elements** 12:11

**eligibility**
140:25 244:16
262:16

**eligible** 36:19
39:5,12 40:9,11,
25 234:22

**employees**
128:15

**enable** 60:10
84:20 150:16

**enacted** 47:8

**enclosure**
229:22

**encompass**
145:13

**encourage**
61:13,24 62:4
140:11 141:18

**end** 98:19 99:20
102:2 119:13
124:5 126:9
149:16 158:21
170:2 178:22
179:12 223:15
234:19 248:8
259:14 260:2

**ended** 44:5
221:22

**engage** 156:2
192:5,20

**engaged** 141:6
155:4,5,17
186:22

**engagement**
20:14 192:14

**English** 169:4

**enhancements**
115:2,20

**enlighten** 61:18

**ensure** 41:11

**ensuring** 21:24
36:18 39:4,11
40:5

**enter** 62:15
64:24

**entered** 60:24
64:22 70:9,12
82:1 124:9

**entering** 76:13

**entire** 40:3
46:20 87:5 96:12
117:17 121:25
176:4 183:8

**entirety** 195:21
248:7

**entitled** 188:5
264:3

**Entitlement**
120:24

**Entitlements**
121:7

**entry** 24:7 66:24
80:23

**ERIC** 149:18,20,
24 150:6,10,12,
15,20,21,23,24
223:12,16,19
224:2,8 227:10
228:9,12,13,16,
19 239:23 240:7,
9,12

**error** 60:3,4,5,12
94:10,15,22,25
95:4,25 102:10
137:6,10,13
145:21 146:5

**essentially**
48:17 52:23
98:20 106:1
245:15

**Essohouna**
80:20

**establish** 48:9
75:12 183:24
184:6

**established**
103:17 127:21
129:12

**establishing**
127:18

**Eugene** 198:10

**evaluating**
130:1

**evening** 265:1

**evidence**
192:11 220:23
234:4

**exact** 75:15 86:8
127:24

**EXAMINATION**
6:4

**examine** 113:19
178:6

**examined** 6:3
178:25

**examples**
162:11 254:25

**excel** 183:5,14
247:20 253:17
254:2

**excerpt** 38:25

**excess** 170:1,13

**excluded**
238:12

**excuse** 74:18
84:6 115:16
174:21 207:24
224:24 258:2

**executive** 20:24
21:2 103:12

108:3 201:2,4

**exhibit** 7:6,12,
14 13:19 14:17,
18 24:6,15 25:6
28:20,21 29:1,8
31:11 32:15
34:17 35:1,5,18,
25 36:1,24 39:2,
6 44:21,24 45:2
46:12 50:16,19,
20 51:20 54:2,4,
14 56:4,9 66:14,
16,23,24 68:9
73:17,20,22
74:11 75:3 77:3
79:13,15,16
83:3,13,16 84:25
85:13,17,18,25
86:18 91:11,23
92:14 97:22
103:10,13
104:10 105:11
107:1,24,25
112:4,10,22,24
114:4 127:13
131:12 132:3,7,
13,22 133:15
140:21 145:13
149:14 151:2,3,
4,8 153:1
156:18,19,21,25
157:5 166:20,21
167:2 169:6,9,
10,12 187:18,25
188:3 190:15,18
194:7,9 197:8,
17,20 198:9
200:13,18,19
202:5,23,24
203:21 207:21
209:2,4,15,16,
19,20 210:11,17,
23 211:18 212:8
213:3 215:14,23
216:24 222:16,
18 223:22
224:24 226:22,
25 227:25 228:2,
23 229:4,6,7
230:14 232:5,7
235:25 237:10,
12 242:5,8,9,16,
25 245:14,15,17
246:3,4,8 257:16

259:23 260:9
262:23

**exhibits** 7:4,18
56:13 96:5
224:20 225:6
233:6 246:5
260:2,7

**exist** 26:3 31:4
32:2 33:2,10,17,
23 34:3,25
137:9,12,16
149:5 260:25
261:11,24

**existed** 34:7
225:23 243:17,
18

**existence** 26:25
28:15 34:15

**expand** 45:24
126:17

**expanding**
119:11

**expect** 65:4,7
117:5 139:16
176:20 183:14
214:18 234:16
246:21 251:21

**expectation**
64:9 95:19

**expected** 65:21

**experience** 7:1

**expert** 141:6,23
142:4,5,6,7,9,16
143:19,20 144:2
145:8 146:10
147:6,11,17
167:19 188:23
189:9,23 190:19
191:8,13,15,16,
25 192:13 193:2,
4,6,7,9,14 194:2,
17,18,23 195:4,
7,14,15,21,25
196:3,9,10,12
197:4 199:21
200:12,16 201:7
203:6,18,19
204:19,25
205:10 206:3,16,

20 207:9,10,16, 23 208:8,19 210:13 222:7 224:23 239:14, 17

**experts** 155:4,5, 17 156:2 196:19 224:16

**explain** 37:24 76:12 101:20 166:7 172:4 181:20 186:19 191:23 212:11 245:3

**explained** 166:9 261:18 262:21 263:3

**explaining** 126:20 262:4

**explicit** 49:19

**explicitly** 59:22, 24

**Export** 22:24 53:9 72:14,16,22 183:9

**expressed** 134:1

**extend** 11:18

**extent** 12:24 15:3 16:19 22:4 27:2,13,23 30:16 31:7,12 33:4,13 36:19 37:16 38:2,15,21 39:14 40:2,13 47:3 63:9 141:14 143:6 144:1 145:4 147:14,24, 25 148:22 151:1 154:10 155:22 167:17 168:4 179:19 189:4 201:23 220:8 228:18 239:8,25 241:16 255:5 261:4,15 262:18

**extra** 6:23

**extract** 99:9,21

101:19

**extracts** 98:20

**eyesight** 45:6

**F**

**F36** 84:4

**fact** 56:22 95:10 108:8 136:5 159:2 194:18,23 212:21

**factual** 192:7,24 196:7,23

**fair** 47:23 48:2 52:7 78:6 83:20 90:11 106:9,18, 21 218:3 252:8

**fall** 17:14,19 141:20

**familiar** 12:2,10 17:5 18:5 35:14 37:6,9 46:23 86:25 87:17 132:17 142:15 153:16 156:12, 15 188:7,13,14 258:16

**Fax** 57:22

**feature** 7:5

**February** 18:20, 22 19:4,5 229:10 246:7

**fed** 149:4

**federal** 47:8 63:16 77:15 168:5 172:1 231:6 235:14,18 238:16,19 241:4, 19 242:3

**feel** 26:11

**Felipe** 68:22 69:8 72:9

**fell** 103:4

**felt** 133:19

**field** 69:19 70:1 73:10 111:9,23

**file** 11:8,9 60:17 207:3 237:1,4,6 254:2,4 255:7

**file'** 236:20

**files** 60:18 219:5,8,9,17 240:16,21,23

**filings** 12:8 13:11,12

**filled** 61:5 84:17

**Finally** 151:19

**finance** 20:13, 16

**find** 16:24 61:4 97:15 101:24 123:24 254:2

**finding** 161:25

**fine** 9:11,23 15:18 112:16 131:22 233:18

**Finish** 128:9

**finished** 6:19,20 30:4 260:3

**firsthand** 94:16 227:17

**fit** 102:24 119:23

**Fitzgerald** 103:12 108:2

**five-minute** 187:20

**five-year** 39:20 42:2 89:11 235:13

**fix** 24:20

**Florida** 221:19 222:2

**focus** 116:9,11 178:14

**follow** 43:12 65:10,14 142:1 148:7 218:13,20

251:25

**follow-up** 164:4, 9,17

**font** 45:10

**forget** 224:20

**form** 12:7,15,18 23:11 25:14,18 26:5 27:1,12,22 29:13 30:8,15 31:6 33:3,12 34:9 35:9 37:15 38:14,20 39:13 40:1,12 41:3,17 44:9 47:3,22 48:21 52:10 53:24 57:4 59:3, 15 60:1,20 61:9 62:11,23 63:8 65:3,13 66:7 67:23 69:24 70:14 71:21 75:21 78:9,24 79:6 81:10,17 82:4,17 83:7 90:15 91:14,21 92:5 93:12 94:9 101:14 102:1,23 103:6 105:2,22 106:13,20 107:13,20 108:12,22 109:20 110:1,6 111:3 114:6 116:20 117:1 119:19 120:8,13 121:9 122:23 123:15 124:6 125:9 126:10 130:19 131:1,8 135:16 136:3,13, 22 137:11 138:17 139:8 142:12,21 143:6, 21 145:2 146:21 147:13,23 150:14 152:8,16 153:19 155:22 156:14 162:19 163:6,23 164:2, 7,19 165:20 167:14 168:9 170:17 171:7,17

173:2 174:3 175:25 176:17 177:12 178:1,21 179:17 180:12 181:1 182:11 183:17 184:16 185:24 186:6 190:7 194:20 200:14,24 201:22 208:15 211:8,13 214:17 215:6,19,20,23 216:2,21 217:16 218:2 219:2,20 222:6 224:7 225:21 226:1,19 228:17 234:13 235:8 238:21 241:15,24 244:2, 5,20 247:14 253:11,18 257:9 258:24 261:3,15 262:18 263:2

**formal** 130:3

**formally** 129:12

**format** 246:16

**formated** 105:25

**forms** 216:9,12

**forum** 196:5,6

**forward** 76:16 211:15 213:24 231:21

**forwarded** 213:21 214:1 216:3

**found** 119:2 121:15 158:13 184:25

**Foundation** 6:8 11:25 29:10 67:3 79:23 86:3,15 139:18

**Foundation's** 24:8

**frame** 252:19

**fraud** 234:4

Exhibit A

**free** 26:12

**Friday** 132:8

**front** 13:2 39:2 48:7 56:2,8,22 68:12 74:11 77:4 83:1 89:18 92:14 128:3,12 129:2 170:7 188:8 203:1,22 210:23 211:19 222:21 229:2 245:21 249:9 260:10 262:23

**FTP** 219:7

**full** 22:24 26:16 27:4 53:8 72:14 127:3 151:18 157:7 169:14 183:9 188:23 189:1 194:19 196:25 199:13 200:21 220:18 227:16

**fully** 8:11

**function** 53:17 57:2 75:8

**functionality** 55:24

**functions** 59:13,14,17

**funded** 138:13

**future** 115:2 140:8 238:13

**G**

**gave** 264:5

**general** 43:18 46:16 51:5 63:16 90:18 101:10 104:14 129:3 189:21 190:10 198:11 200:6 201:1 230:11

**General's** 197:18 203:7

**generate** 42:24 55:25 72:11 82:10,22 90:14 96:7 100:7 247:11

**generated** 42:23 57:8 80:3 88:2 90:12 98:13 108:14 173:18, 20,23,24 174:2, 5,25 175:4,18, 21,23 184:25 185:3 246:15,19, 23 247:6 252:15

**gist** 129:3

**give** 26:7 37:1 42:5 44:11 60:5 63:6 75:17 110:4 154:14 184:1 221:17 224:9 253:16 256:10

**giving** 9:25 83:23

**glare** 233:9

**good** 6:6,10 112:15 131:12 187:19 204:1

**Government** 112:25 146:5 151:9 186:12 187:11

**grand** 250:9,11, 12

**great** 6:14 24:17 51:22 71:10 75:4 166:10

**ground** 8:9

**group** 57:8 126:7 127:19,21 128:1,18 129:5, 7,10,14,17,18,20 130:2,3,4 132:21,24,25 133:7,8,13,19, 20,21 134:6,14, 16,17 135:10,15, 24 136:1,2,9,12, 16,25 137:19 139:1,2,7,12

