## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THE PUBLIC INTEREST LEGAL FOUNDATION,** | : | **CIVIL ACTION NO. 1:19-CV-622** |
| | : | |
| | : | **(Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LEIGH M. CHAPMAN, Acting Secretary of the Commonwealth of Pennsylvania,[1] and JONATHAN M. MARKS, Deputy Secretary for Elections and Commissions,** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **Defendants** | : | |

### <u>MEMORANDUM</u>

Plaintiff, the Public Interest Legal Foundation ("PILF"), seeks production of voter registration records under the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20507.  PILF claims defendants Leigh M. Chapman, Acting Secretary of the Commonwealth of Pennsylvania, and Jonathan M. Marks, Deputy Secretary of Elections and Commissions, have failed to satisfy the Commonwealth's disclosure obligations under NVRA.  Both parties move for summary judgment under Federal Rule of Civil Procedure 56.  We will grant in part and deny in part the motions.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Acting Secretary Chapman is automatically substituted as a defendant for former Secretary Kathy Boockvar.  <u>See</u> FED. R. CIV. P. 25(d).

I. **Factual Background & Procedural History**[2]

PILF is a public interest organization concerned with, among other things, "the integrity of elections nationwide." (See Doc. 66 ¶ 3). Leigh M. Chapman, Acting Secretary of the Commonwealth of Pennsylvania, is tasked with administering voter registration in Pennsylvania. (See id. ¶ 4). Jonathan Marks is Deputy Secretary for Elections and Commissions at the Pennsylvania Department of State. (See id. ¶ 5). As Chapman and Marks, sued in their official capacities, are avatars for the government of the Commonwealth of Pennsylvania, we will refer to them as "the Commonwealth."

In late 2017, the Commonwealth publicly admitted the existence of a "glitch" in a computer system used by the Pennsylvania Department of Transportation ("PennDOT"). This glitch permitted non-United States citizens applying for or renewing a driver's license to register to vote in the Commonwealth. (See id. ¶¶ 6-7; see also Doc. 64-1 ¶ 7). PennDOT's glitch quickly became a public scandal generating extensive media coverage and investigatory hearings in the Pennsylvania legislature. (See Doc. 66 ¶¶ 6-7, 9 n.2; see also Docs. 66-2, 66-3). As the

_____

[2] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. L.R. 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 63, 66, 70, 72). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

precursor to remedial action, the Commonwealth undertook a series of analyses to ascertain the extent to which the glitch allowed noncitizens onto the Commonwealth's voter registration lists.  (See Doc. 66 ¶¶ 49-65).

### A.   Initial Analysis

The Commonwealth conducted the first analysis ("the initial analysis")[3] in September 2017 by comparing PennDOT's motor vehicle records with the Statewide Uniform Registry of Electors ("SURE"), a computerized compilation of each county's voter registration list.  (See id.¶ 23).  The SURE database includes not only the registrant's voter registration status but also personal information about the voter and their voting history.[4]  (See id. ¶¶ 24-26, 32).  Through the SURE database, the Commonwealth's counties maintain their voter registration lists, adding, updating, and cancelling registrations.  (See id. ¶ 24; see also Marks Dep. 52:12-19, 58:13-59:23).  When county election officials cancel a voter registration, the SURE database records the cancellation as well as the reason for cancellation.  (See Doc. 66 ¶ 28).

---

[3] PILF refers to the Commonwealth's first attempt to determine the number of noncitizens as the "Al Schmidt Analysis" (in reference to Philadelphia City Commissioner Al Schmidt's involvement in publicizing the results of the analysis) and the second analysis as the "Initial Statewide Analysis."  We find PILF's names for the analyses more confusing than helpful because the analysis PILF refers to as being "initial" was not, in fact, the initial analysis.

[4] In this instance, "voting history" refers only to whether the registrant cast a ballot in a particular election and whether they cast the ballot in person or by mail; obviously, it does not include how the voter may have voted in an election.  (See Doc. 66-1, Marks Dep. 105:3-106:24; see also Doc. 72 ¶ 26).

The initial analysis compared the SURE database of registered voters against PennDOT's database of driver's license holders flagged with "INS indicators."  (See id. ¶¶ 49-51; Doc. 64-1 ¶¶ 12-13).  How INS indicators work within PennDOT's record-keeping system is not entirely clear in the record before the court, but they appear to signify merely that the license holder was, at some point in their life, something other than a United States citizen.  (See Doc. 64-1 ¶ 13; Marks Dep. 169:7-172:23).  The initial analysis identified approximately 100,000 registered voters "who may potentially be non-citizens or may have been non-citizens at some point in time."  (See Doc. 64-1 ¶ 13; Doc. 66 ¶ 51).

**B.    Statewide Analysis**

In addition to the initial analysis, the Commonwealth searched the SURE database for records related to any voter registrations cancelled by a county simply because the registrant was not a citizen ("the statewide analysis").  (See Doc. 66 ¶ 55).  The statewide analysis produced voting registration records for 1,160 individuals.  (See id. ¶¶ 55, 59).  However, the 1,160 records reflected only those registrants who self-reported their status as noncitizens and voluntarily requested their voter registration be cancelled.  (See id. ¶ 58).  Of the 1,160 noncitizen registrants, 248 voted in at least one election prior to cancelling their registration.[5]  (See id. ¶¶ 60-61).