140:17 145:9 165:10 243:3,5, 7,10,12,13,17, 21,23

**groups** 131:3 133:25 134:9,12 138:14 139:5 146:8 161:22

**guarantee** 177:20 184:10 205:14

**guess** 71:15 100:19 105:20 176:21 204:10

**guidance** 66:12 127:19

**Guide** 130:6

**H**

**H-E-R-S-H** 144:21

**half** 11:15 159:19

**hand** 27:6 104:5

**handed** 36:24 46:11 68:8 114:4 133:14 152:25 214:21 223:22 248:20

**handle** 23:10

**handled** 23:9

**handles** 21:15, 22

**handling** 25:17

**handwriting** 108:3 229:16 236:18

**handwritten** 69:7

**happen** 123:13 140:8

**happened** 43:13 167:16 173:17 179:25

181:18,20 184:22 187:4 206:6 214:4 218:11

**happy** 192:20,21 196:4,20

**hard** 46:9 80:19 104:1 152:22 166:12 233:8 246:11 250:14

**Harrisburg** 159:11,13

**Harry** 229:23

**head** 8:19 71:12

**header** 35:23 45:4 54:9 87:10 102:17 198:25

**headers** 250:21

**heading** 89:20 93:24 94:14

**headings** 89:11

**Health** 89:21 180:17

**hear** 6:9,12 8:25 99:8 170:3 213:23 244:3

**heard** 9:6 144:20 233:22

**hearing** 113:1, 24 151:10 156:20 157:2,8 187:12

**hearings** 6:16

**heat** 208:25

**held** 18:19

**helpful** 46:3 62:12 154:1 225:24 226:8

**helps** 75:12 221:18 249:2

**Hersh** 144:21

**high** 122:3 172:8 234:23

**high-level** 126:4,12 173:20 177:21

**highlighted** 39:7 45:16,21 46:7,15

**highlighting** 45:21 46:2,8,19

**hires** 196:9,10

**history** 52:17 53:4,6 62:17,19 81:1,20,23 82:7 92:2 105:3,5,13 106:15 122:5 125:1,15 126:4 163:4 263:4

**hm-mm** 8:19

**holding** 203:22

**Homeland** 226:12

**hour** 11:15 138:1 159:19,21 177:21

**hours** 119:21 159:20 189:25 257:17 259:14 260:3 263:24

**House** 112:25 146:4

**hundred** 122:11 174:12 176:24, 25 177:25 178:3, 9,16 205:14 212:12 219:23 221:25

**hundreds** 260:6

**hypothetical** 140:7 195:19

**I**

**ID** 248:13 250:22

**idea** 186:20 232:24

**identification** 14:19 24:16 28:22 36:2 44:22

50:17 54:5 66:15
73:18 79:17
85:14 112:11
132:4 151:5
157:6 169:7
188:1 197:21
209:3,16 222:19
226:23 229:8
232:6 236:1
237:13 242:6
246:9

**identified** 56:9
61:14 62:1
124:14 194:24
260:16 261:12

**identify** 36:21
70:1 126:15
219:18 244:14,
18 245:4 246:5

**identifying**
77:20 80:3
172:19 179:10
240:25 249:4

**identities**
240:21

**identity** 143:18,
19 144:2,8,9
195:6,25 196:2
201:7 241:5

**ii** 212:16 217:2

**image** 107:11
108:19

**immediately**
111:8

**impact** 60:12

**impetus** 162:7

**implement**
43:25 44:7 46:25

**implementation**
36:16 40:4

**implemented**
44:2,15

**implementing**
44:18

**implies** 47:11
80:25

**important** 134:3

**improve** 154:17,
21,22 156:2

**improvement**
116:5 155:16

**improvements**
114:25

**improving**
154:18,20

**inaccurate**
182:3 228:16

**inactive** 72:25
88:23 235:4,15,
17

**inadvertent**
116:10,16,25
117:8 130:14,18,
24 131:6 145:19
146:1,9 162:22

**inadvertently**
115:5,17 116:6
117:4,14 137:8
145:23 163:17

**inappropriate**
195:13 201:9
264:1

**include** 32:11
39:19 40:6,11
91:19 103:3
110:12 116:12
125:18 133:24
134:5 138:15
240:21,25

**included** 120:10
122:2 143:23
148:18 230:10
240:16,23 241:2
244:12

**includes** 20:19
41:7 127:19
128:23 129:1

**including** 13:15
52:17 99:10
146:8 155:24
166:24 208:13
223:11 224:1
228:7 239:22

**inclusion** 82:12

**inclusive** 208:4

**incorrectly**
102:11

**indicating**
80:12 82:8
109:17 117:3
123:18 125:12
160:10 161:19
163:11

**indication**
80:17 103:23

**indicative** 60:25
178:5,7,8,11

**indicator**
120:25 121:3
171:4 172:13
175:15 176:10
177:4,10,22
178:19 184:15,
19 222:5

**indicators**
169:23 170:11
172:17 221:13
222:3,9

**indirectly** 23:25

**individual** 50:8
60:13 64:12
95:15 96:10
106:23 117:25
126:5 162:13,14
228:14 254:22

**individual's**
244:15

**individuals**
125:6 128:14
133:19 134:10
137:8 139:2
140:24 141:9,25
142:11,20
144:25 145:9,11,
12,14,16,23
146:1 147:2,8,12
148:7 160:23
162:24 177:19
190:22 204:4
210:15 214:9
215:10 220:24
221:10 229:25

238:17 240:15,
17,22,24 241:5
255:4 256:25

**individuals'**
244:11

**ineligible**
113:17 114:1,13
119:17 120:4,11

**influence** 9:16

**inform** 114:22
115:3

**informal** 129:10
130:4 133:12,21
134:19 135:10
139:1,5 140:17

**information**
12:25 16:22
22:8,16,22,25
23:4,5,8,10,18
41:24 42:11
43:11 53:8 62:15
73:3 82:24 88:5,
12 93:16,19
97:15 98:23
99:11 101:19
104:25 106:2,3
107:9 109:12,15,
22 110:12,17
111:5 116:14
117:6 119:21
123:1,18 125:6
128:11 130:20,
22 141:15
142:15 143:11,
22 144:3 145:6
146:6 147:2
149:25 156:15
161:19 163:10,
19 172:23 174:5
179:10,20
183:21 185:10
189:11 190:23
200:6 201:15,19,
21 207:13
208:22 211:16
218:9 220:17,24
221:2,8 223:12,
16,19 224:2,5
226:18 227:10,
18 228:8,20
230:20 240:9

241:1,3 242:2
244:13,14,19
245:1,4,9 249:4
253:21,22 254:4
256:21,23 260:5

**informative**
223:20 224:6
240:9

**informed** 130:7
137:2

**infrastructure**
50:12

**infrequent**
230:24

**initial** 18:1
110:15,20 113:9
121:15 169:21
170:10 171:6,16
177:24 190:21
204:3 210:14
227:12

**initially** 118:3
134:7 220:6

**input** 97:5

**INS** 169:23
170:11 171:4
172:13,17
175:15 176:10
177:4,10,22
178:19 184:14,
19 221:12 222:3,
4,9

**inside** 149:11
208:25 248:16

**Inspect** 24:9

**inspection**
36:14

**instance** 96:1
248:10

**instances** 95:22

**instant** 55:2

**instruct** 189:10
202:20 204:23

**instructed**
167:20 211:14
216:20

**instructing** 186:24

**Integrity** 188:6 194:14 202:25 210:13

**intend** 162:24

**intended** 264:20

**intense** 140:23 141:1 146:19 147:5,17

**intensely** 141:4

**intent** 163:9

**interchangeably** 75:14

**interest** 6:7 11:25 24:8 29:10 67:2 79:23 86:2, 15 134:1 139:17 234:24

**interested** 128:4,13

**interests** 162:16

**internally** 155:18 168:2 224:15

**interrogatories** 12:9 227:2,23

**interrogatory** 227:7,8,20

**interrupting** 248:19

**intervening** 212:14

**interviewed** 131:7

**introduce** 35:18

**introduced** 8:16

**investigate** 95:5,7 244:23

**investigated** 234:2,6

**investigation** 167:18 189:13

191:14 194:1 196:25 202:22 206:16 218:13 219:11 220:15 221:23 239:9 240:2 256:19

**investigations** 195:21 234:10, 11

**involve** 41:23

**involved** 22:2,4 120:17 134:16

**involves** 41:24

**involving** 193:14

**irregularity** 244:25

**issue** 65:10 114:20 115:4,19, 25 118:6 119:9 130:2,9,11,12 137:17 139:4 142:6 154:7 158:9 161:20 162:4 163:21 165:1,8 236:25 244:24 254:10 263:21

**issued** 142:7

**issues** 134:3 139:7 140:9 154:3 192:24 207:3 236:19 237:7

**item** 75:23

_____

**J**

**January** 81:6 83:5,22 84:6 232:16 262:13

**job** 18:16 20:9, 10 21:10 41:1,5 66:12 70:11,15 126:20

**join** 133:20

**Jonathan** 6:2 29:2 113:3 253:6

**July** 158:3,7 159:3,5 219:6 227:2,3 242:23

**jumped** 118:24

**June** 208:10 215:24 240:4

**jurisdictions** 37:18,20

**jury** 229:17 230:1,3

_____

**K**

**Kansas** 226:15

**Kathryn** 132:14 135:22 144:24 237:16

**Kathy** 11:25 144:23 223:1 238:4

**keeping** 135:14, 25 146:13

**Kerns** 6:5,6,10 10:23 11:2 13:24 14:4,9,12,16 15:17,19 24:17, 22 25:2,9 26:17 29:4 30:19 32:16,18 34:19, 22 35:24 36:23 45:6,20 51:15,18 54:1,6 56:6,16, 24 61:16,21 62:5 74:2 75:4 83:15, 25 84:24 85:3,5 87:6 91:24 112:7,12 114:7 115:10 131:10, 15,19,23 132:5 133:14,16 143:9 144:4 153:21 157:7,13 167:21 168:7 187:21 188:2 190:16 191:9,18,22 192:20 193:8,15 195:23 196:8,24

**Jonathan** 6:2 29:2 113:3 253:6

197:7,15 206:18 209:8,17 213:6 215:5 222:15 223:21,23 224:18 228:22 229:3 233:14 242:24 244:3 245:13,24 246:1 248:6,22 249:2 251:5 252:11 257:20 260:4 263:12 264:4,24

**key** 127:20

**kind** 6:22 22:6, 12 103:21 109:24 110:14 225:24 262:7

**knowing** 152:19 250:19

**knowledge** 10:6 18:9 90:22 94:16,19 123:6 227:17 248:2

_____

**L**

**labels** 247:25 248:12 251:11

**lack** 219:19

**language** 26:16 203:5

**languages** 169:3

**larger** 26:11

**law** 22:17 40:8 42:13 47:7,8 168:6 172:1 235:24 238:19 241:4,19 242:3

**laws** 40:15 238:16,25

**lead** 44:13 61:20

**League** 128:23 133:11 138:21, 23

**leaning** 138:19

**leanings** 138:16

**learn** 65:10

**learned** 158:11

**leaves** 217:19

**led** 115:17 137:7 145:23

**leeway** 44:11 62:3 263:24 264:5

**left** 80:2 138:19

**leftist** 138:13,18

**leftist-type** 138:13

**Legacy** 44:4 122:13

**legal** 6:7 11:25 20:1 24:8 27:2, 13,23 29:10 30:16 31:7 32:4 33:4,13 37:16 38:3,15,21 39:14 40:2,13 41:18 47:3 63:9 67:2 79:23 86:2,15 139:17 191:24 192:4 193:4,9,19 195:18 241:8,17, 22 261:4,5,16 262:12,18 263:8, 10,11 264:1,17

**legally** 223:9 239:21

**Legislation** 10:13 19:2,22 20:2

**letter** 24:13 25:13,17,19,24 26:1,2,8,22,23, 25 27:7,8 29:2, 10,12,17,19,20 30:5,14,17,20,23 31:2,10,23 32:3, 9 34:20,21 35:2 85:22 86:1,3,14, 21,22 92:15,18 93:15 108:4,8, 11,13,15,17,18 142:10,19 145:1,

Exhibit A

18 167:6 168:11
208:11 209:25
210:7,9,14,24
211:4 212:9,11,
24 213:1,11
215:11,24
217:25 229:17,
21,22 230:5,19
231:19 236:13,
17,18 238:10
239:4 240:4,15
249:6 259:23
260:25 261:9,10
262:10 263:9
264:16,19

**letterhead**
108:1

**letters** 57:18,21,
23,24 58:1,7
86:20,23 93:3
147:7,12,19,21
162:12 205:19
206:9,13,24
207:24 208:7,9,
13,18 210:15
213:16,18 214:4,
5,11,16,25
220:5,19 224:21,
22 225:14
230:23 231:11,
14,17 232:3
240:17 255:1