---

[5] In conjunction with the statewide analysis, the Commonwealth asked counties to provide copies of any cancellation requests received by the county from noncitizens seeking to cancel their voter registration.  (See Doc. 64-1 ¶ 11).  Only Allegheny, Philadelphia, and Dauphin Counties provided records in response to the request.  (See id.)

### C.     Noncitizen Matching Analysis

Following the statewide analysis, the Commonwealth consulted with the Office of Chief Counsel regarding appropriate action in light of the results of the analysis.  (See id. ¶ 15; Doc. 64-3 ¶ 6).  The Office of Chief Counsel engaged outside counsel who, in turn, retained an expert to assist in addressing the problem.  (See Doc. 64-1 ¶¶ 16-17; Marks Dep. 141:6-11).  The expert analyzed the Commonwealth's voting records, including the SURE database, to identify registrants whose eligibility to vote required additional scrutiny in terms of citizenship ("the noncitizen matching analysis").  (See Doc. 66 ¶¶ 62-65).  Based on the expert's analysis, the Commonwealth mailed 7,702 letters to registrants reminding them of the eligibility requirements for voting and 11,198 letters requesting registrants affirm their eligibility to vote.  (See Doc. 66 ¶¶ 64-70; Doc. 64-1 ¶¶ 18-22).  The Commonwealth retained all responses confirming citizenship, forwarded requests for cancellation from noncitizens to the appropriate county, and notified counties of the need to investigate eligibility of the nonrespondents.  (See Doc. 66 ¶¶ 71-74; see also Doc. 64-1 ¶ 22).

### D.     PILF's Request

In response to publicity surrounding the glitch, PILF sent Marks a letter on October 23, 2017, requesting the Bureau of Commissions, Elections and Legislation ("the Bureau") provide PILF copies of or the ability to inspect four categories of records pursuant to NVRA.  (See Doc. 66 ¶¶ 8-9; Doc. 63 ¶ 1).  PILF sought:

> 1.   Documents regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration from any official

information source, including information obtained from the various agencies within the U.S. Department of Homeland Security and [PennDOT] since January 1, 2006.  This request extends to all documents that provide the name of the registrant, the voting history of such registrant, the nature and content of any notice sent to the registrant, including the date of the notice, the response (if any) of the registrant, and actions taken regarding the registrant's registration (if any) and the date of the action. . . . This request includes all voter records that were referenced in recent news media reports regarding individuals improperly exposed to registration prompts due to a "glitch" in PennDOT's Motor Voter compliance system.  At least one news report claims that "a Pennsylvania Department of State review is underway."  I seek all voter records contained in this review.

2.  All documents and records of communication received or maintained by your office from registered voters, legal counsel, claimed relatives, or other agents since January 1, 2006 requesting a removal or cancellation from the voter roll for any reason related to non-U.S. citizenship/ineligibility.  Please include any official records indicating maintenance actions undertaken thereafter.

3.  All documents and records of communication received or maintained by your office from jury selection officials—state and federal—since January 1, 2006 referencing individuals who claimed to be non-U.S. citizens when attempting to avoid serving a duty call.  This request seeks copies of the official referrals and documents indicating where your office or local registrars matched a claim of noncitizenship to an existing registered voter and extends to the communications and maintenance actions taken as a result that were memorialized in any written form.

4.  All communications regarding list maintenance activities relating to #1 through 3 above to appropriate local prosecutors, Pennsylvania Attorney General, Pennsylvania State Police, any other state law enforcement agencies, the United States Attorney's office, or the Federal Bureau of Investigation.

(See Doc. 66 ¶ 9; Doc. 1-9).  The Commonwealth denied PILF's request claiming NVRA applied only to records relating to statutorily mandated removal programs, not the records sought by PILF.  (See Doc. 66 ¶ 17; Doc. 72 ¶ 17; see also Doc. 1-11).

PILF filed a lawsuit against the Commonwealth in this court, asserting the Commonwealth's denial of PILF's records request violated NVRA.  We held PILF falls within NVRA's "zone of interests" and had standing, but that it failed to comply with the statute's notice requirements.  See Pub. Int. Legal Found. v. Boockvar, 370 F. Supp. 3d 449, 454-58 (M.D. Pa. 2019).  Accordingly, we dismissed the lawsuit.  See id.

After fulfilling the notice requirement, (see Doc. 66 ¶¶ 18-19), PILF refiled its NVRA claims in the instant lawsuit.  The Commonwealth subsequently moved to dismiss, reiterating its claim that the records sought by PILF did not fall within the ambit of NVRA's disclosure requirement and, in the alternative, the records sought by PILF are protected by the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721.  Our decision disposing of the Commonwealth's motion held that the Commonwealth's investigation of the glitch falls within the ambit of NVRA's disclosure requirement but that records and derivative lists created during the investigation are protected by DPPA to the extent they include personal information obtained by PennDOT in connection with a motor vehicle record.  (See Doc. 23 at 17; Doc. 24 ¶ (1)(a)).