**level** 59:18
70:19,21 96:15
122:3 172:8
221:14

**license** 167:12
168:3,4 169:22,
25 170:11,13
177:6,8 178:18
179:3,15,22,23
180:3,4,10,14,
17,21 184:5
222:4 238:24
255:23,25

**licenses** 158:16

**life** 232:11
233:22

**lights** 233:9

**limited** 124:16

**limiting** 127:8,
10

**Linda** 6:6

**link** 157:7

**Lisa** 238:4

**list** 15:10 16:5
26:19 28:17
40:7,9,16,19,20
41:21 42:13,20
43:8 55:16,17,
18,22 57:3,9
63:13 73:14
78:19,22,25
80:19 81:3,5,7,
11,15 82:22
87:22 91:17 93:5
98:7 102:18,25
128:2 129:2
133:3 138:7
140:23 141:24,
25 142:23,25
143:3 148:6,9
149:11,18,20
150:3,10,17
151:20 152:6,11
153:3,7 154:19
174:2,4,25 175:4
182:21 184:25
185:2 190:22
191:4 204:3,7,8,
9,14,22 205:2,5
211:6 219:9
223:10 224:3
225:25 230:9
236:18 238:8,9,
17,23 239:20,23
240:5,8 246:14,
18,22 252:1
253:24 254:17
255:9,10 256:15

**listed** 52:8
227:25

**Listing** 76:18,22
77:11,13 79:19

**lists** 36:18 39:5,
12,25 40:11,17
90:11 154:18

**literally** 172:8

**litigate** 146:20

**litigation**
146:12,15,16,25
147:1 197:2

**live-person**
6:17

**lived** 233:22

**loaded** 219:6

**lobbying** 20:16

**local** 161:21
211:11

**log** 59:12,14
62:21,25 106:1
109:16 238:11

**long** 18:19 19:3,
12 131:16
137:24 150:5
158:25 159:16,
19 233:23
243:16

**longer** 129:21
159:17

**looked** 77:20
92:13,21 96:3
117:16 118:16
156:19 166:5
182:12 260:14
263:17

**lot** 6:17,25 10:3
61:23 138:12,19
197:10 234:24
251:4 252:20
261:7 263:3

**lunch** 112:8,13
132:23

**luncheon**
131:25

**M**

**made** 13:11
22:16 23:1 31:9,
16,25 35:8
62:21,25 63:3
64:9 65:5,15
102:10 109:13
115:20,22,24
116:14,22 123:9,

16 133:23
136:17 183:20
194:7 241:12
258:21 259:2

**magazine**
232:15

**magnified** 6:22

**mail** 57:12
135:24 142:19
240:18

**mailed** 84:17
207:23 208:6,9
210:15 213:10,
11 239:4

**mailing** 39:21
42:2 103:2
205:19 225:12

**maintain** 36:13
47:12,17 48:4,6,
10,11 49:7 52:15
59:18 135:19
136:4 149:11
231:20

**maintained**
49:1,8 55:4,12
62:16 106:22
119:12 122:13
135:20 136:10
177:17 231:24
262:11

**maintaining**
41:15 47:21 53:1
65:9 66:1,3
136:6,15

**maintenance**
28:17 40:7,17
41:22 42:13,20
43:8 55:16,17,
19,22 57:3,9
63:13 98:7
102:18,25
149:18,20 150:4,
11,17 151:21
152:6,12 153:3,7
154:19 205:2
223:9,11,13
224:3 225:25
239:20,23 240:8
258:12

**majority** 10:5
163:14

**make** 10:8 15:25
26:11 30:19
31:21 36:14
38:18 42:17
56:21 58:10
59:21 60:2,12
65:18,24 66:5
70:22 71:2 72:11
73:6 79:10 95:15
98:25 105:23
123:21 126:19
138:8 146:13
194:17,24 195:1
207:1 227:23
235:22 245:9
248:24

**makes** 241:18

**making** 43:5
264:2

**management**
52:17 53:3
199:20 200:22,
23

**Manager** 236:14

**mandated**
154:19

**marathon** 9:9
112:18

**mark** 35:25
157:4 197:16
222:16 236:14,
16 245:17 246:3

**marked** 14:18
24:15 25:5 28:21
29:1,8 31:10
36:1 44:21 50:16
51:20 54:4 66:14
68:9 73:17 75:2
79:16 85:13
112:10 114:4
132:3 151:4
157:5 169:6
187:25 197:20
203:2 209:2,16
222:18 226:22
229:7 235:25
237:12 242:5
246:8

Exhibit A

**marking** 54:14 56:23 85:25 229:5

**Marks** 6:2,7 7:24 11:24 13:2 14:23 18:16 24:12 25:5,12 29:3,7 31:21 33:8 34:24 35:14,21 40:23 45:2 50:24,25 51:7 54:8 56:13 57:1 62:8 66:19, 20 67:7 73:23 74:24 79:19 85:19 87:15 113:3 118:22 119:15 133:14 143:25 144:7,16, 20 147:16 157:19 158:23 170:3 194:7 195:2,16 197:12, 22,25 198:1 200:21 202:4,19 203:21 204:21 205:1 206:11 207:15 208:24 209:5,22 226:6 232:20 241:18 246:10 249:12 251:18 253:6 257:21 259:18 260:9 263:19 264:8 265:1

**mass** 39:21

**match** 169:22 170:10,25 171:1, 6,12,16 172:9,25 173:3,15,18,20, 25 174:8,19,22 176:5,7,20 177:10,21,24 178:9,23 179:8,9 180:23,24 181:5, 6,7,9,11,17,24 182:1,4,5 183:15,25 184:3, 6,8,12,18 185:23 186:5,19 204:11 221:7

**matched** 174:24 175:24 177:2,5,

8,9 179:2,4 220:6

**matches** 175:1, 6,11,15 176:9, 12,14 178:17 182:9,12,16 219:24

**matching** 174:11 183:22 227:11

**material** 194:16

**math** 235:13 254:11

**matter** 102:8 160:11 195:7,11 196:13,14,24 201:8,11 205:11 238:14

**matters** 16:21 140:9 201:24 203:16,20

**meaning** 37:5, 12 39:24 74:23 121:24 122:6 169:20 252:11

**means** 55:16 69:19 76:20 80:8,23 111:11 126:24 204:6 212:12 234:5,6 253:16

**meant** 58:4 138:18 149:23

**mechanics** 182:13,14

**mechanism** 212:24

**media** 234:21

**meet** 215:10

**meet all** 238:11

**meeting** 134:24, 25 135:6,7,12 137:20,21,24 138:4,9,10 139:11,13,15 159:17,18,20,22, 23,25 160:2,3,7,

13,14,17,18,20, 21,22,25 161:4, 10,11,17 162:9 163:19 164:5,6, 10,24 165:4,13, 16,24 166:1 170:5 171:15 174:14 185:16 255:1

**meetings** 134:18 135:3,5 136:20 139:20 158:6 159:3,5,7, 8,14,16 170:9 171:11,12 253:9, 13

**meets** 41:11

**member** 150:1, 3,5,22,25 243:2, 7

**members** 129:6 134:14,15 139:25 140:19 243:15

**memorized** 72:3 73:15

**memory** 34:11

**mentioned** 15:4 63:18 132:21 187:10

**mentioning** 18:11

**Menu** 74:17,21 75:6,8 80:11

**merged** 182:10

**met** 40:21 41:7 212:22

**method** 84:15 106:7,16

**methodology** 141:12 206:20 256:20

**middle** 184:7 199:9

**Mike** 173:12 174:17 178:15 180:22 181:4,17,

23 182:3 185:7,9

**millions** 183:10

**mind** 24:22,23 83:23 122:7

**mine** 249:10

**minimum** 54:23 184:2

**minute** 85:4

**minutes** 96:3 134:23 209:11 257:16

**mischaracteriz es** 147:24 175:3 176:1 178:2 191:5 241:14

**mischaracterizi ng** 177:15 181:2 194:21 208:16

**missing** 235:4

**mission** 129:23, 24 155:1,2

**misunderstandi ng** 116:17,19 162:3 163:12

**misunderstood** 48:1

**modernization** 151:21 152:4,12 153:3,8 155:15

**modify** 167:8 168:19

**moment** 29:19 51:17

**Monday** 242:23

**monitor** 42:19 43:18 65:23

**monitoring** 43:7

**Montgomery** 97:17

**month** 208:11

**months** 113:23, 24 114:14 125:4

23 182:3 185:7,9

**morning** 6:6,10 9:15 11:14 18:11 242:1 245:20 246:25 247:1,3 254:25 260:21

**Moser** 173:12 174:17 178:15 180:22 181:4,17, 23 182:3 185:8,9

**Motion** 207:3

**motor** 116:4 123:17 130:5 137:6,17 141:7 142:23 145:22 148:18 150:2 151:10 167:8 168:19 169:2 177:3,4,18,22 181:12 238:24 259:10

**move** 28:20 33:6 35:5 36:7 67:5 73:6 85:16 86:18 89:3,16 100:3 102:15 112:4 131:11 151:17 169:9 198:18 237:9

**moved** 139:21

**moving** 247:22

**multipage** 74:1

**multiple** 146:8

**multitude** 152:3

**Murren** 257:25 259:4

**MVRA** 263:10

**N**

**N-U-M** 247:25

**NAACP** 138:21

**names** 81:14 177:7 179:4 230:9 240:23

138:6

Exhibit A

**narrative** 258:9, 11

**narrow** 241:22

**National** 35:15 36:5 37:6,10,14, 25 38:12 39:19 42:1

**nationally-recognized** 149:17 223:10

**natural** 138:20

**nature** 114:20

**NC** 78:17

**nearing** 257:17

**necessarily** 56:17 78:1 97:16,17 105:22

**needed** 64:1 71:18 123:19 130:8 141:25 206:12 208:20

**nice** 265:1

**Nick** 237:21 238:15

**night** 11:4 13:16 17:18,19 18:4,6, 10,13 245:18 250:24 252:23 260:7 264:6

**non-citizen** 64:19 96:7 103:1 156:11 172:15 227:11 230:15 256:9

**non-citizens** 82:3 93:10 103:4 113:1 115:16 116:10,11,13 117:13 130:15 154:4 158:15 163:21 167:25 178:12 186:10 256:16,19 257:7

**non-partisan** 138:24

**non-u.s.** 262:15

**notaries** 20:11, 19,20

**notation** 111:1,4

**note** 10:24 11:3 12:23 15:2 16:18 44:10 47:2 61:8 69:7 114:5 143:5 147:14 155:21 168:3 176:17 189:3 200:14 203:9 214:20 220:7 224:13 225:21 229:14 239:7 249:3 262:17

**noted** 140:13 143:12 240:3 255:11 264:21

**notes** 13:2 138:2 159:14,22,23,25 160:1

**notice** 10:25 15:4 39:20 42:2 61:14,19,25 84:9 140:5,12 144:15 153:17,18 154:9 155:8,20 235:13

**noticed** 6:21

**notices** 42:23 43:5,11,14 55:25

**notification** 43:1 63:13 89:22

**notified** 230:1

**notify** 229:22,25

**noting** 193:10

**November** 80:24 88:8,25 230:11

**Num** 248:13

**number** 23:14 52:16 68:10 83:24 87:23 88:10 91:3 94:2 99:13,16 101:3, 7,18,20 124:24 126:18 133:9

156:3 175:16 176:8,12,21,22 177:1,24 178:6, 7,8,12,24 180:20 184:17 185:3,12, 13,14 186:1,9, 10,13,17 187:11 194:12 197:13 209:7,8 239:16 241:1 249:8 256:1,10

**numbered** 26:19

**numbers** 93:21, 23 99:5 100:10, 12,23 101:13,25 103:3 126:12 169:22,25 170:11,13 179:15 180:3,4, 21 250:22

**NVRA** 35:15 38:19 42:12 192:19 235:23

---

## O

**oath** 8:10

**object** 125:9 153:18 181:1 196:22 206:25 238:21 241:15, 16,24

**objected** 207:7

**objection** 12:7, 15,18,24 15:2 16:19 23:11 25:14,18 26:5 27:1,12,22 28:3, 7,12,18 29:13 30:8,15 31:6,12, 24 32:4 33:3,12, 24 34:9 35:9 37:15 38:2,14,20 39:13 40:1,12 41:3,17 44:9 47:2,22 48:21 50:2 52:10 53:24 57:4 59:3,15 60:1,20 61:8,12 62:11,23 63:8