Following our Rule 12(b)(6) decision, the Commonwealth endeavored to comply with PILF's requests.  We detail the particulars of the Commonwealth's efforts in the discussion section below.  Both PILF and the Commonwealth now

move for summary judgment contesting whether, as a matter of law, those efforts were sufficient.  The motions are fully briefed and ripe for disposition.

## II.    **Legal Standard**

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of proof tasks the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The court is to view the evidence "in the light most favorable to the non[]moving party and draw all reasonable inferences in that party's favor."  Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmoving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

Courts may resolve cross-motions for summary judgment concurrently.  See Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008); see also Johnson v. FedEx, 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2015).  When doing so, the court is bound to view the evidence in the light most favorable to the nonmoving

party with respect to each motion.  FED. R. CIV. P. 56; Lawrence, 527 F.3d at 310

(quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III.   **Discussion**

NVRA requires states to "make available for public inspection . . . and

photocopying . . . all records concerning the implementation of programs and

activities conducted for the purpose of ensuring the accuracy and currency of

official lists of eligible voters."  52 U.S.C. § 20507(i)(1).  PILF brings the present

action against the Commonwealth under Section 20510 of NVRA, which grants

private parties aggrieved by a state's violation of NVRA, including its disclosure

provision, the right to seek declaratory and injunctive relief.  See id. § 20510.  The

gravamen of both parties' instant motions is whether the Commonwealth has fully

complied with PILF's four record requests made pursuant to Section 20507.  We

will address each request *seriatim*.

### A.   **Request 1: Potential Noncitizens**

PILF's first request seeks documents related to registrants who the

Commonwealth identified as potentially not satisfying the citizenship requirements

for registration since January 1, 2006.  (See Doc. 66 ¶ 9; Doc. 1-9).  The

Commonwealth provided PILF with copies of the form letters sent to registrants

asking them to affirm their eligibility to vote, statements to the press, summary data

concerning the responses to the letters, and communications with county election

officials.  (See Doc. 63 ¶ 4; see also Doc. 64-1 ¶ 29).  The Commonwealth claims to

have provided PILF with all documents related to the Commonwealth's analysis of

the glitch not derived from or including personal information obtained from

PennDOT motor vehicle records.  (See Doc. 64 at 12).

PILF mounts several attacks on the accuracy of the Commonwealth's

assertion, averring the Commonwealth (1) adopted an impermissibly narrow

construction of the scope of PILF's request, (2) failed to disclose records contained

in the SURE database that fall within the scope of the request, and (3) adopted an

overly broad construction of our previous ruling on the scope of protections

afforded personal information by DPPA in order to justify withholding records from

PILF.  (See Doc. 67 at 10-18; Doc. 71 at 2-3).  PILF also assails the Commonwealth's

insinuations that records related to the noncitizen matching analysis are protected

by attorney-client privilege and that the Commonwealth has the right to refuse

certain disclosure requests on privacy grounds.  (See Doc. 67 at 18-23; Doc. 71 at 5-

12, 15-17).

### 1.    *Scope of the Request*

The Commonwealth denies narrowing the scope of PILF's request and

insists the documents disclosed to PILF represent the only nonprotected

documents within the universe of documents covered by PILF's request.  (See Doc.

64 at 12.)  To support this contention, the Commonwealth points to Marks' assertion

the Commonwealth "received no documents within the relevant period from the

Department of Homeland Security or any other official government source

identifying potential non-citizens on the voting rolls."  (See Doc. 64-1 ¶ 30).  The

implication of Marks' statement is that the only efforts undertaken in the relevant

period to identify potential noncitizens are the initial analysis and noncitizen

matching analysis, the records of which the Commonwealth believes are protected by DPPA.[6]

PILF argues that the Commonwealth's disclosure is incomplete, but PILF is unable to provide any proof that additional records exist and are in the possession of the Commonwealth. Although PILF suggests that the Commonwealth has not shown it conducted a search for the requested documents, we interpret Marks' statement to imply that the Commonwealth did, in fact, conduct the requisite search but the search produced nothing. (See Doc. 64-1 ¶ 30). PILF's mere speculation is not evidence and cannot satisfy its Rule 56 burdens. See Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006) (citing Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109–10 (3d Cir. 1985)). PILF casts a wide net in its first request, but a wide net does not guarantee a large catch.

### 2.   *SURE Records*

PILF claims the Commonwealth falls short of fulfilling PILF's request by not disclosing the records contained in the SURE database related to every registrant whose registration was cancelled because of their noncitizen status. (See Doc. 67 at 12). The Commonwealth asserts the records contained in the SURE database are not subject to disclosure, citing a district court holding there is no obligation under NVRA to disclose voting records or other related documents when those documents are not used to update or maintain the voter rolls. (See Doc. 73 at 7-8 (citing True the Vote v. Hosemann, 43 F. Supp. 3d 693 725-29 (S.D. Miss. 2014))).