64:8 65:3,13 66:7 67:23 69:24 70:14 71:21 75:21 78:9,24 79:6,7 81:10,17 82:4,14,17 83:7 90:15 91:14,21 92:5 93:12 94:9 101:14 102:1,23 103:6 105:2 106:13,20 107:13,20 108:12,22 109:20 110:1,6 111:3 114:5,16 115:9,13 116:20 117:1 119:19 120:8,13 121:9 122:23 123:15 124:6 126:10 129:15 130:19 131:1,8 135:16 136:3,13,22 137:1,11 138:17 139:8,21 140:2, 15 141:14 142:12,21 143:5, 12,21,22,23 144:10,18 145:2 146:21 147:9,13, 14,23,25 148:10, 22 150:14 152:8, 16 153:13 154:5 155:7,19,21 156:14 162:19 163:6,23 164:2, 7,13,19 165:20 167:14,17 168:4, 9 170:17 171:7, 14,17 173:2 174:1,3 175:2, 22,25 176:17 177:12 178:1,21 179:5,17,19 180:12 181:22 182:11 183:17 184:16 185:1,24 186:6 187:5 189:3,24 190:7 191:5 192:8 193:5,10,11 194:20 195:5,17 200:3,7,14,19,24 201:6,22 202:14

203:9,15 204:15, 23 206:1,14 207:18 208:15, 21 211:8,13 214:17 215:1 217:16 218:2 219:2,20 220:7, 20 222:6 224:7, 13 225:3,21 226:1,19 228:17 234:13 235:8 239:7,25 241:7, 21 244:5,5,20 245:6 247:14 253:11 257:9 258:24 259:12 261:3,14 262:2, 17 263:2 264:17

**objections** 10:25 15:3 44:13 61:15 62:1 140:6,12 143:24 144:15 153:18 154:13 155:9 263:14

**obligation** 41:21 244:17

**obtain** 41:25 117:5

**obtained** 123:18 223:12 224:2 228:8 255:2

**obvious** 180:15

**occasion** 60:11

**occasions** 60:2, 8 102:8

**occur** 150:12 223:9 235:17 239:21,24 240:8

**occurred** 182:1 189:2 240:5

**occurring** 158:12 173:15 183:23

**October** 19:4,13 24:9 26:24 27:10 34:20 113:1,11 125:2 259:24 264:16

Exhibit A

**offered** 155:10

**office** 10:4 11:5,
7 16:12 17:3,8,
10,12,18 22:11,
13,14,19 23:3,6
37:5,12 38:10,
11,17 57:22
84:18 97:5 113:8
141:3 142:14
143:14,16
146:11 148:5
160:18,24 161:9,
21 166:17
186:23 187:3
188:19 189:8,14,
15,17,20,21
190:2,9 193:18
196:10 207:16
216:4,7,8,10,13,
16 230:1 231:22
249:5 250:23
252:22 253:10,
13 254:9,11,16
262:12

**officer** 22:10

**offices** 10:11
37:22,23 89:2
101:11 211:11,
16 213:22 214:2
216:22 217:15
218:10 221:24

**official** 36:18
39:4,11,25 40:9
47:13 48:11,15,
17 49:5 58:15
60:21,25 62:13
63:23 64:6,23
65:1 66:3 68:2,5
70:10,25 71:4
100:9 108:24
116:24 149:9,11,
13

**officials** 64:15
116:1,15,22
117:9,12,20
128:4 131:3
133:10,24 146:9
243:4

**ongoing** 155:2
156:1

**open** 7:13
245:19

**opened** 11:10

**operation** 21:16

**operations**
20:15 21:22,25
197:10 252:1,20

**opinion** 226:11

**opposed** 17:14
22:13,19 180:20

**opposite** 204:10

**option** 7:15
82:10

**order** 59:19
142:17,19 259:9,
11,17,20

**organization**
150:24

**organizations**
133:11 138:12,
13,22

**original** 65:25
236:18

**originally** 50:22
74:6

**other's** 97:10

**outreach**
219:10

**oversee** 20:10
21:21

**overseeing**
20:14

**P**

**p.m.** 11:6 131:25
132:1 265:6

**Pa** 54:9

**Pacer** 103:24

**paelectiondirec
tors@
yahoogroups.
com** 242:20

**paelectiondirec
tors@
yahoogroups.
com.** 242:21

**pages** 11:11
74:3 112:5
197:10 252:1,20

**paginated**
232:17

**paging** 74:7

**paper** 27:8
30:20 36:24
46:13 56:3 61:6
83:16,18 84:17
91:22 109:6
190:15 211:19
213:4 215:6
223:22 248:20
249:9

**paragraph** 26:8,
16,18 27:3 28:2,
6,9,11,16 32:9,
22 46:15,20,23
47:1 61:19
113:14,22
118:11 120:20
127:3,14 140:22
149:15 150:19
151:18 157:8
169:15 199:10,
13,15 200:21
202:4,5 227:16
229:21 230:8
233:4,7,20
260:14,20 261:2,
22 262:9

**paragraphs**
27:17 262:24
263:18 264:15

**part** 23:21 36:5
39:6 47:17 49:11
51:1 52:4 57:2,6
75:6,10 113:19
124:23 156:1
157:11 173:23
176:19 183:15
189:20 190:5
205:2,10 208:17
213:12 219:16
232:21 234:1

238:23 246:22
247:22 249:13,
25 254:23 256:3,
6,18

**participants**
138:10

**participated**
6:15

**participating**
139:19

**parts** 48:19,22
50:6

**party** 255:22

**past** 11:5 96:3
135:1 172:16

**Pedro** 86:3,5,14
92:15 93:3
166:22

**pending** 9:12
32:24

**Penndot** 12:21
104:5 115:1,25
137:6,17 145:22
146:6 158:18
168:12,16,22
171:4 172:3,18
176:3 183:12,16
199:14 202:6
204:12 259:9

**Penndot's**
171:2,25 172:13
173:4 176:7
177:3,18 179:7
184:19 222:8

**Pennsylvania**
9:25 14:22 18:18
38:5 39:9,15,17
40:15 42:12
43:25 44:7,17
46:25 51:4 54:15
79:5 86:6 93:11
98:6 125:7
128:25 149:6,25
150:5 166:25
167:7 170:1,14
197:18 199:6
222:1 229:20,24
230:2 231:8
235:2 254:12

258:10

**Pennsylvania's**
22:17 40:8 47:7
235:24

**people** 23:9,23
24:1,4 40:24
41:2 83:4 94:13
138:15 163:4
165:7 167:24
178:8 201:11
208:12 209:25
210:25 212:17,
18 217:24 220:4
233:23 238:6
239:3,6 254:17

**percent** 122:11
174:12 178:9
184:10 205:13,
14 234:21

**percentages**
100:21

**perform** 52:16
57:3 181:5

**Performance**
197:18 198:10,
25 199:6

**performed**
170:16,20 171:6,
16 172:24
180:23 181:6,7
182:4 184:12
191:8 205:16
206:21 225:2
247:5

**performing**
66:6 225:25

**performs**
174:19,22

**period** 19:20
63:12,16 109:5
127:6 235:12

**periodically**
230:25 231:1

**Permit** 55:1

**person** 25:16
70:11,16 97:4
120:25 144:17
159:9 160:19

161:3,6 172:15
176:6 177:20
181:9,13 184:23
233:25

**person's** 59:12,
14 70:5,10
121:11 172:14

**personal** 18:9
147:2 179:10
249:4

**personally**
10:17 12:2 13:8
16:14 23:8 37:9
156:7

**persons** 120:16

**Philadelphia**
80:1,4 82:2
84:12 91:16 92:8
96:4 97:4,5,16
117:23 118:1
119:7 128:24
156:5,11 159:12
160:16 161:4
165:1,5 232:15
234:11,23
237:21 238:5,6
239:4 254:6,15
255:13 256:16
257:3,10

**Philly** 233:5,21

**phone** 184:24
212:24

**photo** 36:15

**photocopy**
67:15

**phrase** 40:4

**physical** 134:25
135:3

**physically**
173:14

**pick** 184:23

**picture** 109:8

**piece** 122:6

**pile** 253:1

**PILF** 67:1 74:5
83:14,25 84:3

86:1 87:6,14
89:4,17 93:2,22,
23 197:15 229:5

**pivot** 248:4,15
249:13 250:13,
18,21

**place** 11:21
56:10 129:17,21
133:9 135:2
136:21 167:2
187:19 192:8,22
196:21

**places** 60:18

**Plaintiff's** 66:24
227:1

**plan** 151:21,25
152:2,4,5,10
153:4,8,25 155:1

**planned** 260:4

**planning** 260:8

**plans** 115:2
152:14 154:2

**play** 157:3

**Pleas** 231:9

**pleasant** 112:20

**point** 33:7 34:13
35:1 45:12 93:8,
11 110:9 113:19
125:12 139:14
146:18 158:18
162:2 167:11
172:10,12,15,21
174:9 178:16
186:7,17 188:22
190:20 192:21
204:2 205:25
208:3 222:12
235:22 241:6
257:13

**point-in-time**
120:22 221:7

**pointing** 163:1

**points** 180:24
182:21 183:24
205:18 208:5

**political** 138:16

199:21 200:2
202:8

**polls** 106:8,11,
17,19,24

**Portals** 52:5

**position** 11:22
18:19,21,25
19:3,9,12,18
20:8 21:6,12
23:22 94:22
95:20 115:15,17
192:14 193:15,
21,25 195:2
196:12 201:7
207:7

**possessing**
115:6 116:6

**possession**
27:19 166:12,13
204:14,22 260:6
261:25

**possibility**
116:5

**Post** 57:21

**Post-it** 229:14

**Postal** 57:25

**posted** 229:15

**potential**
115:19,25
116:13 117:13
118:5 126:6
130:14 141:9,25
146:24 175:14
176:9,12,14
186:10 205:12
220:22 226:3
244:24 256:19

**potentially**
99:16 176:6
244:22 260:16
261:12

**Powell** 85:23
86:2,14

**power** 58:9
65:18

**practices**
223:11

**practitioner**
106:6

**pre-date** 84:10

**preceded** 263:7

**preferable**
184:6

**prepare** 13:8
16:14 113:6

**prepared** 16:16
17:22 51:9 60:6
61:10 71:10
113:8 114:15

**prescribed** 40:7

**present** 173:14
175:8

**presented**
114:15

**preserve** 11:17
58:9

**preserves**
65:17

**preserving**
11:22

**press** 161:8
192:1 258:1,2,5

**pretty** 20:22
61:16 101:16
137:15 138:22
184:8

**previous** 69:15
78:8 105:12
126:13 132:22
200:13 202:23
208:2 212:8

**previously**
104:9 137:5
145:21 166:19,
20 210:18 225:7

**primarily**
117:23 134:20

**primary** 208:6
223:8 224:22
239:20

**print** 15:16
50:21 197:9

**printed** 97:23
103:21 259:25

**printing** 51:16
56:11 233:11,19

**printout** 248:21
250:14

**prior** 9:12,13
14:24,25 15:7
16:5 18:11,22
19:6,15,24,25
47:8 79:3,8
81:15 88:7 90:2,
8 91:13 113:24
114:14 122:10
125:4 132:16
138:4 158:24
208:6 247:1,2
258:17

**privacy** 238:16,
20

**privilege** 141:16
154:12 155:25
191:21 192:15
194:3 195:1,11
196:1,8,11,15
202:3,17 203:17
204:17 206:5
207:11 208:23
220:10

**privileged**
143:7 144:3
145:5,6 147:15
148:1,3,11,15,
23,24,25 167:18
179:20 186:25
189:5,12 191:7,
11,16,19 192:3
193:12 194:16
195:7,10 196:13
197:5 201:8,11,
24 202:1,2,3,21
205:8 206:3,15,
16 207:13,19
220:14,15 239:9
240:1 241:13

**privileges**
155:24

**probabilities**
100:22

Exhibit A

**problem** 11:9
24:19,24 119:2
131:4 158:13,14
165:4

**procedurally**
182:7

**proceeded**
205:19

**proceedings**
6:22 25:1 85:12
187:24 209:14

**process** 51:16
52:15 56:10
113:20 114:21
127:18 130:1
153:6 154:11
155:23 167:9
168:19 173:23
178:14,15
183:23 219:16
230:3 259:10