---

[6] In contrast, the statewide analysis was clearly a cataloguing of registrants who had already been identified as noncitizens. (See Doc. 64-1 ¶ 33).

The principle evoked in <u>True the Vote</u> strikes us as sound but inapplicable to the SURE database because the Commonwealth, by its own admission, uses the SURE database to maintain the accuracy and currency of official lists of eligible voters.  (<u>See</u> Doc. 66 ¶ 24; Doc. 72 ¶ 24).  For example, the Commonwealth used the SURE database in conjunction with PennDOT records to conduct the noncitizen matching analysis.  (<u>See</u> Doc. 66 ¶¶ 49-51, 55, 59, 62, 65).  The Commonwealth then used the results of the noncitizen matching analysis to send letters to registrants asking them to affirm their eligibility to vote.  (<u>See</u> <u>id.</u> ¶¶ 62-74).  Even if ultimate responsibility for removing voters from the rolls lays in the hands of individual counties, <u>see</u> 25 PA. CONS. STAT. § 1203(a); (Doc. 64-1 ¶¶ 5-6; <u>see also</u> Doc. 66 ¶ 74), the database was nonetheless used to augment the reliability of voter rolls by identifying registrants in need of further "scrutiny" by the counties, (<u>see</u> Marks Dep. 140:21-141:11; <u>see also</u> Doc. 66 ¶ 63).

NVRA requires states to disclose "all records" related to any effort by the state to ensure "the accuracy and currency" of voter registration lists.  <u>See</u> 52 U.S.C. § 20507(i)(1).  As we explained in our decision on the Commonwealth's motion to dismiss, "[t]he word 'all' is expansive." (<u>See</u> Doc. 23 at 11 (citing <u>Project Vote/Voting for Am., Inc. v. Long</u>, 682 F.3d 331, 336 (4th Cir. 2012))).  Congress intended NVRA's disclosure obligations to reach a broad array of "programs and activities."  <u>See</u> 52 U.S.C. § 20507(i)(1); (<u>see also</u> Doc. 23 at 12).  The Commonwealth's use of the SURE database to maintain the accuracy and currency of county voting registration lists brings the records held in that database within the universe of disclosable records under NVRA.  <u>See</u> 52 U.S.C. § 20507(i)(1).  Unless disclosure is blocked by some

other law or legal principle, the Commonwealth must disclose the requested SURE records.

### 3.   *DPPA Protections*

PILF's third attack is on the Commonwealth's invocation of DPPA protections.  (See Doc. 71 at 12-15).  Our order granting in part and denying in part the Commonwealth's motion to dismiss held the Commonwealth was exempt from disclosing "records containing protected personal information obtained by the Department of Motor Vehicles in connection with a motor vehicle record as defined in the Driver's Privacy Protection Act."  (See Doc. 24 ¶ 1(a)).  In the accompanying memorandum, we explained that "glitch-related records and derivative lists created during the Commonwealth's investigation" were exempted from disclosure by DPPA "to the to the extent they include personal information obtained by the [Department of Motor Vehicles ("DMV")] in connection with a motor vehicle record."  (See Doc. 23 at 17).  The Commonwealth interpreted our decision to apply DPPA's protections to any record derived from or *including* personal information.  (See Doc. 64 at 12).  Accordingly, the Commonwealth withheld documents, at least in response to PILF's first request, that contained any personal information obtained or derived from DMV records.  (See id. at 12; see also Doc. 64-1 ¶ 29).

The Commonwealth's interpretation of our ruling is overbroad.  As indicated by our use of the phrase "to the extent they include," our holding applies only to the personal information obtained from DMV motor vehicle records and information derived from that personal information.  (See Doc. 23 at 17).  Our holding does not

protect information derived from non-DMV sources even when that information is included in a record containing personal information obtained from DMV records.

When the entirety of the information in a document or other record is derived from personal information obtained from DMV records, the whole of the record may be withheld.  Nevertheless, when only some of the information is or derives from personal information obtained from DMV records, the record or document must be disclosed with only personal information or derived information redacted.  (See Doc. 23 at 14 n.3); see also Project Vote, Inc. v. Kemp, 208 F. Supp. 3d 1320, 1344-46 (N.D. Ga. 2016) (employing redaction to protect sensitive information, such as Social Security numbers and birth dates, from disclosure under NVRA); True the Vote, 43 F. Supp. 3d at 732-39 (holding NVRA does not require disclosure of all information in records related to maintenance of voter registration lists).

### 4.    *Right to Privacy*

PILF seeks the name and voting history of any registrant identified as a potential noncitizen.  (See Doc. 66 ¶ 9).  To the extent not covered by DPPA protections, the Commonwealth argues in the alternative that it has no obligation to disclose personal information under NVRA when disclosure would violate the individual's right to privacy and expose them to harassment, abuse, and accusations of criminal voting activity or immigration violations.  (See Doc. 64 at 13-15).