**processed**
102:7 166:17

**processes**
154:22 156:2

**processing**
30:7

**produce** 25:23
30:13,24 31:22
136:12 155:11
253:24

**produced** 66:25
79:8,23 92:15
93:2 101:21
164:16,18,21
252:4,9,10,13
253:8,12,15
263:10

**product** 130:5
143:8,10 148:12,
24 189:5,13
191:7,16 192:3
202:3 204:18

**products** 152:3,
11

**professor**
199:21 200:2,9
201:5 202:7,8

**program** 39:19
42:1 89:12
120:24 121:8
149:24 182:8
183:6 223:13
224:3 228:13
239:23 240:8

**programming**
137:6,10,13
145:21 146:5

**programs** 36:17
39:3,10,16 40:4,
17 42:13,15,18,
25 55:19 149:17
150:10

**progressed**
134:10,12

**prohibit** 9:17

**prohibition**
111:16

**prohibits** 235:2

**projects** 21:24

**prominently**
168:20

**pronounce**
80:19

**properly** 94:10

**protect** 147:1
238:16 241:5

**protected** 31:14
141:15 154:11
168:5 171:25
179:21 183:19
192:15 196:1,4
197:5 202:16
203:16 204:16
206:4 208:22
220:9 238:23
239:9 241:13,19

**protecting**
238:19

**protocol** 109:1

**proven** 121:4

**provide** 17:25
23:3,4,7 42:10
53:8 76:14 82:24

90:25 99:1,11
118:18 126:15
127:3 182:14,22
183:20 201:18,
21 205:12
228:20 230:20
238:8 240:9
242:2

**provided** 17:22
23:17 33:15,19
34:2 75:23 76:2
93:14 100:7
102:19 133:22
142:23 143:2,3,
11 158:19
162:13,18
165:21 172:23
174:13 176:2
180:19 182:20,
21 183:11
185:11 191:3
216:20 218:9
225:6 227:2

**providing** 21:23
41:24 193:4,9

**provision** 37:6,
10,13 38:18

**provisions**
37:25 38:11

**public** 6:7 11:25
22:2,5,8,15 24:8
29:10 36:8,14
43:18 67:2 72:17
73:2 79:22 86:2,
15 113:1 139:17
151:10 194:8,19
195:3 258:21
259:2

**publicly** 22:22
23:1,16,19 88:5
133:18 141:22

**publish** 22:23

**published** 43:4
73:2 88:12,18
90:18

**publishes** 72:14

**publishing**
56:23

**pull** 14:2 112:8
157:9 187:17
222:15 228:23
232:8 242:8
247:19,20

**pulled** 88:14,18
183:12

**pulling** 157:11
229:4 250:2

**purchase** 259:9,
11,17,20

**purpose** 36:17
39:3,10 40:5,14,
17 55:13 59:17
69:25 178:23
227:19

**purposes** 52:25

**Pursuant** 26:18

**pursue** 123:21

**purview** 38:8

**put** 15:15,16
24:11 28:23
44:25 54:3 56:2,
8 66:17 73:20
79:13 84:25 85:6
112:5 115:15,16
132:7 140:10
148:9 169:11
186:12 188:2
191:10 197:11
209:20 210:17
213:8 236:7
246:1 247:24
249:9 254:16

**putting** 56:22
193:11

**Q**

**qualification**
230:3

**qualifications**
41:11 58:11
65:19 115:6
116:7 123:20
141:10 145:10
148:8 195:15
212:22

**qualified** 40:21
89:13 163:13
212:21

**quarters** 158:14

**queried** 124:18,
20,25

**queries** 175:19

**query** 100:6
101:2,21 102:4,5
124:2,4,5,15,23
125:17 126:8
247:5,9,11,17
249:17,18
251:18,20

**querying**
247:18

**question** 8:24
9:5,6,12 16:3
27:17 28:9,16
30:23 32:24
33:1,17,21
49:11,22 56:18
64:5,11 71:19,20
73:14 90:7
111:19 114:9,10
115:7 140:14,18
143:14 153:19
154:14 155:22
168:20 176:18
186:15 193:23
195:12 200:17,
20 202:21
203:10 205:8,23
206:6,7 220:13
224:14 226:5,6
233:20 234:20
241:16,24 251:1
261:21,22 263:7,
19 264:9

**questioning**
61:20,23 201:8

**questions** 8:11
9:17 10:3,6 13:5
61:12 112:19
140:7 179:5
181:2 191:7
192:7,23 193:13
194:5 195:10,19
196:7,23 197:4
200:19 201:13

204:24 207:4,5,8
220:8 263:11,23,
25

**quick** 24:22,23

**quote** 39:2
170:9 236:19

**R**

**race** 141:23

**raise** 118:5

**raised** 161:21

**raising** 161:25

**ran** 84:13 249:16

**rarely** 20:18
102:9

**raw** 248:17
250:19

**reach** 26:12
139:3

**reached** 118:4
158:3 206:23

**reaches** 128:20

**read** 15:12 29:20
36:12 38:25 40:3
45:8,10,16 46:2,
6 104:20 122:4
146:3 198:15
205:17 260:18
264:10

**reading** 27:3
114:17 146:2
251:10

**reads** 229:21

**ready** 7:12

**reality** 150:12

**realize** 76:4
102:10 163:14
234:7

**realized** 163:16

**reason** 10:18
63:20 64:19,20,
21,24 65:5
69:16,20,22,25

70:4,5,8,12,23
71:2,8 72:8,22
75:23 76:1,3
77:16 78:12 79:2
80:14 81:12,22
82:7,11,23 91:18
94:3,5,12,24
95:2 102:13
106:11 117:18
123:4,12 125:14
180:13,15
240:11 249:10
252:2 262:15

**reasonable**
36:15

**reasons** 63:6,17
76:5 89:10 100:2
180:21

**recall** 25:25 34:5
71:12 73:12
74:25 86:8 107:8
118:9 125:10
127:24 138:5
159:5 160:1,8,19
161:7,9,24
162:21 164:8,24
165:15 166:2,9
210:8 216:12
217:4,12 218:23
225:10 231:10
238:1 247:2
254:24

**receive** 25:13
29:11 206:13
211:3 217:25
230:23 231:7,14,
16

**received** 11:4
25:20 26:2,22,23
27:18 29:17
30:5,21 31:2
67:3 74:4,12
107:19 117:2
147:5,17 190:14
208:18 210:1
213:16 218:5
230:10,18
231:11 243:9
245:18 250:24
255:7 260:25
261:9,10,25
262:9,11

**receives** 62:15
63:13 231:18

**receiving** 216:2

**recently** 32:11
159:1 239:3

**recess** 24:25
85:11 131:25
187:23 209:13

**recipients**
132:20 210:6,8
211:10

**recollection**
31:1 34:7 134:11
159:18,20
160:12 161:18
165:6 171:8
231:2

**reconfigure**
259:10

**record** 8:8,17,21
10:24 11:13
24:18 25:3 34:20
48:15 49:25
50:1,4 56:7 59:4,
25 60:13,17
62:20,24 63:1,
10,15 64:1,2,11
65:16,21 66:23
67:16,22 68:2,7,
20,24 69:15
70:2,3,6 71:2
75:1 81:2,20
82:25 84:15
91:22 92:2 94:6
105:4,8 106:10,
15,22 109:13
123:11,18
135:15 136:6
153:15 157:12,
16 171:5 175:24
176:11 177:4,6,
8,9,22 179:22,24
180:10,11 183:2
184:20 191:10
192:8 193:11
209:11 214:20
231:23 235:16
254:22 255:25
257:12 263:6
264:2

**recorded** 63:18
69:23 81:2,21,23
92:2 105:8
106:15,17
108:19 119:22
125:15

**records** 11:19
12:12,17,20
13:12,14,15 18:1
22:3,5 24:9
25:24 26:3,24
27:10,19 28:1,6,
10,15 30:12,14,
24 31:4,10,22
32:2,12 33:1,17,
19,22 34:14,25
35:3 36:16,20
38:7 47:13 48:4,
12 49:1,8,12,18
50:7,10,11 52:15
55:3,12 59:21
64:17 65:10,25
66:3 67:2,25
72:25 74:3 76:16
79:1,22 81:12
82:3,6 84:10
89:6,19 91:17
92:1 93:9 94:1,2
95:13,15,17,18
96:19 97:11,12
100:9,12,15,25
102:6 104:23
108:24 109:2,6
117:17 118:17,
20,25 119:2,12,
23,25 120:6,18
121:15,16
122:16,18 123:3,
22 124:1,14
125:1,13,15
126:15,16,21
127:1,8 134:17,
21,22 135:18,25
136:4,7,8 141:7,
8 142:24,25
145:17 148:18,
19,20 149:3,7,13
166:5,11,12
167:13,23,24
168:3,5,8 169:24
170:12 171:1,2,
4,25 172:9,18,20
173:21 174:6,7,
15,24 175:9

176:3 177:1,3,
17,19 178:3,6,24
180:1,2,4 182:16
183:8,10,19
184:13,17
185:18 186:20
205:13 212:7,15
214:14 217:20
218:8,21,25
220:25 225:13,
14 230:10
231:24 232:1,3
238:24 244:11,
12 246:18 247:6,
23 248:25
250:13 252:2
254:12 255:2,5,
13 257:4,7,11
260:25 262:11
264:5,22

**redactions**
249:4

**refer** 13:19
50:19 54:2 55:7
122:16 125:24
167:3 189:14
259:22

**reference** 240:7

**referenced** 24:3
166:23 167:6
195:22 200:13
248:23

**references**
224:25

**referencing**
152:20 203:6

**referred** 40:16
113:22 170:8
210:18

**referring** 10:11
13:4 22:7 26:17
32:14,22 39:1
57:14 87:4
152:2,9,23
153:25 167:1
168:13 171:1
189:15 194:9
201:2 228:7,16
234:9,17 235:10
236:23 238:18

239:1,11 240:12 242:22 250:8

**refers** 39:2 126:22 127:1 152:18 212:6

**reflect** 75:1

**refresh** 34:7,11

**regard** 21:10,20 32:10,21 39:23 41:14 43:8 63:5 76:3 123:22 144:23 145:12 186:4 222:3 225:15 226:18 240:7 262:23

**register** 20:21 36:20 40:22 84:18 97:3 110:20 115:17 117:14 158:17 162:24 163:13

**registered** 36:22 84:16,18 88:11 93:10 97:7 113:18 114:1,13 117:4 120:4 148:8 162:2 163:3,17,22 165:8,9,11 178:12 180:14, 16,18 184:14 186:11 212:22 218:22 221:11 225:18 234:22 235:11 239:4 255:22 262:12

**registering** 41:8,9 115:5 116:6 137:8 145:23 163:15

**registrant** 94:8 95:23 110:13 111:6 116:19 117:6 119:17 121:16 122:21 123:7,20 241:3

**registrants** 40:11 79:4 91:11 93:25 94:13 95:3,9 103:3

115:5 120:11 121:20 122:17, 19 124:22 126:7 165:17 205:20 206:12,23 207:25 208:1,2, 7,10 217:11 219:19 220:19 228:21 256:15 260:15 261:11

**registrar** 38:6,9 49:20

**registrar's** 41:20 97:5

**registrars** 38:13 58:2 66:2 149:10

**registration** 35:15 36:6,9,21 38:7 40:8 47:13 48:4,12 51:4 52:9,15,19 55:3, 11 58:21 59:1 60:17 61:1,3 63:6,7,10,19,22 64:7,17 65:20 69:9 79:1 86:23 87:10,13 88:11 93:15 98:1,7,8 100:1 113:16,20 114:12 116:25 117:9 120:3 121:17 123:17 127:19 130:1,6, 14,24 139:7,10 140:24 141:7 146:1 148:19,20 149:2,24 150:2 151:20 152:6,11 153:3,7 154:3 156:11 166:17 167:13,24 169:24 170:12 171:3 176:3 177:2,6,7,17 178:17 179:2,13, 16 180:4,10 182:15 183:2 188:5,23 190:23 194:13 195:16 197:1 199:1,10, 23 202:10,25 204:4,12 210:12

212:17,19 216:6, 18,22 217:15 223:12 224:2 226:14 227:10, 18 228:8 235:2, 24 244:11 255:22 261:13