The expansive obligation under NVRA to disclose voting registration records gives rise to legitimate privacy concerns.  Nonetheless, we agree with the Fourth Circuit Court of Appeals' observation that the balance between privacy and

transparency must be struck by the legislature, not the courts.  See Long, 682 F.3d at 339.  Congress struck such a balance when it enacted NVRA, deciding transparency in how states determine voter eligibility—the vital bedrock of our electoral system—is generally paramount.  See id.  Redaction—not withholding—is the appropriate tool for assuaging privacy risks.[7]

### 5.   *Privilege*

Lastly, the Commonwealth posits records related to the noncitizen matching analysis are protected by attorney-client privilege and the work-product doctrine. (See Doc. 64 at 12 n.6).  Shortly after the emergence of the glitch scandal, the Commonwealth "engaged the Office of Chief Counsel to provide legal advice concerning [the glitch], including potential voting by non-citizens." (See Doc. 64-1 ¶ 15).  The Office of Chief Counsel retained outside counsel, who, in turn, retained an expert to review the data resulting from comparison of the SURE database with PennDOT records.  (See id. ¶ 16).  Most importantly for the litigation at hand, the Commonwealth used the noncitizen matching analysis produced by the expert as

---

[7] PILF proposes redaction as a solution, citing a recent Fourth Circuit Court of Appeals decision on a similar request by PILF.  (See Doc. 75 at 10 (citing Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections, 996 F.3d 257, 267 (4th Cir. 2021)); see also Doc. 71 at 17).  In this case, the Fourth Circuit delineates information subject to redaction as follows: (1) Social Security numbers, (2) "identities and personal information of those subject to criminal investigations," and (3) personal information of citizens initially identified as potentially failing to meet the citizenship requirement for voter registration but ultimately exonerated. See id.  We view PILF's reliance on N.C. State Bd. of Elections to indicate PILF is amenable to these privacy-related limitations on disclosure.  Moreover, we agree with the Fourth Circuit's *ratio decidendi* which appropriately balances privacy and transparency interests at issue.  The Commonwealth may redact the private personal information outlined in N.C. State Bd. of Elections from records disclosed under the NVRA.

the basis for sending thousands of letters asking registrants to affirm their eligibility to vote.  (See Doc. 66 ¶¶ 62-64, 66-68; see also Doc. 64-1 ¶¶ 16-21).  The parties agree PILF's first request encompasses the noncitizen matching analysis.  (See Doc. 64 at 11-12; Doc. 71 at 5).

PILF disclaims seeking any records involving communications between the Commonwealth and its attorneys, (see Doc. 71 at 7), *i.e.*, documents or records that would fall within the ambit of attorney-client privilege, see *In re* Teleglobe Commc'ns Corp., 493 F.3d 345, 359 (3d Cir. 2007) (quoting Restatement (Third) of Law Governing Lawyers § 68 (Am. L. Inst. 2000)).  PILF only seeks the records produced as part of the noncitizen matching analysis, (see Doc. 71 at 7), an activity that involved only the expert and no attorneys, (see Doc. 66 ¶¶ 62-64; see also Doc. 64-1 ¶¶ 15-18).  We agree the noncitizen matching analysis is not protected by attorney client-privilege.

The work product doctrine protects certain materials made or prepared by an attorney or their agent in anticipation of litigation.  See Fed. R. Civ. P. 26(b)(3); Hickman v. Taylor, 329 U.S. 495, 511 (1947); *In re* Cendant Corp. Sec. Litig., 343 F.3d 658, 662 (3d Cir. 2003).  Rule 26(b)(3)(A) states in pertinent part: "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative" except upon a showing of substantial need and undue hardship.  See Fed. R. Civ. P. 26(b)(3)(A).  The work-product doctrine extends to purely factual materials, as long as the materials are prepared in contemplation of litigation.  See Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1261 (3d Cir. 1993).  The party claiming

protection of the work-product doctrine bears the burden of showing the materials were prepared for anticipated litigation.  See Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124, 138 (3d Cir. 2000) (citing Haines v. Liggett Group, Inc., 975 F.2d 81, 94 (3d Cir. 1992)).

It is undisputed that the subject expert was an agent of the Commonwealth's outside counsel.  (See Doc. 64-1 ¶¶ 15-16; Doc. 64-3 ¶ 6).  PILF contends the expert did not undertake the noncitizen matching analysis in anticipation of litigation.[8] (See Doc. 71 at 8-12).  To invoke the protection of the work-product doctrine, the party's anticipation of litigation must be "objectively reasonable."  See Martin, 983 F.2d at 1260.  However, the threat does not have to be a specific threat from a specific party; the threat of litigation can be general, see In re Ford Motor Co., 110 F.3d 954, 967 (3d Cir. 1997), abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter, 558 U.S. 100 (2009), or prospective, see United States v. Rockwell Int'l, 897 F.2d 1255, 1266 (3d Cir. 1990).