**registrations** 58:14,18 64:14 71:7 78:22 87:21,24 88:7,23 91:3 116:10,11, 12,16 130:18 149:5 251:8

**registry** 12:21 19:11 21:13 43:22 47:11 48:9,16,17 49:5 58:15 60:21 62:13 149:9 199:7

**relate** 20:14 22:3 36:20 154:7

**related** 12:20 21:11,12,24,25 38:7 52:18 53:3 139:9 141:11 154:3 238:14 262:15

**relates** 77:19 130:9,11

**relationship** 207:9

**relatives** 262:13

**release** 192:1 238:17

**releasing** 56:11

**relevant** 110:3 153:20 154:8 155:9

**reliability** 122:11

**reliable** 120:25 121:2,6,11 220:23 221:2 225:17,23 226:13,16,18

**remain** 61:13,25

**remainder** 218:5

**remaining** 205:18

**remember** 17:4 225:19 233:24 240:19 247:4 260:20

**remind** 42:14 66:12

**reminders** 42:11

**reminding** 42:16

**removal** 55:19 89:12 262:14

**removed** 103:3 212:12 235:3 256:25

**Rendell** 86:9

**reopen** 11:19

**reordered** 168:23

**repeat** 9:2 16:3 21:8 264:11,12

**rephrase** 48:25

**replied** 25:25 30:17,23 262:4

**reply** 63:14

**report** 20:23,24 23:9,23,24 24:1 43:3 51:4,6,9,14, 25 53:5 71:7,13, 16 72:7,12,23,24 73:5,9,16 74:24 75:20,23 76:1,2, 12,18,23,25 77:11,21,23,24, 25 78:7 79:11 80:3,9,11,15 82:6,9,10,19 83:3,4,8,10 84:13 86:17,23 88:1,10 90:1,8, 10,12,14,17,23

91:7,10,17,19,25 92:4,14,20 96:4, 7,11,18,19,21 97:17 99:2,10 100:1,4 101:9 102:10,14,21 105:19,22,25 118:12 123:23 124:21 130:2,23 142:6,8 162:9 173:18,19,23 197:19 198:10, 20 203:8 230:15 234:21 249:14, 16,17 252:6

**reported** 43:16 117:12 119:14 137:5 145:20 165:22 166:14, 15 251:9

**reporter** 7:3 8:15 14:16 25:9, 11 157:13 264:10

**reporting** 99:22 165:8

**reports** 52:18 53:2,10,13,23 71:11,24 72:2,6 73:12,13,15 74:17,21 75:6,8 78:3 82:20,21 92:7,11 96:10, 15,17,23,25 97:11 101:15,18

**represent** 6:7 36:4 93:24 94:1 100:12 250:16

**representation** 47:23 48:3 170:25

**representations** 192:12

**representative** 171:22

**represented** 148:6 181:23

**representing** 161:22 162:16

255:4

**represents**
100:15

**request** 18:1
22:8,9,21 23:16,
17,18,20 24:8
26:4 27:11 28:1
30:7,9,25 31:5
32:10,13,21
33:2,7,11,15,18,
22 34:13,15,25
35:4 59:24 63:11
100:2 101:22
102:15 136:11
143:22,24 154:6
216:17 261:1,15,
19 262:1,4,5,18,
21 264:23

**requested**
22:25 23:1 59:22
201:14 214:13

**requesting** 60:3
98:22 214:9
262:14

**requests** 11:7
12:25 16:12,15,
25 22:2,5,7,11,
12,15 23:8,12
27:21 49:19
215:21 263:1
264:6

**require** 205:15
219:10 245:1
263:11

**required** 37:13,
25 38:11,13
42:24 56:10 57:9
102:19 133:22
135:19 136:7,15
140:25 141:9
144:25 145:9
148:7 149:10
150:3 154:23
190:23 195:8
204:5 205:5,24
257:5 263:9

**requirement**
44:16 48:8
168:25 215:10

**requirements**
40:22 41:7 54:18
235:23 238:12
260:17 261:13

**requires** 42:25
57:19 59:18
173:3

**research** 125:18
156:10,12,17
162:7 166:3

**researching**
161:20

**resend** 11:13

**residents**
113:17 114:1,13
120:4

**resides** 50:14

**resolution**
219:15

**respect** 158:5
227:11

**respond** 23:20
31:22 210:6
211:15 212:23
218:6 219:14
238:10 243:12

**responded**
103:1 210:9
211:10 212:20
238:15 240:17

**responding**
8:18

**response** 25:22,
24 30:25 31:23
32:1,6 33:19
107:21 200:17,
18 217:5,22
218:1 227:15,16
237:20 261:19
262:21 263:5
264:21

**responses**
12:10 13:11
211:4,7,9
213:17,21 214:1
227:1,8

**responsibilities**

21:11,19

**responsibility**
38:18,23 41:10,
14 42:12 47:17
66:4

**responsible**
66:2 148:6
190:22 204:3,7,
8,9,14 221:21

**responsive**
11:7 16:25 26:3,
25 27:11,20
28:1,6,10,15
30:11,14 31:4,10
32:3,13 33:2,11,
15,18,22 34:25
35:3 250:25
261:18 262:5
263:8 264:22

**rest** 17:15,19
75:25 206:8

**result** 119:13
142:10 173:17,
24 184:13
206:21 247:12
253:8

**resulted** 225:12
251:18

**resulting** 240:5

**results** 191:14
201:17 247:8,16
249:18

**retain** 194:17
207:16

**retained** 167:19
188:22 190:19
191:13 192:1,12
194:18 196:13
199:20 204:19
206:3,17 213:18,
19 214:5,15

**returned**
216:10,13

**reveal** 144:9
195:3

**review** 13:15
15:7 16:17 22:5
52:12 71:23 83:8

94:18 119:8
130:23 147:6
148:4 212:1
215:16 216:25
217:3,7,19

**reviewed** 12:8,9
13:10,12,14
16:11 29:22 30:1
113:7 158:23
166:6 244:10
258:17 262:25
263:3 264:13

**reviewing** 30:4
119:21 215:11
260:20

**Rich** 103:12
108:2

**right-hand**
78:11 80:6

**Right-to-know**
22:9,10,13,16,
17,19

**Rights** 37:7,10,
14 38:1,12

**rights'** 128:22
134:1

**Robert** 151:13,
19

**robust** 205:11

**Rojas-orta**
68:22 69:8 72:9
108:5

**role** 41:1 58:12
65:8 227:9

**roles** 40:22,24

**roll** 223:9 262:15

**rolls** 41:2,6,10,
12,13,16 60:22
61:1 62:14 79:5
93:11 165:18
188:24 219:1
235:3 257:1

**room** 265:2

**roughly** 20:19
24:3

**routinely** 84:22

**row** 100:2 235:5
247:24,25
248:11 251:11

**Rule** 10:25 14:21

**rules** 8:9

**run** 53:2,5,11,12,
13,22,23 71:7,
13,14,25 72:2,6,
7 73:5,9,13,15
75:20 77:25
78:3,7 81:5
90:23 91:10,15,
16,25 92:3,7
96:6,9,11,15,17,
18,21,23,25
97:11,17 99:25
101:15,18 102:9,
21 123:23
249:13,20,21,22
251:19

**running** 22:1
76:1 77:21 83:10
100:4

**runs** 92:11
157:17

**RV** 53:11

**S**

**S-A-V-E** 225:16

**sake** 8:8

**samples** 255:1

**Sari** 21:4

**satisfying**
260:16 261:12

**SAVE** 120:24
225:16 226:15

**scan** 107:12
108:19 110:25

**scanned** 215:7

**scheduled**
139:14

**Schmidt** 118:3
119:1 156:6,13

157:1 158:1,2
159:3 160:9,15
161:2,12,15,16,
19 162:8,18
163:2,20 165:3,
12,17 169:13,19,
20 170:8,16,20
171:11,13
172:23 174:13
176:25 178:5
185:17,20 186:8
187:10 219:23
220:22 234:2

**Schmidt's**
162:10 235:1
253:10,13

**Science** 199:22
200:2 202:9

**scope** 114:20
115:18 144:14
155:19 241:23
259:13

**screen** 7:7,19
13:3,21,25 14:1,
7 24:11,19 25:6,
7 28:24 29:5
35:19 36:8 39:7
44:25 45:25 46:1
50:21,24,25 54:3
56:19 66:17
67:5,14,15 68:6
69:1 70:7 73:21,
22 74:6,16,18,
19,20,21,24
75:19 76:18
79:14 83:2 84:25
85:6,20 87:9
103:16,17
104:11 107:3
109:8,9 112:6
132:8 151:7,8
162:12 168:25
169:11 188:3
197:11 198:18
202:5 209:21
232:10 233:16
236:7 246:2
247:24 248:7
249:1 251:13

**screens** 116:4
168:23 169:3

**scroll** 29:19 30:3
188:16 211:1
213:13 227:22
232:19 237:20

**scrolling** 87:2

**scrutiny** 141:10
145:10

**search** 97:9
164:11 238:7

**secondhand**
94:19

**seconds** 157:17
233:13

**secrecy** 193:17

**secretary** 18:17
20:24,25 21:3,6
86:4,5,7 134:8
149:23 151:13
153:10 158:4
160:9,14 161:1,
14 185:11,14,21
186:16 223:6,25
226:15 227:16
228:15

**section** 26:19
35:23 36:5,7,12
37:1 39:22,23
45:5,12 52:13
54:10,15 58:8
69:16

**security** 20:12
21:15 173:6,13
180:20 219:6
226:12 249:19
252:16 256:1

**seeking** 12:13,
20 161:23
191:24 206:19
207:2 241:16

**seeks** 262:18

**selected** 65:4
75:22 80:13
83:10

**self-
explanatory**
32:6

**self-
functioning**
134:13

**self-reported**
121:17,20
122:21,25 123:1

**self-reporting**
123:5,8

**Senate** 151:9
186:12 187:11

**send** 7:6,12
15:14,17,20
42:24 57:19,23
58:6,7 145:1
147:7,12,19,21

**sending** 240:14

**sends** 58:1

**sense** 10:8
105:23 126:19
133:23 183:20
221:3,5

**sensitive**
160:11

**sentence** 54:21
120:21 145:20
146:2 151:22
168:10,13,14
199:18 200:22
201:14 230:9
239:19

**sentiments**
233:5,21

**separate** 96:16
145:15 146:12,
14 175:19
224:16 254:7

**separately**
136:10

**September**
158:8 159:4,6
171:9 249:23
252:19 253:6
259:8

**series** 158:6

**serve** 10:25

**served** 15:3
140:12 154:6

**servers** 50:13
99:22

**Service** 57:25

**Services** 236:10

**SESSION** 132:2

**set** 139:5

**Seth** 160:15
253:5

**Seventeen**
51:25

**shaking** 8:19

**share** 13:21
50:21 150:1
163:19 200:5
246:2

**shared** 14:5
156:16 186:1

**Shari** 244:8

**sharing** 7:18
45:25

**Shawna** 85:23
86:2

**sheet** 256:9

**short** 47:6

**shorthand**
52:24

**shot** 67:14,15
69:1 70:7 74:16,
20 75:20 103:16,
17 104:11 109:8

**shots** 162:12

**show** 14:25
35:19 44:24
66:16 67:4 68:7
91:22 92:1
107:16,18 111:5
126:16,17
130:17 232:7

**showed** 82:19
84:17 92:8

**showing** 74:15

**shown** 162:20
254:25

**shows** 62:25
81:19 82:25
130:23

**shrouded**
193:17

**side** 173:10
175:14 179:8
181:25 183:13,
16

**sign-off** 21:23

**signature** 265:7

**signed** 86:3

**similar** 90:23
91:10,17 124:3
221:19 251:20

**similarly** 168:3

**simply** 79:7
99:13 193:16
220:22 226:11
235:11

**single** 96:14
234:3 236:19

**sit** 27:25 28:5,10,
14 32:12 34:14
72:6

**site** 43:4 73:2
88:12,18 128:12
130:5 152:4,7,
13,15

**sites** 219:7

**Six-forty-two**
250:17

**size** 247:21

**skipped** 209:19

**small** 45:13 46:2
174:16

**smoothly** 22:1

**snapshot** 102:3
255:12

**served** 15:3
140:12 154:6

91:11 93:9
158:20

**social** 180:20 256:1

**software** 182:8 183:6

**solicitor** 218:18 244:22 245:11

**someone's** 226:21

**sort** 109:16 134:13 158:10 248:16

**sought** 32:10

**sound** 191:23

**sounds** 112:16 129:8 191:25

**source** 84:21 90:19 111:9,12, 13,17 225:17 226:16 255:22

**sources** 88:20 141:24 142:2 181:14 226:18

**Spanish** 169:4

**speak** 13:1 53:20 148:4 179:7 228:11 256:17,20

**speaking** 13:7 56:17

**speaks** 41:17 114:6 256:18

**special** 6:23

**specific** 21:11, 19 38:5 44:12 70:4 71:8,13,16 73:16 76:2 77:24 88:15 96:1 102:4,5,13 117:11 129:18 137:10 139:4,6 140:5 190:2,12 226:3 258:25 259:2