As both parties acknowledge, the glitch created considerable public attention.  (See Doc. 66 ¶¶ 6-7, 9 n.2; Doc. 72 ¶¶ 6-7; Docs. 66-2, 66-3, 66-5).  The risk of litigation in the wake of a public scandal involving the possibility of illegal voting, coupled with an atmosphere of anxiety about election security, is obvious.  In the

---

[8] In addition, PILF argues that the noncitizen matching analysis is ineligible for protection under the work-product doctrine because the Commonwealth carried out the noncitizen matching analysis in the ordinary course of business.  (See Doc. 71 at 11-12).  We find this argument unsupported by anything in the record.  The relevant evidence in the record all points to the expert conducting the analysis at the impetus of outside legal counsel.  (See Doc. 64-1 ¶ 16; Doc. 64-3 ¶ 6; Marks Dep. 141:6-11, 142:9-16, 146:10-14, 148:4-8, 189:7-9).  No evidence suggests the analysis was a routine part of the Commonwealth's duties.

instant matter, despite the absence of a specific notice of intent to file suit, the

general threat of litigation in the wake of such a resonant scandal is sufficient to

invoke the work-product doctrine.  It is clear to the court that, in light of the hue

and cry over the glitch, the Commonwealth developed the noncitizen matching

analysis with the assistance of its expert as a means of responding to heightened

scrutiny of the kind that would be imposed through the civil justice system.  See

Ford, 110 F.3d at 967; Rockwell, 897 F.2d at 1266.  PILF offers a great deal of

speculation but no evidence suggesting the expert conducted the noncitizen

matching analysis for any purpose other than the anticipation of litigation.[9]  (See

---

[9] PILF's only citations to the factual record supporting its allegation the nonmatching citizen analysis was conducted in order to solve the glitch problem—not in preparation for litigation—are a single statement by Marks in his deposition and a press statement describing efforts to rectify the problems created by the glitch.  (See Doc. 71 at 10 (quoting Marks Dep. 115:12-21; Doc. 66-4 at 1)).  As for the first argument, PILF leans on Marks' statement that the Commonwealth "wanted to understand both the scope of the [glitch] issue and, and also the potential causes of it, so that any additional enhancements that [it] made would be effective."  (See Doc. 71 at 10 (quoting Marks Dep. 115:12-21)).  PILF misconstrues Marks' statement and divorces it from critical context.  Marks is not referring to the noncitizen matching analysis conducted by the outside expert; he is referring to the initial statewide analysis undertaken using the SURE database.  (See id. at 114:10-118:21, 146:10-14).  When Marks describes the noncitizen matching analysis, he unequivocally describes litigation concerns as motivating the analysis.  (See Doc. 64-1 ¶ 17; Marks Dep. 146:10-147:3).

Doc. 71 at 8-12).  The Commonwealth has met its burden of showing the records in

question are protected by the work-product doctrine because all relevant evidence

supports the Commonwealth's assertion that the expert conducted the noncitizen

matching analysis in preparation of possible litigation.  (See Doc. 64-1 ¶ 16; Doc. 64-

3 ¶ 6; Marks Dep. 141:6-11, 142:9-16, 146:10-14, 148:4-8, 189:7-9).  We also find Marks'

declaration provides sufficient information about the noncitizen matching analysis

and its origins to satisfy Rule 26(b)(5)(A). [10]  See Fed. R. Civ. P. 26(b)(5)(A); see also

---

PILF likewise takes the Commonwealth's press statement out of context.
(See Doc. 71 at 10 (quoting Doc. 66-4 at 1)).  The press statement describes the
Commonwealth's overall effort to send letters to individuals who might be
noncitizens and then attributes that effort to a desire to protect election integrity.
(See id. at 1-2).  Included in the letter are two references to the expert analysis.  (See
id.)  We view this statement as merely reiterating what is already well known in this
matter: that the expert analysis provided the basis for the Commonwealth's letters
to potential noncitizen registrants.  (See id.)  An *ex-post* statement vaguely relating
the noncitizen matching analysis to the overall effort to address the glitch problem
says nothing about why the expert analysis was undertaken in the first place.  (See
id.)  Nor does it contraindicate the assertion that the noncitizen matching analysis
was undertaken at the behest of the Commonwealth's outside counsel.  (See id.)

[10] PILF cursorily asserts the Commonwealth waived the work-product
doctrine by disclosing the existence of the noncitizen matching analysis.  We find
this argument to be without merit.  (See Doc. 67 at 22-23).  The Commonwealth
disclosed the existence of the analysis and the results of the analysis, but it did not
publicly disclose the individual records and documents produced by the analysis,
*i.e.*, the focus of PILF's requests.

Doc. 64-1 ¶¶ 15-18).  Hence, the work-product doctrine shields the records produced in conjunction with the noncitizen matching analysis from disclosure.[11]

### B.    Request 2: Cancellation Requests

PILF also seeks documents related to noncitizens who requested removal from voter registration lists since January 1, 2006.  (See Doc. 66 ¶ 9; Doc. 1-9).  The Commonwealth provided PILF with copies of county records supplied to the Commonwealth in which registrants requested cancellation of their voter registration due to noncitizenship.  (See Doc. 63 ¶¶ 7-8; see also Doc. 64-1 ¶¶ 31-35). The Commonwealth also disclosed to PILF a redacted list of 1,160 purported noncitizens who requested to be removed from the voter registration lists.  (See Doc. 63 ¶ 8; see also Doc. 64-1 ¶ 34; Doc. 66-10).  PILF alleges these documents and records do not fully satisfy its request.  (See Doc. 71 at 3-4).