**specifically** 67:19 116:9 136:9 141:11

152:1,10 206:2 224:1 238:25

**specifics** 203:19

**speculation** 140:16 226:2

**spent** 119:20

**spite** 186:8

**spoke** 16:6 114:8 187:7

**spoken** 43:21 219:22 220:1

**spreadsheet** 88:13,14 183:5, 14 246:17 248:16,17 250:15 252:6,7,8 253:17 255:21 256:4,7

**square** 228:10

**SSN** 184:5

**staff** 128:3 136:6 166:16 173:7 181:24 201:3,5

**stakeholder** 132:19 133:2,5, 7,8 134:14 137:5 139:18,25

**stakeholders** 116:3 127:20 128:5,14,20 129:11 133:1,13, 20 135:11 139:1

**stamp** 198:23

**stamped** 50:22 69:4 242:9

**stand** 35:8,13 214:24

**stands** 111:14, 20,21

**start** 20:3 76:6 87:6 117:19 122:8 139:19 199:9 243:5

**started** 20:5

44:4 133:10 161:20 221:20

**starting** 26:20 28:1,2 76:11,15 80:21 113:19 172:10,20 233:9 253:18 258:8

**starts** 32:9 33:7 46:16 89:6 137:4 199:13 202:6 209:1,9 233:5,20 258:11

**state** 10:1,7,10 12:13 14:22 16:13 18:18,22 19:7,16 20:4,6, 21 25:13,23 29:11 30:13,23, 24 36:13 37:6,13 42:5,17 43:6,10, 12 44:18 47:14, 19,24 48:18 49:3,14,17,24 50:7 51:10 52:21 53:4,7,11,22 55:8,11 58:5,21, 25 59:9,20,25 60:15 65:8,23 66:5,8 67:21 70:20 71:14 86:4,6,7 90:13, 23 92:3,7,10 93:4,9,13 95:5,8 96:20,22,25 97:7 98:16 99:3,5,17, 25 108:25 112:25 118:8,12 128:15,21 135:14,23 136:17,20,25 139:3,6 142:18 143:18 144:8 145:1 146:5 147:4,6,10,18,20 150:3 151:9 155:3 158:5 159:2,12 161:12 163:18,20,25 166:23 167:12 168:6 169:21 170:8,10 171:19, 22 174:18 180:2 181:8,15,24

183:24 185:4,6, 22 186:2,12 187:11,14 188:25 189:16, 22 190:6,11,12 191:3 193:16 199:6,20 200:5 201:4,15,18,20 203:4,5,13 204:13,21 206:22 207:17 213:15 216:1,7, 11,19 218:7,20 219:18 221:19 223:15 226:15 229:25 230:18, 22 231:7,8,11, 14,17,18,19 234:10 237:3 238:16,19 241:4, 19,20 242:3 243:24 251:19 254:8 256:22 258:11 259:9 261:10

**State's** 58:12 101:21 173:10 179:12 183:16 201:2 261:25

**stated** 199:20 226:13

**statement** 188:5,18 194:10, 13 202:24 203:23 210:12 225:11 235:6,21

**statements** 228:10

**states** 36:4 57:21,25 63:24 64:7,16 127:17 145:20 149:16 150:1,8,22,25 162:6 199:18 223:7 224:1 227:9,16 229:12, 18 231:5

**statewide** 12:21 19:11 21:13 43:22 47:12 48:9,12,16 62:13

96:15 113:16 114:11 119:11 120:2 121:15 123:24 133:11 199:7 227:12

**stating** 228:1

**statistical** 93:16,18

**statistics** 90:25 91:2 93:21 98:20 99:9 100:7,11,20 126:5

**status** 64:19,25 69:16,20,22,25 70:1,12,23 71:8 72:8,22 73:9 75:23 76:1,10, 13,19,23 77:11, 14,16,19 78:12 80:13 83:4,5 84:5 119:18 120:12 121:12, 21 123:12 190:23 204:4 222:5 228:14,20 238:13 240:10 252:2

**statuses** 83:21

**statute** 40:15 44:17 55:20 57:18 65:17 102:19,20 109:3 133:22

**Statutes** 54:16

**statutorily** 39:18 57:9 154:19,23

**statutorily-mandated** 55:18 60:11

**statutorily-required** 109:5

**statutory** 40:21, 22 41:7,21 44:16 48:8 66:13 111:16

**step** 118:22 174:16

**steps** 119:3 218:18 239:22

**Stevens** 21:4

**stick** 262:3

**sticking** 61:17 140:11

**stored** 62:9,17

**straying** 44:10,12 47:4

**street** 80:16

**subject** 135:20 140:5 147:3 192:25 194:4 195:11,22 196:16 207:14

**submitted** 110:13,18 111:6

**subordinate** 10:11

**subsection** 54:18,21

**subsequent** 185:16 186:22 205:20 240:4

**subset** 132:24

**substance** 9:16

**sudden** 248:16

**suggest** 196:21 220:24

**suggesting** 244:16

**summarize** 127:2

**summarized** 250:13

**summarizes** 248:16 251:6

**summary** 87:20 92:24 93:2 118:18 248:4 250:19

**summer** 11:8 158:3,7 264:7

**Supervisor** 229:18

**supplementing** 254:4

**support** 21:17 41:19 47:17 48:3,5 49:7 59:19 60:3,14 66:9 154:22

**supporting** 47:20 53:1 55:13 65:9

**suppose** 137:2

**supposed** 42:6 241:23

**survive** 112:14

**suspiciously** 234:23

**system** 21:13, 16,17,20,24 22:1,3 41:19,25 42:3 43:20,23 44:1,4,6,8,19 46:25 47:9,12, 15,16,18,20,21, 25 48:12,14,19, 23 49:2,4,7,9,12, 13,16,18 50:6,14 53:1,14 54:22 55:4,12,21,23 57:2 58:9,13,17 59:2,8,13,14,18, 19 60:7,9,16,19, 21,25 61:5 62:9, 16,18,22 63:2,18 64:3,21,22 65:17 66:1,3,10,11 67:17 68:3,6 70:13 71:5,6,11, 23,25 72:3 73:8, 9 74:17 75:7,9, 13,15 78:1,4 82:10 84:5,15 88:16,19,21 89:1 90:20,24 92:4 96:6 98:21 99:18,20 100:18 101:1,17 103:18 104:11,18 108:9, 11,14,16,19

**Supplementing**

109:23,25 119:5, 16,22 120:5 121:6,10 122:1, 13 123:24 124:10 125:17, 20 126:9 137:7 145:22 148:21 149:3,7,8,12 175:19 180:2 182:22 231:12, 15,17,25 235:2 237:6 253:21,23, 24

**system-generated** 57:10

**Systematic** 120:23 121:7

**systems** 154:20 175:20 176:15

---

**T**

**tab** 104:24,25 105:17,20 106:1, 2 107:1 109:10, 11 110:9,11

**table** 248:5,15 250:13,18,21 251:9,19

**tabs** 104:13,19, 21 109:10

**tail** 259:14 260:1

**takes** 65:20

**taking** 136:20

**talk** 15:9 16:4 18:3 43:20 71:10 113:11 114:25 127:7 140:4 154:6 160:6,8,10 179:1

**talked** 20:18 62:8 104:9 132:21,22 145:12 156:9 166:19,20 253:9

**talking** 6:19,20, 21,25 22:6 23:12

72:16 100:21 120:21 124:4 130:13 146:3 150:18 156:4,21 165:4 176:13 183:10 192:4 196:25 197:1,3 207:21 212:7 222:1 226:4

**talks** 238:19 254:1

**task** 53:3

**tasks** 52:16

**technical** 100:5 248:2

**Technology** 20:12 21:15 173:6,13 249:20 252:16

**telling** 73:11 95:14

**tenured** 199:21 200:1,10 201:5 202:7,8

**term** 55:15,17 99:20 117:8,11 145:18 153:9,11

**termed** 116:9

**terms** 39:24 121:11 141:10

**terrific** 158:5

**testified** 6:3 8:5 146:22 147:16 151:19 155:14 157:1 170:7 176:25 177:24 186:11 192:9 225:16 240:14 254:24

**testify** 60:7 61:11 62:2 125:4 144:12 203:16

**testifying** 196:3 225:19

**testimony** 9:25 34:24 35:6,7,13 40:25 108:7

113:2,4 114:17, 25 119:14 120:1 121:14 122:4,15 125:2,5,23 127:17 130:17 143:17 144:7 146:4 147:24 151:12,23 152:18 156:19 157:25 158:21, 24 169:14,18 170:2 175:3 176:1 177:15 178:2 181:2 192:11 194:21 219:23 220:2 240:19 241:15, 25

**testing** 92:12 248:2

**theoretical** 196:18

**theoretically** 50:3 53:17,19

**theory** 53:20

**thing** 75:15 134:13 221:20 224:8 233:23 260:19

**things** 20:18 50:13 140:7 146:13 248:24

**thinking** 35:6 112:8

**thousand** 176:24 177:1,25 178:3,17 207:24 219:24 221:22

**thread** 239:13

**threat** 146:11,15 147:1

**threatened** 146:20

**tie** 233:17

**ties** 146:4 224:19

**tightly** 59:8,11

Exhibit A

**time** 19:20 26:2
27:18 31:2 63:1,
12 85:3 93:9
102:3,5,8 104:1
109:6,14 115:8
121:4 122:1,3
124:9,22 125:3
127:5 130:21
131:12,17
134:10,11
146:18 149:23
158:19,25 162:2
164:1 167:11
169:17 171:10
174:14 186:8
196:20 198:4
212:14 221:11
222:13 225:9
233:8 234:3
241:6 252:19
260:25 261:9
262:9

**timeframe**
121:23

**timeline** 102:12
125:11 127:25
164:23

**times** 6:17 8:2
10:11 104:5
106:19 124:24
145:19 187:6
193:25 195:6
200:15,20
201:25 234:3

**title** 18:16 36:3
54:15 70:11,15
79:19

**titled** 86:23
97:25 151:9

**today** 11:1 15:1
27:25 28:5,10,14
32:13 33:2,10,
18,23 34:14
44:11 47:5 60:8
61:10 62:1 72:6
79:9 90:2,8,23
97:4 132:16
139:23 153:17
155:21 158:24
195:9 196:6
201:13 214:24

225:20 251:20
259:14,16
260:14 261:7
263:1,3,7,16,17
264:14

**told** 119:1
144:19 152:16
185:17 193:6,24
195:6 200:15,16,
18 201:25 207:5
220:21 260:1

**top** 14:20 29:18
35:22 69:15,16,
17 71:12 77:18
78:11 80:2,6
81:6 83:4 87:12
98:5 100:2
103:11,23 104:4,
13 105:13 108:1
112:25 125:24
126:14 151:18
168:18 198:24
210:3 211:25
229:15 230:15
232:12,22,23
236:9 248:9
258:10 259:7