Cancellation of voter registrations is the sole domain of Pennsylvania counties.  See 25 PA. CONS. STAT. § 1203(a); (see also Doc. 64-1 ¶¶ 11, 32-33).  The Commonwealth only allows for voter registration list maintenance programs to target registrants who are deceased or have relocated.  See 25 PA. CONS. STAT. § 1901(a).  Consequently, the Commonwealth claims the limited number of records

---

[11] Our holding on this point should not be construed as stating that the work-product doctrine applies to: (1) the analysis done by the Commonwealth before retention of the expert, (2) records used by the expert to conduct their analysis, or (3) the thousands of letters sent to potential noncitizen registrants based upon the results of the noncitizen matching analysis.  The work-product doctrine applies solely to the documents and records produced by the expert at the request of counsel in anticipation of litigation.

turned over to PILF represent the entire universe of records within the scope of Request 2—the universe is simply small. (See Doc. 73 at 9).

PILF insists the Commonwealth truncated the scope of its request but produces no evidence to support its contention. PILF points to Marks' assertion before the Pennsylvania House State Government Committee that "[t]he 1,160 records identified were from 46 counties" as implying the Commonwealth is withholding responses from additional counties. (See Doc. 71 at 4 (citing Doc. 66-2 at 1)). But PILF's contention relies on a misreading of Marks' statement: Marks is referring to the 1,160 registrants pulled from the SURE database who requested cancellation of their own registrations, not the Commonwealth's request for counties to submit copies of the actual cancellation request letters received by county officials. (See Doc. 64-1 ¶¶ 33-34). Marks attests to the Commonwealth receiving records related to cancellation requests from only three counties, (see Doc. 64-1 ¶¶ 11, 33), and the parties agree the Commonwealth disclosed those records to PILF, (see Doc. 63 ¶ 7). Moreover, the parties agree that the list of 1,160 noncitizens who requested cancellation is the result of searching the SURE database. (See Doc. 66 ¶¶ 55, 59; Doc. 72 ¶¶ 55, 59). The Commonwealth disclosed that list to PILF, albeit in redacted form. (See Doc. 63 ¶ 8; Doc. 70 ¶ 8). There is no genuine dispute of fact as to whether the SURE database was searched and the results provided to PILF—it was, and they were.

PILF's objection to the Commonwealth's extensive redaction of the list has merit. The list provided to PILF is a veritable sea of black ink and contains no voting histories. (See Doc. 66-10). As discussed in relation to Request 1, the

Commonwealth can only redact information in its records if that information is specifically protected by DPPA, see *supra* at 13-14, or necessary for protection of privacy, see *supra* at 14-15.  The Commonwealth admits the SURE database contains the voting histories of registrants.  (See Doc. 66 ¶ 60; Doc. 72 ¶ 60).  Voting histories cannot derive from DMV records nor are they especially private since they only document when an individual voted in a particular election.  (See Doc. 66-1, Marks Dep. 105:3-106:24; see also Doc. 72 ¶ 26).  The Commonwealth must disclose the voting histories of the 1,160 noncitizens who requested cancellation.

### C.  Request 3: Jury-Selection Letters

PILF's third request seeks records provided by jury-selection officials to the Commonwealth referencing individuals who attempted to avoid jury duty by claiming to be noncitizens.[12]  (See Doc. 66 ¶ 9; Doc. 1-9).  PILF asserts this information is relevant to its interest in noncitizen voting because the Commonwealth draws its jury pools from voter registration lists; therefore, a noncitizen summoned for jury duty must, by definition, be registered to vote.  See 42 PA. CONS. STAT. § 4521.  PILF seeks all such records from January 1, 2006 to the present.  (See Doc. 66 ¶ 9; Doc. 1-9).

The Commonwealth acknowledges occasionally receiving letters from jury-selection officials related to individuals who purported to be noncitizens.  (See Doc. 63 ¶ 10; Doc. 64-1 ¶ 37).  As maintenance of voter registration lists is reserved to the counties, the Commonwealth generally forwards those letters to the relevant

---

[12] Only United States citizens can serve on juries in Pennsylvania.  See 42 PA. CONS. STAT. § 4501.

county.  (See Doc. 63 ¶ 10; Doc. 64-1 ¶ 38).  Nonetheless, the Commonwealth asserts it conducted a search for letters related to jury selection received between October 2015 to March 2019 but found none.  (See Doc. 64-1 ¶ 40).  The Commonwealth determined the timeframe for the search by counting back two years from PILF's original NVRA request in October 2017.  (See id.)