**topic** 14:11
144:11 153:20

**topics** 14:21
15:10 16:5
44:10,12,13 47:5
61:9,11,14 62:2
139:22 140:5
154:8 155:10,20
156:3 196:22
259:13,15

**Torres** 151:13,
19 153:10

**torture** 9:10
112:18

**total** 24:4 86:24
88:10 126:18,25
175:16 250:9,11,
12 251:23,24
252:1

**totals** 87:10,13
88:13,24 89:1
93:16 99:1

**tough** 50:20

**track** 63:2 211:9,
11

**tracked** 213:17

**transactions**
100:18 101:4,8

**transcribe**
157:14

**transcribed**
157:11

**transcript** 157:2

**transition** 44:3

**transitioning**
122:8

**translated**
169:2,5

**transparent**
43:16

**Transportation**
151:10 166:25
167:8,23 171:19
173:8 174:20,22
181:9,12,25
182:15 184:12,
23 254:12

**Transportation'
s** 175:14 183:19

**triggered**
115:12

**trouble** 45:9
118:25 250:2

**true** 190:11

**Trump's** 233:5,
20

**truthfully** 8:12
9:18

**turn** 166:4 249:8

**turned** 13:13,16
129:4,13 137:17
165:1

**turning** 183:8
215:14

**two-year** 44:3

**type** 11:9,17
23:10 68:5 88:20
96:21 107:17
109:17 130:22
237:4 241:12
243:23 258:9

**types** 8:20 89:6,
19 92:11 109:1
232:3 261:23

**typical** 104:22

**typically** 102:7,
12 128:22
247:19

———

**U**

**U.S.** 121:1 230:1,
3

**ultimate** 38:17

**ultimately** 38:22
63:15 116:22
128:19 129:6
133:7 142:22
143:15 147:3
217:17

**unclear** 217:5

**undeliverable**
217:22 218:1,4

**undelivered**
240:18

**undergone**
115:1

**underneath**
248:12

**understand**
8:10,13,14,24
9:24 10:14 11:22
12:19 97:14,21
114:20 115:18
116:2 149:2
179:25 182:13
189:18,19 192:2
207:1 224:14
251:7

**understanding**
9:17 33:14 38:16
39:24 56:21

118:25 145:7
166:10 190:8
222:8 257:2

**understood**
9:14 16:23
110:24 218:16
228:19

**undertake**
113:21,25
114:11 187:14

**undertaken**
239:15

**undertaking**
53:18

**undertook**
113:15 114:19
115:3 118:12,24
119:10 120:2,15

**uniform** 12:21
19:11 21:13
43:22 47:11
48:9,16 199:7

**United** 36:3
57:21,25 63:24
64:6,16 162:5
229:12,18 231:5

**universe** 117:17
121:19 141:8
172:9,20 173:21
174:15 184:13
185:18 186:20
212:1 215:16
216:25 217:19
219:12 220:4,22
221:20

**Unlawful** 151:11

**unprivileged**
194:25

**unreliable**
121:5

**update** 63:14

**updated** 62:20
223:11 224:1,9
228:8

**updates** 110:21

**updating**
104:22

**upload** 109:25

**uploaded**
109:22 110:5
182:9

**upset** 260:8

**USCS** 35:23
45:4

**use-nationally-recognized**
150:9

**user** 50:11 60:11
71:6,23 73:8
75:22,25 80:12
92:6 96:14,24
104:22 107:6
109:9 110:10

**users** 59:20
168:24

**utilize** 71:6

---

**V**

---

**valid** 72:25

**validate** 95:20
101:19 123:19

**validated** 130:7

**validating**
121:11

**validation** 99:14

**Vansickle**
229:23

**variety** 53:13
71:11 72:1
152:21 172:17
221:12

**vast** 10:5

**vehicle** 141:8
148:18 150:2
177:3,4,18,22
181:13 238:24

**verbatim** 190:24

**verification**
120:24 121:7
223:14

**verified** 123:10
214:13

**verify** 98:22 99:6
100:8 123:19
256:21,23

**verifying** 225:18
226:13

**Veronica** 21:7,9

**versa** 97:20

**version** 45:18

**versus** 11:25

**very-high**
221:14

**vice** 97:20

**video** 157:8,25
158:21 169:12,
14,18 170:2

**videotape** 157:3

**view** 14:7

**virtual** 135:5

**virtually** 137:21

**vote** 36:20 41:8,
9 52:17 53:5
81:1,20,22 82:7
92:2 97:3 105:3,
5,9,17 106:2,15
110:20 115:5
117:4 122:5
124:25 125:15,
16 126:4,16
137:8 140:1,14
145:24 158:18
162:3,24 163:3,
5,13,15,22 165:9
178:13 180:18
186:11 228:21
234:22 257:11

**voted** 72:12
80:22,24 81:16,
19,24 82:3,8,13,
15 91:9,12,20
104:5 105:6
106:11,19,23
124:22,24 125:7
126:23 233:24
238:6 256:2
257:8

**voter** 22:24
35:15 36:5,8,21,
22 38:6,7,8 40:6,
8,21 41:8,10,20,
21 43:1 47:13
48:4,11,17 49:20
51:4 52:8,15,19
53:4,9 55:16,17,
19,21 57:3,8
58:13,15,18,20,
25 59:25 60:13,
17,18,22,25
61:4,5 62:13,24
63:5,11,12,13,
15,19,23 64:2,6,
13,15,17 65:1,20
66:2 67:16,24
68:19,20 69:9,15
72:12,14 75:23
76:1,18,22
77:11,13,15,16
78:12 79:5,19
80:15,18,20
81:2,23 82:6
84:16 86:23
87:10,12,20
88:11 89:12
91:17 93:11,15,
25 94:1,2,5,7,8,
13 95:3,9,13,23
98:1,6,8 100:1,2,
3,12,15 101:22
102:14,15,18,25
104:22 105:6,8,
14 106:6,10,15,
18 107:10,17,19
108:5 109:13
110:18 113:16,
20 114:11 116:4,
19,25 117:3,17
120:3 122:18
124:22 127:1,18
130:1,5,6 137:7,
17 139:7,9
140:24 141:7
142:24 145:22
148:18,19,20
149:2,5,10,18,20
150:2,10,17
151:11,20 152:5,
11 153:2,7
154:19 165:17,
18 166:17 167:9,
13,23 168:19

169:3,23 170:12
171:3 176:3
177:2,5,7,17
178:17 179:2,13,
16 180:3,10,14,
16,19 182:14
183:1,9 188:5,24
190:22 194:13
199:23 202:10,
24 204:4,11
210:12 212:15
216:17,22
217:11,14 219:1
220:25 221:13
223:9,13 224:3
225:25 226:14
230:10 232:1
235:16,24
238:11 239:23
240:8 241:1
244:11 246:18
248:13 250:22
257:1,6 259:10
262:15

**voter's** 62:20
63:1,7,10 64:1
68:20,21,24
81:20 82:25

**Voteridnum**
247:25

**voters** 36:19
39:5,12 40:9
42:24 43:6,12
52:19 56:1 57:8,
12,19 67:15
78:22 79:1,4
81:7,12,16
82:11,23 83:21
84:5 88:11 91:20
93:10,17,25
117:7 126:23
128:23 131:7
133:12 138:21,
24 149:11
162:13,14
165:22 184:14
218:22 219:10
225:18 234:22
255:3 262:12

**votes** 104:14,24
105:3 107:2
109:11 126:18

**voting** 37:7,10,
14 38:1,12 58:2
62:17,19 105:13
106:16 113:1,18
114:2,13 120:4
128:22 134:1
151:11 152:12
154:3,18,20
156:11 163:4
233:23 238:13

**VR** 52:9,13,14,
22,23 53:2 57:2
67:19 75:10,13,
14

---

**W**

---

**wait** 216:13
229:1

**waive** 194:25

**waived** 265:7

**walk** 119:3
233:16

**Walosik** 236:14,
15,16

**Walsh** 7:21
10:23 11:20
12:7,15,18,23
13:23 14:1,2,6,
10,13 15:2,14,
18,20 16:18
23:11 24:21,24
25:14,18 26:5,
10,15 27:1,7,12,
22 28:3,7,12,18
29:4,13 30:8,15
31:6,12,18,24
32:4,14,17 33:3,
12,24 34:9,19,23
35:9,11 37:15
38:2,14,20 39:13
40:1,12 41:3,17
44:9 45:19,23
46:1,9 47:2,22
48:21 50:2 51:1,
15,19 52:10
53:24 57:4 59:3,
15 60:1,20 61:8,
18,24 62:11,23
63:8 64:8 65:3,
13 66:7 67:9,23

68:7 69:24 70:14 71:21 74:1 75:1, 21 78:9,24 79:6 81:10,17 82:4, 14,16 83:7,15,23 84:1 85:2,9 87:4, 8 90:15 91:14,21 92:5 93:12 94:9 101:14 102:1,23 103:6 105:2 106:13,20 107:13,20 108:12,22 109:20 110:1,6 111:3 112:7,16 114:3,16 115:9, 13 116:20 117:1 119:19 120:8,13 121:9 122:23 123:15 124:6 125:9 126:10 129:15 130:19 131:1,8,17,18,21 133:14 135:16 136:3,13,22 137:1,11 138:17 139:8,21 140:2, 4,15 141:14 142:12,21 143:5, 12,21 144:1,10, 14,18 145:2,4 146:21 147:9,13, 23 148:10,14,22 150:14 152:8,16, 25 153:13,23 154:5 155:7,19 156:14,21 157:10 162:19 163:6,23 164:2, 7,13,15,19 165:20 167:1,14, 17 168:1,9 170:17 171:7,14, 17 173:2 174:1,3 175:2,22,25 176:17 177:12, 14 178:1,21 179:5,17,19 180:12 181:1,22 182:11 183:17 184:16 185:1,24 186:6,24 187:2, 5,19,22 189:3, 10,24 190:7,14

191:5,12,20 192:5 193:5,10, 22 194:20 195:5, 17,24 196:2,12 197:3,13 199:3 200:3,7,14,24 201:6,22 202:14, 20 203:9,15 204:15,23 205:7 206:1,14 207:4, 18 208:15,21 209:7,12 211:8, 13 213:4 214:17, 20 215:1,4 217:16 218:2 219:2,20 220:7, 13,20 222:6 223:21 224:7,13 225:3,21 226:1, 19 228:17,24,25 233:11,13 234:13 235:8 238:21 239:7,25 241:7,14,21 242:22 244:2,4, 5,20 245:6,22, 23,25 247:14 248:6,19,23 249:3 250:4 251:2,6 252:10 253:11 256:10 257:9,15 258:24 259:12 260:1,5 261:3,14 262:2, 17 263:2,20 264:4,17 265:1,3

**Wanda** 257:25 259:3

**wanted** 7:1 15:25 56:18 58:25 59:4 61:2 115:18 147:1 160:10 165:11

**warnings** 186:9 187:10

**warrants** 244:15,19 245:4

**Web** 43:4 73:2 88:12,18 128:11 130:5 152:4,7, 13,15

**week** 17:4,8,10, 14 264:6

**weekly** 22:23 72:15 88:10,14

**weeks** 135:8 137:20

**weird** 250:1

**well-established** 184:9

**Western** 229:19 230:2

**whittled** 221:24

**widely** 138:22

**window** 7:13,17 171:10

**witness's** 147:24

**Wolf** 86:10

**Women** 128:23 133:12 138:21, 23

**word** 10:4 99:18 100:11,20 162:22 248:3 253:15

**words** 8:18 77:13,17

**work** 23:6 130:4, 10 133:8 142:10 143:8,10 148:12, 24 152:3,10 181:11 189:5,12 190:1,3,9 191:7, 16 192:3 207:9 244:22

**work-in-progress** 254:5 255:12

**work-product** 141:17 191:21 192:16 194:3 195:12 196:15 202:17 203:18 204:18 206:5 208:23 220:10

**worked** 173:9

**working** 7:17 67:8 73:24 127:19,21 128:1, 3,18 129:5,7,14, 17,18,20 130:2, 3,4 132:20,24 137:19 139:7,11 155:15 162:1 167:7 168:16 173:4 197:23 199:14 202:6 209:6,23 254:3

**workings** 60:7

**works** 8:7 71:11 100:6

**wrap-up** 259:22

**write** 224:4 264:19

**writing** 13:1

**written** 12:24 113:2,4 143:23 151:12 152:17 225:8 253:18 263:5

**wrong** 46:14 164:23

**wrote** 104:4 140:22 238:4

**X**

**XNC** 77:16 78:12,16 80:7

**Y**

**Yahoo** 243:3,5, 7,10

**year** 20:3 42:11 98:19 101:5 102:3 248:11 251:8

**years** 19:25 20:6 36:14 121:24 126:5 133:9 135:2 231:3

235:4,12 243:19

**yesterday** 249:6

**yielded** 140:23 190:21 204:3

**Z**

**ZOOM** 6:16

**ZOOM-TYPE** 6:21

Exhibit A