The timeframe of the Commonwealth's search is insufficient.  NVRA requires states to "maintain for at least 2 years" all records related to maintaining voter registration lists.  See 52 U.S.C. § 20507(i)(1).  The two-year limitation only applies to the maintenance of records; it does not apply to the duty to disclose those records.  See id.  If a state chooses to maintain records longer than the two-year minimum, the state is obliged to disclose those records should they be relevant to an inquiry.  See Ill. Conservative Union v. Illinois, No. 20 C 5542, 2021 WL 2206159, at *7 n.3 (N.D. Ill. June 1, 2021); Judicial Watch, Inc. v. Lamone, 399 F. Supp. 3d 425, 441 (D. Md. 2019).

### D.    Request 4: Law Enforcement Correspondence

PILF's fourth request seeks all records relating to any communication between the Commonwealth and law enforcement concerning alleged noncitizen voting or voter registration.  (See Doc. 66 ¶ 9; Doc. 1-9).  The Commonwealth claims it never engaged in any such communications and therefore lacks any records to disclose.  (See Doc. 64 at 17-18; Doc. 64-1 ¶¶ 42-43).  PILF quibbles about the Commonwealth's framing of its request, alleging the Commonwealth limited its search to correspondence related to "voting activities" instead of the requested "list maintenance activities," but we find this to be a distinction without a difference.

(See Doc. 70 ¶ 12 (quotation omitted); see also Doc. 75 at 6).  Otherwise, PILF fails to identify any evidence suggesting the Commonwealth failed to comply with PILF's fourth request.  (See Doc. 71 at 5; Doc. 67 at 14).  There is no genuine dispute of fact as to whether the Commonwealth has fully satisfied its disclosure obligations with regard to PILF's fourth request.

###### E.    Defendant Marks

The Commonwealth asserts in its motion for summary judgment that Marks is an improperly named defendant.  (See Doc. 64 at 18).  However, the Commonwealth provides no case law supporting its assertion that Acting Secretary Chapman is the only proper defendant in this suit.  (See Doc. 64 at 18; Doc. 74 at 14-15).  Consequently, the Commonwealth has not met its Rule 56 burden for showing Marks is an improperly named defendant.

###### G.    Permanent Injunction

PILF asks the court to grant permanent injunctive relief compelling the Commonwealth to comply with future disclosure requests under NVRA.  (See Doc. 71 at 19-22).  Before the court may grant permanent injunctive relief, PILF must prove, first, that it will suffer irreparable injury absent the requested injunction; second, that legal remedies are inadequate to compensate that injury; third, that balancing of the respective hardships between the parties warrants a remedy in equity; and fourth, that the public interest is not disserved by an injunction's issuance.  See eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006) (citations omitted).  The Commonwealth contests PILF's request for permanent injunctive relief on both procedural and substantive grounds.

As a preliminary matter, the Commonwealth asserts PILF failed to seek a permanent injunction in its complaint.  (See Doc. 74 at 13-14).  We construe the second paragraph of PILF's complaint, which avers "Plaintiff seeks injunctive relief to compel Defendants to comply with Section 8 of NVRA," to encompass a request for both current and prospective injunctive relief.  (See Doc. 1 ¶ 2).  Nevertheless, we find PILF has not proven a likelihood of irreparable injury.  See MercExchange, 547 U.S. at 391.  As we referenced in our decision on the Commonwealth's motion to dismiss, the precise scope of NVRA's disclosure provision is largely untested in the courts of the Third Circuit.  (See Doc. 23 at 9).  We view the Commonwealth's failure to fully comply with PILF's requests as an unfortunate consequence of the dearth of applicable case law, not intentional obstruction or negligent effort.  After our first opinion defined the scope of NVRA to include the Commonwealth's response to the glitch, the Commonwealth made a good-faith, if imperfect, effort to comply with PILF's requests.  The Commonwealth indicates a similar good-faith effort will follow our present opinion now that we have more fully illuminated its obligations.  (See Doc. 74 at 13-14 & n.10).  Hence, PILF's fears of baseless future denials and withholding are purely speculative.  Moreover, should the Commonwealth fail to satisfy its disclosure obligations in the future, NVRA already includes an adequate remedy at law.  See 52 U.S.C. § 20510.  We will deny PILF's motion for summary judgment on this issue.

## IV.   Conclusion

The Commonwealth has met its Rule 56 burden regarding PILF's first request insofar as the noncitizen matching analysis is protected by the work-

product doctrine and fourth request in its entirety.  PILF has met its Rule 56

burden regarding its first request to the extent that the SURE database is subject to

disclosure, records including DPPA-protected information must be redacted not

withheld, and personal information about registrants must be disclosed to the

extent that the information is not "uniquely personal information."  PILF has also

met its Rule 56 burden regarding its second request, insofar as the Commonwealth

excessively redacted the records provided and withheld the voting histories of the

registrants at issue, and its third request, insofar as the Commonwealth

impermissibly truncated the timeframe covered by the request.  Accordingly, we

will grant in part and deny in part both parties' motions for summary judgment.  An

appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     March 31, 2022